14 CV 5797

JUDGE SCHEINDLIN

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BARBARA STROUGO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff(s),<br><br>v.<br><br>BARCLAYS PLC, BOB DIAMOND, ANTONY JENKINS, CHRIS LUCAS and TUSHAR MORZARIA,<br><br>Defendants. | Case No.<br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

RECEIVED
JUL 28 2014
U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Plaintiff Barbara Strougo ("Plaintiff"), individually and on behalf of all other persons similarly situated, by her undersigned attorneys, for her complaint against defendants, alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Barclays PLC, ("Barclays" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action brought on behalf of a class consisting of all persons and entities, other than Defendants (defined below) and their affiliates, who purchased or otherwise acquired Barclays American Depositary Shares ("ADSs"), and options contracts to purchase or sell such ADSs, between August 2, 2011 and June 25, 2014, inclusive (the "Class Period").  Plaintiff seeks to pursue remedies against Barclays and certain of its officers and directors for violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Defendant Barclays PLC is a global financial services provider engaged in retail banking, credit cards, wholesale banking, investment banking, wealth management and investment management services.  Barclays is a United Kingdom corporation whose shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "BCS."

3.     Prior to and during the Class Period, Barclays operated a so-called "dark pool" electronic trading venue known as Barclays LX.  As an alternative trading system, Barclays' dark pool allows big blocks of shares to be traded anonymously without informing the market until completion of the desired trade.  This allows the trader to minimize the risk of price movement to the disadvantage of the trader, in the event the market receives notice of the trader's intent before execution.  Such private trading venues, many of which are operated by banks like Barclays, accounted for 14.8% of the stock trading volume in the United States in April 2014.

4.     This case arises out of a scheme and wrongful course of business whereby Barclays provided sophisticated high-frequency trading (or "HFT") firms with material, non-public information so that those market participants could use the informational advantage

2

obtained in a manner that was designed to and did manipulate trading within Barclays LX, to the detriment of Barclays' own institutional clients.

5.      Throughout the Class Period, Defendants made false and/or misleading statements, and failed to disclose material adverse facts regarding the Company's operation of its dark pool.  Specifically, during the Class Period, Defendants made false and/or misleading statements and/or failed to disclose that:  (i) Barclays engaged in a "systematic pattern of fraud and deceit" by using its dark pool to favor high-frequency traders over its other clients; (ii) the pools were promoted as offering investors protection from predatory traders, while Barclays instead courted HFT firms by charging them lower rates; (iii) Barclays falsely understated the percentage of aggressive HFT activity in its dark pool; (iv) Barclays failed to provide monitoring services it promised to investors which would protect the dark pool from aggressive, predatory HFTs; (v) Barclays routed a disproportionately high percentage of client orders to its own dark pool while falsely representing that it routed client orders in a manner that did not favor Barclays LX; (vi) Barclays secretly gave HFT firms informational and other advantages over other clients trading in the dark pool; (vii) Barclays' practices subjected it to regulatory scrutiny and significant reputational harm; (viii) and as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

6.      On June 25, 2014, the New York State office of the Attorney General ("NY AG") issued a press release announcing a lawsuit against Barclays, arising from the operation of Barclays' dark pool and other aspects of its electronic trading division. The press release stated in part:

3

The complaint alleges Barclays has dramatically increased the market share of its dark pool through a series of false statements to clients and investors about how, and for whose benefit, Barclays operates its dark pool. Contrary to Barclays' representations that it has implemented special safeguards to protect clients from "aggressive" or predatory high-frequency traders, Barclays is accused of operating its dark pool to favor high-frequency traders.

"The facts alleged in our complaint show that Barclays demonstrated a disturbing disregard for its investors in a systematic pattern of fraud and deceit," Attorney General Schneiderman said. "Barclays grew its dark pool by telling investors they were diving into safe waters. According to the lawsuit, Barclays' dark pool was full of predators – there at Barclays' invitation."

The complaint alleges that Barclays falsified marketing material purporting to show the extent and type of high frequency trading in its dark pool.

*　　*　　*

Barclays heavily promoted a service called Liquidity Profiling, which Barclays claimed was a "surveillance" system that tracked every trade in Barclays' dark pool in order to identify predatory traders, rate them based on the objective characteristics of their trading behavior, and hold them accountable for engaging in predatory practices.

