**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BARBARA STROUGO, Individually and on Behalf of All Others Similarly Situated, | Case No. 14-cv-5797 (SAS) |
| Plaintiff(s), | **CLASS ACTION** |
| v. | **DEMAND FOR JURY TRIAL** |
| BARCLAYS PLC, BARCLAYS CAPITAL, INC., ROBERT DIAMOND, ANTONY JENKINS, CHRISTOPHER LUCAS, TUSHAR MORZARIA, and WILLIAM WHITE, | |
| Defendants. | |

## CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Lead Plaintiff Mohit Sahni and plaintiff Joseph Waggoner ("Plaintiff" or "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against defendants, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of defendants' public documents, a review of the allegations asserted against Barclays PLC and Barclays Capital, Inc. in a complaint filed by the Attorney General of the State of New York on June 25, 2014, in the Supreme Court of the State of New York, County of New York ("NYAG Complaint"), conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Barclays, analysts' reports and advisories about Barclays, and information readily obtainable on the Internet. According to the NYAG Complaint, the facts

described there "are the result of an investigation by the Office of the Attorney General.  The Attorney General's investigation has been aided significantly by a number of high-level former Barclays insiders, each of whom was in a position to observe much of the conduct described in this Complaint.  These witnesses provided meaningful assistance to the Attorney General's investigation."  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action brought on behalf of a class consisting of all persons and entities, other than Defendants (defined below) and their affiliates, who purchased or otherwise acquired Barclays American Depositary Shares ("ADSs") between August 2, 2011 and June 25, 2014, inclusive (the "Class Period").  Plaintiff seeks to pursue remedies against Barclays and certain of its officers and other top management for violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").  Barclays is a global financial services provider engaged in, among other things, retail and investment banking.  As part of its business in New York, Barclays operates as a registered broker-dealer.

2.      Recently Barclays has been marred by a series of unprecedented scandals involving, among other matters, the manipulation of the London Interbank Offered Rates ("LIBOR" or "Libor"), the premier benchmark for interest rates worldwide, for which the company was fined over $450 million; the manipulation of gold prices, for which the company was fined $43.8 million; and the manipulation of the foreign-exchange market.  The Libor scandal was particularly damaging for Barclays, with regulators implicating senior executives in

a "widespread" fraud.  Barclays lacked the appropriate internal controls and procedures that would have uncovered the fraud, such as periodic reviews of potentially fraudulent communications.  An independent review of Barclays' practices commissioned by the company and covering all business units without exception found that Barclays' bankers had a "winning at all costs" attitude, with an "over-emphasis" on short-term financial performance.  Barclays' pay culture rewarded money-making above all.  That culture led to "reputational damage and a loss of public trust."

3.    Under withering criticism, Barclays vowed change.  Commanded by its newly-minted CEO, Barclays claimed to have made bank-wide changes "to strengthen the governance relating to conduct and reputation" and "increase transparency and conduct business in the right way."  "The pursuit of profit that is achieved in ways inconsistent with [values of integrity] will not be tolerated."  Yet Barclays never changed.

4.    The conduct at issue involves Barclays' "dark-pool" (marketed as Barclays' Liquidity Cross, or LX), a private trading venue where investors can trade stocks almost anonymously.  During the Class Period, Barclays' dark pool catapulted into the financial stratosphere, becoming the number one U.S. dark pool with market share growth of 33% per year.  Barclays accomplished this goal ("We will not be happy until we are number one") through false representations about the dark pool's transparency and safeguards.  Barclays touted LX as a safe trading venue "built on transparency," with "built in safeguards to manage toxicity [of aggressive traders]" who victimize investors trading in the dark pool by trading ahead of anticipated purchase and sell orders, thereby rapidly capitalizing on proprietary information regarding trading patterns.  Barclays' Head of Equities Electronic Trading, Defendant William

3

White, who was the mastermind of LX, repeatedly represented that Barclays' dark pool employed "a sophisticated surveillance framework that protects clients from predatory trading activity in LX." Barclays called this surveillance program "Liquidity Profiling." Contrary to those representations, not only did Barclays allow aggressive traders to trade in its dark pool, but also wooed them with perks purposefully designed to provide them with a competitive advantage over traditional traders.

5.     On June 25, 2014, the New York State office of the Attorney General commenced a lawsuit against Barclays under the New York Martin Act, alleging that Barclays concealed material information regarding the operation of its dark pool. The complaint cites a litany of internal documents and emails, as well as statements by Barclays former employees with intimate knowledge of the dark pool, revealing that Barclays intentionally "*falsified marketing materials*" about the safeguards of LX to dramatically increase its market share. One marketing presentation intentionally deleted from its list of market participants the largest and very toxic participant in Barclays' dark pool, Tradebot. Emails reveal Barclays' fraudulent intent to conceal the existence of Tradebot. A Vice President in charge of marketing the dark pool stated: "I had always liked the idea that we were being transparent, *but happy to take liberties if we can all agree*" (emphasis added). Barclays' Head of Product Development agreed: "I think the accuracy [of the chart] is secondary to [the] objective" of showing clients that Barclays monitors the trading in its dark pool, and "so if you want to move/kill certain [traders], it doesn't really matter." Barclays' Head of Equities Sales responded: "Yes! U smart." These and other scheming documents, as well as information supplied by informants, demonstrate that:

- Barclays has never prohibited any trader from participating in its dark pool, regardless of how predatory its activity was determined to be;

4

- Barclays did not regularly update the ratings of high-frequency trading firms monitored by Liquidity Profiling;

- Barclays "overrode" certain Liquidity Profiling ratings – including for some of its own internal trading desks that engaged in high-frequency trading – by assigning safe ratings to traders that were otherwise determined to be toxic; and

- Barclays operated its dark pool to favor high-frequency traders and actively sought to attract them by giving them systematic advantages over others trading in the pool.

6.     On news of the NYAG lawsuit, Barclays' securities fell $1.16, or 7.38%, on extraordinarily heavy volume, to close at $14.55 on June 26, 2014.

7.     On June 27, 2014, the Telegraph reported that "Barclays dark pool fine 'could top Libor'" and that while the "size of any potential fine is difficult to judge, [it is] estimated at more than £300m by analyst[s]."   On June 30, the next trading day, Barclays' stock dropped an additional 1.5%, on extraordinarily high trading volume of over 11 million shares.

8.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

11.    Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as a significant portion of the Defendants' actions, and the subsequent damages, took place within this District.

12.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

13.    Lead Plaintiff Mohit Sahni, as set forth in his previously filed Certification, purchased Barclays ADSs at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

14.    Plaintiff Joseph Waggoner, as set forth in his previously filed Certification, purchased Barclays ADSs at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

15.    Defendant Barclays PLC is registered in England and functions in the United States through Barclays Capital Inc., its wholly-owned subsidiary.

16.    Defendant Barclays Capital Inc. is a registered broker dealer and investment adviser with its primary offices at 745 Seventh Avenue, New York, New York.  Barclays PLC has control over Barclays Capital Inc., its wholly-owned subsidiary.  Barclays PLC undertakes its U.S. securities and investment banking business in the name of Barclays Capital Inc. Barclays PLC lists Barclays Capital Inc. as one of its "most significant subsidiaries in the context of [Barclays]' business, results or financial position."  Barclays Capital Inc. owns and operates

6

Barclays' alternative trading system ("ATS")—the LX dark pool. Barclays Capital Inc. is responsible for all aspects of the ATS, including development, operation, and maintenance of the matching engine and the Barclays ATS technology, execution, trading, clearing, and settlement of transactions.  Barclays Capital Inc. is part of a global financial services organization, and support functions for the Barclays ATS may be performed by compliance, legal, operations, and other support personnel of affiliates of Barclays Capital Inc.

17.     Defendant Robert Diamond served as Barclays PLC's Chief Executive Officer from January 2011 until July 3, 2012, when he resigned following controversy over manipulation of Libor interest rates by traders employed by the bank.

18.     Defendant Antony Jenkins replaced Defendant Diamond as Barclays PLC's Chief Executive Officer in August 2012, and continues to serve in that position.

19.     Defendant Christopher Lucas served as Barclays PLC's Finance Director from April 1, 2007 until he resigned in August 2013.

20.     Defendant Tushar Morzaria replaced Defendant Lucas as Barclays PLC's Finance Director.  Defendant Tushar became Barclays' Finance Director in October 2013 and continues to serve in that position.

21.     Defendant William White is the Head of Equities Electronic Trading at Barclays Capital Inc.

22.     Defendants Barclays PLC and Barclays Capital Inc. are collectively referred to as "Barclays."

23.     Defendants in ¶¶ 17-21 are collectively referred to as the "Individual Defendants."

24.     Defendants in ¶¶ 15-21 are collectively referred to as "Defendants."

## BACKGROUND

**During the Class Period, Barclays Was Marred by a Culture of Greed That Top Management Vowed but Failed to Reform**

25.     Barclays' culture of winning at all costs permeated all facets of its business and spread among Barclays' top echelon.  For example, in 2012 Barclays agreed to pay roughly $500 million to U.S. and British authorities to settle allegations that it manipulated Libor, a key benchmark for interest rates worldwide, continuously from 2005 through 2009.   That probe also claimed the scalp of Barclays' CEO Robert Diamond, and raised questions regarding the conduct of Barclays' senior managers and compliance officers.  The U.K. Financial Services Authority ("FSA") concluded that derivatives traders requested the false submissions in the Libor and Euribor setting process, as they were "motivated by profit and sought to benefit Barclays' trading positions."  The FSA found the misconduct to be "serious and widespread."  The FSA noted that Barclays' traders were in fact quite transparent in their routine attempts to lobby their colleagues who submitted the bank's estimate of its borrowing costs.  The FSA was particularly concerned because it appeared to be "accepted culture" amongst some staff.  The U.S. government also implicated senior executives at Barclays in its settlement, citing reams of emails that showed how the bank sought to move Libor rates to profit on trades and to hide its high borrowing costs during the financial crisis.[1]

26.     The lack of specific internal controls, particularly in reviewing email communications, was one of the failures cited by a Commodity Futures Trading Commission

---

[1] Libor directly influences the value of trillions of dollars of financial deals between banks and other institutions.  Libor can also affect lending rates to the public, for instance, with some mortgage deals.

("CFTC") regulatory order implementing its share of the Barclays settlement.  According to the CFTC order, "appropriate daily supervision of the desk by the supervisors, as well as periodic review of the communications, should have discovered the conduct.  However, Barclays lacked specific internal controls and procedures that would have enabled Barclays' management or compliance to discover this conduct."

27.     Barclays' Chief Executive at that time, Robert Diamond, acknowledged that the Libor manipulation would damage customer and investor trust in the bank.

28.     Plagued by the Libor scandal, in July 2012 Barclays commissioned an independent review of its practices, "with a view to providing a comprehensive roadmap for cultural change at the bank."  The aim "was to understand whether or not there was any underlying cultural root cause to each of those events and, if so, what change needed to be made to prevent them from recurring in the future."  The review was carried out by Sir Anthony Salz, a prominent lawyer and former chairman of the BBC.  On April 3, 2013, Salz issued a 244-page report (the "Report"), finding that Barclays' bankers were engulfed in a culture of "edginess" and had a "winning at all costs" attitude.  Pay "contributed significantly to a sense among a few that they were somehow unaffected by the rules."  Salz found that "[s]ignificant failings developed in the organization as it grew."  "[T]he business practices for which Barclays has rightly been criticized were shaped predominantly by its cultures, which rested on uncertain foundations.  There was no sense of common purpose in a group that had grown and diversified significantly in less than two decades."  The result, according to the report, was a "strong drive to win," particularly as the bank became increasingly dominated by the investment banking business, which possessed a strong culture of winning.  This meant there was an "over-

emphasis" on short-term financial performance, reinforced by a bonus and pay culture that rewarded money-making over serving the public interest. "At Barclays, pay was emphasized above any other aspect of people management. In addition, rather than being seen as a means of driving culture, people management was considered predominantly as a tool to increase business performance." There was also a sense that senior management did not want to hear bad news. "Barclays was sometimes perceived as being within the letter of the law but not within its spirit," the review said, describing "an institutional cleverness."

29.     The Report found that "the absence of a common purpose or common set of values has led to conduct problems, reputational damage and a loss of public trust."

30.     Salz made 34 formal recommendations to "provide a valuable road map for the future." The scope of the review's recommendations "*is global and spans all businesses within Barclays without exception*" (emphasis added).

31.     Barclays' new chairman Sir David Walker described the Salz report as "an insightful, rigorous, and, crucially, independent view of how Barclays could improve," which was "informed by unprecedented access to the bank and its people."

32.     Barclays committed to implement in full each and every recommendation in the Salz report "as part of [Barclays'] determination to regain the trust of all of Barclays' shareholders." In Barclays' 2012 Annual Report, Walker acknowledged that "*it is imperative that [Barclays' corporate governance framework] is supported by the right culture, values and behaviours, both at the top and throughout the entire organisation*" (emphasis added).

33.     Barclays claimed that it did not stand idly by during the seven months over which the review was conducted. Instead, led by its new Chairman and CEO, Defendant Jenkins,

10

Barclays claims to have made changes starting in 2012 through a so-called "Transform Programme" designed to "*deliver the fundamental cultural, financial and performance changes necessary" to gain the public trust* (emphasis added)[2].  The changes were said to cover the entire bank.  First and foremost, Barclays "believe[s] that building a sustainable, values-based culture will form the foundation of [its] long-term success."  Barclays repeatedly reaffirmed its commitment to a changed culture and repeatedly assured investors that it "introduced a common purpose and set of values," "to help people achieve their ambitions—in the right way" and to instill values of "integrity."  Barclays "committed to acting openly in the way [it] operate[s]." The Company represented that "[i]n the spirit of transparency and rebuilding trust, Barclays will publish updates on [its] progress in [its] implementation programme."  Barclays also "aim[ed] to have the majority of all the recommendations fully implemented by 2015."

34.     In 2013, Barclays introduced the Enterprise Risk Management Framework, which sets out a framework and approach applicable to the whole bank, all employees, and all types of risk.  According to Barclays, "*to strengthen the governance relating to conduct and reputation matters, Conduct Risk and Reputation Risk were recategorized as Principal Risks in 2013 with Executive Committee sponsorship from the Principal Risk Owner, the Head of Compliance."* (emphasis added).  Barclays readily acknowledged that a "key focus over 2013 and the coming years is rebuilding the trust that customers, clients, and stakeholders have in our organization." Accordingly, Barclays "pledged to increase transparency and conduct [its] business in the right way, as set out in [the Company's] values."

---

[2] Barclays' former CEO Robert Diamond left in July 2012, days after the issuance of the Libor fine, having lost the confidence of the governor of the Bank of England and the chairman of the financial regulator.

35.   Defendant Jenkins met regularly with members of the Business Practices Review Committee, who oversaw the progress of the Salz Review.