Contrary to those promises, the complaint alleges that:

- Barclays has never prohibited any trader from participating in its dark pool, regardless of how predatory its activity was determined to be;

- Barclays did not regularly update the ratings of high-frequency trading firms monitored by Liquidity Profiling;

- Barclays "overrode" certain Liquidity Profiling ratings – including for some of its own internal trading desks that engaged in high-frequency trading – by assigning safe ratings to traders that were otherwise determined to be toxic.

The complaint further alleges that, contrary to Barclays' representations that it protects clients from aggressive or predatory high-frequency trading in its dark pool, Barclays in fact operates its dark pool to favor high-frequency traders and has actively sought to attract them by giving them systematic advantages over others trading in the pool. As alleged in the complaint, this included:

4

- Falsely underrepresenting the concentration of aggressive high-frequency trading in its dark pool;

- Misrepresenting its "Liquidity Profiling" service – which Barclays claimed protected investors from predatory behavior -- by failing to provide many of the benefits marketed with the service; and

- Claiming that Barclays does not favor its own dark pool when routing client orders to trading venues, while in fact doing just that. As alleged in our Complaint, Barclays falsified an analysis of how it routed a major client's orders.

7.    On the news, Barclays' securities fell $1.16, or 7.38%, on extraordinarily heavy volume, to close at $14.55 on June 26, 2014.

8.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

10.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

11.    Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as a significant portion of the Defendants' actions, and the subsequent damages, took place within this District.

12.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

13.     Plaintiff, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased options to acquire Barclays ADSs at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

14.     Defendant Barclays is a financial services company headquartered in the United Kingdom with offices in New York City.  Barclays' securities trade on the NYSE under the ticker symbol "BCS."  Barclays functions in the United States through Barclays Capital Inc. ("Barclays Capital"), an affiliate of Barclays PLC.  Barclays Capital is a registered broker dealer and investment adviser with its primary offices at 745 Seventh Avenue, New York, New York. Barclays Capital also operates a dark pool, Barclays LX, through the Equities Electronic Trading division.  In late 2013, Barclays LX took over as the leading alternate trading venue according to published trading volumes.

15.     Defendant Bob Diamond ("Diamond") was the Company's Group Chief Executive until August 30, 2012.

16.     Defendant Antony Jenkins ("Jenkins") has served the Company's Group Chief Executive since August 30, 2012.

17.     Defendant Chris Lucas ("Lucas") served as the Company's Group Finance Director until August 15, 2013.

18.     Defendant Tushar Morzaria ("Morzaria") has served as the Company's Group Finance Director since October 15, 2013.

19.     Defendants referenced above in ¶¶ 15 – 18 are sometimes referred to herein, collectively, as the "Individual Defendants."

6

20.    Defendant Barclays and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

**Alternative Trading Venues**

21.    In the United States, equities securities are traded on eleven public stock exchanges and dozens of privately-owned and operated alternate trading venues, including venues known as "dark pools." Alternate trading venue trading is trading volume or liquidity that is not openly available to the public. The bulk of alternate trading venue trades represent large trades by financial institutions that are offered away from public exchanges *purportedly* so the trades remain anonymous.

22.    Neither the size of the trade nor the identity of the participant is revealed until the trade is filled.  One of the main *purported* advantages for institutional investors in using alternate trading venues is the buying or selling large blocks of securities without showing their hand to others and thus avoiding market impact. However, it also means that the institutional investors trading in them must place even greater reliance upon the honesty and integrity of their brokers and the dark pool operators to act in their clients' best interest.

23.    Alternate trading venues are of various types and can execute trades in multiple ways, including throughout the day or at scheduled times. The traders affiliated with the financial institution operating a particular alternate trading venue can also trade in that venue.

24.    Alternate trading venues have grown to such a degree that experts worry that publicly quoted prices for stocks on exchanges no longer properly reflect the true market value. About 15% of U.S. equity-trading volume is transacted in dark pools, more than triple levels of five years ago.