36.   Despite this proclaimed commitment to reform, reportedly a survey of 9,000 staff by Salz found that 70% had a high degree of skepticism about the changes.  Indeed, as shown by Barclays' frolics in the equities electronic trading division, such skepticism was not unfounded. Misconduct at Barclays continued unabated despite Barclays' pledge to clean up its culture.

37.   In May 2014, an additional fine was levied upon Barclays, this time for manipulating gold prices.  As reported on May 23, 2014 by Reuters, Barclays was fined $43.8 million "for failures in internal controls that allowed a trader to manipulate the setting of gold prices, just a day after the bank was fined for rigging Libor interest rates in 2012."  According to the Financial Conduct Authority, there were failings at Barclays from 2004 until 2013, but the key event occurred on June 28, 2012, a day after Barclays was fined over $450 million for Libor rigging.  "A firm's lack of controls and a trader's disregard for a customer's interests have allowed the financial services industry's reputation to be sullied again," said Tracey McDermott, the FCA's director of enforcement and financial crime.

38.   In light of Barclays' repeated transgressions, on July 29, 2014, the Wall Street Journal reported that banking regulators threatened to install government monitors inside Barclays' United States offices after concluding that the bank may have manipulated the foreign-exchange market.  In a subsequent article published on November 7, 2014, the Wall Street Journal reported that as part of a proposed settlement related to the foreign-exchange manipulation, regulators "are likely to criticize [Barclays] for allegedly failing to appropriately supervise their foreign-exchange employees and lacking sufficient internal controls."

39.    The bank's chairman, David Walker, conceded that "[c]ompliance has not been seen as a serious enough specialist activity.  Our track record in culture has not been good.  It's important for us all to have a concept of culture, conduct and compliance."  Given so many repeated incidents, Walker also stated that Barclays had to work on the basis that "we are guilty until we prove ourselves to be innocent."

## IN A QUEST TO BOOST PROFITS, BARCLAYS RESOLVED TO DRAMATICALLY EXPAND ITS DARK POOL BUSINESS

### Alternative Trading Venues

40.    In the United States, equities securities are traded on eleven public stock exchanges and dozens of privately-owned and operated alternate trading venues, including venues known as "dark pools."  Dark pools are electronic trading venues that, unlike national public exchanges, are not openly available to the public.  Dark pools were first established to avoid large block orders from influencing financial markets and to ensure trading privacy.  Trading in dark pools is conducted away from public exchanges purportedly so the trades remain anonymous.  Neither the size of the trade nor the identity of the participant is revealed until the trade is filled.  The Financial Industry Regulatory Authority ("FINRA") has defined a dark pool as "an ATS that does not display quotations or subscribers' orders to any person or entity, either internally within an ATS dark pool or externally beyond an ATS dark pool (other than to employees of the ATS)."  Precisely because these trades are conducted "in the dark," institutional investors trading in these venues *rely upon the honesty and integrity* of their brokers and the dark pool operators to act in their clients' best interest.

41.    Alternate trading venues have grown to such a degree that experts worry that publicly-quoted prices for stocks on exchanges no longer properly reflect the true market value.

About 15% of U.S. equity-trading volume is transacted in dark pools, more than triple levels of five years ago.

**High-Frequency Trading**

42.     While dark pools were designed to protect investors from rapid traders, many dark pools are now stomping grounds for high-speed firms.  High frequency trading ("HFT"), or "flash trading," uses highly sophisticated high-speed computer technology to allow traders to view orders from other market participants fractions of a second before others in the marketplace.  HFT utilizes sophisticated technological tools and computer algorithms to rapidly trade securities, moving in and out of positions in fractions of a second.  This mechanism gives flash traders the advantage of being able to gauge supply and demand and recognize movements in market sentiment before other traders.  Accordingly, high frequency traders are able to "trade ahead" of the purchase and exploit the inefficiencies of price delays.

43.     HFT has grown exponentially since its inception in 1999 following the Securities and Exchange Commission's ("SEC") authorization of electronic exchanges in 1998.  In the early 2000s, high frequency trading accounted for fewer than 10% of equity orders, but according to data provided by the NYSE, overall trading volume grew by about 164% between 2005 and 2009, a material portion of which can be attributed to high frequency trading.  As of 2009, studies suggested HFT trading accounted for 60%-73% of all U.S. equity trading volume.

44.     The speed of computer connections, measured in milliseconds or microseconds, has become critical in the equity marketplace. High frequency traders move in and out of positions very quickly, aiming to capture sometimes just a fraction of a cent in profit on every trade—resulting in low margins.  HFT firms make up for their low margins with very high

volumes of trading, frequently numbering in the millions.  At the turn of the 21st century, HFT trades had an execution time of several seconds, whereas by 2010 this had decreased to milli— and even micro—seconds.

45.     Special access to trading venues, such as the Barclays LX dark pool, is particularly crucial for HFT firms.  Some of these traders pay to "co-locate" or "cross-connect" their trading computers in the same facilities as public exchanges in order to reduce the amount of time it takes to receive market information from those trading venues, and in order to rapidly place or cancel orders.  These firms pay a premium for "direct data feeds" from the public exchanges, which are high-speed data feeds that travel faster and contain more information than market data available to ordinary investors by other, less expensive means.

46.     Those speed and technology advantages allow HFTs to profile the pending orders on an exchange in order to detect the presence of large pending orders, usually from institutional investors.  This "information leakage" allows HFTs to trade ahead of an anticipated stock purchase or otherwise have an impact on price.  Speed and technology advantages also allow for strategies that seek to exploit the small, temporary pricing dislocations in a security that occur because of differential and/or delayed access to market data.  This strategy is sometimes referred to as "latency arbitrage," because the trader is seeking to exploit the relative slowness, or "latency," in the transmission of market data experienced by other participants.

47.     In his well-acclaimed book about the rise of high-frequency trading, "Flash Boys: A Wall Street Revolt," released in 2014, Michael Lewis wrote that bank-owned dark pools now often serve as a key intersection between high-frequency traders and investors who are clients of the banks.  The banks charge high-frequency traders for the right to trade against orders placed

by their brokerage customers.  "Why would anyone pay for access to the customers' orders inside a Wall Street bank's dark pool?", Lewis wrote.  "The straight answer was that a customer's stock market order, inside a dark pool, was fat and juicy prey."[3]

48.  Barclays itself commonly labeled these types of high frequency strategies as "toxic," "predatory," or "aggressive."  Ordinary investors generally seek to avoid interactions with high frequency traders because of the effect those sorts of strategies can have on an investor's trading performance.

49.  The magnifying glass has been on HFT for years.  Indeed, HFT has been under scrutiny by the SEC as early as 2009 and throughout the Class Period, amid concerns that this technique is placing less tech-savvy investors at a disadvantage.  In 2009, Mary Schapiro, the SEC Chairwoman, asked her staff to investigate the impact of automated dark pools for their lack of transparency: "This lack of transparency has the potential to undermine public confidence in the equity markets, particularly if the volume of trading activity in dark pools increases substantially."  Accordingly, the SEC would be taking a "serious look at what regulatory actions may be warranted in order to respond to the potential investor protection and market integrity concerns raised by dark pools.  For example, the lack of reliable information can prompt speculation and suspicion about the basis for market fluctuations," Schapiro said, adding that the success of dark pools could threaten the price discovery function of publicly quoted share prices. In October 2009, the SEC identified a number of concerns with dark pools.  The SEC noted that the practice of not sharing with the public indications of interest and/or price quotations could

---

[3] The day after Flash Boys was released, the Federal Bureau of Investigation announced an investigation into high frequency trading, in particular about possible front running, market manipulation, and insider trading.

lead to a "two-tiered market in which the public does not have fair access to information about the best available prices and sizes for a stock that is available to some market participants." Moreover, the SEC also noted that dark pools do not, in all instances, report fully post-trade information which, in the SEC's view, "detracts from the public's ability to access the sources of liquidity in a stock and dark pool trading activity in general." The latter point was addressed by making each trade in a dark pool immediately reportable, and FINRA has added a rule that any ATS, including dark pools, may also voluntarily report trading data in the aggregate after the market closes.[4] Then, in July 2012, the SEC adopted a new rule that requires FINRA and the stock exchanges, among other things, to submit to the SEC a detailed, comprehensive plan for consistently tracking order and execution information. This rule seeks to create what the SEC refers to as a "consolidated audit trail," which will track order and execution information across the various exchanges and other regulated markets. On January 8, 2013, FINRA pronounced that it planned to increase its focus on dark pools. Richard Ketchum, FINRA's chief executive, announced that the regulator is expanding its oversight of the dark-trading venue, with an eye on whether orders placed in public exchanges are "trying to move prices or encourage sellers that may advance their trading in the dark market." The regulator also announced that it is boosting surveillance of high-speed trading and is increasingly looking at rapid-fire trading across exchanges: "You're going to see more [focus] in those areas in 2013," Ketchum said.

50.     In light of the intense regulatory scrutiny of dark pools during the Class Period, the Individual Defendants knew or were reckless in not knowing that this murky business

---

[4] Order Approving Proposed Rule Change Relating to Publication of Certain Aggregate Daily Trading Volume Data, March 5, 2010, SEC. Rel. No. 34-61658 (Fed. Reg. Vol. 75, No. 48).

segment was subject to manipulation.   Consistent with Barclays' repeated commitment to "transparency," Defendant White repeatedly reassured the market that Barclays' "biggest theme of [2013] was transparency….*We felt that with the regulatory environment and the concerns about market structure, we would take a very strong position on market transparency*, and I think that's what resonates loudest as we look at achievements of last year…LX Liquidity Profiling analyzes each interaction in the dark pool, allowing us to monitor the behavior of individual participants.  This was a very significant step because *it was important to provide transparency not only by reporting our overall volumes, but also by providing clients with transparency about the nature of counterparties in the dark pool and how the control framework works*" (emphasis added).   Accordingly, given both Barclays' prior multiple internal control lapses, as well as the recognized risk for market manipulation and other illicit activities occurring in dark pools, Barclays and the Individual Defendants should have exercised particular vigilance with respect to Barclays' dark pool.

**Barclays Was Determined to Make its Dark Pool the Largest in the United States**

51.    As recently as 2009, Barclays LX was languishing in 10th place among its U.S. dark pool peers.   That was just not good enough for Barclays.   Barclays wanted to propel to the very top.   Being the largest dark pool in the United States became a principal goal of Barclays' Equities Electronic Trading division.   This strategy was not only central to driving profits for the division, but also an imprimatur of prestige.   Barclays' dark pool was referred to internally as "The Franchise."

52.     Bill Bell, the head of electronic and program distribution at Barclays who reported to Defendant White, put Barclays' goal bluntly: "*We will not be happy until we are number one.*"

53.     According to the NYAG Complaint, in an internal document, Barclays instructed its employees that "[a]ggregating [order] flow into Barclays LX has strategic and economic value for the entire Equities business," including the savings Barclays would realize by not having to pay commissions to execute trades on other venues; fees gained from firms paying to trade in the dark pool; and the "internal trading P&L [profit and loss] opportunities" available to internal Barclays trading desks that trade in the dark pool against brokerage client order flow.

54.     As reflected in the NYAG Complaint, Barclays also identified the "market share value of attracting more [order] flow" into its dark pool.  As Barclays' dark pool became larger, it would become increasingly attractive to additional traders seeking trading opportunities. Internal Barclays documents valued this growth opportunity at between $37 and $50 million per year.

55.     According to a former senior Director in the electronic equities division, as cited in the NYAG Complaint, "[a]t every sales meeting or product meeting, the main goal they were talking about was to grow the size of [Barclays' dark pool] to become the largest pool.  All the product team's goals, which would also include their compensation[,] were tied to making the pool bigger.  [Barclays had] great incentive at all costs to make the pool bigger."

56.     To grow its dark pool, Barclays had to increase the number of orders that Barclays, acting as a broker, executed in the dark pool.  This required Barclays to send more of its clients' orders into the dark pool, and to make sure that there was sufficient liquidity in the

dark pool to fill those orders.  To meet that need, Barclays looked to attract high frequency traders to its dark pool.

57.     Defendant White and his lieutenants embarked on a mission to completely rebuild Barclays' electronic trading system in 2011.  Barclays asked Defendant White to spearhead the effort.  White was a Wall Street veteran and had run Barclays' market-making unit on the floor of the New York Stock Exchange.  White is credited with overhauling Barclays' algorithms, building a smart order router ("SOR"), the centerpiece of the desk's electronic trading, and making modifications to the LX dark pool itself.  A self-proclaimed connoisseur of high frequency trading, White boasted:  "I know the trading side.  I know HFT.  I know how to execute in this market structure."  Barclays aimed "to cross more internally in the dark pool—that's where we can control market costs the best….We want to attack the market."

58.     A key hire by Defendant White in 2012 was Dave Johnsen, whom he tasked with helping run the electronic trading desk at Barclays.  Johnsen was a former senior executive at Goldman Sachs Group Inc.'s dark pool.  According to FINRA's BrokerCheck, Wall Street's self-regulator, Johnsen had been fired in 2012 by Goldman Sachs for "concerns relating to the performance of his supervisory responsibilities," including not completing certain reports on a timely basis.  Johnsen admitted that "the dates didn't reflect the date I completed the reports." But at Barclays, Johnsen flourished: he became Defendant White's right-hand man, running the day-to-day operations of Barclays' LX.[5]

59.     Barclays' efforts to market its dark pool were hugely successful.  Through false and misleading statements and marketing materials, Barclays LX eventually moved into second

---

[5] White and Johnsen have been removed from their daily responsibilities at Barclays and are said to be focusing on the firm's response to the NYAG's lawsuit.

place in January 2013, and later in the year, based on published volumes, ascended to the top. On July 13, 2013, Barclays published "key facts and H1 2013 business highlights." In the first bullet point under the rubric "equities," Barclays touted its dark pool as number one: "[o]ne of the fastest growing dark pools in both the US and Europe: Barclays LX US is ranked #1 among reporting dark pools, growing market share 33% year over year."

60.     By late 2013, independent analysts reported that Barclays operated one of the two largest dark pools in the United States, as measured by reported average daily shares traded. According to one industry publication, Barclays, "which was barely among the 10 biggest U.S. dark pools as recently as 2009, moved into second place in January 2013, and later in the year ascended to the top of the heap."

61.     In February 2014, Barclays' dark pool was named the "Best Dark Pool" by an industry publication. Defendant White attributed its growth to Barclays' commitment to being transparent about how Barclays operates, how Barclays routes client orders, and the kinds of counterparties traders can expect to deal with when trading in the dark pool. Transparency was "the one issue that we really took a stance on . . . We always come back to transparency as the key driver — letting [clients] know how we're interacting with their flow and what type of flow they're interacting with." *"Transparency on multiple levels is a selling point for our entire equities franchise."*

62.     Barclays marketing material dated April 2014 also touted the market share of its dark pool:



**To Propel to the Top, Barclays Lied About LX's Transparency and Safeguards**

63.     Barclays consistently represented publicly that it provides a safe, transparent trading environment, and protects its clients from aggressive high frequency traders.