7

**High-Frequency Trading**

25.     High frequency trading, or "flash trading," uses highly sophisticated high-speed computer technology to allow traders to view orders from other market participants fractions of a second before others in the marketplace. HFT utilizes sophisticated technological tools and computer algorithms to rapidly trade securities. HFT uses proprietary trading strategies carried out by computers to move in and out of positions in fractions of a second. This gives flash traders the advantage of being able to gauge supply and demand and recognize movements in market sentiment before other traders.

26.     High frequency trading has grown exponentially since its inception in 1999 following the SEC's authorization of electronic exchanges in 1998. In the early 2000s, high frequency trading accounted for fewer than 10% of equity orders, but according to data provided by the NYSE, overall trading volume grew by about 164% between 2005 and 2009, a material portion of which can be attributed to high frequency trading. As of 2009, studies suggested HFT trading accounted for 60%-73% of all U.S. equity trading volume.

27.     The speed of computer connections, measured in milliseconds or microseconds, have become critical in the equity marketplace. High frequency traders move in and out of positions very quickly, aiming to capture sometimes just a fraction of a cent in profit on every trade – providing very low margins. HFT firms make up for their low margins with incredibly high volumes of trading, frequently numbering in the millions. At the turn of the 21st century, HFT trades had an execution time of several seconds, whereas by 2010 this had decreased to milli – and even micro – seconds.[1]

---

[1]     A millisecond is one thousandth of a second; a microsecond is one millionth of a second. By way of comparison, one millisecond is to one second as one second is to 16.67 minutes and one microsecond is to one second as one second is to 11.574 days. Estimates of the time it takes

28.     Thus, special access to trading venues, such as the Barclays LX dark pool, is particularly crucial for HFT firms. Some of these traders pay to "co-locate" or "cross-connect" their trading computers in the same facilities as public exchanges and dark pools in order to reduce the amount of time it takes to receive market information from those trading venues, and in order to rapidly place or cancel orders. These firms pay a premium for "direct data feeds" from the public exchanges, which are high-speed data feeds that travel faster and contain more information than market data available to ordinary investors by other, less expensive means.

29.     Those speed and technology advantages allow HFTs to profile the pending orders on an exchange in order to detect the presence of large pending orders, usually from institutional investors.  This "information leakage" allows HFTs to trade ahead of an anticipated stock purchase or otherwise have an impact on price.  Speed and technology advantages also allow for strategies that seek to exploit the small, temporary pricing dislocations in a security that occur because of differential and/or delayed access to market data.  This strategy is sometimes referred to as "latency arbitrage," because the trader is seeking to exploit the relative slowness, or "latency," in the transmission of market data experienced by other participants. Barclays itself commonly labeled these types of high frequency strategies as "toxic," "predatory," or "aggressive." Ordinary investors generally seek to avoid interactions with high frequency traders because of the effect those sorts of strategies can have on an investor's trading performance.

**Barclays LX**

30.     Barclays LX was barely among the top ten U.S. dark pools as recently as 2009. However, Barclays rebuilt its entire LX technology platform in 2012, a technological initiative

---

to blink your eye range from 100 millisecond (100,000 microsecond) to 400 millisecond (400,000 microsecond) – just a mere fraction of a second.

that quickly paid off, as Barclays LX moved into second place in January 2013, and later in the year ascended to the top, based on published volumes.

31.     As the equity-trading volume in the Barclays LX pool increased, the Company embarked on a public campaign to demonstrate the overall transparency of its dark pool. When a leading competitor decided in April 2013 to cease voluntarily disclosing trading volume, the Company announced in a May 20, 2013 press release that Barclays intended to report monthly trading volume within its dark pool.

32.     Aside from reaffirmed transparency in the form of published volume numbers of Barclays LX, the Company also discussed the "toxicity framework" known as "Liquidity Profiling" in the May 20, 2013 press release.  According to William White, Head of Electronic Trading at Barclays Capital, the LX Liquidity Profiling analyzes each interaction in the dark pool, allowing the Company to monitor the behavior of individual participants.  This step purportedly provided Barclays LX clients with transparency about the nature of counterparties in the dark pool and how the control framework works, in addition to reporting overall volumes.