64.     For example, in March 2013, defendant White stated that Barclays' dark pool "is an integral part of our electronic trading offering, providing clients with enhanced execution quality . . . built on transparency and preventing information leakage.  We have built in safeguards to manage toxicity, and to help our institutional clients understand how to manage their interactions with high-frequency traders."

65.     Barclays' efforts to convince the market of the safety of trading in its dark pool relied, in large part, on a service Barclays calls "Liquidity Profiling."  This tool purportedly allowed Barclays to monitor the "toxicity" of the trading behavior taking place in its dark pool

22

and, as Barclays claimed, "hold [traders] accountable" if their trading was "aggressive," "predatory," or "toxic."

66.     First marketed in 2011, Barclays represented that Liquidity Profiling works by grouping the traders in its dark pool into six categories based on their trading behavior, ranked 0 to 5.  In the "0" and "1" categories are those traders conducting the most aggressive, predatory trading activity; in the "4" and "5" categories are those traders conducting the safest, most passive, long-term investor-like trading activity.  Participants in Barclays' dark pool were told that they could disable their orders from interacting with traders falling into any of the various categories.  In particular, clients could opt-out of trading with traders that were identified by the Liquidity Profiling service as engaging in potentially harmful high frequency trading strategies.

67.     Barclays touted Liquidity Profiling as a "sophisticated surveillance framework, helping to protect you from predatory trading . . . our team proactively monitors the behavior of individual participants and quickly responds with corrective action when adverse behavior is detected."  Liquidity Profiling, according to Barclays, "improve[s] the overall quality of [Barclays' dark pool because] High-alpha takers [*i.e.*, high frequency traders] can be held accountable . . . transparency means that aggressive flows will be quickly identified by the Barclays ATS team."  "By identifying aggressive behavior, we can take corrective action with clients who exhibit opportunistic behavior in the pool."  Barclays represented that it would "refuse a client access" to the dark pool if they engaged in aggressive or "toxic" high frequency trading strategies.[6]

_____

    [6] Such statements appeared in, among others, *Traders Magazine*, *Markets Media*, and *HedgeWeek*.

68.     Defendant White, Barclays' mouthpiece for its dark pool, told the market that through the Liquidity Profiling service "we are able to restrict HFTs interacting with our clients [and] we're getting the better half of their order flow (i.e. higher quality liquidity) such as hedges or low impact positions . . . When you're watching behavior to that degree, behavior changes. If an end user has been delivering low-rated flow, we tell them 'Either change it, or don't send it here.'"  Defendant White further represented that Liquidity Profiling lets Barclays "make sure that we have very good participants in our pool."

69.     Determined to grab the number one spot, when a leading competitor decided in April 2013 to cease voluntarily disclosing trading volume, Barclays announced in a May 20, 2013 press release that it intended to report monthly trading volume within its dark pool.

70.     In a November 12, 2013 letter to the SEC, Barclays publicly supported a FINRA rule proposal, which would require each ATS to report to FINRA the aggregate weekly share volume and number of trades executed within the ATS, while also requiring each ATS to acquire and use a single, unique market participant identifier when reporting information to FINRA. Defendant White told the SEC that the proposal "will complement the Commission's recent initiatives regarding transparency and analysis of market structure data, which [Barclays] similarly support[s]."

71.     Barclays' false assurances did not stop there.  In response to more recent public, industry-wide discussion about the potential risks of high frequency trading, Barclays has continued to rely heavily on its Liquidity Profiling service to reassure the market that Barclays protects investors from aggressive, predatory high frequency traders.  According to the NYAG

Complaint, on March 28, 2014, Defendant White distributed "Internal Q&A and Talking Points on Barclays Electronic Trading and Order Handling Practices."  The document, marked "For Internal Use Only," notes that given "recent press on market structure [and the] NY Attorney General's comments on HFT . . . we have an opportunity to engage with clients about how we think about electronic trading and best execution."  Barclays instructed its employees to tell clients that Barclays "[i]nvented Liquidity Profiling to police trading behaviour" in the dark pool, and Barclays "can deny access to predatory participants." Employees were instructed to represent that "Liquidity Profiling encourages passive/benign liquidity provision," and that Liquidity Profiling "manages toxicity within the pool without limiting access to potentially beneficial liquidity."

72.    Throughout the Class Period, Defendant White marketed LX heavily.  Barclays sent White to make a presentation on Barclays' LX at a June 2012 event sponsored by the American Enterprise Institute ("AEI"), a widely-followed non-profit entity.  AEI is a private, nonpartisan, institute dedicated to research and education on issues of government, politics, economics and social welfare.  AEI's purpose is to serve leaders and the public through research and education on the most important issues of the day.  AEI has over 40,000 followers on Twitter.  It also has its own Facebook page, which is followed and "liked" by over 100,000 individuals or entities.  At the AEI conference, Defendant White described how Barclays protects his clients from predatory market behavior by measuring client activity and implementing a control process where "high alpha takers can be held accountable."  A full video of the conference was also posted and made available on the AEI's website.  A post-event summary of Defendant White's presentation on Barclays' LX transparency and integrity was

similarly made available on AEI's website.  White's presentation slides continue to be publicly available through a simple internet search.

73.     White also made rosy statements about LX to Traders Magazine, HedgeWeek, and Markets Media, publications widely-followed by the investment community, including portfolio managers.  Traders Magazine describes itself as "the industry's leading source of information for the Institutional Trading Community on the buy and sell side since 1967.  As the leading provider of news, analysis and opinion in the cash equities trading business, Traders Magazine covers the business of trading, including a heavy emphasis on the buyside, the sellside and the technology and products that they use, as well as the regulations that oversee the process. Traders Magazine not only focuses on electronic trading tools— like algorithms and program trading—but also on the trading venues such as crossing networks and exchanges, and the latest news and analysis on trading, technology and regulation.   Traders Magazine publishes unparalleled coverage of the entire trading process, including equities and options, major trends, financial industry news, executive profiles and the technological developments that keeps Wall Street running.  Read by C-Level Executives, Senior Management, Head Traders, Managing Directors, Partners and Portfolio Managers, Traders Magazine directly reaches the purchasing decision makers."   Similarly, HedgeWeek is "the largest online news publisher serving institutional investors/wealth managers and their investment managers/advisers across all asset classes, with six daily global newswires and news-driven websites" covering, among others, institutional investors/pension funds and their managed funds/investment managers, and hedge funds and institutional investors.  The publisher attracts approximately 158,000 monthly unique visitors to global fund media websites per month and has around 53,000 registered subscribers to

26

its daily newsletters.  Likewise, Markets Media describes itself as a publisher whose "editorial mission is to cover the complex interrelationships among key decision makers at hedge funds, exchanges, and pension funds, plus professionals like broker-dealers, money managers, service providers and regulators in an ever-evolving marketplace.  As marketplaces have swelled with new entrants and many players have assumed new roles, either as entrepreneurs or with a growing middle market, we work to trace patterns and explain the changes transforming the industry."

74.     Contrary to Barclays' widely-disseminated assurances, however, Barclays' dark pool was a magnet for high frequency traders.  According to a Wall Street Journal article published July 20, 2014, Barclays' dark pool "drew early alarms," with trading firms and employees raising concerns about high-speed traders at Barclays' dark pool long before the New York Attorney General sued Barclays.  Reportedly, some trading firms became concerned that their poor results were caused from high-frequency trading in Barclays' LX.  Meanwhile, a number of Barclays' employees privately expressed concerns to top stock-trading executives that the firm was giving high-frequency traders too much access to its dark pool without informing the public.

## BARCLAYS' STATEMENTS ABOUT THE TRANSPARENCY AND SAFEGUARDS OF ITS DARK POOL WERE FALSE AND MISLEADING

### Barclays Falsified an Analysis Purporting to Show the Extent of High Frequency Trading in its Dark Pool

75.     Barclays made false representations regarding the participants in its dark pool. Barclays marketed analyses about the landscape of trading in its dark pool, purporting to show how clients were protected from aggressive high frequency trading activity and underscoring

Barclays' commitment to transparency.  According to the NYAG Complaint, one such analysis was contained in a widely-disseminated document intended for institutional clients titled *Liquidity Profiling – Protecting You in the Dark*.  That document represented the "liquidity landscape" of Barclays' dark pool, as follows:



76.     Each circle in the chart represents one firm trading in Barclays' dark pool. The size of the circle corresponds to the level of trading activity conducted in the dark pool by that firm. Different types of traders are assigned different color circles; the pale green circles are "electronic liquidity providers" ("ELP"), which is the term Barclays used for high frequency traders. Within the chart are two color-coded regions, a green rectangle representing "passive" (*i.e.*, safe, non-predatory) trading activity, and a red rectangle representing "aggressive" (*i.e.*, predatory) trading. The x-axis, ("modified take percentage," which is percentage of a trader's orders that take liquidity), and the y-axis, ("1-second alpha," which is the price movement in the

one-second following each trader's trades), are presented here as relevant measures of trading behavior on the dark pool.  According to the chart, very little of the trading in Barclays' dark pool is "aggressive."

77.    As reflected in the NYAG Complaint, Barclays' sales staff heavily promoted this analysis to investors as a representation of the trading within the dark pool, and marketed that analysis as "a snapshot of the participants" in order to show clients "an accurate view of our pool." In addition, certain Barclays marketing materials appended a notation to the chart explaining that it portrays the top 100 clients trading in the dark pool.

78.    In reality, the chart and accompanying statements misrepresented the trading within Barclays' dark pool.  Senior Barclays employees de-emphasized the presence of high frequency traders in the pool and removed from the analysis Tradebot, one of the largest and most toxic participants in the dark pool.

79.    According to the NYAG Complaint, on October 5, 2012, a draft version of the analysis was sent via email to senior executives in Barclays' Equities Electronic Trading division. The accompanying email noted that Barclays "de-emphasized the number of ELPs [electronic liquidity providers, or high frequency traders] by moving them to the back." The email also stated that the chart "remov[es] Tradebot." Tradebot Systems had historically been, and was at that time, the largest participant in Barclays' dark pool, with an established history of trading activity that was known to Barclays as "toxic." Those alterations misrepresented the amount of high frequency trading activity in the dark pool by disguising the total number of high frequency trading firms and deleting one significant firm altogether.

29

80.     In a response email, one employee objected to the modified chart, stating that removing Tradebot from the analysis was a falsification of the data.   In response to this objection, a Director in the Equities division wrote that "the point of the chart is not to show what's in the pool. The point is to market our capability . . . to monitor individual participants in the pool."

81.     A Vice President responsible for selling the dark pool to clients disputed that explanation, replying to the group that "[m]y point when selling that picture was always: 'here is a snapshot of the participants in [Barclays' dark pool] as an accurate view of our pool.' I was never using it like an 'illustration'" of Barclays capability to monitor the pool. "I had always liked the idea that we were being transparent, but **happy to take liberties if we can all agree.**" (emphasis added).

82.     Barclays' Head of Product Development (who was also the second in command within Barclays' Equities Electronic Trading division) agreed. He responded, "***I think the accuracy [of the chart] is secondary to [the] objective*** *of showing clients that Barclays monitors the trading in its dark pool, and* ***"so if you want to move/kill certain bubbles, it doesn't really matter."***  *(emphasis added).*

83.     Barclays' Head of Equities Sales responded, "Yes! U smart." In another email that same day, Barclays' Head of Equities Sales noted in reference to the analysis that some in the industry viewed Barclays' dark pool as a "toxic landfill," and so "[i]f we can help ourselves we should[;] its in our control."

84.     This false marketing presentation remained in circulation during the Class Period.

**B.**     **Barclays Underrepresented the Amount of "Aggressive" Trading Activity in its Dark Pool**

85.     Barclays also issued marketing material that included representations purporting to show the amount of aggressive trading activity in its dark pool. According to the NYAG Complaint, in marketing materials released in early 2013, Barclays claimed that the trading in its dark pool was "48% passive," "43% neutral," and "9% aggressive."  In March 2014, Barclays issued revised marketing materials that were even more favorable for Barclays, claiming that its dark pool was comprised of 36% passive activity, 58% neutral activity, and 6% aggressive activity:



86.     This presentation was used by Barclays at least through April 2014.

87.     In reality, however, there was significantly more "aggressive" activity in Barclays' dark pool than the "6% aggressive" represented to clients.

88.     In March 2014, Barclays reportedly was engaged in discussions with a prominent high frequency trading firm wherein Barclays itself categorized approximately 25% percent of the orders taking liquidity in its dark pool as aggressive.  In an internal document prepared on the basis of information provided by Barclays, that firm summarized the data provided to it by

Barclays, and concluded that the trading activity in Barclays' dark pool was "50% good, 50% aggressive."

### C.    "Liquidity Profiling" Did Not Protect Investors From Predatory Trading

89.    As indicated above, Barclays represented that its Liquidity Profiling tool "protect[s] investors from predatory trading . . . [by] quickly respond[ing] with corrective action when adverse behavior is detected."  According to Barclays, Liquidity Profiling "analyzes ***each interaction*** in the dark pool" to "***police*** trading behavior" so that Barclays is "able to ***restrict HFTs*** interacting with our clients" and will "***refuse a client access***" if the that trader's activity becomes toxic (emphasis added).

90.    Those claims were false for a number of reasons.

91.    According to the NYAG Complaint, first, contrary to Barclays' claim that it uses Liquidity Profiling to police its dark pool, and will "refuse a client access" if its trading is toxic, Barclays has never prohibited a single trader from participating in its dark pool, regardless of its toxicity level.  For example, on January 16, 2014, senior leaders in the Equities Electronic Trading division were provided an analysis identifying over a dozen major high frequency trading firms engaged in significant trading activity in Barclays' dark pool. That analysis discussed those firms' history of sending "toxic" order flow. One high frequency trading firm was described in the analysis as "historically . . . very toxic." Another firm was described as having "[trading activity that] is very toxic, and the client is up-front about this."  Another firm was described as having "[k]nown latency arbitrage flow" in the dark pool.  Barclays has not denied any of those firms (or others) access to its dark pool.

32

92.     Second, according to the NYAG Complaint, despite Barclays' representations that "[w]e monitor client orders continuously," the Company has not regularly updated the ratings of its traders, so traders have often been categorized in ways that did not reflect their aggressive trading activity in Barclays' dark pool. According to a former senior-level employee in the Equities Electronic Trading division, updates to Liquidity Profiles were infrequent and inconsistent, and participants "could be and would be in the wrong tiers for *months* before [re-]calibration happened." In an internal document dated December 13, 2013, Barclays recognized that Liquidity Profiling "reviews were sporadic and sometimes not performed" for months at a time. "As a result Liquidity Profiles may become stale and inaccurate," which would result in "clients…not getting the quality executions expected."