33.     Barclays' purported commitment to report volumes in LX follows several other initiatives introduced in recent years, and emphasized again in the May 20, 2013 press release, which the Company claimed promoted transparency to assist clients in making informed decisions while trading in its dark pool:

- LX reporting to clients: Using the quantitative metrics from Liquidity Profiling and Barclays' in-house transaction cost analysis tools, clients can receive regular reports on their trading performance in LX.

- Real-time executions monitor: Through Barclays' Portfolio WebBench® analytics suite, clients can monitor on which venues their orders are being executed, historically or in real time, and can use that information to adjust their strategy based on where liquidity resides.

- DirectEx block trade system: Launched at the end of 2012, the DirectEx platform added Barclays' own and clients' actionable indications of interest (IOIs) to the Bloomberg Professional Service, and made them executable electronically, thereby giving clients more transparency into the availability of natural sources of block liquidity.

- Bloomberg trade advertisements: In November 2012, Barclays announced that clients using the Bloomberg Professional Service could now see Barclays' trading activity in a desired stock in both the aggregate and broken out by high-touch and low-touch execution channels, posted on a near-real time basis on the IOIA and RANK screens.

34.     In a November 12, 2013 letter to the SEC, Barclays publicly supported a Financial Industry Regulatory Authority ("FINRA") rule proposal, which would require each alternative trading system ("ATS") to report to FINRA the aggregate weekly share volume and number of trades executed within the ATS, while also requiring each ATS to acquire and use a single, unique market participant identifier when reporting information to FINRA.

### Materially False and Misleading
### Statements Issued During the Period

35.     On August 2, 2011, the Company issued a press release and filed a Form 6-K with the SEC, announcing operating and financial results as of, and for the quarter ended, June 30, 2011. Profit before tax was £989 million, or £4.00 per share, on revenue of £7.93 billion compared to profit before tax of £2.13 billion, or £11.60 per share, on revenue of £8.52 billion for the quarter ended June 30, 2010.

36.     On October 31, 2011, the Company issued a press release and filed a Form 6-K with the SEC, announcing operating and financial results for the quarter ended, September 30, 2011. Profit before tax was £2.42 billion, or £9.70 per share, on revenue of £9.88 billion compared to profit before tax of £327 million, or £0.40 per share, on revenue of £6.29 billion for the quarter ended September 30, 2010.

37.     On February 10, 2012, the Company issued a press release and filed a Form 6-K with the SEC, announcing operating and financial results for the quarter and full year, ended December 31, 2011. For the quarter, profit before tax was £813 million, or £2.9 per share, on revenue of £7.08 billion compared to Profit before tax of £1.79 billion, or £9.1 per share, on revenue of £8.57 billion for the quarter ended December 31, 2010. For the full year, profit before tax was £5.88 billion, or £25.1 per share, on revenue of £32.29 billion compared to profit before tax of £6.07 billion, or £30.4 per share, on revenue of £31.44 billion for the prior year.

38.     On March 30, 2012, the Company filed an annual report for the period ended December 31, 2011 on Form 20-F with the SEC, which was signed by defendant Lucas, and reiterated the Company's previously announced quarterly and year-end financial results and financial position.  In addition, the 2011 Form 20-F contained certifications signed pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by defendants Diamond and Lucas, stating that the financial information contained in the Form 20-F was accurate, and disclosed any material changes to the Company's internal control over financial reporting.

39.     Moreover, the 2011 Form 20-F stated the following pertaining to compliance with relevant laws and regulations:

> During 2011, the Group developed an enhanced policy for the governance of subsidiary entities, increasing focus on, and ensuring senior management's line of sight to, the legal entity structure of the Group. A framework of varying minimum standards has been introduced, with the most onerous requirements being placed on larger or more complex subsidiaries that are deemed to carry greater risk. Compliance with the enhanced policy is overseen by the Group's Legal Entity Review Committee.
>
>       *                *                *
>
> Throughout the year ended 31 December 2011, and to date, the Group has operated a system of risk management and internal control, which provides reasonable assurance of effective and efficient operations covering all controls, including financial and operational controls and compliance with laws and regulations.