93.     Third, as described in the NYAG Complaint, Barclays has applied "overrides" to a number of traders in the dark pool, assigning safe Liquidity Profiling ratings to certain traders that should have been rated as toxic. Reportedly, a number of those "overrides" have been applied to internal Barclays trading desks. For example, an internal, proprietary trading desk named Barclays Capital Market Making, which engaged in high-speed, high-order volume trading akin to high frequency trading, was granted an "override." That trading desk should have been categorized as a "0" or "1" trader in the Liquidity Profiling system based on objective profiling criteria (and, as such, been blocked by those relying on the Liquidity Profiling service to help them avoid trading with high frequency traders), but instead was categorized as a "4." That "override" made Barclays Capital Market Making appear as a safe trading partner to Barclays' clients, when in fact it was not. Other overrides were applied to firms for whom Barclays' acted

as a broker.  Barclays justified these "overrides" as being in Barclays' own economic interest, noting that "it is our darkpool, after all."

94.    Barclays' management acknowledged that its "overrides" are problematic.  In an internal document dated December 13, 2013, Barclays noted that management did not "formalise a control framework for monitoring customer trading patterns (Liquidity Profiling), including…documentation and escalation requirements for profile overrides."  Barclays recognized that this could "give the appearance that certain clients are shown favoritism during the profiling process."

95.    Fourth, according to the NYAG Complaint, Liquidity Profiling does not apply to a significant portion of the trading activity in Barclay's dark pool, a fact Barclays concealed from investors.  Client orders that are routed to the dark pool via Barclays' proprietary algorithms are not included in the Liquidity Profiling service.  Similarly, Liquidity Profiling only protects traders when they *provide* liquidity (*i.e.*, post an order to the dark pool).  Liquidity Profiling does not protect traders when they *take* liquidity (*i.e.*, accept an already-posted order).  Accordingly, a large portion of Barclays' clients' traders are completely unprotected by Liquidity Profiling from interaction with aggressive or toxic traders.  Barclays did not disclose these facts.

96.    Fifth, as alleged in the NYAG Complaint, Barclays falsely represented how Liquidity Profiling evaluated traders. As discussed above, Barclays disseminated a document entitled *Liquidity Profiling – Protecting You in the Dark*, which included a chart purporting to represent the "liquidity landscape" in Barclays' dark pool.  That chart is misleading because traders represented to be in the "passive" field of the chart were not necessarily rated by the

34

Liquidity Profiling service as having passive trading behavior on the 0-5 scale described above. The same is true of the "aggressive" field.

97.     Barclays knows that its Liquidity Profiling tool is ineffective.  As reflected in the NYAG Complaint, in an internal document dated December 2013, Barclays recognized that "Liquidity Profiling reviews may not be completed for all clients, may rely on inaccurate information and results and rationale for profiling changes may not be evidenced; leading to reputational damage as the service . . . may not function as advertised to clients."

98.     As stated by one former Barclays Director in the Equities Electronic Trading division, Barclays "purport[s] to have a toxicity framework that will protect you when everybody knows internally that that thing is done manually with outliers removed and things are classified [only] if they feel like it."  Another former Director in the division described Liquidity Profiling as "a scam."

> **D.    Contrary to its Representations, Barclays Actively Recruited High Frequency Traders**

99.     As indicated, Barclays publicly claimed to protect investors from aggressive and predatory high frequency traders: LX is "built on transparency and preventing information leakage.  We have built in safeguards to manage toxicity, and to help our institutional clients understand how to manage their interactions with high-frequency traders."  Unbeknownst to the market, however, Barclays in fact *favored* high frequency trading firms over more traditional investors trading in its dark pool.  According to the NYAG Complaint, one former senior-level Director within the Equities Electronics Trading division reportedly explained that "Barclays was doing deals left and right with high frequency firms to invite them into the pool to be trading partners for the buy side.  So the pool is mainly made up of high frequency firms."  "[T]he way

35

the deal would work is [Barclays] would invite the high frequency firms in.  They would trade with the buy side.  The buy side would pay the commissions.  The high frequency firms would pay basically nothing.  They would make their money off of manipulating the price.  Barclays would make their money off the buy side.  And the buy side would totally be taken advantage of because they got stuck with the bad trade . . . this happened over and over again."

100.    To capture the interest of high frequency traders, Barclays provided them with information not otherwise made available to traditional traders, including the following:

- The routing logic of Barclays' order router, including the percentage of Barclays' internal order flow that was first directed into its own dark pool;

- A breakdown of trades executed in the dark pool by participant type (*e.g.*, percentage of orders from institutional investors, high frequency traders, etc.); and

- A breakdown of trades executed in the dark pool by "toxicity" level.

101.    According to the NYAG Complaint, in 2013, Barclays reportedly was approached by a prominent high frequency trading firm seeking information similar to that set forth above. This firm informed Barclays that "we have our largest trading team…looking to get into the dark pool space," and "are try[ing] to get more teams connected to your dark pool."  Similarly, in 2013, Barclays was approached by another prominent high frequency trading firm with questions regarding the dark pool's "functionality, mechanics, and general color."  The firm stated that it wanted to make sure that it was "not missing any opportunities."  In each instance, Barclays readily provided the information requested.

102.    The NYAG Complaint reports that Barclays has taken other actions to capture high frequency traders:

- Barclays charges high frequency trading firms little or nothing to trade in its dark pool.  For instance, Barclays' charges the two largest participants in its dark pool –

36

both of which are high frequency trading firms – virtually nothing to execute trades.  Since at least 2011, these firms were charged nothing per share when posting orders, and between $0.0002 and $0.0005 per share when taking available orders.

- Barclays allows high frequency traders to "cross-connect" to its servers.  As of the filing of the NYAG Complaint, several dozen of the most well-known and sophisticated high frequency trading firms in the world are cross-connected with Barclays, allowing them to take advantage of Barclays' non-high frequency trading clients, by getting a speed advantage over those slower-moving counterparties.

- While Barclays represented that it used ultra-fast "direct data feeds" to process market price and trade data in order to deter latency arbitrage by high frequency traders in its dark pool, Barclays in fact processed that market data so slowly as to allow latency arbitrage.  Internal analyses confirmed that Barclays' slow processing of market data allowed high frequency traders to engage in such predatory activity.

103.    As described by one former senior Barclays Director: "there was a lot going on in the dark pool that was not in the best interests of clients.  The practice of almost ensuring that every counterparty would be a high frequency firm, it seems to me that that wouldn't be in the best interest of their clients . . . It's almost like they are building a car and saying it has an airbag and there is no airbag or brakes."

### E.    Barclays Falsely Represented How It Routes Client Orders

104.    Barclays also misrepresented how it routes client orders to benefit its clients.  Barclays publicly claimed that its "dynamic router minimizes information leakage" and "uses predictive liquidity models to prevent information leakage *by sending orders to the minimal number of venues with the greatest likelihood of fill*" (emphasis added).  Barclays' predictive liquidity models "synthesize[] historical and real-time data and executions to predict liquidity," through "probability of fill models for both aggressive and passive trading; dark and hidden liquidity forecasting; based on research at the symbol by venue level."  Barclays represented that

37

its "dynamic router performance reports execution summaries for posting and taking[;] venue toxicity analysis[;] mean reversion analysis[;] and symbol analysis."

105.    In reality, however, Barclays did not route client orders to venues with the greatest likelihood of fill, in the best interests of its clients.  Instead, Barclays selectively routed orders to trading venues that benefitted Barclays.  Unbeknownst to the market, Barclays routed client orders to Barclays' own dark pool first, regardless of the likelihood of fill or information leakage.  As detailed in the NYAG Complaint, according to an internal analysis conducted by Barclays, after having been routed to Barclays' dark pool, unfilled orders were then routed disproportionately to other trading venues based on where Barclays had been most profitable over the previous twenty days.

106.    However, Barclays did reveal its true order routing preferences to a select group of high frequency trading firms.  According to the NYAG Complaint, in March 2014, Barclays told one such firm that, apart from minor exceptions, "everything goes to [Barclays' own dark pool] first."  Barclays told another high frequency trading firm that approximately 90% of all orders "are first directed into the dark pool."

107.    As recalled by a former Barclays employee with knowledge of order routing, "[Barclays was] supposed to route trades based on best probability of a fill.  Based on what was the best benefit to clients.  That is the way it was supposed to work . . . [it did not work that way] because that was not economically advantageous for Barclays."  In the words of this Director, Barclays routes trades to its own dark pool "whether it is right or not."

108.    Barclays knew that its public statements on order routing practices were false.  In 2013, senior Directors in the Equities Electronic Trading division began a broad analysis of

38

Barclays' order routing practices, gathering detailed trade data from over 100 million unique trades.  Upon analyzing the data, these Directors determined that Barclays had an extremely high "internalization rate" – that is, a high rate of routing client orders into Barclays' own dark pool. The analysis also determined that certain trading venues were disadvantaged by Barclays' routing procedures, either because Barclays was submitting orders that had no chance of being accepted in that particular venue, or because those venues were not seen as financially beneficial for Barclays.  The analysis found that the trading venues to which Barclays routed unfilled orders (after first having routed them to its own dark pool) tended to be venues hosted by high-speed trading firms, "[n]one of which," recalled one Director, "had a reputation for being favorable to clients from an execution perspective."   Those venues included Knight Capital, Getco, and Citadel.

109.    In October, 2013, Barclays prepared a trading analysis for a major institutional investor that services millions of individual accounts both inside the United States and abroad ("Institutional Investor").  According to the analysis:

- Approximately 88% of this Institutional Investor's sampled trades in dark venues were executing in Barclays' dark pool;

- Approximately 60% of the trading counterparties for the Institutional Investor's sampled orders were high frequency trading firms; and

- Approximately 75% of *all* orders routed by Barclays to dark venues were executing in Barclays' own dark pool.

110.    According to the NYAG Complaint, in preparation for a meeting with the Institutional Investor to explain these findings, two senior Directors prepared a PowerPoint presentation that included the results of the trading analysis.  Two days before the scheduled meeting, one of those Directors was called into a meeting with senior leadership in the Equities

Electronic Trading division, who instructed him not to disclose the findings to the client. According to this Director, "[t]here was no suggestion at that meeting, or at any other point, that the analysis was wrong," merely that it should not be shared with the client because it reflected poorly on Barclays.  Despite the pressure from senior leadership, this Director declined to withhold the findings from the Institutional Investor.  The following day, and before the scheduled meeting with the Institutional Investor, this Director was fired.

111.    As described in the NYAG Complaint, another Director was then instructed to change crucial figures in the PowerPoint presentation, so that they were more favorable to Barclays.  Specifically, that Director was instructed to change Barclays' internalization rate for all orders routed to dark venues from 75%, as noted above, to 35%.  This drastically lower number was far less damning to Barclays and made the Institutional Investor's 88% internalization rate look like an outlier.  As described by this former Director, this was an "intent [by Barclays] to shift blame to the client…This 35 percent is not true and not validated by anything."  Despite this Directors' protestations, the analysis was altered, and the PowerPoint was presented to the Institutional Investor.  Shortly after this incident, this Director resigned from Barclays.

112.    One former Barclays employee also recalled that "what Barclays did was rather than route [client orders] in a manner that would fulfill [their] needs that would give best execution . . . they jammed it all into [Barclays own dark pool]."  Another former employee explained that "such a high [] internalization rate could suggest that there were other opportunities being missed and [clients] weren't receiving the true best executions."

**DEFENDANTS' FALSE AND MISLEADING STATEMENTS ABOUT THE TRANSPARENCY AND SAFEGUARDS OF IT DARK POOL, AS WELL AS ABOUT BARCLAYS' PROCLAIMED COMMITMENT TO REFORM, KEPT BARCLAYS' STOCK AT ARTIFICIALLY INFLATED PRICES**

113.    Defendants' false and misleading statements about Barclays' transparency and safeguards, as well as Barclays' repeated commitment to a reformed culture, maintained the price of Barclays' common stock at levels which reflected investor confidence in the integrity of the company.   Particularly in light of the public's concern of aggressive trading and manipulations by high frequency traders, Defendants' assurances of Barclays' transparency and credibility were meant to and did assuage those concerns.

114.    In ignorance of the materially false and misleading nature of the misrepresentations and omissions, described below, made by Defendants, Plaintiff and the other members of the Class relied, to their detriment, on those statements and/or the integrity of the market price of the stock in purchasing Barclays' stock.  Had Plaintiff and the other members of the Class known of the material adverse information not disclosed by the Defendants, they would not have purchased Barclays stock at the artificially inflated prices that they did.

115.    Having chosen to tout Barclays' LX, Defendants had a duty to provide all relevant information about its dark pool.   Were Defendants truthful about their deceitful campaign employed to garner investor confidence, Barclays' stock would have traded at a substantially lower price.

116.    The stock was maintained at an artificially inflated level until June 25, 2014, when news about Barclays' lack of integrity and transparency was revealed to the public by means of a complaint brought by the New York Attorney General.  The complaint's allegations quote numerous high-level informants at Barclays attesting that:

41

- Barclays falsified marketing materials purporting to show the extent and type of high frequency trading in its dark pool.  Barclays intentionally excluded from the material the dark pool's then-largest participant—a high frequency trading firm Barclays knew engaged in predatory behavior in the dark pool. Internally, Barclays acknowledged that it was "taking liberties" with the truth by suppressing the disclosure of this high frequency trading firm, but decided to falsify the analysis in order to "help ourselves";

- Barclays falsely marketed the percentage of aggressive high frequency trading activity in its dark pool, asserting to clients and to the investing public that less than 10% of the trading activity in the pool was "aggressive," while at the same time secretly indicating to at least one high frequency trading firm that the level of such trading activity was at least 25%;

- Barclays claimed that its Liquidity Profiling service "analyzes each interaction in the dark pool" to "protect [clients] from predatory trading," to "continuously police . . . trading activity" and to "maintain quality flow" in the dark pool.  In reality, and undisclosed to the public, Barclays failed to provide those services, because it (i) failed to remove known predatory traders from its dark pool; (ii) failed to regularly profile traders in its dark pool; (iii) granted liberal "overrides" to high frequency trading firms and to Barclays' own internal trading desks (which themselves employed "aggressive" trading strategies), in order to make them appear less "toxic" than they really are; (iv) failed to apply the protections of Liquidity Profiling to a significant portion of the trading in its dark pool; and (v) misled clients as to how Liquidity Profiling actually evaluated traders;

- Barclays falsely represented that it routed client orders for securities to trading venues in a manner that did not favor Barclays' own dark pool.  While representing that Barclays "treat[s] all venues the same based on execution quality," Barclays, in fact, routed a disproportionately high percentage of client orders to its own dark pool.  When a detailed analysis of Barclays' order routing practices was conducted for a major institutional investor—showing that Barclays was routing and executing the vast bulk of this client's sampled orders to Barclays' own dark pool—Barclays senior executives directed that a written presentation to that client include falsified information, in an effort to mask Barclays' biased order routing practices; and

- At the same time that Barclays marketed its dark pool as offering protection from high frequency traders, Barclays secretly gave high frequency trading firms informational and other advantages over other clients trading in the dark pool.  For instance, Barclays provided detailed information regarding the structure and composition of its dark pool to high frequency trading firms, including information about the identity and trading activity of other traders in the pool.  Such information would allow high frequency trading firms to maximize the effectiveness of their aggressive trading strategies in the dark

42

pool.  Barclays did not generally provide such information to its brokerage clients.  Barclays also charged high frequency trading firms virtually nothing to trade in its dark pool.