12

40.     On April 26, 2012, the Company issued a press release and filed a Form 6-K with the SEC, announcing operating and financial results for the quarter ended March 31, 2012. Loss before tax was £475 million, or £4.50 per share, on revenue of £5.52 billion compared to profit before tax of £1.66 billion, or £8.50 per share, on revenue of £7.40 billion for the quarter ended March 31, 2011.

41.     On July 27, 2012, the Company issued a press release and filed a Form 6-K with the SEC, announcing operating and financial results for the quarter ended, June 30, 2012. Profit before tax was £1.23 billion, or £5.10 per share, on revenue of £7.24 billion, compared to profit before tax of £989 million, or £4.00 per share, on revenue of £7.93 billion for the quarter ended June 30, 2011.

42.     On October 31, 2012, the Company issued a press release and filed a Form 6-K with the SEC, announcing operating and financial results for the quarter ended, September 30, 2012. Loss before tax was £47 million, or £2.30 per share, on revenue of £5.80 billion, compared to profit before tax of £2.42 billion, or £9.70 per share, on revenue of £9.88 billion for the quarter ended September 30, 2011.

43.     On February 10, 2013, the Company issued a press release and filed a Form 6-K with the SEC, announcing operating and financial results for the quarter and full year, ended December 31, 2012. For the quarter, loss before tax was £466 million, or £6.80 per share, on revenue of £6.14 billion compared to Profit before tax of £813 million, or £2.9 per share, on revenue of £7.08 billion for the quarter ended December 31, 2011. For the full year, profit before tax was £246 million, or a loss of £8.50 per share, on revenue of £24.69 billion compared to profit before tax of £5.88 billion, or £25.1 per share, on revenue of £32.29 billion for the prior year.

44.     On March 13, 2013, the Company filed an annual report for the period ended December 31, 2012 on Form 20-F with the SEC, which was signed by defendant Lucas, and reiterated the Company's previously announced quarterly and year-end financial results and financial position.  In addition, the Form 20-F contained signed certifications pursuant to SOX by defendants Diamond and Lucas stating that the financial information contained in the Form 20-F was accurate, and disclosed any material changes to the Company's internal control over financial reporting.

45.     Moreover, the 2012 Form 20-F stated the following pertaining to compliance with laws and regulations:

> Throughout the year ended 31 December 2012, and to date, the Group has operated a system of risk management and internal control which provides reasonable assurance of effective and efficient operations covering all controls, including financial and operational controls and compliance with laws and regulations.

46.     On April 24, 2013, the Company issued a press release and filed a Form 6-K with the SEC, announcing operating and financial results for the quarter ended, March 31, 2013. Profit before tax was £1.54 billion, or £6.70 per share, on revenue of £7.48 billion.

47.     On May 20, 2013, Barclays confirmed its commitment to reporting volumes in its dark pool, LX, on a monthly basis.  The press release stated, in part:

> "Our commitment to reporting volumes and other aggregate details about LX underscores Barclays' belief that transparency is not only important, but that it benefits both our clients and the market overall," said Bill White, Head of Equities Electronic Trading. "As the equities market structure continues to evolve, our belief is that more transparency will assist clients in finding natural sources of liquidity and allow them to make more informed decisions on their trading.

48.     Moreover, Barclays stated the following in the May 20, 2013 press release in regard to its "Liquidity Profiling":

14

Liquidity Profiling in LX: Introduced in January 2012, Liquidity Profiling allows Barclays to evaluate each client's trading in LX based on quantitative factors, thereby providing more accurate assessments of aggressive, neutral and passive trading strategies. Clients can then choose which trading styles they interact with, instead of choosing by the more arbitrary designation of client type.

49.     Barclays' purported commitment to report volumes in LX follows several other initiatives introduced in recent years, and emphasized again in the May 20, 2013 press release, which the Company claimed promoted transparency to assist clients in making informed decisions while trading in its dark pool:

- LX reporting to clients: Using the quantitative metrics from Liquidity Profiling and Barclays' in-house transaction cost analysis tools, clients can receive regular reports on their trading performance in LX.

- Real-time executions monitor: Through Barclays' Portfolio WebBench® analytics suite, clients can monitor on which venues their orders are being executed, historically or in real time, and can use that information to adjust their strategy based on where liquidity resides.