117.    In a memo sent to Barclays' staff on June 26, 2014, Barclays' CEO said the Attorney General's lawsuit represents "serious charges that allege a grave failure to live up to our values and to the culture at Barclays which we are trying to create."

118.    Barclays' shares fell 7.38 % on June 26, 2014, the biggest decline since June 2012.

119.    On June 27, 2014, the Telegraph reported that "Barclays dark pool fine 'could top Libor'" and that while the "size of any potential fine is difficult to judge, [it is] estimated at more than £300m by analyst[s]."   On this news, on June 30, the next trading day, Barclays' stock dropped an additional 1.5%, on heavily traded volume of over 11 million shares.

120.    Some money managers and brokers began shunning Barclays' dark pool after the allegations emerged.  Voya Financial Inc., Sanford C. Bernstein & Co., Deutsche Bank AG and Royal Bank of Canada each stopped sending orders to the LX venue.  Barclays' dark pool volume fell 66% a week after the Attorney General's lawsuit.

121.    According to analysts, while "equity execution is not a high margin business," "it is the core, the bedrock on which all the rest is based."  If a bank loses trading business, it is unlikely that clients will do derivative trades with the entity.  The bank may also lose share in underwriting stock offerings.  As another analyst put it, "[t]he salient point is what this means for their equity business, as Barclays seeks to rebuild a smaller investment bank with equities at its core."  Another analyst summed it all up: "It may take a decade to rebuild trust in the bank after the series of scandals that have tarred its reputation."

**MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD**

**A. Statements Made in August 2011**

122.   On August 2011, Traders Magazine published statements made by Defendant White touting how Barclays protects its clients from predatory high frequency traders. Defendant White explained that high-frequency traders can add value to a firm's other clients, but only if they interact with those clients in a fair manner.  If a client offers 100 shares, but sends a cancel order right behind, so the offer's life span in the system is a microsecond, Barclays considers that client not to be a legitimate liquidity provider.  White was quoted as saying: "We monitor client orders continuously.  We build a liquidity spectrum by looking at all activity to set up a profile, client by client."  White explained that if Barclays believes an HFT is practicing predatory trading, the firm will restrict that trader's access to other clients.  Traders who continue to behave in that way will quickly have trouble finding counterparties.  White also said that the ability to restrict clients can be a helpful tool in steering high-frequency traders away from potentially abusive activities.  "I can go back to specific high-frequency clients to discuss their liquidity profile if a portion is deemed not to be in accordance with our standards. That could result in a beneficial agreement where the client saves both their time and ours by filtering the type of order flow they send through."

123.   Defendant White's statements in ¶ 122 above that Barclays provides safeguards against aggressive high-frequency traders by, for example, "go[ing] back to specific high-frequency clients to discuss their liquidity profile if a portion is deemed not to be in accordance with [Barclays'] standards" and that "[w]e monitor client orders continuously.  We build a

liquidity spectrum by looking at all activity to set up a profile, client by client" were materially

false and misleading by omission or otherwise because:

    i.    Barclays did not in fact protect clients from aggressive high frequency trading activity, did not restrict predatory traders' access to other clients, nor did it eliminate traders who continued to behave in a predatory manner (Compl. ¶¶ 75-98);

    ii.    Barclays in fact favored high frequency traders over more traditional investors trading in the dark pool, and selectively provided high frequency traders with information about Barclays' dark pool that was not otherwise available to traditional investors (Compl. ¶¶ 99-103);

    iii.    Barclays did not monitor client orders continuously (Compl. ¶ 92);

    iv.    Barclays applied "overrides" to several traders in the dark pool, assigning safe Liquidity Profiling ratings to certain traders that should have been rated as toxic (Compl. ¶¶ 93-94); and

    v.    Barclays' "Liquidity Profiling" tool did not apply to a significant portion of the trading activity in Barclays' dark pool (Compl. ¶ 95).

### B. Statements Made in June 2012

124.    On June 18, 2012, Defendant White was a panelist at a presentation sponsored by

AEI, discussing high frequency trading and its implications for financial markets.  Defendant

White described how Barclays protects its clients from predatory market behavior by measuring

client activity and implementing a control process.  White's presentation was titled "Buying and

selling at the speed of light: Taking stock of high frequency trading" and contained the logo

"Barclays."

125.    According to the presentation, Barclays' "dynamic router minimizes information

leakage" and "uses predictive liquidity models to prevent information leakage by sending orders

to the minimal number of venues with the greatest likelihood of fill."  Barclays' dynamic router

offers the following advantages: "**symbol-based logic** vs. sector/capitalization models; **dynamic** capabilities vs. static logic; **latency arbitrage**; **predictive**: hunting liquidity *through probability of fill* models; and **access to LX**."  (emphasis in original).  Barclays' predictive liquidity models "synthesize[] historical and real-time data and executions to predict liquidity," through "probability of fill models for both aggressive and passive trading; dark and hidden liquidity forecasting; based on research at the symbol by venue level."  Barclays "[u]tilizes the unique liquidity and technology throughout the firm to enhance execution logic (#3 Broker-dealer ATS, Barclays LX Liquidity Cross)" and "[o]ffers high performance access to all major exchanges and dark pools [through] [c]o-located connectivity and market data [and] [h]ardware accelerated technology."  Barclays' "dynamic router performance reports execution summaries for posting and taking[;] venue toxicity analysis[;] mean reversion analysis[;] and symbol analysis."

126.    Defendants' statements in ¶ 125 above describing the use of Barclays' dynamic router that, for example, "uses predictive liquidity models to prevent information leakage by sending orders to the minimal number of venues with the greatest likelihood of fill," that "Barclays "[u]tilizes the unique liquidity and technology throughout the firm to enhance execution logic (#3 Broker-dealer ATS, Barclays LX Liquidity Cross)," and that Barclays' "dynamic router performance reports execution summaries for posting and taking[;] venue toxicity analysis[;] mean reversion analysis[;] and symbol analysis" were materially false and misleading by omission or otherwise because:

      i.      In reality, Barclays did not route client orders to venues with the largest likelihood of fill, in the best interest of its clients.  Instead, Barclays selectively routed orders to trading venues that benefitted Barclays.  Barclays routed client orders to its own dark pool first, regardless of the likelihood of fill or information leakage.  After having been routed to Barclays' dark pool, unfulfilled orders where then

routed disproportionately to other trading venues based on where Barclays had been most profitable over the previous twenty days (Compl. ¶¶ 104-112).

127.    According to the presentation, Barclays' "client profitability tool" "allows transparency of [the] client's profitability."  It "monitor[s] changes in client's flow or trading behavior" and "effectively engage[s] in pricing strategy by considering all monetizing points (e.g. LX).  Barclays' "LX Profiling improves access to beneficial liquidity" by "constantly monitoring flow quality."  "The new LX Liquidity Profiling framework provides Barclays with transparency into the flow coming from individual participants in LX: Firms classified as ELPs include both aggressive and *passive* liquidity providers, e.g. those operating market making strategies [and] institutions and BDs segments include both passive and *aggressive* liquidity providers, e.g., those with high-alpha flows."  "By understanding the characteristics of flow at the client level, Barclays can improve the overall quality of LX liquidity: passive liquidity providers can be identified and encouraged, high alpha takers can be held accountable, e.g., by demanding liquidity providing strategies, or by refusing a client access, [and] natural selection— transparency means aggressive flows will tend to be suppressed by clients."   Moreover, according to the presentation, Barclays' "LX reports provide transparency to clients" and "insight into a client's trading activity and performance in LX."  According to Barclays, its LX reports provide the following "benefits": "understand how your flow is profiled based on the new Liquidity Profiling framework [with] factors includ[ing] short-term alpha, order size, provide vs. take ratio"; "see trends in your order flow charted over time"; and "view details around interactions by counterparty segment [with] percentage of interaction against each segment [and] performance measurements by counterparty segment."

128.    Defendants' statements in ¶ 127 above regarding LX's transparency and safeguards, for example that Barclays "monitor[s] changes in client's flow or trading behavior," that "high alpha takers can be held accountable," and that Barclays "LX reports provide transparency to clients" and "insight into a client's trading activity and performance in LX" were materially false and misleading by omission or otherwise because:

     i.      Barclays did not in fact protect clients from aggressive high frequency trading activity, did not restrict predatory traders' access to other clients, nor did it eliminate traders who continued to behave in a predatory manner (Compl. ¶¶ 75-98);

     ii.     Barclays in fact favored high frequency traders over more traditional investors trading in the dark pool, and selectively provided high frequency traders with information about Barclays' dark pool that was not otherwise available to traditional investors (Compl. ¶¶ 99-103);

     iii.    Barclays did not monitor client orders continuously (Compl. ¶ 92);

     iv.     Barclays applied "overrides" to several traders in the dark pool, assigning safe Liquidity Profiling ratings to certain traders that should have been rated as toxic (Compl. ¶¶ 93-94); and

     v.     Barclays' "Liquidity Profiling" tool did not apply to a significant portion of the trading activity in Barclays' dark pool (Compl. ¶ 95).

## C. Statements Made in July 2012

129.    On July 27, 2012, Barclays PLC filed with the SEC a Half Yearly Report for the period ended June 30, 2012, on Form 6-K, which was signed by Defendant Barclays PLC. Patrick Gonsalves, Deputy Secretary, as duly authorized, signed on behalf of registrant Barclays PLC.[7]

---

[7] Barclays PLC reports consolidated financial statements that contain the financial statements of its subsidiaries, including Barclays Capital Inc.

130.    The Half Yearly Report disclosed that "Barclays has clear risk management objectives, and a well-established strategy and framework for managing risk."  Under the rubric "operational risk," Barclays PLC identified legal risks as key risks.

131.    Defendant Barclays PLC's statements in ¶ 130 above that Barclays has a "well-established strategy and framework for managing [legal] risk[s]" were materially false and misleading by omission or otherwise because:

    i.    Barclays did not have a "well-established strategy and framework for managing [legal] risk" but instead lacked specific internal controls and procedures, including in reviewing email communications that would have enabled it to discover the fraudulent conduct in its dark pool equities electronic trading division (Compl. ¶¶ 25-39; 75-112); and

    ii.    Despite being levied unprecedented fines for having participated in fraudulent activity relating to the Libor scandal, key Barclays employees were still engaging in activities that subjected Barclays to significant legal and regulatory scrutiny (Compl. ¶¶ 25-39; 75-112).

## D.  Statements Made in October 2012

132.    According to the NYAG Complaint, Barclays publicized a falsified document entitled "Liquidity Profiling—Protecting You in the Dark," which purported to represent the "liquidity landscape" of Barclays' dark pool, as shown below:



Figure 1: Sample liquidity landscape by category

Participants in the same category do not trade in the same manner. With LX Profiling, the Barclays ATS team can quickly identify aggressive flow from an individual client.

133.     This chart was materially false and misleading because it purposefully understated the presence of high frequency traders in the pool and removed from the analysis one of the largest and most toxic participants in the dark pool, Tradebot Systems (Compl. ¶¶ 75-84).

**E.  Statements Made in January 2013**

134.     On January 17, 2013, Defendant Jenkins publicly announced the introduction of Barclay's new, *bank-wide* Purpose and Values as "the set of standards under which all of us at Barclays will work, and against which performance of every one of us will be assessed and rewarded."  Barclays' Purpose was described as "helping people achieve their ambitions—in the right way."  The Values were: "Respect, Integrity, Service, Excellence and Stewardship."  Specifically with respect to "Integrity," Jenkins explained that it "demands we act fairly, ethically and honestly.  This requires us to have the courage always to do the right thing, never tolerating the wrong thing, and to be accountable for our decisions."  Jenkins represented that

"[h]aving a firm commitment throughout the business to strong values is not something I want to do for public relations or political benefit.  It is not window dressing.  It is simply how I will run Barclays and make it a more valuable and sustainable institution…The rules have changed."

135.    Defendant Jenkins' statements in ¶ 134 above that "the rules have changed" and that Barclays has promulgated Purpose and Values standards ensuring that Barclays acts "fairly, ethically, and honestly"  were materially false and misleading by omission or otherwise because:

i.       The rules had not changed at Barclays.  Barclays' top brass continued to act unethically and dishonestly.  For example, motivated by greed, Barclays lied about the transparency and safeguards of its dark pool in a quest to boost profits (Compl. ¶¶ 75-112).

### F.  Statements Made in February 2013

136.    On February 12, 2013, Barclays PLC filed with the SEC "Barclays PLC Results Announcement" for the period ended December 31, 2012, on Form 6-K, which was signed by Defendant Barclays PLC.  Patrick Gonsalves, Deputy Secretary, as duly authorized, signed on behalf of registrant Barclays PLC.

137.    In the Form 6-K, Defendant Jenkins explained that "2012 was a difficult year for Barclays.  In June we reached a settlement with various regulators regarding the Bank's misconduct in relation to LIBOR and EURIBOR.  We know that we need to change the way we do business if we are going to regain the trust of our various stakeholders and begin to restore our reputation.  The process will take time, but we are committed to transforming Barclays.  We have defined our goals as becoming the 'Go-To bank, an ambition for Barclays to be the instinctive bank of choice for all those with whom we engage.  We want that choice to be both rational and emotional—because of what we deliver (our performance), and how we deliver (our values).  In the Autumn, I established a program, which we called 'TRANSFORM', as a route

51

through which we will become the 'Go-To' bank.  That programme is made up of three parts, each with a distinct objective, they are:  1) Turnaround: To stabilise the organisation, ensuring short-term momentum is maintained while preparing the organisation for the change to come;  2) Return Acceptable Numbers: To improve business returns through defining and executing a plan to deliver a return on equity above the cost of equity; 3) Sustain Forward Momentum: To become the 'Go-To' bank for all of our stakeholders - customers and clients, colleagues, investors and wider society."