- DirectEx block trade system: Launched at the end of 2012, the DirectEx platform added Barclays' own and clients' actionable indications of interest (IOIs) to the Bloomberg Professional Service, and made them executable electronically, thereby giving clients more transparency into the availability of natural sources of block liquidity.

- Bloomberg trade advertisements: In November 2012, Barclays announced that clients using the Bloomberg Professional Service could now see Barclays' trading activity in a desired stock in both the aggregate and broken out by high-touch and low-touch execution channels, posted on a near-real time basis on the IOIA and RANK screens.

50.     On July 30, 2013, the Company issued a press release and filed a Form 6-K with the SEC, announcing operating and financial results for the quarter ended June 30, 2013. Profit before tax was £142 million, or £8.10 per share, on revenue of £7.68 billion, compared to profit before tax of £1.40 billion, or £6.10 per share, on revenue of £7.29 billion for the quarter ended June 30, 2012.

51.     On October 31, 2013, the Company issued a press release and filed a Form 6-K with the SEC, announcing operating and financial results for the quarter ended, September 30, 2013. Profit before tax was £1.17 billion, or £5.70 per share, on revenue of £6.23 billion compared to profit before tax of £91 million, or £8.30 per share, on revenue of £5.93 billion for the quarter ended September 30, 2012.

52.     In a November 12, 2013 letter to the SEC, Barclays publicly supported a FINRA rule proposal, which would require each ATS to report to FINRA the aggregate weekly share volume and number of trades executed within the ATS, while also requiring each ATS to acquire and use a single, unique market participant identifier when reporting information to FINRA. According to William White, Head of Electronic Trading at Barclays Capital:

> FINRA's objectives are fully aligned with Barclays' approach to managing LX. Earlier this year, Barclays publicly announced its commitment to disclosing LX volumes on a monthly basis, despite the lack of a regulatory requirement. Our commitment to reporting volumes, together with other initiatives undertaken to share information about how we operate LX, demonstrate our belief that transparency benefits not only our clients, but the market overall. We encourage efforts to standardize ATS transparency across the industry and feel that FINRA is well-positioned to do so.

> We commend FINRA for recognizing the benefits of making standard ATS statistics accessible to the public on a delayed basis. As the market structure continues to evolve, this transparency will assist traders in finding natural sources of liquidity and allow them to make more informed decisions about their trading. It will also give the investing public a reliable and uniform source of data which can be used to help understand and evaluate ATSs as a significant segment of the market structure. Further, this will complement the Commission's recent initiatives regarding transparency and analysis of market structure data, which we similarly support.

53.     On February 10, 2014, the Company issued a press release and filed a Form 6-K with the SEC, announcing operating and financial results for the quarter and full year, ended December 31, 2013. For the quarter, profit before tax was £17 million, or a loss of £5.00 per share, on revenue of £6.54 billion compared to a loss before tax of £165 million, or £4.50 per

share, on revenue of £7.08 billion for the quarter ended December 31, 2011. For the full year, profit before tax was £2.87 billion, or a loss of £3.80 per share, on revenue of £27.94 billion compared to profit before tax of £797 million, or a loss of £4.80 per share, on revenue of £25.01 billion for the prior year.

54.     On March 13, 2014, the Company filed an annual report for the period ended December 31, 2013 on Form 20-F with the SEC, which was signed by defendant Morzaria, and reiterated the Company's previously announced quarterly and year-end financial results and financial position. In addition, the Form 20-F contained signed certifications pursuant to SOX by defendants Jenkins and Morzaria stating that the financial information contained in the Form 20-F was accurate, and disclosed any material changes to the Company's internal control over financial reporting.

55.     With respect to the Company's compliance policies, the 2013 20-F stated, in relevant part:

Revised Risk Management Structure

In 2013, the Group also introduced the Enterprise Risk Management Framework (ERMF), which sets out a framework and approach that is applicable to the whole bank, all colleagues and to all types of risk. To strengthen the governance relating to conduct and reputation matters Conduct risk and Reputation risk were re-categorised as Principal Risks in 2013 with Executive Committee sponsorship from the Principal Risk Owner, the Head of Compliance. The Board Enterprise Wide Risk Committee was also created in 2013. It recommends to the Board the Group's overall risk appetite as well as evaluating and reporting details of the Group's overall risk profile and risk monitoring.