138.    According to Jenkins, "But how we do things at Barclays in the future will be every bit as important as what we do.  In January of this year, we launched Barclays new purpose and values—*a set of standards that will apply consistently across all businesses and serve as the basis against which the performance of every colleague and every business across the organisation will be assessed and rewarded* (emphasis added).  Our Purpose is simple: to help people achieve their ambitions - in the right way.  Our Values appear simple but have deep implications for the behaviour that we expect of each and every colleague: Respect, Integrity, Service, Excellence and Stewardship.  The pursuit of profit that is achieved in ways inconsistent with that purpose and those values will not be tolerated.  I believe Barclays will only be a valuable business if it is a values-driven business.  We must operate to the highest standards if our stakeholders are to trust us and bring their business to Barclays.  Our long-term performance depends on it.  We know that we have a great deal of work to do. We know that we will be judged by our actions, not our words.  We are completely committed to becoming the 'Go-To' bank - for our customers and clients; colleagues; investors; and wider society."

139.   Defendant Jenkins' statements in ¶ 138 above that Barclays' new Purpose and Values standards "apply consistently across all businesses and serve as the basis against which the performance of every colleague and every business across the organisation will be assessed and rewarded" and that "the pursuit of profit that is achieved in ways inconsistent with that purpose and those values will not be tolerated" were materially false and misleading by omission or otherwise because:

     i.     Barclays' top brass continued to act unethically and dishonestly.  For example, motivated by greed, Barclays lied about the transparency and safeguards of its dark pool in a quest to boost profits (Compl. ¶¶ 75-112).

140.   On February 12, 2013, Barclays PLC issued a press release announcing the outcome of a strategic review it had conducted, and set out commitments for the future. Defendant Jenkins claimed that "Barclays is changing.  We intend to change what Barclays does and how we do it and have set out clear commitments against which our progress can be measured.  Our goal is to make Barclays the "Go-To" bank for all our stakeholders.  The plan we set out today is critical to delivering that goal."  Barclays made the following "non-financial commitments": "provide greater disclosure and transparency around our financial performance; [and] embed our purpose and values across Barclays and publish an annual scorecard assessing our performance."

141.   Defendants' Barclays PLC and Jenkins' statements in 140 above that "Barclays is changing" and that we "have set out clear [non-financial] commitments" to "provide greater disclosure and transparency around our financial performance; [and] embed our purpose and values [of integrity] across Barclays" were materially false and misleading by omission or otherwise because:

     i.      Barclays was not changing.  Barclays' top brass continued to act unethically and dishonestly.   For example, motivated by greed, Barclays lied about the transparency and safeguards of its dark pool in a quest to boost profits (Compl. ¶¶ 75-112).

142.    In February 2013, Barclays PLC publicly announced in a document it posted on its website "important ATS disclosures" about "Barclays LX."  With respect to its "liquidity profiling," Barclays PLC made the following statements:

> The Barclays ATS team measures the order characteristics and post-trade outcomes of individual participants in LX to detect the presence of aggressive or predatory trading.   The measures used in this surveillance protocol, called 'Liquidity Profiling,' may include short-term alpha (price movement in favor of a trade within one second after execution), order size, ratio of providing versus taking liquidity and one-sidedness of buying versus selling the same stock. Barclays' quantitative research has shown these measures to be factors that most strongly differentiate participants in LX.

143.    Barclays PLC's statements in ¶ 142 above that "Barclays ATS team measures the order characteristics and post-trade outcomes of individual participants in LX to detect the presence of aggressive or predatory trading" were materially false and misleading by omission or otherwise because:

     i.      Barclays did not protect clients from aggressive high frequency trading activity, did not restrict predatory traders' access to other clients, nor did it eliminate traders who continued to behave in a predatory manner (Compl. ¶¶ 75-98);

     ii.     Barclays in fact favored high frequency traders over more traditional investors trading in the dark pool, and selectively provided high frequency traders with information about Barclays' dark pool that was not otherwise available to traditional investors (Compl. ¶¶ 99-103);

     iii.    Barclays did not monitor client orders continuously (Compl. ¶ 92);

     iv.    Barclays applied "overrides" to several traders in the dark pool, assigning safe Liquidity Profiling ratings to certain traders that should have been rated as toxic (Compl. ¶¶ 93-94); and

     v.     Barclays' "Liquidity Profiling" tool did not apply to a significant portion of the trading activity in Barclays' dark pool (Compl. ¶ 95).

## G. Statements Made in March 2013

144.    On or about March 8, 2013, Defendant White made statements, reported in Markets Media, touting the transparency and safeguards of the LX dark pool:

> LX is an integral part of our electronic trading offering, providing clients with enhanced execution quality.  LX is built on transparency and preventing information leakage.  We have built in safeguards to manage toxicity, and to help our institutional clients understand how to manage their interactions with high-frequency traders.

145.    Defendant White's statements in ¶ 144 above about the transparency and safeguards of LX, i.e. that "LX is built on transparency" and has "built in safeguards to manage toxicity, and to help our institutional clients understand how to manage their interactions with high-frequency traders" were materially false and misleading by omission or otherwise because:

     i.     Barclays did not in fact protect clients from aggressive high frequency trading activity, did not restrict predatory traders' access to other clients, nor did it eliminate traders who continued to behave in a predatory manner (Compl. ¶¶ 75-98);

     ii.    Barclays in fact favored high frequency traders over more traditional investors trading in the dark pool, and selectively provided high frequency traders with information about Barclays' dark pool that was not otherwise available to traditional investors (Compl. ¶¶ 99-103);

     iii.   Barclays did not monitor client orders continuously (Compl. ¶ 92);

     iv.   Barclays applied "overrides" to several traders in the dark pool, assigning safe Liquidity Profiling ratings to certain traders that should have been rated as toxic (Compl. ¶¶ 93-94); and

     v.     Barclays' "Liquidity Profiling" tool did not apply to a significant portion of the trading activity in Barclays' dark pool (Compl. ¶ 95).

146.    On March 13, 2013, Barclays PLC filed with the SEC an Annual Report for the year ended December 31, 2012, on Form 20-F.  Defendants Antony Jenkins and Christopher

Lucas provided Sarbanes-Oxley Certifications, certifying that "[t]he Annual Report on Form 20-F for the year ended December 31, 2012 (the "Report") of Barclays fully complies with the requirements of section 13(a) of the Securities Exchange Act of 1934 and information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Barclays." Defendants Jenkins and Lucas also provided Sarbanes Oxley Certifications, certifying that they "have reviewed the [2012] annual report on Form 20-F" and that "based on [their] knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."   Defendants Jenkins and Lucas further certified that they "are responsible for establishing and maintaining disclosure controls and procedures…and internal control over financial reporting…for the company and have…[e]valuated the effectiveness of the company's disclosure controls and procedures and presented in this report [their] conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation."

147.    The 2012 Annual Report disclosed under the title "Risk management and internal control" that "Barclays is committed to operating within a strong system of internal control that enables business to be transacted and risk taken without exposing itself to unacceptable potential losses or reputational damage."  The 2012 Annual Report also disclosed that "[t]hroughout the year ended 31 December 2012, and to date, the Group has operated a system of risk management and internal control, which provides reasonable assurance of effective and efficient operations covering all controls, including financial and operational controls and compliance with laws and

regulations."  The 2012 Annual Report further disclosed that "[m]anagement has assessed the effectiveness of internal control over financial reporting as of 31 December 2012…Management concluded that, based on its assessment, the internal control over financial reporting was effective as of 31 December 2012."

148.  Defendants Barclays PLC's, Jenkins, and Lucas' statements in ¶ 147 above that "Barclays is committed to operating within a strong system of internal control that enables business to be transacted and risk taken without exposing itself to unacceptable potential losses or reputational damage," that "[t]hroughout the year ended 31 December 2012, and to date, the Group has operated a system of risk management and internal control, which provides reasonable assurance of effective and efficient operations covering all controls, including . . . operational controls and compliance with laws and regulations," and that "[m]anagement concluded that, based on its assessment, the internal control over financial reporting was effective as of 31 December 2012" were materially false and misleading by omission or otherwise because:

i.  Barclays lacked specific internal controls and procedures, including in reviewing email communications that would have enabled it to discover the fraudulent conduct in its dark pool—equities electronic trading division (Compl. ¶¶ 25-39; 75-112); and

ii.  Barclays did not have sufficient internal controls to ensure compliance with applicable laws and regulations because, despite being levied unprecedented fines for having participated in fraudulent activity relating to the LIBOR scandal, key Barclays employees were still engaging in illegal or unethical activities that subjected Barclays to significant legal and regulatory scrutiny (Compl. ¶¶ 25-39; 75-112).

149.  The 2012 Annual Report also disclosed that "Barclays operates within a robust system of internal control that seeks to ensure that business is transacted and risk taken without exposure to unacceptable potential losses or reputational damage."

150.    Defendants Barclays PLC, Jenkins, and Lucas' statements in ¶ 149 above that "Barclays operates within a robust system of internal control that seeks to ensure that business is transacted and risk taken without exposure to unacceptable potential losses or reputational damage" were materially false and misleading by omission or otherwise because:

    i.    Barclays did not have a "robust system of internal control that seeks to ensure that business is transacted and risk taken without exposure to unacceptable potential losses or reputational damage" but instead lacked specific internal controls and procedures, including in reviewing email communications that would have enabled it to discover the fraudulent conduct in its dark pool—equities electronic trading division (Compl. ¶¶ 25-39; 75-112); and

    ii.    Barclays did not have sufficient internal controls to ensure compliance with applicable laws and regulations because, despite being levied unprecedented fines for having participated in fraudulent activity relating to the LIBOR scandal, key Barclays employees were still engaging in illegal or unethical activities that subjected Barclays to significant legal and regulatory scrutiny (Compl. ¶¶ 25-39; 75-112).

151.    On or about March 14, 2013, Defendant White again made statements, reported in Markets Media, lauding the superiority of the LX dark pool, which he said protects clients trading in the dark:

It's a sophisticated surveillance framework that protects clients from predatory trading activity in LX, the second-largest broker-dealer dark pool in the U.S….[individual clients within the same traditional category] behave very differently across a spectrum.  Within the institutional base, some are passive, most have a blend of passive and aggressive, and some are moving toward the aggressive side of the spectrum.  By identifying aggressive behavior, we can take corrective action with clients who exhibit opportunistic behavior in the pool.

152.    Defendant White's statements in ¶ 151 above that LX "protects clients from predatory trading activity in LX" and that "[b]y identifying aggressive behavior, we can take corrective action with clients who exhibit opportunistic behavior in the pool" were materially false and misleading by omission or otherwise because:

i.     Barclays did not in fact protect clients from aggressive high frequency trading activity, did not restrict predatory traders' access to other clients, nor did it eliminate traders who continued to behave in a predatory manner (Compl. ¶¶ 75-98);

ii.    Barclays in fact favored high frequency traders over more traditional investors trading in the dark pool, and selectively provided high frequency traders with information about Barclays' dark pool that was not otherwise available to traditional investors (Compl. ¶¶ 99-103);

iii.   Barclays did not monitor client orders continuously (Compl. ¶ 92);

iv.    Barclays applied "overrides" to several traders in the dark pool, assigning safe Liquidity Profiling ratings to certain traders that should have been rated as toxic (Compl. ¶¶ 93-94); and

v.     Barclays' "Liquidity Profiling" tool did not apply to a significant portion of the trading activity in Barclays' dark pool (Compl. ¶ 95).

## H. Statements Made in April 2013

153.   On April 25, 2013, Barclays PLC published its response to the Salz review, titled: "Integrity. Barclays' response to the Salz Review."   Defendant Jenkins represented that "Barclays has now completed the examination of the 34 formal recommendations contained in the Review's report that we committed to when it was published earlier this month.  This report is our response to those recommendations and strives to outline our approach to implementing each of those in a clear and transparent fashion."   Defendant Jenkins represented that Barclays implemented the Transform Program to drive the "fundamental changes to how [Barclays] run[s] [its] business.  We revealed the first steps in that process in January through the introduction of our new, bank-wide Purpose and Values, and in February through the publication of the results of our strategic review and the 2015 commitments it produced."

154.   Defendant Jenkins' statements in ¶ 153 above that Barclays implemented the Transform Program to drive the "fundamental changes to how [Barclays] run[s] [its] business"

and that Barclays "introduc[ed] . . . bank-wide Purpose and [integrity] Values" were materially false and misleading by omission or otherwise because:

    i.    Barclays was not changing. Barclays' top brass continued to act unethically and dishonestly.  For example, motivated by greed, Barclays lied about the transparency and safeguards of its dark pool in a quest to boost profits (Compl. ¶¶ 75-112).

155.    Barclays PLC explained that the Board commissioned the Salz review "to help the bank to rebuild trust and, by accelerating a cultural shift, to make it a leader in business practices among its peers and multinational corporations generally."  Barclays committed to implement all 34 formal recommendations for change published in the Salz report, including fundamental cultural changes, through a "Transform Programme" composed of 11 projects, each of which covers the entire bank.  Barclays claimed that it was "establishing a consistent set of practices across Barclays to ensure that [the Company] restore, enhance and protect the trust that is so vital to the long-term success of [its] business, driven by a dedicated team and incorporating best practices from other industries."  Barclays represented that it is "committed to implementing the [Salz] Review's recommendation to regain the trust of all of Barclays' stakeholders."  "Barclays' Purpose (Helping people achieve their ambitions – in the right way) and Values (Respect, Integrity, Service, Excellence and Stewardship) are standards which will guide our decision-making and against which all employees will be assessed and rewarded."

156.    Barclays PLC's statements in ¶ 155 above that it was "establishing a consistent set of practices across Barclays to ensure that [the Company] restore, enhance and protect the trust that is so vital to the long-term success of [its] business, driven by a dedicated team and incorporating best practices from other industries," that Barclays is "committed to implementing the [Salz] Review's recommendation to regain the trust of all of Barclays' stakeholders," and

that the "Purpose and [integrity] Values are standards which will guide our decision-making and against which all employees will be assessed and rewarded" were materially false and misleading by omission or otherwise because:

      i.     Barclays' top brass continued to act unethically and dishonestly.  For example, motivated by greed, Barclays lied about the transparency and safeguards of its dark pool in a quest to boost profits (Compl. ¶¶ 75-112).

157.    Barclays PLC represented that it "will establish and implement a new Governance Risk and Control framework that seeks to be best practice for banks and seeks to meet the requirements of regulators.  This framework will incorporate clear statements on our Group risk appetite for all types of risk and clearly articulate roles and responsibilities across the three lines of defence.  Implementation across the Group will be guided by an understanding of where the principal gaps exist, which may include certain front-office functions, but will consistently embed adherence to the articulated Group risk appetite and control framework into all business units regardless."  Barclays PLC stated that its new risk culture and control framework "will also be strengthened by actions to reinforce a control and compliance culture throughout the bank." "Implementation of the framework will incorporate mechanisms to ensure that conduct, reputational and operational risks are fully factored into business decisions and governance."