        *               *               *

Focus of efforts in 2014

In 2014, we will continue to build on the progress made in 2013. We will focus on delivering on our financial commitments and expect to see the benefits of our 2013 work on cost begin to crystallise.

17

We aim to respond positively to the evolving regulatory landscape. We have sought to constructively engage our regulators and improve our regulatory and public disclosures in order to improve transparency and consistency with society's expectations.

The new regulatory and emerging business environment will inevitably call for continued rigorous review and adaption of the mix and structure of the businesses of the Bank to ensure we generate sustainable returns.

However, care needs to be taken to ensure that regulation does not go too far. A healthy banking sector ensuring returns above the cost of equity is essential to economic growth. Vibrant economies need vibrant banks. It is therefore important to ensure that the rightly-increased focus by the regulator on conduct supervision does not inadvertently result in the withdrawal of services and the restriction of choice.

Another key focus over 2013 and the coming years is rebuilding the trust that customers, clients, and stakeholders have in our organisation. We have pledged to increase transparency and conduct our business in the right way, as set out in our values.

We need to better respond to the current needs and anticipate the future demands of our customers and clients. As they become increasingly technology savvy we have worked to embed technology across our product offering. This ranges from payment innovations such as PingIt to expanding our Investment Bank's electronic trading platform BARX.

56.     On May 6, 2014, the Company issued a press release and filed a Form 6-K with the SEC, announcing operating and financial results for the quarter ended, March 31, 2014. Profit before tax was £1.81 billion, or £5.90 per share, on revenue of £6.77 billion, compared to profit before tax of £1.54 billion, or £6.30 per share, on revenue of £7.48 billion for the quarter ended March 31, 2012.

57.     The statements referenced in ¶¶ 35 – 56 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the operation of Barclays LX, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) a significant portion of Barclays' revenues were earned though the Company's engagement in a "systematic pattern of fraud and deceit" by using its dark pools to

18

favor high-frequency traders over its other clients; (ii) the pools were promoted as offering investors protection from predatory traders, while Barclays instead courted HFT firms by charging them lower rates; (iii) Barclays falsely understated the percentage of aggressive HFT activity in its dark pool; (iv) Barclays failed to provide monitoring services it promised to investors which would protect the dark pool from aggressive, predatory HFTs; (v) Barclays routed a disproportionately high percentage of client orders to its own dark pool while falsely representing that it routed client orders in a manner that did not favor Barclays LX; (vi) Barclays secretly gave HFT firms informational and other advantages over other clients trading in the dark pool; (vii) Barclays' practices subjected it to regulatory scrutiny and significant reputational harm; (viii) and as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

### The Truth Emerges

58. On June 25, 2014, the NY AG issued a press release announcing a lawsuit against Barclays, arising from the operation of Barclays' dark pool and other aspects of its electronic trading division. In the press release, it stated in part:

> The complaint alleges Barclays has dramatically increased the market share of its dark pool through a series of false statements to clients and investors about how, and for whose benefit, Barclays operates its dark pool. Contrary to Barclays' representations that it has implemented special safeguards to protect clients from "aggressive" or predatory high-frequency traders, Barclays is accused of operating its dark pool to favor high-frequency traders.
>
> "The facts alleged in our complaint show that Barclays demonstrated a disturbing disregard for its investors in a systematic pattern of fraud and deceit," Attorney General Schneiderman said. "Barclays grew its dark pool by telling investors they were diving into safe waters. According to the lawsuit, Barclays' dark pool was full of predators – there at Barclays' invitation."

The complaint alleges that Barclays falsified marketing material purporting to show the extent and type of high frequency trading in its dark pool.

*      *      *

Barclays heavily promoted a service called Liquidity Profiling, which Barclays claimed was a "surveillance" system that tracked every trade in Barclays' dark pool in order to identify predatory traders, rate them based on the objective characteristics of their trading behavior, and hold them accountable for engaging in predatory practices.