158.    Barclays PLC's statements in ¶ 157 above that its new risk culture and control framework "will also be strengthened by actions to reinforce a control and compliance culture throughout the bank" and that "implementation of the framework will incorporate mechanisms to ensure that conduct, reputational and operational risks are fully factored into business decisions and governance" were materially false and misleading by omission or otherwise because:

i.     Barclays' top brass continued to act unethically and dishonestly.  For example, motivated by greed, Barclays lied about the transparency and safeguards of its dark pool in a quest to boost profits (Compl. ¶¶ 75-112); and

ii.    Barclays lacked specific internal controls and procedures, including in reviewing email communications that would have enabled it to discover the fraudulent conduct in its dark pool—equities electronic trading division (Compl. ¶¶ 25-39; 75-112).

159.   Barclays PLC further represented that "Barclays' Investment Bank adopted new processes for effectively learning from mistakes in 2012 following an internal review.  We will consider how best to put in place similar processes consistently across the Group and monitor how successfully those processes look widely to understand why the issues arose and for any related issues elsewhere in the business.  This should allow Barclays to understand and address underlying root causes of issues and apply lessons learned more broadly."

160.   Barclays PLC's statements in ¶ 159 above that "Barclays' Investment Bank adopted new processes for effectively learning from mistakes in 2012 following an internal review," which "allow[s] Barclays to understand and address underlying root causes of issues and apply lessons learned more broadly" were materially false and misleading by omission or otherwise because:

i.     Barclays' top brass continued to act unethically and dishonestly.  For example, motivated by greed, Barclays lied about the transparency and safeguards of its dark pool in a quest to boost profits (Compl. ¶¶ 75-112); and

ii.    Barclays lacked specific internal controls and procedures, including in reviewing email communications that would have enabled it to discover the fraudulent conduct in its dark pool—equities electronic trading division (Compl. ¶¶ 25-39; 75-112).

161.    Barclays PLC also stated that it is "committed to robust oversight in the form of a world-class compliance function.  Barclays will reinforce a culture of compliance throughout the bank via a combination of training, discussion forums and performance management."

162.    Barclays PLC's statements in ¶ 161 above that it is "committed to robust oversight in the form of a world-class compliance function" were materially false and misleading by omission or otherwise because:

  i.    Barclays' top brass continued to act unethically and dishonestly.  For example, motivated by greed, Barclays lied about the transparency and safeguards of its dark pool in a quest to boost profits (Compl. ¶¶ 75-112); and

  ii.   Barclays lacked specific internal controls and procedures, including in reviewing email communications that would have enabled it to discover the fraudulent conduct in its dark pool—equities electronic trading division (Compl. ¶¶ 25-39; 75-112).

163.    In April 2013, Traders Magazine pointed to statements made by Defendant White touting Barclays' LX pool and its Liquidity Profiling surveillance.  Defendant White explained that by incorporating new surveillance technology Barclays can monitor trading behavior, including toxicity, of those in the pool and remove traders who do not benefit the firm's clients.  White stated that clients know Barclays is actively looking out for their best interests and quality of execution.  White was quoted as saying: "Clients know we have controls within the pool to stop certain traders from taking advance of our liquidity."  White also represented that Barclays rewrote all the logic in its existing algorithms and redesigned its smart order router, creating new algorithms for clients and a dynamic order router that constantly examines market conditions in real time and adjusts its order-handling strategy immediately.  Defendant White was also quoted as saying that "[t]he number-two ranking [of Barclays LX] is a reflection of the success of that plan and the strength of our entire equity franchise."

164.    Defendant White's statements in ¶ 163 above that "Clients know we have controls within the pool to stop certain traders from taking advance of our liquidity" and that "[t]he number-two ranking [of Barclays LX] is a reflection of the success of that plan and the strength of our entire equity franchise" were materially false and misleading by omission or otherwise because:

i.    Barclays did not in fact protect clients from aggressive high frequency trading activity, did not restrict predatory traders' access to other clients, nor did it eliminate traders who continued to behave in a predatory manner (Compl. ¶¶ 75-98);

ii.   Barclays in fact favored high frequency traders over more traditional investors trading in the dark pool, and selectively provided high frequency traders with information about Barclays' dark pool that was not otherwise available to traditional investors (Compl. ¶¶ 99-103);

iii.  Barclays did not monitor client orders continuously (Compl. ¶ 92);

iv.   Barclays applied "overrides" to several traders in the dark pool, assigning safe Liquidity Profiling ratings to certain traders that should have been rated as toxic (Compl. ¶¶ 93-94);

v.    Barclays' "Liquidity Profiling" tool did not apply to a significant portion of the trading activity in Barclays' dark pool (Compl. ¶ 95); and

vi.   Barclays did not route client orders in the best interest of its clients.  Instead, Barclays selectively routed orders to trading venues that benefitted Barclays. Barclays routed client orders to its own dark pool first, regardless of the likelihood of fill or information leakage.  After having been routed to Barclays' dark pool, unfulfilled orders where then routed disproportionately to other trading venues based on where Barclays had been most profitable over the previous twenty days (Compl. ¶¶ 104-112).

## I.   Statements Made in May 2013

165.    On May 20, 2013, Barclays confirmed its commitment to reporting volumes in its dark pool, LX, on a monthly basis.  Defendant White, in the Company's announcement, which was also reported by Markets Media, stated the following:

Our commitment to reporting volumes and other aggregate details about LX underscores Barclays' belief that transparency is not only important, but that it

benefits both our clients and the market overall….As the equities market structure continues to evolve, our belief is that more transparency will assist clients in finding natural sources of liquidity and allow them to make more informed decisions on their trading.

166.    Defendants Barclays PLC and White's statements in ¶ 165 that Barclays operated

with transparency to assist clients was false and misleading by omission or otherwise because:

    i.    Barclays engaged in a campaign designed to mislead investors about the transparency and safeguards of its dark pool in a quest to boost profits (Compl. ¶¶ 75-112).

167.    Moreover, Barclays PLC stated the following in the May 20, 2013 press release:

The commitment to report volumes in LX follows several other initiatives introduced in recent years which have also promoted transparency to help clients make informed decisions:

    •    Liquidity Profiling in LX: Introduced in January 2012, Liquidity Profiling allows Barclays to evaluate each client's trading in LX based on quantitative factors, thereby providing more accurate assessments of aggressive, neutral and passive trading strategies.  Clients can then choose which trading styles they interact with, instead of choosing by the more arbitrary designation of client type.

168.    Defendant Barclays PLC's statements in ¶ 167 above that "Liquidity Profiling

allows Barclays to evaluate each client's trading in LX based on quantitative factors, thereby

providing more accurate assessments of aggressive, neutral and passive trading strategies" were

materially false and misleading by omission or otherwise because:

    i.    Barclays' "Liquidity Profiling" tool did not apply to a significant portion of the trading activity in Barclays' dark pool (Compl. ¶ 95); and

    ii.    Barclays engaged in a campaign designed to mislead investors about the transparency and safeguards of its dark pool in a quest to boost profits (Compl. ¶¶ 75-112).

169.    On or about May 21, 2013, Defendant White made the following statements to

theTRADEnews, which were reported by theTRADEnews on May 21, 2013:

We want to maintain our dark pool volume reporting because we believe the market benefits from an appropriate level of transparency. Clients want to know which pools are relevant and which are attracting liquidity.

170. Defendant White's statements in ¶ 169 above that "[w]e want to maintain our dark pool volume reporting because we believe the market benefits from an appropriate level of transparency" were materially false and misleading by omission or otherwise because:

    i.    Barclays engaged in a campaign designed to mislead investors about the transparency and safeguards of its dark pool in a quest to boost profits (Compl. ¶¶ 75-112).

## J. Statements Made in June 2013

171. On or about June 6, 2013, Defendant White made the following statements which were published in HedgeWeek:

Regardless of who you are, we'll look at your flow in the aggregate and if it shows up as being toxic we'll benchmark it into five different groups. Clients can then look at what pools of liquidity they want to trade with. I call it the IRS Theory. When you're watching behaviour to that degree, behaviour changes. If an end user has been delivering low rated flow we tell them, "Either change it, or don't send it here.' We give them the ability to break up their low toxicity flow versus their high.

Toxicity is defined in Barclays LX in terms of what the price of that order was when it arrived, which then gets assessed in multiple time sheets. Generally if someone is coming in and taking liquidity aggressively the bid is going to change. So we look at it in time series. We have an algorithm and a scoring methodology that basically creates a liquidity spectrum. The far left being passive and low toxic liquidity, the far right being aggressive, high toxic liquidity. As we are able to restrict HFTs interacting with our clients we're getting the better half of their order flow (i.e. higher quality liquidity) such as hedges or low impact positions.

172. Defendant White's statements in ¶ 171 above that "[r]egardless of who you are, we'll look at your flow in the aggregate and if it shows up as being toxic we'll benchmark it into five different groups were materially," that "[i]f an end user has been delivering low rated flow we tell them, 'Either change it, or don't send it here.' We give them the ability to break up their

low toxicity flow versus their high," and that "[w]e have an algorithm and a scoring methodology that basically creates a liquidity spectrum.  The far left being passive and low toxic liquidity, the far right being aggressive, high toxic liquidity.  As we are able to restrict HFTs interacting with our clients we're getting the better half of their order flow (i.e. higher quality liquidity) such as hedges or low impact positions" were false and misleading by omission or otherwise because:

      i.      Barclays did not in fact protect clients from aggressive high frequency trading activity, did not restrict predatory traders' access to other clients, nor did it eliminate traders who continued to behave in a predatory manner (Compl. ¶¶ 75-98);

      ii.     Barclays in fact favored high frequency traders over more traditional investors trading in the dark pool, and selectively provided high frequency traders with information about Barclays' dark pool that was not otherwise available to traditional investors (Compl. ¶¶ 99-103);

      iii.    Barclays did not monitor client orders continuously (Compl. ¶ 92);

      iv.    Barclays applied "overrides" to several traders in the dark pool, assigning safe Liquidity Profiling ratings to certain traders that should have been rated as toxic (Compl. ¶¶ 93-94); and

      v.     Barclays' "Liquidity Profiling" tool did not apply to a significant portion of the trading activity in Barclays' dark pool (Compl. ¶ 95).

173.    Defendant White also stated:

We have seen activity increase consecutively month on month as our liquidity aggregation on the platform has improved.  We've invested heavily in the latency component, but it's also thanks to how our router works and the toxicity framework that we have in place.  As a result, our client base has become comfortable with how we manage liquidity in the dark venue…We show them, real-time, where we are executing orders, what the execution profile is for each order etc.

We understand what execution quality and information protection means. Introducing a stable router, a low latency platform with control over liquidity profiling: all of the enhancements we've made over the last two years help to explain why LX has enjoyed consistent growth in the market.

174.   Defendant White's statements in ¶ 173 above that "it's also thanks to how our router works and the toxicity framework that we have in place.  As a result, our client base has become comfortable with how we manage liquidity in the dark venue…We show them, real-time, where we are executing orders, what the execution profile is for each order," and that "[i]ntroducing a stable router, a low latency platform with control over liquidity profiling: all of the enhancements we've made over the last two years help to explain why LX has enjoyed consistent growth in the market" were materially false and misleading by omission or otherwise because:

i.     Barclays did not in fact protect clients from aggressive high frequency trading activity, did not restrict predatory traders' access to other clients, nor did it eliminate traders who continued to behave in a predatory manner (Compl. ¶¶ 75-98);

ii.    Barclays in fact favored high frequency traders over more traditional investors trading in the dark pool, and selectively provided high frequency traders with information about Barclays' dark pool that was not otherwise available to traditional investors (Compl. ¶¶ 99-103);

iii.   Barclays did not monitor client orders continuously (Compl. ¶ 92);

iv.    Barclays applied "overrides" to several traders in the dark pool, assigning safe Liquidity Profiling ratings to certain traders that should have been rated as toxic (Compl. ¶¶ 93-94);

v.     Barclays' "Liquidity Profiling" tool did not apply to a significant portion of the trading activity in Barclays' dark pool (Compl. ¶ 95); and

vi.    In reality, Barclays did not route client orders to venues with the largest likelihood of fill, in the best interest of its clients.  Instead, Barclays selectively routed orders to trading venues that benefitted Barclays.  Barclays routed client orders to its own dark pool first, regardless of the likelihood of fill or information leakage. After having been routed to Barclays' dark pool, unfulfilled orders where then routed disproportionately to other trading venues based on where Barclays had been most profitable over the previous twenty days (Compl. ¶¶ 104-112).

### K. Statements Made in July 2013

175.    On July 30, 2013, Barclays PLC filed with the SEC a Half Yearly Report for the period ended June 30, 2013, on Form 6-K, which was signed by Defendant Barclays PLC. Patrick Gonsalves, Deputy Secretary, as duly authorized, signed on behalf of registrant Barclays PLC.

176.    The July 30, 2013 Form 6-K disclosed that "Barclays has clear risk management objectives, and a well-established strategy and framework for managing risk."  Barclays identified legal risks as key risks.

177.    Defendant Barclays PLC's statements in ¶ 176 above that Barclays has "a well-established strategy and framework for managing [legal] risk[s]" were materially false and misleading by omission or otherwise because:

    i.    Barclays did not have a clear, well-established strategy for managing legal risk. Barclays lacked specific internal controls and procedures, including in reviewing email communications that would have enabled it to discover the fraudulent conduct in its dark pool— equities electronic trading division (Compl. ¶¶ 25-39; 75-112); and

    ii.   Despite being levied unprecedented fines for having participated in fraudulent activity relating to the LIBOR scandal, key Barclays employees were still engaging in illegal or unethical activities that subjected Barclays to significant legal and regulatory scrutiny (Compl. ¶¶ 25-39; 75-112).

178.    On July 2013, Barclays PLC published in a document it posted on its website "Key facts and H1 2013 business highlights."  With respect to "equities," Barclays PLC represented the following:

> One of the fastest growing dark pools in both the US and Europe: Barclays LX US is ranked # 1 among reporting dark pools, growing market share 33% year over year.

179.    Defendant Barclays PLC's statements in ¶ 178 above that "Barclays LX US is ranked # 1 among reporting dark pools, growing market share 33% year over year" were materially false and misleading by omission or otherwise because:

   i.    Barclays' LX became number 1 as a result of Barclays' deceitful marketing campaign (Compl. ¶¶ 75-112).

**L.  Statements Made in November 2013**

180.    In a November 12, 2013 letter to the SEC, Barclays claimed publicly to support a FINRA rule proposal, requiring each ATS to report to FINRA the aggregate weekly share volume and number of trades executed within the ATS, while also requiring each ATS to acquire and use a single, unique market participant identifier when reporting information to FINRA.  The letter was signed by Defendant White as "Head of Electronic Trading," "Barclays Capital Inc." The letterhead contained the following identifications: "Barclays" (which Barclays uses as a symbol for Barclays PLC), barclays.com (which is the website for Barclays PLC), and Barclays Capital Inc.