Contrary to those promises, the complaint alleges that:

- Barclays has never prohibited any trader from participating in its dark pool, regardless of how predatory its activity was determined to be;

- Barclays did not regularly update the ratings of high-frequency trading firms monitored by Liquidity Profiling;

- Barclays "overrode" certain Liquidity Profiling ratings – including for some of its own internal trading desks that engaged in high-frequency trading – by assigning safe ratings to traders that were otherwise determined to be toxic.

The complaint further alleges that, contrary to Barclays' representations that it protects clients from aggressive or predatory high-frequency trading in its dark pool, Barclays in fact operates its dark pool to favor high-frequency traders and has actively sought to attract them by giving them systematic advantages over others trading in the pool. As alleged in the complaint, this included:

- Falsely underrepresenting the concentration of aggressive high-frequency trading in its dark pool;

- Misrepresenting its "Liquidity Profiling" service – which Barclays claimed protected investors from predatory behavior – by failing to provide many of the benefits marketed with the service; and

- Claiming that Barclays does not favor its own dark pool when routing client orders to trading venues, while in fact doing just that. As alleged in our Complaint, Barclays falsified an analysis of how it routed a major client's orders.

59.     On the news, Barclays stock fell $1.16, or 7.38%, on extremely heavy volume, to close at $14.55 on June 26, 2014.

60.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'CLASS ACTION ALLEGATIONS

61.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Barclays ADSs, and options contracts to purchase or sell such ADSs, during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

62.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Barclays securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Barclays or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

63.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

64.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

65.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Barclays;

- whether the Individual Defendants caused Barclays to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Barclays securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

66.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

67.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Barclays securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold Barclays securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

68.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

69.     Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

70.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

71.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

72.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Barclays securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Barclays securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

73.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Barclays securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Barclays's finances and business prospects.

74.     By virtue of their positions at Barclays, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants

acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

75.     Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Barclays securities from their personal portfolios.

76.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Barclays, the Individual Defendants had knowledge of the details of Barclays's internal affairs.

77.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Barclays. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Barclays's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price for Barclays' securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Barclays's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or

25

otherwise acquired Barclays securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

78.     During the Class Period, Barclays' securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Barclays securities at prices artificially inflated by Defendants' wrongful conduct.   Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Barclays securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Barclays securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

79.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

80.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

26

## COUNT II

### Violation of Section 20(a) of
### The Exchange Act Against The Individual Defendants

81.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

82.     During the Class Period, the Individual Defendants participated in the operation and management of Barclays, and conducted and participated, directly and indirectly, in the conduct of Barclays's business affairs.  Because of their senior positions, they knew the adverse non-public information regarding Barclays' business practices.

83.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Barclays's financial condition and results of operations, and to correct promptly any public statements issued by Barclays which had become materially false or misleading.

84.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Barclays disseminated in the marketplace during the Class Period.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Barclays to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Barclays within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Barclays securities.

85.     Each of the Individual Defendants, therefore, acted as a controlling person of Barclays.  By reason of their senior management positions and/or being directors of Barclays, each of the Individual Defendants had the power to direct the actions of, and exercised the same

27

to cause, Barclays to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Barclays and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

86.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Barclays.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:   July 28, 2014

Respectfully submitted,
POMERANTZ LLP

Jeremy A. Lieberman
Francis P. McConville
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
        fmcconville@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.  I, _Barbara Strougo_, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.  I have reviewed a Complaint against Barclays, PLC ("Barclays" or the "Company"), and authorize the filing of a comparable complaint on my behalf.

3.  I did not purchase or acquire Barclays securities at the direction of plaintiffs counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.  I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Barclays securities during the class period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.  To the best of my current knowledge, the attached sheet lists all of my transactions in Barclays securities during the Class Period as specified in the Complaint.

6.  During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.  I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.

Executed ___7/28/14_____
                 (Date)

_____
(Signature)

_____
(Type or Print Name)

**Barclays PLC (BCS)**                                      Strougo, Barbara

### LIST OF PURCHASES AND SALES

| DATE | SECURITY | PURCHASE OR SALE | NUMBER OF SHS/UTS | PRICE PER SH/UT |
|------|----------|------------------|-------------------|-----------------|
| 04/14/2014 | Call-Sept 2014 $12 | PUR | 10 | $3.9000 |