181.    In the letter to the SEC, Defendants made the following representations:

FINRA's objectives are fully aligned with Barclays' approach to managing LX. Earlier this year, Barclays publicly announced its commitment to disclosing LX volumes on a monthly basis, despite the lack of a regulatory requirement. Our commitment to reporting volumes, together with other initiatives undertaken to share information about how we operate LX, demonstrate our belief that transparency benefits not only our clients, but the market overall. We encourage efforts to standardize ATS transparency across the industry and feel that FINRA is well-positioned to do so.

We commend FINRA for recognizing the benefits of making standard ATS statistics accessible to the public on a delayed basis. As the market structure continues to evolve, this transparency will assist traders in finding natural sources of liquidity and allow them to make more informed decisions about their trading. It will also give the investing public a reliable and uniform source of data which can be used to help understand and evaluate ATSs as a significant segment of the

market structure. Further, this will complement the Commission's recent initiatives regarding transparency and analysis of market structure data, which we similarly support.

182.    Defendants Barclays PLC, Barclays Capital Inc., and White's statements in ¶ 181 above touting to support "transparency," that "FINRA's objectives are fully aligned with Barclays' approach to managing LX," that "[e]arlier this year, Barclays publicly announced its commitment to disclosing LX volumes on a monthly basis, despite the lack of a regulatory requirement," and that "[w]e encourage efforts to standardize ATS transparency across the industry" were materially false and misleading by omission or otherwise because:

     i.     Rather than being transparent, Barclays engaged in a campaign designed to mislead investors about the transparency and safeguards of its dark pool in a quest to boost profits (Compl. ¶¶ 75-112).

**M. Statements Made in February 2014**

183.    On or about February 20, 2014, Defendant White again made statements touting the transparency and safeguards of the LX dark pool.  Market Media reported those statements in an article published on February 20, 2014, titled "Best Dark Pool: Barclays LX."  Defendant White stated the following:

> For us, the biggest theme of the [2013] year was transparency.  It was an important topic throughout the year, and it remains a core element of our strategy.  [Transparency was] the one issue that we really took a stance on.  We felt that with the regulatory environment and the concerns about market structure, we would take a very strong position on market transparency, and I think that's what resonates loudest as we look at achievements of last year….LX Liquidity Profiling analyzes each interaction in the dark pool, allowing us to monitor the behavior of individual participants.  This was a very significant step because it was important to provide transparency not only by reporting our overall volumes, but also by providing clients with transparency about the nature of counterparties in the dark pool and how the control framework works.  Transparency on multiple levels is a selling point for our entire equities franchise….We always come back to transparency as the key driver—letting them know how we're interacting with their flow and what type of flow they're interacting with.

184.    Defendants' statements in ¶ 183 above regarding Barclays' "transparency," particularly with respect to LX, were materially false and misleading by omission or otherwise because:

>    i.    Rather than being transparent, Barclays engaged in a campaign designed to mislead investors about the transparency and safeguards of its dark pool in a quest to boost profits (Compl. ¶¶ 75-112).

## N.  Statements Made in March 2014

185.    On March 14, 2014, Barclays PLC filed with the SEC an Annual Report for the year ended December 31, 2013, on Form 20-F.  Defendants Antony Jenkins and Tushar Morzaria provided Sarbanes-Oxley Certifications, certifying that "[t]he Annual Report on Form 20-F for the year ended December 31, 2013 (the "Report") of Barclays fully complies with the requirements of section 13(a) of the Securities Exchange Act of 1934 and information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Barclays."   Defendants Jenkins and Morzaria also provided Sarbanes Oxley Certifications, certifying that they "have reviewed the [2013] annual report on Form 20-F" and that "based on [their] knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."   Defendants Jenkins and Morzaria further certified that they "are responsible for establishing and maintaining disclosure controls and procedures…and internal control over financial reporting…for the company and have…[e]valuated the effectiveness of the company's disclosure controls and procedures and presented in this report [their] conclusions

about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation."

186.    The 2013 Annual Report disclosed under the rubric "Risk management and internal control" that "Barclays is committed to operating within a strong system of internal control that enables business to be transacted and risk taken without exposing itself to unacceptable potential losses or reputational damage."   The 2013 Annual Report further disclosed that "[m]anagement has assessed Barclays PLC Group's and Barclays Bank PLC Group's internal control over financial reporting as of 31 December 2013….Management concluded that, based on its assessment, the internal control over financial reporting was effective as of 31 December 2013."

187.    Defendants Barclays PLC, Jenkins, and Morzaria's statements in ¶ 186 above that "Barclays is committed to operating within a strong system of internal control that enables business to be transacted and risk taken without exposing itself to unacceptable potential losses or reputational damage" and that "[m]anagement concluded that, based on its assessment, the internal control over financial reporting was effective as of 31 December 2013" were materially false and misleading by omission or otherwise because:

  i.  Barclays lacked specific internal controls and procedures designed to protect Barclays from reputational damage, including in reviewing email communications that would have enabled it to discover the fraudulent conduct in its dark pool— equities electronic trading division.(Compl. ¶¶ 25-39; 75-112); and

  ii.  Despite being levied unprecedented fines for having participated in fraudulent activity relating to the LIBOR scandal, key Barclays employees were still engaging in illegal or unethical activities that subjected Barclays to significant legal and regulatory scrutiny (Compl. ¶¶ 25-39; 75-112).

188.    According to the 2013 Annual Report, "[i]n 2013, the Group also introduced the Enterprise Risk Management Framework (ERMF), which sets out a *framework and approach that is applicable to the whole bank, all colleagues and to all types of risk*.  To strengthen the governance relating to conduct and reputation matters Conduct risk and Reputation risk were re-categorised as Principal Risks in 2013 with Executive Committee sponsorship from the Principal Risk Owner, the Head of Compliance" (emphasis added).

189.    Defendants Barclays PLC, Jenkins, and Morzaria's statements in ¶ 188 above that "[i]n 2013, the Group…introduced the Enterprise Risk Management Framework (ERMF), which sets out a *framework and approach that is applicable to the whole bank, all colleagues and to all types of risk* [including Conduct risk and Reputational risk]" were materially false and misleading by omission or otherwise because:

   i.    Barclays did not strengthen the governance relating to conduct and reputational matters.  Barclays lacked specific internal controls and procedures designed to protect Barclays from conduct and reputational damage, including in reviewing email communications that would have enabled it to discover the fraudulent conduct in its dark pool—electronic equities trading division.  Barclays' top brass continued to act unethically and dishonestly.  For example, motivated by greed, Barclays lied about the transparency and safeguards of its dark pool in a quest to boost profits (Compl. ¶¶ 25-39; 75-112).

190.    The 2013 Annual Report also disclosed that "[a]nother key focus over 2013 and the coming years is rebuilding the trust that customers, clients, and stakeholders have in our organisation.  We have pledged to increase transparency and conduct our business in the right way, as set out in our values."

191.    Defendants Barclays PLC, Jenkins, and Morzaria's statements in ¶ 190 above that "[w]e have pledged to increase transparency and conduct our business in the right way, as set out

in our values" in order to "rebuild[] the trust that customers, clients, and stakeholders have in our organization" were materially false and misleading by omission or otherwise because:

  i.   Barclays' top brass continued to act top brass continued to act unethically and dishonestly. For example, motivated by greed, Barclays lied about the transparency and safeguards of its dark pool in a quest to boost profits (Compl. ¶¶ 75-112).

### O. Statements Made in June 2014

192.   Barclays PLC published in a document posted on its website "Barclays LX® FAQs" "as of June 2014."

193.   With respect to the question "what is LX 'Liquidity Profiling' and how is it used to monitor trading activity in LX?", Barclays PLC provided the following answer:

Barclays employs a framework called Liquidity Profiling for monitoring and categorizing activity within our ATS. For the purposes of monitoring, various factors are measured including, but not limited to: take-to-provide ratio, order-to-trade ratio, order duration, order placement logic, order type usage and market movement, or "alpha", measured over various horizons. The Liquidity Profiling framework is also utilized for the purposes of categorizing all LX direct subscribers into different segments, based on two measures:

- 1-second take alpha: midpoint to midpoint market movement over a 1-second horizon
- Normalized order size: order size relative to the average execution size in the market for a given symbol

Participants in LX can be segmented according to their Liquidity Profiling characteristics, ranging from passive to neutral to aggressive segments.

194.   Barclays PLC's statements in ¶ 193 above that Liquidity Profiling monitors and categorizes activity within ATS through, among other things, monitoring of market movement, or "alpha," and categorizes subscribers into different segments, from passive to neutral to aggressive segments, were false and misleading by omission or otherwise because:

    i.        Barclays' "Liquidity Profiling" tool did not apply to a significant portion of the trading activity in Barclays' dark pool (Compl. ¶ 95); and

    ii.       Barclays engaged in a campaign designed to mislead investors about the transparency and safeguards of its dark pool in a quest to boost profits (Compl. ¶¶ 75-112).

## THE TRUTH EMERGES

195.    On June 25, 2014, the NYAG issued a press release announcing a lawsuit against

Barclays, arising from the operation of Barclays' dark pool.  It stated in part:

> The complaint alleges Barclays has dramatically increased the market share of its dark pool through a series of false statements to clients and investors about how, and for whose benefit, Barclays operates its dark pool.   Contrary to Barclays' representations that it has implemented special safeguards to protect clients from "aggressive" or predatory high-frequency traders, Barclays is accused of operating its dark pool to favor high-frequency traders.

> "The facts alleged in our complaint show that Barclays demonstrated a disturbing disregard for its investors in a systematic pattern of fraud and deceit," Attorney General Schneiderman said.   "Barclays grew its dark pool by telling investors they were diving into safe waters.  According to the lawsuit, Barclays' dark pool was full of predators – there at Barclays' invitation."

> The complaint alleges that Barclays falsified marketing material purporting to show the extent and type of high frequency trading in its dark pool.

>                 \*        \*        \*

> Barclays heavily promoted a service called Liquidity Profiling, which Barclays claimed was a "surveillance" system that tracked every trade in Barclays' dark pool in order to identify predatory traders, rate them based on the objective characteristics of their trading behavior, and hold them accountable for engaging in predatory practices.

> Contrary to those promises, the complaint alleges that:

> • Barclays has never prohibited any trader from participating in its dark pool, regardless of how predatory its activity was determined to be;

> • Barclays did not regularly update the ratings of high-frequency trading firms monitored by Liquidity Profiling;

76

- Barclays "overrode" certain Liquidity Profiling ratings – including for some of its own internal trading desks that engaged in high-frequency trading – by assigning safe ratings to traders that were otherwise determined to be toxic.

The complaint further alleges that, contrary to Barclays' representations that it protects clients from aggressive or predatory high-frequency trading in its dark pool, Barclays in fact operates its dark pool to favor high-frequency traders and has actively sought to attract them by giving them systematic advantages over others trading in the pool.  As alleged in the complaint, this included:

- Falsely underrepresenting the concentration of aggressive high-frequency trading in its dark pool;

- Misrepresenting its "Liquidity Profiling" service – which Barclays claimed protected investors from predatory behavior – by failing to provide many of the benefits marketed with the service; and

- Claiming that Barclays does not favor its own dark pool when routing client orders to trading venues, while in fact doing just that.  As alleged in our Complaint, Barclays falsified an analysis of how it routed a major client's orders.

196.    On this news, Barclays' stock fell $1.16, or 7.38%, on extremely heavy volume of over 28 million shares, to close at $14.55 on June 26, 2014.

197.    On June 27, 2014, the Telegraph reported that "Barclays dark pool fine 'could top Libor'" and that while the "size of any potential fine is difficult to judge, [it is] estimated at more than £300m by analyst[s]."  On this news, on June 30, the next trading day, Barclays' stock dropped an additional 1.5%, on heavily traded volume of over 11 million shares.

198.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

77

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

199.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Barclays ADSs during the Class Period (the "Class"), and were damaged upon the revelation of the alleged corrective disclosures.   Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

200.    The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Barclays securities were actively traded on the NYSE.   While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by Barclays or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

201.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

202.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

78

203.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Barclays;

- whether the Individual Defendants caused Barclays to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Barclays securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

204.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

205.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

79

- the omissions and misrepresentations were material;

- Barclays securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold Barclays securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

206.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

207.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

208.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

209.   This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

210.   During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.   Such scheme was intended to, and, throughout the Class Period, did:   (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Barclays securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Barclays securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

211.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Barclays securities.   Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Barclays's finances and business prospects.

81

212.    By virtue of their positions at Barclays, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

213.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is also peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Barclays, the Individual Defendants had knowledge of the details of Barclays's internal affairs.

214.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Barclays.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Barclays's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price for Barclays' securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Barclays's business and financial condition which

were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Barclays securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

215.    During the Class Period, Barclays' securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Barclays securities at prices artificially inflated by Defendants' wrongful conduct.   Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Barclays securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Barclays securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

216.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

217.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure

that the Company had been disseminating false and misleading statements about Barclays' dark pool to the investing public.

## COUNT II

### Violation of Section 20(a) of
### The Exchange Act Against The Individual Defendants

218.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

219.     During the Class Period, the Individual Defendants participated in the operation and management of Barclays, and conducted and participated, directly and indirectly, in the conduct of Barclays's business affairs.  Because of their senior positions, they knew the adverse non-public information regarding Barclays' business practices and the operation of its dark pool.

220.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Barclays's business practices and the operation of its dark pool, and to correct promptly any public statements issued by Barclays which had become materially false or misleading.

221.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Barclays disseminated in the marketplace during the Class Period.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Barclays to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Barclays within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Barclays securities.

84

222.    Each of the Individual Defendants, therefore, acted as a controlling person of Barclays.  By reason of their senior management positions, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Barclays to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Barclays and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

223.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Barclays.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

85

Dated:  December 15,  2014                    Respectfully submitted,

                                              **POMERANTZ LLP**

                                              */s/Jeremy A. Lieberman*
                                              Jeremy A. Lieberman
                                              Emma Gilmore
                                              600 Third Avenue, 20th Floor
                                              New York, New York 10016
                                              Telephone:  (212) 661-1100
                                              Facsimile:  (212) 661-8665
                                              Email:  jalieberman@pomlaw.com
                                              Email: egilmore@pomlaw.com

                                              **POMERANTZ LLP**
                                              Patrick V. Dahlstrom
                                              10 South La Salle Street, Suite 3505
                                              Chicago, Illinois 60603
                                              Telephone:  (312) 377-1181
                                              Facsimile:  (312) 377-1184
                                              Email:  pdahlstrom@pomlaw.com

                                              *Attorneys for Plaintiff*