UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
                                            :

BARBARA STROUGO, Individually and on Behalf of  :
All Others Similarly Situated,                      :
                                            :
                        Plaintiff(s),         :
                                            :
                -against-          :     Civil Action No.:
                                          :     1:14-cv-05797-SAS
BARCLAYS PLC, BARCLAYS CAPITAL INC.,       :
ROBERT DIAMOND, ANTONY JENKINS,          :
CHRISTOPHER LUCAS, TUSHAR MORZARIA, and  :
WILLIAM WHITE,                       :
                                          :
                        Defendants.     :
                                          :
                                          :
------------------------------------------------------------------x

**DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED COMPLAINT**

January 20, 2015

# TABLE OF CONTENTS

*Page*

**PRELIMINARY STATEMENT** ................................................................1

**BACKGROUND** ...........................................................................4

    A.    The Defendants ...............................................................4

    B.    Barclays LX ...................................................................5

    C.    High Frequency Traders ...................................................5

    D.    Barclays LX Liquidity Profiling .......................................6

    E.    Plaintiffs' Allegations .....................................................8

        1.    Alleged Misstatements Regarding Barclays' Risk Controls and Commitment to Transparency and Compliance .........................8

        2.    Alleged Misstatements Regarding LX in Confidential Marketing Materials ...................................................9

        3.    Alleged Misstatements Regarding LX in News Articles and a Conference .............................................11

**STANDARD OF REVIEW** ...............................................................13

**ARGUMENT** ...............................................................................14

I.    **PLAINTIFFS CANNOT RELY ON ALLEGATIONS COPIED FROM THE NYAG COMPLAINT WITHOUT INVESTIGATION** .......................15

II.    **THE AMENDED COMPLAINT FAILS TO PLEAD ANY MATERIAL MISREPRESENTATIONS**.............................................17

    A.    The Amended Complaint Fails to Plead Any Actionable Misrepresentations Regarding Barclays' General Business Practices and Risk Controls .............................................17

        1.    It Is Black-Letter Law that Barclays' Generalized Statements About Its Business Practices and Risk Controls Are Inactionable Puffery.......................................18

        2.    Plaintiffs Have Not Alleged that Statements About Barclays' General Business Practices and Risk Controls Were Materially False or Misleading.......................................21

B.    The Amended Complaint Fails to Allege Any Material Misrepresentations Regarding LX or Liquidity Profiling......................................23

    1.    LX's Minor Effect on Barclays' Financial Success Renders the Alleged Misstatements Immaterial as a Matter of Law. ...........................23

    2.    Plaintiffs Cannot Allege Reliance on Non-Public Marketing Materials ........................................................................................... 25

    3.    Plaintiffs Fail to Meet the Basic Requirements of Rule 9(b) as to Many of the Alleged Misstatements ........................................... 28

    4.    Plaintiffs Have Not Alleged that Any of Barclays' Public Statements About LX or Liquidity Profiling Were Materially False or Misleading ...................................................................... 29

**III.    THE AMENDED COMPLAINT FAILS TO PLEAD SCIENTER** ...........................34

    A.    Plaintiffs Fail to Allege a Motive to Commit Fraud. ...............................34

    B.    Plaintiffs Fail to Allege That Any of Barclays' Employees Acted With Intent or Recklessness .................................................................36

    C.    Because the Amended Complaint Fails to Plead Scienter as to the Individual Defendants, it Fails as to Barclays as Well ..........................41

**IV.    THE AMENDED COMPLAINT FAILS TO PLEAD LOSS CAUSATION AS TO THE JUNE 27 TELEGRAPH ARTICLE** ..............................42

**V.    THE AMENDED COMPLAINT FAILS TO PLEAD CONTROL PERSON LIABILITY UNDER SECTION 20(A)** .......................................................43

**CONCLUSION** ................................................................................................44

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Amgen Inc.* v. *Conn. Ret. Plans & Trust Funds*,
    133 S. Ct. 1184 (2013)........................................................................................28

*Anschutz Corp.* v. *Merrill Lynch & Co.*,
    690 F.3d 98 (2d Cir. 2012)...........................................................................14, 28

*Ashcroft* v. *Iqbal*,
    556 U.S. 662 (2009)...........................................................................................13

*Avila* v. *Lease Fin. Grp., LLC*,
    2012 WL 3165408 (S.D.N.Y. July 31, 2012) ..................................................29

*Bell Atl. Corp.* v. *Twombly*,
    550 U.S. 544 (2007)...........................................................................................13

*Berks Cnty. Emps. Ret. Fund* v. *First Am. Corp.*,
    734 F. Supp. 2d 533 (S.D.N.Y. 2010)..............................................................29

*Boca Raton Firefighters & Police Pension Fund* v. *Bahash*,
    506 F. App'x. 32 (2d Cir. 2012) .......................................................................18

*C.D.T.S. No. 1* v. *UBS AG*,
    2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013) ..................................................19

*Cagan* v. *Gadman*,
    2012 WL 5422270 (E.D.N.Y. Oct. 31, 2012)...................................................24

*Caiafa* v. *Sea Containers Ltd.*,
    525 F. Supp. 2d 398 (S.D.N.Y. 2007)...............................................................16

*City of Dearborn Heights Act 345 Police & Fire R.* v. *Axonyx, Inc.*,
    374 F. App'x 83 (2d Cir. 2010) ........................................................................38

*City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*,
    752 F.3d 173 (2d Cir. 2014)..............................................................................18

*Conte* v. *Flota Mercante Del Estado*,
    227 F.2d 664 (2d Cir. 1960)..............................................................................24

*Defer LP* v. *Raymond James Fin., Inc.*,
    654 F. Supp. 2d 204 (S.D.N.Y. 2009)...............................................................35

*Dura Pharm., Inc.* v. *Broudo*,
    544 U.S. 336 (2005)................................................................................43

*ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)............................................................ *passim*

*Erica P. John Fund, Inc.* v. *Halliburton Co.*,
    131 S. Ct. 2179 (2011)............................................................................25

*Foley* v. *Transocean Ltd.*,
    861 F. Supp. 2d 197 (S.D.N.Y. 2012).............................................39, 40

*Geinko* v. *Padda*,
    2002 WL 276236 (N.D. Ill. Feb. 27, 2002) ..........................................16

*Gusinsky* v. *Barclays PLC*,
    944 F. Supp. 2d 279 (S.D.N.Y. 2013)..............................................19, 20

*Hutchison* v. *Deutsche Bank Sec. Inc.*,
    647 F.3d 479 (2d Cir. 2011)...................................................................25

*I. Meyer Pincus & Assocs., P.C.* v. *Oppenheimer & Co.*,
    936 F.2d 759 (2d Cir. 1991).....................................................................6

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*,
    2009 WL 1740035 (S.D.N.Y. June 17, 2009) ......................................25

*In re Austl. & N.Z. Banking Grp. Sec. Litig.*,
    2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009) .................................20, 21

*In re CIT Grp., Inc. Sec. Litig.*,
    349 F. Supp. 2d 685 (S.D.N.Y. 2004)....................................................22

*In re eSpeed, Inc. Sec. Litig.*,
    457 F. Supp. 2d 266 (S.D.N.Y. 2006)....................................................37

*In re FBR Inc. Sec. Litig.*,
    544 F. Supp. 2d 346 (S.D.N.Y. 2008)....................................................22

*In re Federated Dep't Stores, Inc., Sec. Litig.*,
    2004 WL 444559 (S.D.N.Y. Mar. 11, 2004) ........................................37

*In re Gentiva Sec. Litig.*,
    932 F. Supp. 2d 352 (E.D.N.Y. 2013) ...................................................19

*In re Gulf Oil/Cities Serv. Tender Offer Litig.*,
    725 F. Supp. 712 (S.D.N.Y. 1989)....................................................27, 28

*In re Initial Pub. Offering Sec. Litig.*,
   544 F. Supp. 2d 277 (S.D.N.Y. 2008).................................................................5

*In re ITT Educ. Servs., Inc. Sec. & S'holder Derivative Litig.*,
   859 F. Supp. 2d 572 (S.D.N.Y. 2012)..............................................................20

*In re Livent, Inc. Noteholders Sec. Litig.*,
   151 F. Supp. 2d 371 (S.D.N.Y. 2001)........................................................14, 33

*In re Lululemon Sec. Litig.*,
   14 F. Supp. 3d 553, 577-81 (S.D.N.Y. 2014) .................................................22

*In re Marsh & Mclennan Cos. Sec. Litig.*,
   501 F. Supp. 2d 452 (S.D.N.Y. 2006)..............................................................27

*In re Merrill Lynch Auction Rate Sec. Litig.*,
   851 F. Supp. 2d 512 (S.D.N.Y. 2012)..............................................................35

*In re Moody's Corp. Sec. Litig.*,
   274 F.R.D. 480 (S.D.N.Y. 2011) ................................................................26, 27

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010)........................................................................14, 43

*In re OSG Sec. Litig.*,
   12 F. Supp. 3d 619, 622 (S.D.N.Y. 2014).......................................................17

*In re OSG Sec. Litig.*,
   971 F. Supp. 2d 387 (S.D.N.Y. 2013)..............................................................37

*In re Par Pharm., Inc. Sec. Litig.*,
   733 F. Supp. 668 (S.D.N.Y. 1990)..............................................................20, 27

*In re PXRE Grp., Ltd. Sec. Litig.*,
   600 F. Supp. 2d 510 (S.D.N.Y. 2009)..............................................................39

*In re Refco, Inc. Sec. Litig.*,
   609 F. Supp. 2d 304 (S.D.N.Y. 2009)..............................................................28

*In re Salomon Analyst Level 3 Litig.*,
   373 F. Supp. 2d 248 (S.D.N.Y. 2005)..............................................................40

*In re Sec. Capital Assurance, Ltd. Sec. Litig.*,
   729 F. Supp. 2d 569 (S.D.N.Y. 2010)..............................................................37

*In re Smith Barney Transfer Agent Litig.*,
   884 F. Supp. 2d 152 (S.D.N.Y. 2012)..............................................................44

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008)............................................................37, 41, 43

*In re Tronox, Inc. Sec. Litig.*,
  2010 WL 2835545 (S.D.N.Y. June 28, 2010) ...................................................16, 17

*In re UBS AG Sec. Litig.*,
  2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012).........................................................16

*In re Wachovia Equity Sec. Litig.*,
  753 F. Supp. 2d 326 (S.D.N.Y. 2011)..........................................................30, 39, 40

*In re Waterford Wedgwood USA, Inc.*,
  500 B.R. 371 (Bankr. S.D.N.Y. 2013) ....................................................................24

*Janbay* v. *Canadian Solar, Inc.*,
  2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) .....................................................16, 43

*Janus Capital Group, Inc. v. First Derivative Traders*,
  131 S. Ct. 2296 (2011)........................................................................................18, 31

*Jones* v. *Perez*,
  550 F. App'x 24 (2d Cir. 2013) .................................................................................38

*Kalnit* v. *Eichler*,
  264 F.3d 131 (2d Cir. 2001)................................................................................34, 36

*Kuriakose* v. *Fed. Home Loan Mortg. Corp.*,
  897 F. Supp. 2d 168 (S.D.N.Y. 2012)................................................................23, 34

*Lentell* v. *Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005).....................................................................................42

*Lerner* v. *Fleet Bank, N.A.*,
  459 F.3d 273 (2d Cir. 2006).....................................................................................14

*Levitt* v. *J.P. Morgan Sec., Inc.*,
  710 F.3d 454 (2d Cir. 2013).....................................................................................27

*Local No. 38 IBEW Pension Fund* v. *Am. Express Co.*,
  724 F. Supp. 2d 447 (S.D.N.Y. 2010)................................................................37, 39

*Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund* v. *Am. Express Co.*,
  430 F. App'x 63 (2d Cir. 2011) ..........................................................................34, 38

*Low* v. *Robb*,
  2012 WL 173472 (S.D.N.Y. Jan. 20, 2012) .............................................................17

*Morrison* v. *Nat'l Austl. Bank Ltd.*,
 561 U.S. 247 (2010)......................................................................................1

*Newman* v. *Family Mgmt. Corp.*,
 530 F. App'x 21 (2d Cir. 2013) ...................................................................22

*Novak* v. *Kasaks*,
 216 F.3d 300 (2d Cir. 2000)........................................................................38

*Okla. Firefighters Pension & Ret. Sys.* v. *Student Loan Corp.*,
 951 F. Supp. 2d 479 (S.D.N.Y. 2013)..........................................................40

*Plumbers' & Pipefitters' Local # 562 Supp. Plan & Trust* v. *J.P. Morgan
  Acceptance Corp. I*,
 2012 WL 601448 (E.D.N.Y. Feb. 23, 2012)..................................................15

*Plumbers & Pipefitters Local Union No. 719 Pension Trust Fund* v. *Conseco Inc.*,
 2011 WL 1198712 (S.D.N.Y. Mar. 30, 2011) ...............................................41

*Plumbers & Steamfitters Local 773 Pension Fund* v. *Canadian Imperial Bank of
  Commerce*,
 694 F. Supp. 2d 287 (S.D.N.Y. 2010)..........................................................37

*Resnik* v. *Swartz*,
 303 F.3d 147 (2d Cir. 2002).........................................................................27

*Rombach* v. *Chang*,
 355 F.3d 164 (2d Cir. 2004).........................................................................30

*Roth* v. *Jennings*,
 489 F.3d 499 (2d Cir. 2007)...........................................................................6

*RSM Prod. Corp.* v. *Fridman*,
 643 F. Supp. 2d 382 (S.D.N.Y. 2009)..........................................................17

*Rubinstein* v. *Skyteller, Inc.*,
 48 F. Supp. 2d 315 (S.D.N.Y. 1999).............................................................44

*Russo* v. *Bruce*,
 777 F. Supp. 2d (S.D.N.Y. 2011).................................................................41

*Saltz* v. *First Frontier, L.P.*,
 485 F. App'x 461 (2d Cir. 2012) ..................................................................35

*Schwartz* v. *Novo Industri, A/S*,
 658 F. Supp. 795 (S.D.N.Y. 1987)...............................................................29

*SEC* v. *First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Cir. 1996)..........................................................................44

*Shemian* v. *Research In Motion Ltd.*,
    2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) ...........................................35

*Silsby* v. *Icahn*,
    17 F. Supp. 3d 348, 362 (S.D.N.Y. 2014).........................................21, 27

*Special Situations Fund III QP, L.P.* v. *Deloitte Touche Tohmatsu CPA, Ltd.*,
    2014 WL 3605540 (S.D.N.Y. July 21, 2014) ....................................43, 44

*Staehr* v. *Hartford Fin. Servs. Grp., Inc.*,
    547 F.3d 406 (2d Cir. 2008)........................................................................15

*Starr ex rel. Estate of Sampson* v. *Georgeson S'holder, Inc.*,
    412 F.3d 103 (2d Cir. 2005)........................................................................26

*State* v. *Rachmani Corp.*,
    71 N.Y.2d 718 (1988) (discussing N.Y. Gen. Bus. Law § 352-c(1)) .....................................15

*Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta*,
    552 U.S. 148 (2008)........................................................................26, 27, 28

*Stratte-McClure* v. *Morgan Stanley*,
    784 F. Supp. 2d 373 (S.D.N.Y. 2011)........................................................19

*Tabak* v. *Canadian Solar Inc.*,
    549 F. App'x 24 (2d Cir. 2013) ...........................................................23, 24

*Teamsters Local 445 Freight Div. Pension Fund* v. *Bombardier Inc.*,
    2005 WL 2148919 (S.D.N.Y. Sept. 6, 2005)............................................44

*Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008)..........................................................34, 35, 41

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...............................................................................14, 34

*VNB Realty, Inc.* v. *Bank of Am. Corp.*,
    2013 WL 5179197 (S.D.N.Y. Sept. 16, 2013).........................................16

*Wilson* v. *Comtech Telecomm. Corp.*,
    648 F.2d 88 (2d Cir. 1981)..........................................................................26

**Statutes**

Private Securities Litigation Reform Act, 15 U.S.C.
§ 78u-4 ............................................................................................ *passim*
§ 78u-5 ............................................................................................23

Securities Exchange Act of 1934, 15 U.S.C.
§ 78c ..............................................................................................5
§ 78j ...............................................................................1, 14, 15
§ 78t ...............................................................................1, 15

N.Y. Exec. Law § 63(12) ....................................................................8

Martin Act, N.Y. Gen. Bus. Law § 352 ................................................8, 15

**Regulations**

17 C.F.R.
§ 240.3b-16 ....................................................................................5
§ 240.10b-5 ....................................................................................1
§ 242.300 ........................................................................................5
§ 242.301 ........................................................................................5
§ 242.302 ........................................................................................5
§ 242.303 ........................................................................................5
§ 242.602 ........................................................................................5

**Rules**

Federal Rules of Civil Procedure,
Rule 9 ............................................................................1, 14, 16, 28
Rule 11 ..........................................................................2, 16, 17
Rule 12 ..........................................................................1, 17

**Other Authorities**

Concept Release on Equity Market Structure, Exchange Act Release No. 34-
61358, 75 Fed. Reg. 3594 (Jan. 21, 2010) .......................................5, 6

Regulation of Non-Public Trading Interest, Exchange Act Release No. 34-60997,
74 Fed. Reg. 61,208 (Nov. 23, 2009) .............................................5

SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150 (Aug. 19, 1999) ............................25

Self-Regulatory Organizations, Exchange Act Release No. 34-59039, 73 Fed.
Reg. 74770 (Dec. 9, 2008) ............................................................5

Pursuant to the Private Securities Litigation Reform Act of 1995 ("Reform Act") and Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, defendants Barclays PLC, Barclays Capital Inc. (together, "Barclays"), current Barclays employees Antony Jenkins, Tushar Morzaria and William White, and former Barclays employees Robert Diamond and Christopher Lucas (collectively, the "Individual Defendants") hereby move this Court to dismiss with prejudice plaintiffs' claims brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5(b) thereunder, in the Consolidated Amended Complaint ("Amended Complaint" or "AC").

## PRELIMINARY STATEMENT

Plaintiffs have filed an 86-page Amended Complaint alleging that Barclays secretly advantaged high frequency traders ("HFTs") over other Barclays clients who used Barclays LX ("LX"), an Alternative Trading System ("ATS") used by highly sophisticated investment professionals to trade securities.  Plaintiffs allege that this purported misconduct made defendants' statements as to (i) the bank's general business practices and risk controls, and (ii) LX's protections against supposedly aggressive HFTs, materially false and misleading. Plaintiffs contend that the filing of a lawsuit by the New York Attorney General ("NYAG") (against Barclays, but not against any of the Individual Defendants) revealed the alleged misstatements and caused a drop in the price of Barclays' American Depository Shares ("ADSs").[1]

---

[1]      Under the U.S. Supreme Court's decision in *Morrison* v. *National Australia Bank Ltd.*, 561 U.S. 247 (2010), plaintiffs have limited the putative class to investors who purchased Barclays ADSs.  (AC ¶ 1.)

For all its girth, the Amended Complaint fails to meet even the most basic legal standards under the Reform Act and should therefore be dismissed with prejudice against all defendants, for several independent reasons.

*First*, the Court should strike plaintiffs' allegations because they are premised entirely and impermissibly on the NYAG's unadjudicated complaint.  Plaintiffs have not met their duty under Rule 11 to conduct an independent investigation and, accordingly, the Court should strike plaintiffs' allegations.

*Second*, plaintiffs fail to plead any material misrepresentations.  Plaintiffs attack two sets of alleged misstatements:  (i) generalized statements regarding Barclays' business practices and risk management; and (ii) statements concerning aspects of LX, many of which were made not publicly to the market, but to LX clients in private communications.  As a matter of law, this Court and other courts in this District have routinely dismissed claims regarding generalized statements about business and risk management as inactionable "puffery" because no reasonable investor could rely on such generalized statements.  Moreover, plaintiffs "fail[] to match [their] theory of fraud" to those statements, as the statements do not even mention LX. And the very documents allegedly containing misrepresentations about Barclays' risk controls openly state that such controls are "designed to manage rather than eliminate the risk of failure . . . and can only provide reasonable and not absolute assurance against material misstatement or loss."

As to the statements about LX in particular, such statements are immaterial as a matter of law because LX represented a potential growth opportunity of "between $37 and $50 million per year" (AC ¶ 54), whereas Barclays' yearly revenue during the putative class period was between approximately $42.5 and $54.9 billion.  In other words, revenues from LX

contributed approximately 0.1% of Barclays' total revenue, well below the 5% threshold courts in this Circuit typically have found necessary to allege materiality. Moreover, even if plaintiffs could overcome the fact that Barclays' alleged misstatements were immaterial, many of the alleged misstatements were never made to either plaintiffs or the public, and so cannot support a securities fraud claim. And, in any event, a basic review of the documents plaintiffs reference in the Amended Complaint demonstrates that none of the alleged misstatements was false or misleading, as Barclays clearly disclosed the level of HFTs and "aggressive" trading in LX, and accurately marketed LX as a platform on which clients could benefit from the liquidity provided by HFTs while reducing clients' exposure to "aggressive" order flow.

*Third*, plaintiffs do not allege any facts supporting the "strong inference" of scienter against either Barclays or any of the Individual Defendants required to survive a motion to dismiss under the Reform Act. Plaintiffs fail to tie Messrs. Jenkins, Morzaria, Diamond, and Lucas—all current or former executive officers of Barclays PLC based in London—in any way whatsoever to LX, which was run by a small group of Barclays employees based in New York and contributed only one one-thousandth of Barclays' total revenue. Notably, plaintiffs do not allege that any of these four Individual Defendants knew about LX, much less that they had involvement with it or engaged in misconduct or misrepresentations with respect to it. As for Mr. White, plaintiffs have failed adequately to allege that his statements were misleading, much less that they support a "strong inference" of scienter. Moreover, plaintiffs provide no cognizable motive for anyone at Barclays to defraud Barclays ADS holders. Even if Barclays employees had made misrepresentations to clients to increase profits and grow LX, that would show nothing more than a misguided attempt by some employees to improve returns *for Barclays' ADS holders*, the very members of the putative class.

*Fourth*, the Amended Complaint fails to allege loss causation as to the alleged drop in share price following a June 27, 2014 "Telegraph" article reporting speculation about the size of the fine Barclays might have to pay as a result of the NYAG's June 25, 2014 complaint. Plaintiffs cannot recover damages for changes in Barclays PLC's ADS price allegedly due to a newspaper's speculation about the amount of a fine Barclays might have to pay based on allegations made days earlier.

*Finally*, because plaintiffs have failed to allege a primary violation of Section 10(b), they likewise cannot state a claim under Section 20(a), as it is black-letter law that Section 20(a) liability is merely derivative of Section 10(b) liability.  Nor have plaintiffs come close to alleging the "culpable participation" necessary to plead a Section 20(a) claim.

Accordingly, the Court should dismiss the Amended Complaint with prejudice.

## BACKGROUND

### A.    The Defendants

Barclays PLC is a financial services company based in England.  (AC ¶ 15.)  Its indirect subsidiary, Barclays Capital Inc., has its primary offices in New York City and operates an ATS called Barclays LX.  (AC ¶¶ 15-16.)  Robert Diamond was Barclays PLC's Chief Executive Officer from January 2011 until July 3, 2012, and in August 2012 Antony Jenkins assumed that role.  (AC ¶¶ 17-18.)  From April 1, 2007 until August 2013, Christopher Lucas served as Barclays PLC's Finance Director; Tushar Morzaria took over that position in October 2013.  (AC ¶¶ 19-20.)  William White is the Head of Equities Electronic Trading at Barclays Capital Inc. in New York.  (AC ¶ 21.)

B.      **Barclays LX**

        Barclays LX is an ATS regulated by the SEC.  ATSs perform many of the same functions that national exchanges do, such as receiving and matching buy and sell orders.  *See* 15 U.S.C. § 78c(a)(1); 17 C.F.R. § 240.3b-16(a); SEC Regulation ATS, 17 C.F.R. §§ 242.300-.303. Unlike national exchanges, however, ATSs are not required to provide pricing and order data to the public in real time.  *Compare* 17 C.F.R. § 242.301(b)(3) *and* AC ¶ 51, *with* 17 C.F.R. § 242.602(a).  Indeed, the SEC recognizes that keeping trading data confidential can benefit investors that wish to trade large volumes of stocks without influencing the prices of those stocks.[2]  When an investor places a sell order on a "lit" venue, such as the New York Stock Exchange, the exchange immediately broadcasts the price and quantity that the investor is seeking to sell.  In response to the supply of shares for sale, the market price may drop.  "Dark" pools (such as LX) do not publicly disclose the price or size of pending orders.  (AC ¶ 40.)  As a result, investors can trade with a lower risk of moving the market price.  *See id*.; 74 Fed. Reg. at 61209.

C.      **High Frequency Traders**

        HFTs are a subset of Electronic Liquidity Providers ("ELPs") on LX.  (*See* Ex. 1 (December 2012 Marketing Deck), at 9.)[3]  HFTs use computers to make a large number of trades

---

[2]      *See* Regulation of Non-Public Trading Interest, Exchange Act Release No. 34-60997, 74 Fed. Reg. 61208, 61208-09 (Nov. 23, 2009); *see also* Self-Regulatory Organizations, Exchange Act Release No. 34-59039, 73 Fed. Reg. 74770, 74782 n.206 (Dec. 9, 2008); Concept Release on Equity Market Structure, Exchange Act Release No. 34-61358, 75 Fed. Reg. 3594, 3599 (Jan. 21, 2010).

[3]      All references to "Ex." refer to the exhibits to the Declaration of Jeffrey T. Scott, dated January 20, 2015.  This Court can consider the entirety of the documents on which plaintiffs rely in the Amended Complaint in resolving this motion to dismiss.  *See In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 284 (S.D.N.Y. 2008) (in deciding a motion to dismiss a court may "consider any written instrument attached to the complaint, statements or documents
*(footnote continued)*

very quickly to profit from small changes in the prices of securities.  (AC ¶ 42.)  According to the Amended Complaint, some HFTs "gauge supply and demand and recognize movements in market sentiment before other traders."  (AC ¶ 42.)  These HFTs then allegedly try to "trade ahead" of the investor who placed the order—for example, buying shares before the investor can, and then selling the shares to the investor at a higher price.  (AC ¶ 42.)

Although some HFTs have been criticized for strategies based on "trading ahead" of other investors, the SEC has noted that many "HFT strategies appear to have beneficial effects on market quality, such as by reducing spreads and reducing intraday volatility."[4]  SEC Chairwoman Mary Jo White has noted that computerized trading has benefitted the market and that "investors are doing better in today's algorithmic marketplace than they did in the old manual markets."[5]

### D.    Barclays LX Liquidity Profiling

Prior to 2011, Barclays segmented its clients using LX into four groups: (i) institutional investors, (ii) broker-dealers, (iii) ELPs, which includes HFTs, and (iv) Barclays

---

(*footnote continued*)
incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." (quotation marks omitted)); *see also Roth* v. *Jennings*, 489 F.3d 499, 509 (2d Cir. 2007); *I. Meyer Pincus & Assocs., P.C.* v. *Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991) (court can consider a document containing alleged misrepresentations even if the "plaintiff has chosen not to attach the [document] to the complaint").

[4]       SEC Div. of Trading & Markets, *Equity Market Structure Literature Review, Part II: High Frequency Trading* 9 (Mar. 18, 2014), *available at* http://www.sec.gov/marketstructure/ research/ hft_lit_review_march_2014.pdf; *see also* Concept Release, 75 Fed. Reg. at 3607 ("[S]ome [HFT] strategies may benefit market quality and long-term investors and others could be harmful.").

[5]       *Enhancing Our Equity Market Structure*, Speech at the Sandler O'Neill & Partners, L.P. Global Exchange and Brokerage Conference (June 5, 2014), *available at* http://www.sec.gov /News/Speech /Detail/ Speech/1370542004312#.VLbG2f7wuzd.

internal traders.  (*See* Ex. 1 (December 2012 Marketing Deck), at 9.)  LX clients had the option of restricting which of these segments could trade against their buy or sell orders.  (*See id*.)  For example, a Barclays client could specify that it wanted to prohibit ELPs (as opposed to other categories of users) from executing against the client's orders.  This LX feature is known as "counterparty blocking."

In 2011, Barclays introduced an optional client service called "Liquidity Profiling."  (AC ¶ 66.)  In confidential marketing materials that described this service to clients, Barclays explained that the ELP segment "include[s] both aggressive and *passive* liquidity providers" and "contains . . . beneficial liquidity," not just "aggressive" order flow.  (*See* Ex. 1 (December 2012 Marketing Deck), at 9-10.)  Barclays grouped traders using LX into categories based on their past trading behavior on LX.  (*Id*.)  Liquidity Profiling gave the Barclays clients who chose to use it the option to block counterparties based on whether Barclays rated that counterparty's trading as "aggressive," "neutral," or "passive."  (AC ¶ 66.)  That way, clients who elected to use Liquidity Profiling could allow "neutral" or "passive" ELPs (or other LX clients) to execute against the client's orders, while limiting exposure to "aggressive" ELPs (and other LX clients).  (AC ¶ 66.)  Counterparty blocking was an optional service that only some clients used.  (AC ¶ 66.)  Barclays did not discuss the service publicly beyond brief summaries in news articles, press releases and industry conferences.  Plaintiffs do not—and cannot—allege that more than a few dozen Barclays clients (out of hundreds using LX) ever used Liquidity Profiling, or that the availability of this service had any effect on the price of Barclays ADSs.

In addition to categorizing clients as part of the counterparty blocking service, Barclays stated that it monitored several metrics on LX.  (AC ¶ 193.)  In a *Traders Magazine* article, Mr. White explained that Barclays employees monitoring LX "can go back to specific

high frequency clients to discuss their liquidity profile if a portion is deemed not to be in accordance with our standards."  (AC ¶ 122.)

E.     **Plaintiffs' Allegations**

On June 25, 2014, the NYAG filed a complaint against Barclays, pleading claims under New York's Martin Act and Executive Law § 63(12).  *People ex rel. Schneiderman* v. *Barclays Capita*l, *Inc.*, No. 451391/2014 (N.Y. Sup. Ct., N.Y. Cnty., filed June 25, 2014).  The NYAG publicly acknowledged that his Martin Act claims do not require scienter allegations, or allegations that anyone relied on Barclays' alleged misstatements—the opposite of what is required under federal securities laws.  (Brief for Plaintiff In Opposition to Defendant's Motion to Dismiss, at 10, *People ex rel. Schneiderman* v. *Barclays Capital, Inc.*, No. 451391/2014 (N.Y. Sup. Ct., N.Y. Cnty., filed Sept. 16, 2014).)  The NYAG alleged that some of Barclays' marketing materials for LX, such as a pitchbook and a two-page marketing flyer, contained false or misleading statements to LX customers.  Barclays moved to dismiss the NYAG's complaint on July 24, and oral argument was held on December 18.

Based solely on the NYAG's complaint, plaintiffs now make several allegations of fraud against Barclays.

1.     **Alleged Misstatements Regarding Barclays' Risk Controls and Commitment to Transparency and Compliance**

Plaintiffs allege the following misstatements related to Barclays' general business practices related to risk controls and compliance:[6]

---

[6]     The alleged misstatements in this section are the only ones attributed to any Individual Defendant other than Mr. White.  Thus, no Individual Defendant other than Mr. White is alleged to have made any statements about LX whatsoever, and Mr. Diamond is not alleged to have made any statements at all.  (*See generally* AC ¶¶ 121-94 (specifying each alleged misstatement).)

*Risk Controls*.  In SEC filings, Barclays PLC said that it "has operated a system of risk management and internal control, which provides reasonable assurance of effective and efficient operations covering all controls, including . . . compliance with laws and regulations." (AC ¶ 147; *see also* ¶¶ 130, 149, 176, 186, 188.)  Because Barclays allegedly made false or misleading statements in marketing materials for LX, plaintiffs allege that "Barclays did not have sufficient internal controls."  (AC ¶ 148.)  Although not mentioned in the Amended Complaint, other portions of the same SEC filings disclosed that Barclays' risk controls are "designed to manage rather than eliminate the risk," and that its "[i]nternal control systems, no matter how well designed, have inherent limitations and may not prevent or detect misstatements."  (Ex. 2 (Barclays PLC, 2012 Annual Report (Form 20-F) (Mar. 13, 2013)), at 32-33; Ex. 3 (Barclays PLC, 2013 Annual Report (Form 20-F) (Mar. 9, 2014)), at 56-57.)

*Commitment to Transparency and Compliance*.  Barclays PLC issued a press release and other documents that "set out commitments for the future," including a general commitment that Barclays would "provide greater disclosure and transparency around [its] financial performance."  (AC ¶ 140, *see also* ¶¶ 134, 137-38, 153, 155, 157, 159, 161, 190.) Plaintiffs allege that these general statements about transparency were misleading because "Barclays' top brass continued to act unethically and dishonestly" by making false or misleading statements about LX.  (*See, e.g.*, AC ¶ 135.)

## 2.   Alleged Misstatements Regarding LX in Confidential Marketing Materials

Plaintiffs allege that Barclays made the following misstatements about LX in confidential marketing materials given to select Barclays clients.  Plaintiffs do not allege that they ever saw these confidential statements or that they were otherwise made public:

*Liquidity Landscape Chart*.  Barclays prepared a marketing flyer for institutional clients titled "Liquidity Profiling—Protecting You [*sic*][7] in the Dark."  (AC ¶ 132; *see also id.* ¶ 75.)  One version of the flyer contained a chart that allegedly misrepresented the extent of trading by ELPs on LX because Tradebot, supposedly "one of the largest and most toxic [ELP] participants in the dark pool," was not included on the chart.  (AC ¶ 133.)  Plaintiffs do not allege that this version of the flyer was ever disclosed publicly or to Barclays ADS holders.  In fact, when presenting at an industry conference hosted by the American Enterprise Institute ("AEI"), Mr. White used a version of the flyer that included Tradebot.  (*See* Ex. 5 (AEI presentation slides), at 6.)  Plaintiffs do not allege that the version of the flyer used at the AEI conference was false or misleading.

*Counterparty Blocking*.  Plaintiffs allege that Barclays gave some clients confidential marketing materials that described factors Barclays considered in assigning the Liquidity Profiling ratings that clients could use to block "aggressive" counterparties (AC ¶¶ 100-01; Ex. 6 (Attachment 5, 20-day summary provided to client)), and that Barclays did not disclose to its clients that (i) the Liquidity Profiling ratings were not based solely "on objective profiling criteria" for some traders (AC ¶¶ 93, 123, 128, 143, 145), and (ii) the Liquidity Profiling ratings and counterparty blocking feature did not apply to some interactions in LX (AC ¶¶ 45-46, 64; *see infra* p. 32).  The materials Barclays provided to clients disclosed that "Barclays reserves the right as operators of LX to override the profile of any participant."  (Ex. 6 (Attachment 5, 20-day summary provided to a client).)  In addition, plaintiffs do not allege that

---

[7]     The flyer's actual title is "LX® Liquidity Profiling – Protecting clients in the dark." (Ex. 4.)  The NYAG complaint made this same mistake.  (*See* NYAG Complaint ¶¶ 35, 65.)

Barclays made any public statements or any statements to Barclays ADS holders about how Liquidity Profiling ratings were assigned during the relevant period.[8]

   **_Latency Arbitrage_**.  Barclays allegedly indicated in internal documents "that it used ultra-fast 'direct data feeds'" for its customers' orders placed in LX in order "to deter latency arbitrage" (a form of aggressive trading by ELPs).  (AC ¶ 102; *see also* Ex. 8 (Barclays LX® FAQs), at 1 (stating LX uses "direct exchange feeds"); Ex. 9 (Electronic Trading Products and Order Handling:  Internal Fact Sheet and FAQs), at 1 (mentioning "direct data feeds")).)  Plaintiffs allege that "Barclays in fact processed that market data so slowly as to allow latency arbitrage."  (AC ¶ 102.)  Plaintiffs do not allege that Barclays did not use "direct data feeds," as it said.

   **_Internalization Statistic_**.  In a confidential presentation prepared for a single institutional client, Barclays allegedly misstated its "internalization rate" (*i.e.*, the percentage of orders that Barclays routed to LX, rather than a third-party venue).  (AC ¶¶ 109-12.)  Plaintiffs do not allege that this statistic was given to anyone but that one client, and certainly not to the plaintiffs.

### 3.  Alleged Misstatements Regarding LX in News Articles and a Conference

   Plaintiffs allege that Mr. White—but none of the other Individual Defendants—made certain misstatements about LX and Liquidity Profiling in news articles and a presentation at the AEI conference.  (*E.g.*, AC ¶¶ 122-28.)  Plaintiffs do not allege that they saw these articles

---

[8] Prior to June 2014 (when plaintiffs allege that the truth about LX had emerged (*see* AC ¶ 195), Barclays' only allegedly public statements about the counterparty blocking service were that (i) with Liquidity Profiling, "[c]lients can . . . choose which trading styles they interact with" (AC ¶ 167 (Barclays press release)), and (ii) "[c]lients can . . . look at what pools of liquidity they want to trade with" (AC ¶ 171; Ex. 7 (June 2013 Hedgeweek article quoting Mr. White), at 12).  Plaintiffs cannot and do not allege that these statements were false.  (*See* AC ¶¶ 168, 172.)

or this presentation, or that the alleged misstatements were material to any Barclays PLC investor.  Nor do plaintiffs allege that Mr. White intended to affect Barclays' stock price by making these comments about a single service—offered by a Barclays subsidiary—comprising approximately 0.1% of Barclays' revenue.

       ***Commitment to Transparency***.  Mr. White allegedly said in trade journals and in a comment letter to the Financial Industry Regulatory Authority that, with respect to LX, "the biggest theme of the [2013] year was transparency," and that "Barclays[] belie[ves] that transparency is not only important but benefits both our clients and the market."  (AC ¶¶ 165, 169, 181, 183.)  Plaintiffs do not allege that Barclays or Mr. White said that they would provide any specific information to clients or ADS holders that they did not provide.

       ***LX's Safeguards***.  Mr. White allegedly said in trade journal articles and in slides he used at the AEI conference that (i) Barclays "monitor[ed] client orders continuously" on LX (AC ¶ 122), (ii) Barclays has "controls" and "safeguards to manage toxicity" on LX and "can take corrective action" if necessary (AC ¶¶ 144, 151, 163), and (iii) "[b]y understanding the characteristics of flow at the client level, Barclays can improve the overall quality of LX liquidity: . . . high alpha takers [*i.e.*, aggressive traders] can be held accountable, e.g., by demanding liquidity providing strategies, or by refusing a client access" (AC ¶ 127; Ex. 5 (AEI presentation slides), at 6).  Plaintiffs allege that these and similar statements were misleading because Barclays did not disclose that it (i) did not "eliminate traders who . . . behave[d] in a predatory manner" and did not "restrict predatory traders' access" to LX, (ii) "did not monitor client orders continuously," and (iii) did not apply Liquidity Profiling to some trading activity in LX.  (AC ¶¶ 123, 128, 143, 145, 152, 164, 167, 172, 194.)   As shown below (*infra*

Section II.B.4), plaintiffs allege neither that Barclays failed to monitor LX regularly nor that Barclays failed to take corrective action when appropriate.

> **Order Routing**.  Slides that Mr. White used at the AEI conference indicated that Barclays' order router would "send[] orders to . . . venues with the greatest likelihood of fill" (AC ¶ 125), and Mr. White allegedly told trade journals that Barclays' order router "constantly examines market conditions in real time and adjusts its order-handling strategy immediately" (AC ¶ 163).  Plaintiffs contend that these statements were misleading because Barclays did not disclose that (i) "an internal analysis" found that orders unfilled on LX were "routed disproportionately to other trading venues based on where Barclays had been most profitable" (AC ¶ 126; *see also* ¶¶ 105, 108), and (ii) two unnamed witnesses found, based on a sample of trade data, that client orders were routed to LX at "a high rate" (AC ¶ 108).  Plaintiffs do not allege that any order routed to LX would have had a higher probability of fill (or better execution) on another venue.

*         *         *

The material allegations in the Amended Complaint are based solely on the NYAG's unadjudicated complaint—which alleged a fraud perpetrated on LX clients, not Barclays ADS holders.  Plaintiffs appear to have done no independent investigation to support their claims.

## STANDARD OF REVIEW

The Court must dismiss a complaint if it fails to plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007).  The Court should not accept as true "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009), or allegations "that are contradicted either by statements in the complaint itself or by documents

-13-

upon which its pleadings rely, or by facts of which the court may take judicial notice," *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001).

Because plaintiffs' claims arise under Section 10(b) of the Exchange Act (AC ¶¶ 208-17, 222), the Amended Complaint must satisfy the heightened pleading requirements of Rule 9(b) and the Reform Act.  *Anschutz Corp.* v. *Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012).  Rule 9(b) requires a plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Lerner* v. *Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006).  The Reform Act requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading," and "state with particularity facts giving rise to a strong inference that the defendant acted with [scienter]."  15 U.S.C. § 78u-4(b)(1)-(2).  A complaint can survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw."  *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

## ARGUMENT

"To sustain a claim under Section 10(b), [a plaintiff] must show (i) a material misrepresentation or omission; (ii) scienter; (iii) a connection with the purchase or sale of a security; (iv) reliance by the plaintiff(s); (v) economic loss; and (vi) loss causation."  *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (quoting *Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336, 341-42 (2005)) (internal quotation marks and brackets omitted).  Even setting aside that plaintiffs' allegations are impermissibly copied and pasted from an unadjudicated complaint without investigation (*infra* Section I), plaintiffs fail to allege any facts showing that Barclays made any material misrepresentation (*infra* Section II), that the alleged

misrepresentations give rise to a "strong inference" of scienter (*infra* Section III), or that plaintiffs incurred any losses proximately caused by Barclays' alleged misconduct (*infra* Section IV).[9]  And because the Amended Complaint fails to state a claim under Section 10(b), it likewise fails to state a derivative claim under Section 20(a).  (*Infra* Section V.)

## I.     PLAINTIFFS CANNOT RELY ON ALLEGATIONS COPIED FROM THE NYAG COMPLAINT WITHOUT INVESTIGATION.

As a preliminary matter, this Court should strike plaintiffs' allegations or, in the alternative, give the allegations no weight because they are entirely (and impermissibly) premised on an unadjudicated complaint brought by the NYAG—under laws that require neither scienter or reliance (*supra* note 9)—without any investigation by plaintiffs as to their truth or falsity.  For example, apparently misreading the NYAG complaint, plaintiffs allege that Barclays stated, in certain industry publications, that it could "refuse a client access" to LX.  (AC ¶ 67 & n.6.)  But no such statement appears in the industry publications plaintiffs cite.[10]  Similarly, plaintiffs claim that Barclays defrauded its ADS holders through a marketing flyer referenced in the NYAG complaint (AC ¶ 75), but plaintiffs do not allege that this flyer was ever seen by a single Barclays investor, and plaintiffs reproduced a transcription error that the NYAG made in

---

[9]     Notably, under the Martin Act—the primary New York statute at issue in the NYAG complaint—reliance, scienter, and loss causation are not required elements.  *See State* v. *Rachmani Corp.*, 71 N.Y.2d 718, 725-26 (1988) (discussing N.Y. Gen. Bus. Law § 352-c(1)).  The fact that plaintiffs' allegations against Barclays are copied almost exclusively (and word for word) from a complaint that does not allege these elements underscores that those elements are not satisfied here.

[10]     The Court can take judicial notice of the fact that the publications plaintiffs cite do not contain the statement plaintiffs have alleged.  *See Staehr* v. *Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008); *Plumbers' & Pipefitters' Local # 562 Supp. Plan & Trust* v. *J.P. Morgan Acceptance Corp. I*, 2012 WL 601448, at *11 (E.D.N.Y. Feb. 23, 2012).  The allegations plaintiffs copy from the NYAG complaint relate to a confidential pitchbook—not a public statement.  (Ex. 10 (July 2013 Marketing Deck), at 4.)  Plaintiffs cannot establish "reliance" on that confidential document.  (*See infra* Section II.B.2.)

the title of the flyer—demonstrating that plaintiffs clearly copied the NYAG's allegations verbatim without independent investigation.[11]   Moreover, plaintiffs claim that Mr. White "represented that Liquidity Profiling lets Barclays 'make sure that we have very good participants in our pool.'"   (AC ¶ 68.)   But that statement *was not even made by Mr. White*—it comes from a magazine article in which William *Bell*, a former Barclays employee who is not a defendant here, is being quoted.   (*See* Ex. 11 (Traders Magazine Online News Article dated July 25, 2013), at 4.)   The NYAG complaint made the same mistake.   (*See* NYAG Complaint ¶ 29.)

By relying entirely on the NYAG complaint, plaintiffs have "sidestep[ped] the requirements of Rule 11," *Geinko* v. *Padda*, 2002 WL 276236, at *6 (N.D. Ill. Feb. 27, 2002), and violated "counsel's 'personal, non-delegable responsibility' under Rule 11 to 'validate the truth and legal reasonableness of the papers filed.'"   *VNB Realty, Inc.* v. *Bank of Am. Corp.*, 2013 WL 5179197, at *7 (S.D.N.Y. Sept. 16, 2013) (quoting *Pavelic & LeFlore* v. *Marvel Entm't Grp.*, 493 U.S. 120, 126 (1989)).   The Court should not consider allegations "taken directly from uncorroborated allegations embedded in a complaint in another action," where, as here, "counsel has not conducted independent investigation" as required by Rule 11.   *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *17 n.17 (S.D.N.Y. Sept. 28, 2012); *see also In re Tronox, Inc. Sec. Litig.*, 2010 WL 2835545, at *6 (S.D.N.Y. June 28, 2010) (citing *Geinko*, 2002 WL 276236, at *5-6); *Caiafa* v. *Sea Containers Ltd.*, 525 F. Supp. 2d 398, 411 (S.D.N.Y. 2007) ("[A]llegations . . . contained in pleadings from an unrelated lawsuit . . . are inadmissible.").   This reasoning is amplified by the increased pleading requirements of the Reform Act and Rule 9(b).   *See Janbay* v. *Canadian Solar, Inc.*, 2012 WL 1080306, at *5 (S.D.N.Y. Mar. 30, 2012) ("Allegations

---

[11]   Plaintiffs alleged that the flyer was titled "Liquidity Profiling — Protecting You [*sic*] in the Dark."   The flyer's actual title is "LX® Liquidity Profiling – Protecting clients in the dark." (Ex. 4.)   The NYAG complaint made this same mistake.   (*See* NYAG Complaint ¶¶ 35, 65.)

contained in the complaint of an unrelated matter . . . cannot establish the particularized facts necessary to support [a] securities fraud claim.").  Moreover, courts in this District routinely strike parroted allegations under Rule 12(f).  *See, e.g.*, *RSM Prod. Corp.* v. *Fridman*, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009), *aff'd*, 387 F. App'x 72 (2d Cir. 2010); *Low* v. *Robb*, 2012 WL 173472, at *9 (S.D.N.Y. Jan. 20, 2012).[12]  The Court should do the same here.[13]

## II.    THE AMENDED COMPLAINT FAILS TO PLEAD ANY MATERIAL MISREPRESENTATIONS.

### A.    The Amended Complaint Fails to Plead Any Actionable Misrepresentations Regarding Barclays' General Business Practices and Risk Controls.

Plaintiffs devote eighteen paragraphs of the Amended Complaint to generalized statements about Barclays' business practices that constitute non-actionable puffery and were neither material nor false or misleading.  (AC ¶¶ 130, 134, 137-38, 140, 146-47, 149, 153, 155, 157, 159, 161, 176, 185-86, 188, 190.)  Because these generalized statements are the only alleged misstatements attributed to Messrs. Jenkins, Morzaria, or Lucas, those three Individual Defendants should be dismissed from the case.  (*See* AC ¶¶ 134, 137-38, 140, 146-47, 149, 153, 185-86, 188, 190.)  And *none* of the generalized statements about Barclays' business practices alleged in the Amended Complaint can be attributed to Mr. Diamond—he was not employed by Barclays when any of those statements were made, and was only employed during the time

---

[12]    Although some cases have concluded that "pleadings in ongoing actions" should not be stricken under Rule 12(f), *see In re OSG Sec. Litig.*, 12 F. Supp. 3d 619, 622 (S.D.N.Y. 2014), that does not excuse the plaintiffs from their obligation under Rule 11(b) to investigate independently the allegations before repeating them.  *Tronox*, 2010 WL 2835545, at *6. Plaintiffs have shirked that obligation here by repeating transcription errors and other mistakes in the NYAG complaint that they would not have repeated if they had made any effort to investigate these claims.  *See supra* note 11.

[13]    Attached hereto as Appendix A is a chart setting forth a comparison of the allegations in the Amended Complaint and the allegations in the NYAG complaint.  As shown in that chart, plaintiffs largely copied the NYAG's allegations word for word.

period of two sets of alleged misstatements by Mr. White about LX.[14]  *A fortiori*, Mr. Diamond also should be dismissed outright from the case.  *See Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302-03 (2011) (defendants cannot be liable under Section 10(b) for statements they did not "make," *i.e.*, those over which they did not have "ultimate authority").[15]

### 1.   It Is Black-Letter Law that Barclays' Generalized Statements About Its Business Practices and Risk Controls Are Inactionable Puffery.

This Court should dismiss all allegations concerning Barclays' statements about its general business practices and risk controls as inactionable puffery.  This Court and other courts in this Circuit routinely hold that "general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are 'too general to cause a reasonable investor to rely upon them.'"  *City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (quoting *ECA & Local 134 IBEW Joint Pension Trust of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009)); *see also Boca Raton Firefighters & Police Pension Fund* v. *Bahash*, 506 F. App'x. 32, 37 (2d Cir. 2012) (statements regarding a company's "dedication towards transparent and independent decision-making" are too "generic [and] indefinite" to form the basis of a fraud claim); *JP Morgan*, 553 F.3d 187, 206 (2d Cir. 2009) ("[G]eneralizations regarding [defendant's] business practices . . .

---

[14]    (*See* AC ¶¶ 122-28 (statements allegedly made by Mr. White only, in August 2011 and June 2012, with no allegation that any other Individual Defendant had any awareness about LX or the statements being made); *id.* ¶ 17 (Mr. Diamond was employed by Barclays only until July 3, 2012).)

[15]    Similarly, the Complaint does not—and could not—allege that Mr. White had any involvement in making any of the generalized statements about Barclays' business practices alleged in the Amended Complaint.  (*See* AC ¶¶ 130, 134, 137, 138, 140, 146, 147, 149, 153, 155, 157, 159, 161, 176, 185, 186, 188, 190.)  Under *Janus*, therefore, he cannot be liable for such statements.  131 S. Ct. at 2302-03.

are precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable." (citation omitted)); *Gusinsky* v. *Barclays PLC*, 944 F. Supp. 2d 279, 289 (S.D.N.Y. 2013) (holding that "statements about being a responsible global citizen and doing business ethically" are "squarely within the Second Circuit's definition of non-actionable puffery"), *aff'd in part and rev'd in part on other grounds sub nom. Carpenters Pension Trust Fund of St. Louis* v. *Barclays PLC*, 750 F.3d 227 (2d Cir. 2014).

Similarly, here, Barclays' statements that it "has operated a system of risk management and internal control, which provides reasonable assurance of effective and efficient operations," and that it has introduced a risk management framework "[t]o strengthen the governance relating to conduct and reputation matters," are inactionable.  (AC ¶¶ 147, 188.)[16] In *Gusinky*, this Court held that nearly identical statements regarding Barclays' "operation of a system of internal controls which provides reasonable assurance of effective and efficient operations" were inactionable.  944 F. Supp. 2d at 288; *see also JP Morgan*, 553 F.3d at 205-06 (statements that defendant had "risk management processes [that] are highly disciplined" and that it would "reposition and strengthen [its] franchises" are puffery)  (brackets in original); *C.D.T.S. No. 1*, 2013 WL 6576031, at *2, 4-5 (statements regarding the "new risk culture at the bank" constitute inactionable puffery); *Stratte-McClure* v. *Morgan Stanley*, 784 F. Supp. 2d 373,

---

[16]    Similarly, generalized statements contained in Barclays' Response to the Salz Review (AC ¶¶ 153, 155, 157, 159, 161) are no more than puffery.  For example, statements that Barclays' "new risk culture and control framework 'will also be strengthened by actions to reinforce a control and compliance structure'" (AC ¶ 157), and describing Barclays' "world-class compliance function" (AC ¶ 161), are nearly identical to statements that have previously been held to be non-actionable puffery by this Court.  *See, e.g.*, *C.D.T.S. No. 1*, 2013 WL 6576031, at *2, 4-5 (S.D.N.Y. Dec. 13, 2013) (holding that statements regarding the bank's new "controlled and disciplined risk culture" were inactionable puffery); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 370 (E.D.N.Y. 2013) (holding that statements regarding a bank's "best-of-class" compliance program were puffery).

385 (S.D.N.Y. 2011) (dismissing as puffery "generalized statements about the effectiveness of . . . risk management"); *In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*, 2009 WL 4823923, at *11 (S.D.N.Y. Dec. 14, 2009) ("[G]eneral statements about [defendant's] risk management practices and controls . . . constitute 'puffery.'").[17]

Plaintiffs claim that these generalized statements were materially misleading because some Barclays employees were purportedly engaging in "activities that subjected Barclays to significant legal and regulatory scrutiny."  (AC ¶¶ 131, 148, 150, 177, 187; *see also* AC ¶¶ 135, 139, 141, 154, 156, 158, 160, 162, 189, 191.)  But this Court and the Second Circuit have uniformly held that conclusory and general allegations of misconduct resulting in "reputational damage, and civil and criminal liability" are insufficient to overcome the puffery doctrine.  *E.g., Gusinksy*, 944 F. Supp. 2d at 290.  Moreover, "the securities laws do not impose a general duty to disclose corporate mismanagement or uncharged criminal conduct."  *In re ITT Educ. Servs., Inc. Sec. & S'holder Derivative Litig.*, 859 F. Supp. 572, 579 (S.D.N.Y. 2012) (quoting *In re Marsh & Mclennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006)); *see also In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 678 (S.D.N.Y. 1990).  Without more, "the connection between Barclays' statements regarding risk management" and Barclays' practices surrounding LX is far "too attenuated to find that the alleged . . . misconduct rendered the representations regarding risk management materially misleading."  *Gusinsky*, 944 F. Supp 2d at 290.[18]

---

[17]    Attached hereto as Appendix B is a chart setting forth a list of alleged misstatements dismissed as inactionable puffery by courts within the Second Circuit compared with very similar alleged misstatements here.

[18]    For the same reasons, plaintiffs cannot premise a fraud claim on Barclays' statement that "Barclays LX US is ranked # 1."  (*See* AC ¶¶ 178-179.)  Plaintiffs allege that this statement was false simply because LX's growth was the "result of Barclays' deceitful marketing campaign."

(*footnote continued*)

      **2.**      **Plaintiffs Have Not Alleged that Statements About Barclays' General Business Practices and Risk Controls Were Materially False or Misleading.**

Even if Barclays' statements about its general business practices were not immaterial puffery, plaintiffs point to no facts showing that those statements—for example, that Barclays was "committed to operating within a strong system of internal control," that it "pledged to increase transparency and conduct [its] business in the right way," and that it had "a well-established strategy and framework for managing risk"—were in any way false or misleading.  (AC ¶¶ 130, 147, 176, 186, 190; *see also* AC ¶¶ 134, 137-38, 140, 146, 149, 153, 155, 157, 159, 161, 185, 188.)

None of the statements about risk controls or Barclays' commitment to compliance refers to LX or Liquidity Profiling specifically, about which plaintiffs specifically complain.  For instance, plaintiffs allege that Barclays falsely told ADS holders that its "internal control over financial reporting was effective."  (AC ¶ 187.)  But plaintiffs do not allege that Barclays had any weaknesses in "financial reporting," so Barclays' statements on that topic are irrelevant.  Thus, a fatal "weakness in the Complaint is the plaintiff[s'] failure to match [their] theory of fraud to the public statements" Barclays actually made.  *Austl. & N.Z. Banking Grp.*, 2009 WL 4823923, at *14.

In fact, the very documents plaintiffs cite undermine any contention that Barclays' statements about its risk controls were false.  Those documents explicitly state that internal controls are "designed to manage *rather than eliminate* the risk."  (Ex. 2 (Barclays PLC, 2012 Annual Report (Form 20-F) (Mar. 12, 2013)), at 32) (emphasis added); *see also* Ex. 3 (Barclays

---

(*footnote continued*)
(AC ¶ 179.)  But defendants had "no obligation to accuse themselves of wrongdoing."  *Silsby* v. *Icahn*, 17 F. Supp. 3d 348, 362 (S.D.N.Y. 2014).

PLC, 2013 Annual Report (Form 20-F) (Mar. 14, 2014)), at 56.)  Barclays warned ADS holders that Barclays "is exposed to many forms of risk relating to legal, competition and regulatory proceedings, including that . . . business may not be, or may not have been, conducted in accordance with applicable laws and regulations in the relevant jurisdictions around the world and financial and other penalties may result."  (Ex. 3 (Barclays PLC, 2013 Annual Report (Form 20-F) (Mar. 14, 2014), at 112; *see also* Ex. 2 (Barclays PLC, 2012 Annual Report (Form 20-F) (Mar. 12, 2013)), at 76 (similar); *id.* at 78 (listing other operational risks, such as reputation risk).)  These disclosures made plain that ADS holders cannot expect internal controls or risk management practices to "root out any impropriety," let alone alleged impropriety by a small business unit generating only 0.1% of Barclays' revenue.  *See In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 360 (S.D.N.Y. 2008); *see also JP Morgan*, 553 F.3d at 205-06 (risk controls "did not, and could not, amount to a guarantee that [defendant's] choices would prevent failures in its risk management practices").  Thus, "'taken together and in context,'" it is plain that Barclays' statements about its risk controls were neither false nor misleading.  *See Newman* v. *Family Mgmt. Corp.*, 530 F. App'x 21, 25 (2d Cir. 2013) (quoting *McMahan & Co.* v. *Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990)); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 577-81 (S.D.N.Y. 2014); *In re CIT Grp., Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 689 (S.D.N.Y. 2004).[19]

---

[19]     Many of the alleged misstatements—such as Barclays' "pledge[] to increase transparency and conduct our business in the right way" (AC ¶ 90)—were also forward-looking statements accompanied by cautionary language.  (*See, e.g.*, Ex. 3 (Barclays PLC, 2013 Annual Report (Form 20-F) (Mar. 12, 2014)), at 12 ("Forward-looking statements" proviso); Ex. 12 (Barclays PLC, Form 6-K (July 27, 2012), Exhibit 99.1) (same); Ex. 13 (Barclays PLC, Form 6-K (July 30, 2013), Exhibit 99.1), at 3 (same); Ex. 14 (Barclays PLC, Form 6-K (Feb. 12, 2013), Exhibit 99.1) (same); *see also* Ex. 2 (Barclays PLC, 2012 Annual Report (Form 20-F) (Mar. 12, 2013)), at 245 ("[T]he impact on Barclays of . . . competition and regulatory matters in which Barclays is
(*footnote continued*)

**B.**     **The Amended Complaint Fails to Allege Any Material Misrepresentations Regarding LX or Liquidity Profiling.**

Plaintiffs also allege that Barclays misrepresented the extent to which Liquidity Profiling protected LX clients from aggressive ELP trading.   (AC ¶¶ 89-96.)   But again, plaintiffs fail to show that these statements were materially false or misleading.

**1.**     **LX's Minor Effect on Barclays' Financial Success Renders the Alleged Misstatements Immaterial as a Matter of Law.**

Plaintiffs do not allege any facts suggesting that statements about LX could have been material to any investor in Barclays PLC.   The bare fact that Barclays' ADS price dropped after the NYAG sued Barclays does not suffice to show materiality because the stock drop could reflect the market's reaction to additional regulatory scrutiny of Barclays—rather than a reaction to the correction of prior alleged misstatements about LX.   For that reason, "market volatility alone is 'too blunt an instrument to be depended on in considering whether a fact is material.'" *JP Morgan*, 553 F.3d at 205 (quoting SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45,150-01, 45,152 (Aug. 19, 1999)).   In assessing materiality, the Second Circuit has followed SEC Staff Accounting Bulletin No. 99, which provides that the "'use of a percentage as a numerical threshold, such as 5%, may provide the basis'" for determining whether an alleged misstatement could be material.   *Id.* at 204 (quoting Staff Accounting Bulletin No. 99, 64 Fed. Reg. at 45,151); *see also Tabak* v. *Canadian Solar Inc.*, 549 F. App'x 24, 27 (2d Cir. 2013)

---

(*footnote continued*)
or may in the future become involved cannot always be predicted."); Ex. 13 (Barclays PLC, Form 6-K (July 30, 2013), Exhibit 99.1), at 125 (same); Ex. 12 (Barclays PLC, Form 6-K (July 27, 2012), Exhibit 99.1), at 81 (same).)   Such statements are protected by the Reform Act's safe harbor provision.   15 U.S.C. § 78u-5(c)(1); *Kuriakose* v. *Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 178-79 (S.D.N.Y. 2012), *aff'd sub nom. Cent. States, Se. & Sw. Areas Pension Fund* v. *Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72 (2d Cir. 2013).

($5.7 million overstatement immaterial because it represented only 2.7% of revenue for the quarter and 0.9% of annual revenue).

Plaintiffs' allegations show that LX falls far short of the 5% threshold.  Plaintiffs allege that LX reflected a revenue "growth opportunity" of "between $37 and $50 million per year."  (AC ¶ 54.)  Barclays' reported annual income between 2011 and 2013 was between approximately £25 and £32.3 billion (or between $42.5 and $54.9 billion at prevailing exchange rates on June 25, 2014).  (Ex. 3 (Barclays PLC, 2013 Annual Report (Form 20-F) (Mar. 9, 2014)), at 215; Federal Reserve, Historical Rates for the UK Pound, *available at* http://www.federalreserve.gov/releases/h10/hist/dat00_uk.htm (last accessed Jan. 20, 2015) (stating that the GBP-USD exchange rate on June 25, 2014 was 1.6986).)[20]  Thus, even assuming that the misstatements here artificially inflated the entirety of the value of LX and that LX's revenue garnered "between $37 and $50 million per year" (AC ¶ 54), those misstatements affected only 0.1% of Barclays PLC's total revenue—nowhere near the 5% threshold courts in this Circuit normally apply.  "Because [LX] revenue was only a small portion of [Barclays'] total operations, there is not a 'substantial likelihood' considering the amount of [these] misstatement[s] [that they] 'would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'"  *Tabak*, 549 F. App'x at 27 (quoting *Hutchison* v. *Deutsche Bank Sec. Inc.*, 647 F.3d 479, 485 (2d Cir. 2011)).

Plaintiffs also fail to allege any facts that would support a finding of materiality based on "qualitative factors."  *JP Morgan*, 553 F.3d at 197, 204.  Plaintiffs do not allege that

---

[20]     Courts in this Circuit regularly take judicial notice of currency exchange rates.  *E.g.*, *Conte* v. *Flota Mercante Del Estado*, 227 F.2d 664, 670 (2d Cir. 1960); *In re Waterford Wedgwood USA, Inc.*, 500 B.R. 371, 383 n.8 (Bankr. S.D.N.Y. 2013); *Cagan* v. *Gadman*, 2012 WL 5422270, at *7 n.3 (E.D.N.Y. Oct. 31, 2012).

they or any other Barclays investor reviewed or considered any of the allegedly public misstatements at issue in making their decision to invest in Barclays ADSs.  Nor could they:  the context of these statements overwhelmingly demonstrates that the intended audience was Barclays clients who use LX—not Barclays PLC ADS holders.  And plaintiffs do not allege any facts that would suggest that LX was a segment of the "registrant's business that has been identified as playing a significant role in the registrant's operations or profitability."  Staff Accounting Bulletin No. 99, 64 Fed. Reg. at 45,152.  The registrant here is Barclays PLC, and LX was only a miniscule fraction of Barclays PLC's overall business (just one one-thousandth of it by revenue).  Plaintiffs do not allege that LX was mentioned even once (prior to the NYAG complaint) in any Barclays PLC investor report, in any investor call, or in any analyst report about Barclays PLC.  Misstatements that have such a small impact on a company's overall finances are not material.  *See JP Morgan*, 553 F.3d at 204-05 (Enron was not a "key client" where defendant earned less than 0.1% of its revenues from that relationship); *Hutchison*, 647 F.3d at 490 (allegations that loans did not impact a major segment of the business "fail[ed] for the same reasons we hold that the loans were not quantitatively material").

### 2. Plaintiffs Cannot Allege Reliance on Non-Public Marketing Materials.

Plaintiffs' claims based on LX marketing materials also fail because plaintiffs cannot allege that ADS holders relied on, or even considered, LX marketing materials in deciding whether to invest in Barclays PLC.  "Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action," *Erica P. John Fund, Inc.* v. *Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011), and must be "pleaded with particularity," *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 2009 WL 1740035, at *2 (S.D.N.Y. June 17, 2009).

Unable to allege actual reliance, plaintiffs attempt to frame their allegations as "omissions" to invoke a presumption of reliance that is sometimes available when "there is an omission of a material fact by one with a duty disclose." *Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta*, 552 U.S. 148, 159 (2008) (citing *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128, 153-54 (1972)).[21]  But where, as here, a case "is primarily built around misrepresentations, and omissions, if any, merely serve to exacerbate and bolster their misrepresentation claims, [plaintiffs] are not entitled to the *Affiliated Ute* presumption of reliance." *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 494 (S.D.N.Y. 2011); *see also Starr ex rel. Estate of Sampson* v. *Georgeson S'holder, Inc.*, 412 F.3d 103, 109 n.5 (2d Cir. 2005); *Wilson* v. *Comtech Telecomm. Corp.*, 648 F.2d 88, 93 (2d Cir. 1981) ("[T]he rationale for a presumption of causation in fact in cases like *Affiliated Ute*, in which no positive statements exist[, is that] reliance as a practical matter is impossible to prove.  The situation here does not present that problem." (citations omitted)).  Plaintiffs' claims plainly rest on a misrepresentation theory.  Plaintiffs explicitly allege repeatedly that Barclays "misrepresented" the trading in LX and other facts.  For example:

- Plaintiffs allege that defendants made "false and misleading statements about Barclays' transparency and safeguards, as well as Barclays' repeated commitment to a reformed culture."  (AC ¶ 113.)

- Plaintiffs allege that "the [liquidity landscape] chart and accompanying statements *misrepresented* the trading within Barclays' dark pool."  (AC ¶ 78 (emphasis added).)  Employees allegedly made "alterations [to the chart that] *misrepresented* the amount of high frequency trading activity in the dark pool."  (AC ¶ 79 (emphasis added).)

---

[21]    Plaintiffs repeatedly allege in a conclusory fashion that defendants' statements were "misleading by omission or otherwise." (*See* AC ¶¶ 123, 126, 128, 131, 135, 139, 141, 143, 145, 148, 150, 152, 154, 156, 158, 160, 162, 164, 166, 168, 170, 172, 174, 177, 179, 182, 184, 187, 189, 191, 194.)

- Barclays allegedly "*misrepresented* how it routes client orders." (AC ¶ 104 (emphasis added).)

- Plaintiffs allege that numerous explicit "statements . . . were materially false and misleading." (AC ¶¶ 123, 126, 128, 131, 135, 139, 141, 143, 145, 148, 150, 152, 154, 156, 158, 160, 162, 164, 168, 170, 174, 177, 179, 182, 184, 187, 189, 191, 211.)

For these reasons, plaintiffs' assert a misrepresentation claim for which no presumption of reliance is available under *Affiliated Ute*.[22]

Plaintiffs also attempt to fall back on the "fraud on the market" presumption of reliance on which, according to the Amended Complaint, "[p]laintiff[s] will rely, *in part*." (AC ¶ 205 (emphasis added).) "[U]nder the fraud-on-the-market doctrine, reliance is presumed when the statements at issue *become public*." *Stoneridge Inv. Partners*, 552 U.S. at 159 (emphasis added). "Fundamental to every case applying the fraud on the market theory is that defendants made the fraudulent misrepresentation *with the intent that the false information reach the market so as to affect the stock's price*." *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 725 F. Supp. 712, 752 (S.D.N.Y. 1989) (emphasis added). Plaintiffs allege no facts suggesting that any of the purported misstatements in marketing materials about LX reached the market, let alone were intended to affect the price for Barclays PLC ADSs. To the contrary, plaintiffs allege that most of those materials were "intended for [Barclays'] institutional clients" (AC ¶ 75):

---

[22]    Although plaintiffs allege these statements were "misleading by omission or otherwise," where plaintiffs allege that a statement was misleading because the speaker omitted to disclose other facts, the omission merely "bolster[s] the[] misrepresentation claims," and *Affiliated Ute* is inapplicable. *Moody's Corp.*, 274 F.R.D. at 494.

Even if plaintiffs did articulate an omission theory, it would not be viable because plaintiffs do not allege that defendants omitted to disclose any facts that they had a duty to disclose. *Levitt* v. *J.P. Morgan Sec., Inc.*, 710 F.3d 454, 468 (2d Cir. 2013); *Resnik* v. *Swartz*, 303 F.3d 147, 154 (2d Cir. 2002). "[T]he securities laws do not impose a general duty to disclose corporate mismanagement or uncharged criminal conduct." *In re Marsh & Mclennan Cos. Sec. Litig.*, 501 F. Supp. 2d at 469; *see also Silsby*, 17 F. Supp. 3d at 362-63; *In re Par Pharm.*, 733 F. Supp. at 678.

- ***Liquidity Landscape Chart***.  Plaintiffs do not allege that the allegedly misleading version of the Liquidity Landscape marketing flyer was ever disclosed publicly.  (*See supra* p. 10.)  That precludes plaintiffs from premising their fraud claim on this flyer.  (AC ¶ 133.)

- ***Counterparty Blocking***.  Plaintiffs do not allege that Barclays made any public statements during the putative class period about how Liquidity Profiling ratings were assigned or about the scope of the counterparty blocking service.  (*See supra* p. 10-11.)  Thus, plaintiffs have no basis for asserting fraud based on Barclays' statements to clients about the counterparty blocking service.  (AC ¶¶ 89-96.)

- ***Latency Arbitrage***.  Plaintiffs do not allege that Barclays ever stated publicly "that it used ultra-fast 'direct data feeds' . . . to deter latency arbitrage."  (AC ¶ 102; *see supra* p. 11.)

- ***Internalization Statistic***.  Plaintiffs plainly cannot assert that ADS holders were defrauded because of a single allegedly inaccurate statistic in a confidential presentation delivered to one institutional client.  (AC ¶¶ 109-12; *see supra* p. 11.)

Because Barclays' LX marketing materials for clients "were not communicated to the public," plaintiffs cannot rely on the fraud-on-the-market presumption.  *Stoneridge Inv. Partners*, 552 U.S. at 159; *see also Amgen Inc.* v. *Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1192, 1199 (2013); *In re Refco, Inc. Sec. Litig.*, 609 F. Supp. 2d 304, 317-18 (S.D.N.Y. 2009); *In re Gulf Oil*, 725 F. Supp. at 752-53 (rejecting fraud on the market for non-public statements).[23]

> **3.    Plaintiffs Fail to Meet the Basic Requirements of Rule 9(b) as to Many of the Alleged Misstatements.**

Given the non-public nature of many of the supposed alleged misstatements, plaintiffs fail to meet the requirements of Rule 9(b) and the Reform Act of pleading with specificity "where and when the statements were made" to plaintiffs.  *Anschutz Corp.*, 690 F.3d

---

[23]    In addition, as shown above (*supra* Section II.B.1), plaintiffs have not "demonstrated that defendants' alleged misstatements and omissions [regarding LX] were material" and "therefore cannot avail [themselves] of a presumption of reliance under either the fraud-on-the-market doctrine or *Affiliated Ute*."  *Berks Cnty. Emps.' Ret. Fund* v. *First Am. Corp.*, 734 F. Supp. 2d 533, 541 (S.D.N.Y. 2010).

at 108.  For example, plaintiffs state that a marketing flyer on Liquidity Profiling was "widely-disseminated" and "intended for institutional clients."  (AC ¶ 75; *see also* AC ¶¶ 85-86 (stating only that Barclays "issued marketing material" that was "used by Barclays").)  But a complaint must set forth "the identities of the parties to [any] misrepresentations."  *Avila* v. *Lease Fin. Grp., LLC*, 2012 WL 3165408, at *6 (S.D.N.Y. July 31, 2012).  Plaintiffs' failure to allege with specificity that they actually relied—directly or indirectly—on any of these statements forecloses all of their claims based on marketing materials and presentation slides.  (*See* AC ¶¶ 124-28, 132-133.)

### 4.    Plaintiffs Have Not Alleged that Any of Barclays' Public Statements About LX or Liquidity Profiling Were Materially False or Misleading.

Plaintiffs' attempt to allege, through a handful of public statements in news articles and online publications, that Barclays and Mr. White misrepresented the extent to which Liquidity Profiling protected Barclays' LX clients from aggressive ELP trading.  (AC ¶ 67.)  Again, none of these statements is alleged to have been made by the other Individual Defendants.  And as to Barclays and Mr. White, plaintiffs' allegations rest on little more than short quotes ripped out of context and strung together from different articles and documents, written at different times, by different authors.  *See Schwartz* v. *Novo Industri, A/S*, 658 F. Supp. 795, 799 (S.D.N.Y. 1987) ("[P]laintiff fails to demonstrate how . . . it would be fair to draw an inference of fraud from a statement appearing in a news article over which defendant had less than complete control.").    "[T]aken together and in context, [none of Barclays' alleged

representations] would have misled a reasonable investor." *Rombach* v. *Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004) (quoting *Oppenheimer*, 936 F.2d at 761).[24]

        Most importantly, plaintiffs fail to allege sufficiently the falsity of any of these public statements.  Plaintiffs attempt to manufacture discrepancies between what Barclays and Mr. White described about LX and what was in fact taking place, but even on the face of the allegations, there is no inconsistency.

        ***LX's Safeguards***.  Plaintiffs allege that, although Mr. White said that Barclays (i) had controls to manage toxicity on LX, (ii) could "take corrective action" if necessary, and (iii) could hold aggressive traders accountable, Barclays did not in fact "eliminate traders who . . . behave[d] in a predatory manner" and Barclays did not "restrict predatory traders' access" to LX.  (AC ¶¶ 122-23, 127-28, 144-45, 151-52, 163-64, 171-74.)  But there is no inconsistency between plaintiffs' allegations and Mr. White's statements, and therefore no indication that Mr. White said anything false or misleading.  Plaintiffs do not allege that Mr. White, or any of the defendants, ever represented to investors that Barclays would "eliminate [aggressive] traders." To the contrary, in the AEI presentation slides (*see* AC ¶ 124), Mr. White explicitly disclosed that there was "aggressive" trading on LX (the slides indicated that approximately 14% of the trading at the time was "aggressive").  (Ex. 5 (AEI presentation slides), at 6.)  There is also no allegation that Barclays did not respond to "aggressive" trading in ways other than "eliminat[ing] traders."  Indeed, in one of the magazine articles on which plaintiffs rely, Mr. White explained

---

[24]      Indeed, many of the statements are "too general to cause reliance by a reasonable investor."  *See In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 354 (S.D.N.Y. 2011).  For example, plaintiffs attempt to hold defendants liable for statements about the "transparency" of LX.  (*See, e.g.*, AC ¶¶ 127-28, 144-45.)  But these statements about "transparency," like Barclays PLC's statements about its general business practices, are inactionable puffery.  (*See supra* Section II.A.1.)

that Barclays can hold aggressive traders accountable and take corrective action in a number of ways, including by "go[ing] back to specific high frequency clients to discuss their liquidity profile if a portion is deemed not to be in accordance with our standards." (AC ¶ 122.)  Plaintiffs do not allege that Barclays did not do this when appropriate (in fact, it did).

Plaintiffs also allege that, although Mr. White was quoted in one article as saying that Barclays "monitor[s] client orders continuously," in fact, Barclays did not "regularly update[] the *ratings* of its traders."  (AC ¶¶ 92, 122-23 (emphasis added).)  Again, plaintiffs' allegation and Mr. White's statement are entirely consistent.  The allegation conflates two distinct processes:  the process of "monitoring" client orders and the process of assigning traders Liquidity Profiling "ratings" of "aggressive," "neutral," or "passive" for the counterparty blocking feature.  (*See* AC ¶ 193.)  Although each trader's "rating" was updated only periodically, there is no allegation that Barclays told clients that it was updating the "ratings" any more frequently than it actually did.  The marketing materials on which plaintiffs rely explain that "monitoring" LX is a separate process that relies on a distinct set of metrics and visualization tools.  (AC ¶¶ 193, 194; Ex. 4 (June 2013 Tear Sheet), at 2 (graphic of "[v]isualization tools . . . to identify predatory behavior"); Ex. 1 (December 2012 Marketing Deck), at 9 (separately listing "client profiles" and the "proactive[] monitor[ing]" component of Liquidity Profiling).)  There is no allegation that Barclays did not use these monitoring tools "continuously," just as Mr. White said.[25]

---

[25]     Of course, the allegedly false statement that "Liquidity Profiling lets Barclays 'make sure that we have very good participants in our pool'" that plaintiffs claim was made by Mr. White (AC ¶ 68), but that was actually a quote of William Bell (*see supra* p. 16; Ex. 11 (Traders Magazine Online News Article dated July 25, 2013), at 4.)), cannot support a fraud claim against Mr. White.  *See Janus*, 131 S. Ct. at 2302-03.

Lastly, plaintiffs allege that Mr. White's statements about Liquidity Profiling were misleading because Liquidity Profiling did not apply to all interactions in LX.  (AC ¶¶ 95, 123, 128, 152, 164, 168, 172, 174.)  But plaintiffs do not allege that Mr. White, or anyone at Barclays, ever told clients or ADS holders that Liquidity Profiling was being applied to every category of trading activity.  Clients allegedly could not use Liquidity Profiling to choose their counterparties when the clients were *taking* liquidity (*i.e.*, when the client was executing against another party's passive order).  (AC ¶ 95.)  But "takers" are considered the "aggressive" party in a trade and thus have no need for protection from "providers."  Indeed, Barclays disclosed that Liquidity Profiling was based on a trader's activity when *taking* liquidity.  (Ex. 10 (July 2013 Marketing Deck), at 4 (describing "1-Second *Take* Alpha" (emphasis added)).)  Plaintiffs also allege that orders routed to LX using Barclays' algorithms were not profiled.  (AC ¶ 95.)  But there is no need to profile such orders, which do not pose the same threat as orders of "aggressive" traders.  "Aggressive" trading strategies are implemented by traders using *direct* connections to ATSs to maximize "speed and technology advantages."  (AC ¶¶ 45-46.)  These advantages are lost when using connections filtered through an algorithm—plaintiffs thus allege no reason why orders sent using algorithms would need to be profiled.[26]

---

[26]     Plaintiffs' allegations that Barclays "*favored* high frequency trading firms," and that it concealed such favoritism from the market (AC ¶ 99 (emphasis in source)), are equally unavailing.  Plaintiffs allege that Barclays gave ELPs (of which HFTs are a subset) access to information about LX and allowed them to cross-connect (AC ¶¶ 100, 102), but there is no allegation that Barclays did not provide the same information and cross-connections to any client who asked for those services—nor is there any allegation that Barclays ever told any client or ADS holder that it would not make information and cross-connections available to ELPs.  And although plaintiffs allege that Barclays offered ELPs favorable commissions (AC ¶ 102), they do not allege that Barclays ever told any clients or ADS holders that it would not do this.  As for plaintiffs' suggestion that Barclays fraudulently concealed the *presence* of ELPs on LX, that simply has no basis in fact.  On the contrary, Barclays was transparent about the presence of ELPs on LX and Mr. White clearly disclosed in the presentation slides referenced in the
(*footnote continued*)

*Order Routing*.   Plaintiffs allege that, although the slides Mr. White used at the AEI conference said that Barclays would route client orders to trading platforms based on execution quality and likelihood of fill, another Barclays employee told an ELP firm that 90% of dark pool orders at Barclays "are first directed into" LX and then to venues where it was most profitable for Barclays to execute their orders.  (AC ¶¶ 105-06, 125, 126.)  This allegation is based on a simple misquote.  When properly understood, the statement of the Barclays employee is in complete accord with that of Mr. White.  *See In re Livent, Inc.*, 151 F. Supp. 2d at 405 ("[A] court need not feel constrained to accept as truth conflicting pleadings . . . that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely . . . .").  In the document on which plaintiffs rely, an ELP had asked Barclays, "What % of all internal firm flows are first directed into the dark pool (assumes some % bypasses the dark pool and goes outbound to other venues)[?]"  (Ex. 6 (Attachment 1 to July 9, 2013 e-mail to Barclays client), at 3.)  Barclays responded that "10-15% of flow will by-pass LX" (*id.*), meaning that those order types cannot be routed to LX but must be executed using another trading venue.  Thus, the document makes clear that 85-90% of orders are *eligible* to trade in LX—not that this percentage of orders ultimately was first routed to LX.  A high *eligibility* for routing to LX is in harmony with Mr. White's statement that Barclays would route client orders based on execution quality and likelihood of fill.[27]

---

(*footnote continued*)
Amended Complaint (*see, e.g.*, AC ¶ 72) that 41% of the trading in LX was by ELPs (Ex. 5 (AEI presentation slides), at 6).

[27]     Because plaintiffs have failed to plead adequately that any of Mr. White's statements were false or misleading, he should be dismissed as a defendant outright.

## III.   THE AMENDED COMPLAINT FAILS TO PLEAD SCIENTER.

The Court should also dismiss the Amended Complaint for failure to "plead 'with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *JP Morgan*, 553 F.3d 187, 198 (2d Cir. 2009) (quoting 15 U.S.C. § 78u-4(b)(2)). Under the Reform Act, "a weak yet reasonable inference of scienter will not suffice." *Kuriakose*, 897 F. Supp. 2d at 183 (internal quotation marks omitted). Rather, a complaint can survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw." *Tellabs*, 551 U.S. at 324. In order to establish a strong inference of scienter, a complaint must allege particularized facts that "show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *JP Morgan*, 553 F.3d at 198; *accord Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund* v. *Am. Express Co.*, 430 F. App'x 63, 64 (2d Cir. 2011). To impute scienter to a corporate entity, a plaintiff must plead "that an agent of the corporation committed a culpable act with the requisite scienter, and that the act (and accompanying mental state) are attributable to the corporation." *Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). Far from meeting this standard, plaintiffs rely on allegations attributing the required state of mind to defendants that are "too conclusory to support scienter." *Kalnit* v. *Eichler*, 264 F.3d 131, 142 (2d Cir. 2001).

### A.   Plaintiffs Fail to Allege a Motive to Commit Fraud.

Plaintiffs do not allege that the defendants had any personal motive to defraud them. Rather, plaintiffs baldly allege that the purported fraudulent "scheme was intended to . . . artificially inflate and maintain the market price of Barclays securities." (AC ¶ 210.) But courts

in the Second Circuit have repeatedly held that a purported motive "to maintain the appearance of profitability" cannot establish scienter. *Teamsters Local*, 531 F.3d at 196. Such a motive "could be imputed to any for-profit endeavor," *Defer LP* v. *Raymond James Fin.*, *Inc.*, 654 F. Supp. 2d 204, 217 (S.D.N.Y. 2009), and would lead to "virtually every company in the United States . . . be[ing] forced to defend securities fraud actions," *JP Morgan*, 553 F.3d at 2001. This is particularly so when the alleged benefit is minimal in comparison to defendant's business as a whole, as is the case with LX and Barclays here. *Shemian* v. *Research In Motion Ltd.*, 2013 WL 1285779, at *13 (S.D.N.Y. Mar. 29, 2013), *aff'd*, 570 F. App'x 32 (2d Cir. 2014) ("The plausibility of this alleged motive [*i.e.*, to artificially the inflate stock price in order to acquire another company] is further undercut by the fact that the companies cost . . . less than 1% of [defendant's] approximately $2 billion cash on hand"); *Saltz* v. *First Frontier, L.P.*, 485 F. App'x 461, 464 (2d Cir. 2012) ("If a[n] . . . unremarkable [0.125%] fee earned in the ordinary course of business is sufficient to allege motive, then no company would be free from aspersions of fraud.").

Similarly, plaintiffs' allegation that Barclays misrepresented the "transparency and safeguards of its dark pool" in order to "dramatically increase its market share" (AC ¶ 5) is wholly inadequate. A desire "'to expand the potential customer base for [defendants'] products" to earn fees "amount[s] to no more than a motive 'to increase or maintain profit.'" *In re Merrill Lynch Auction Rate Sec. Litig.*, 851 F. Supp. 2d 512, 528-29, 538 (S.D.N.Y. 2012), *aff'd sub nom. La. Pac. Corp.* v. *Merrill Lynch & Co., Inc.*, 571 F. App'x 8 (2d Cir. 2014) (citations omitted). Moreover, plaintiffs do not allege that the Individual Defendants besides Mr. White even knew about the LX product, much less that they intended to mislead ADS holders with regard to that product.

In fact, plaintiffs allege no facts suggesting that *any* defendant had any motive to defraud Barclays PLC *ADS holders*. Even if plaintiffs could show that any defendant were motivated to make misrepresentations to Barclays' *clients* to increase profits and grow LX (AC ¶¶ 51-62), this would show nothing more than a misguided attempt by some employees to improve returns *for* Barclays ADS holders. As the Second Circuit has held, "[e]arning profits for the shareholders is the essence of the duty of loyalty, and therefore it would be an unusual case where accomplishment of this objective constitutes the requisite motive to defraud the shareholders." *JP Morgan*, 553 F.3d at 200. Any purported "intent to defraud [clients] cannot be conflated with an intent to defraud [Barclays] shareholders." *Kalnit*, 264 F.3d at 141; *see also JP Morgan*, 553 F.3d at 203. Plaintiffs offer no motive—none—that defendants would have to defraud Barclays PLC ADS holders based on statements about LX, because there was none.

### B. Plaintiffs Fail to Allege That Any of Barclays' Employees Acted With Intent or Recklessness.

Where a complaint fails to plead a motive, allegations of intent or recklessness through circumstantial evidence "must be correspondingly greater." *JP Morgan*, 553 F.3d at 199 (internal quotation marks omitted). The Amended Complaint likewise falls far short of this standard.

Plaintiffs do not even allege that Messrs. Jenkins, Morzaria, Diamond, or Lucas— all current or former executive officers of Barclays PLC based in London—had any knowledge of LX's existence, much less that they had any involvement with it or engaged in misconduct with respect to it. And Mr. Diamond departed from Barclays before *any* of the alleged misstatements, except for two sets of statements by Mr. White only,[28] while Messrs. Jenkins,

---

[28]    *See supra* note 14.

Lucas and Morzaria cannot possibly be charged with knowledge concerning statements before

August 2012, after August 2013, and before October 2013, respectively.[29]

Plaintiffs argue that this Court may infer the Individual Defendants' knowledge of

falsity from "their positions" as "senior managers and/or directors" at Barclays.  (AC ¶¶ 212-13.)

But "boilerplate allegations that defendants knew or should have known [certain facts] . . . based

solely on their [positions]" are insufficient.  *In re Sec. Capital Assurance*, *Ltd. Sec. Litig.*, 729 F.

Supp. 2d 569, 595 (S.D.N.Y. 2010) (internal quotation marks omitted); *see also In re Take-Two

Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 304 (S.D.N.Y. 2008) ("'[G]eneral allegations

regarding . . . the organizational role of a defendant are insufficient to raise a strong inference of

a defendant's scienter.") (first alteration in original); *Plumbers & Steamfitters Local 773 Pension

Fund* v. *Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010)

("Courts in this Circuit have long held that accusations founded on nothing more than a

defendant's corporate position are entitled to no weight.").[30]  Plaintiffs also do not allege that any

defendant received specific "internal reports" with contradictory information (let alone allege

with particularity "who prepared [the reports] and when").  *Local No. 38 IBEW Pension Fund* v.

---

[29]     (*See* AC ¶¶ 18-20 (dates of Jenkins', Lucas', and Morzaria's tenures).)

[30]     Prior to the Reform Act, some cases recognized a "core operations" doctrine, under which plaintiffs could allege that senior executives must have known certain basic facts that were key to the core operations of the issuer.  But numerous courts have questioned or rejected the doctrine after Congress adopted the Reform Act to require securities fraud plaintiffs to allege facts giving rise to a strong inference of scienter.  *See, e.g., In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 294 nn.209-210 (S.D.N.Y. 2006).  And even if the doctrine were still available, it would have no relevance where, as here, the only alleged misstatements concern a single service that, by plaintiffs' own allegations (AC ¶ 54), represented a growth opportunity of just 0.1% of Barclays PLC's revenue.  *See In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 409 (S.D.N.Y. 2013) ("[E]ven if the validity of the doctrine were undisputed, it would not apply here." (footnote omitted)); *In re eSpeed*, 457 F. Supp. 2d at 294 ("[T]he Complaint is inadequate . . . because it does not allege that [a new trading option] was so vital to [defendant's business] that its top officers must have known of the extent of [its] failure"); *In re Federated Dep't Stores, Inc., Sec. Litig.*, 2004 WL 444559, at *5 (S.D.N.Y. Mar. 11, 2004).

*Am. Express Co.*, 724 F. Supp. 2d 447, 461 (S.D.N.Y. 2010), *aff'd*, 430 F. App'x 63 (2d Cir. 2011).  At best, plaintiffs allege that Mr. Jenkins met with a committee overseeing a compliance review of Barclays as a whole (AC ¶ 35), but there is no allegation that this committee's work had anything to do with LX or Liquidity Profiling, or that Mr. Jenkins received any information from the committee that contradicted any of the few alleged statements that Mr. Jenkins was involved in making.  Plaintiffs thus offer no allegations of "deliberate illegal behavior" or "an extreme departure from the standards of ordinary care."  *Novak* v. *Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (quotation marks omitted).[31]

Plaintiffs also attempt to allege scienter through circumstantial evidence.  But none of plaintiffs' circumstantial allegations of scienter suffices under settled law:

**Confidential Witnesses**.  Parroting allegations from the NYAG complaint, plaintiffs allege that two anonymous witnesses said that "everybody knows internally" that Liquidity Profiling is "a scam."  (AC ¶ 98; *see also id.* ¶¶ 99, 103, 107-12.)[32]  But confidential witness statements do not support any inference of scienter where, as here, they are merely generalized assertions that "fail to offer any factual underpinnings."  *City of Dearborn Heights Act 345 Police & Fire R.* v. *Axonyx, Inc.*, 374 F. App'x 83, 85 (2d Cir. 2010).  Plaintiffs do not allege any facts about communications or meetings in which the confidential witnesses participated that would support their conclusory assertions.  *Jones* v. *Perez*, 550 F. App'x 24, 28 (2d Cir. 2013).  And the confidential witness allegations fail for the independent reason that the confidential witnesses' statements are "undated" and not directed at any Individual Defendant.

---

[31]     The absence of even those patently insufficient allegations against Messrs. Diamond, Lucas and Morzaria mandate their dismissal from this case as well.

[32]     Plaintiffs do not allege that they have spoken to these confidential witnesses themselves, and again appear simply to copy these unnamed witnesses' statements—impermissibly (*see supra* Section I)—from the NYAG complaint.

*In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011); *accord Local No. 38*, 724 F. Supp. 2d at 460 (dismissing claims where "Plaintiff's allegations of reckless disregard are a gossamer patchwork of general statements from the [confidential witnesses] and inferences from reports published after the allegedly false and misleading statements were made").

       ***Internal Audit Report***.   Plaintiffs allege that a December 2013 internal (and voluntary) audit report concluded that "Liquidity Profiling reviews may not be completed for all clients, may rely on inaccurate information . . . [and] may not function as advertised to clients." (AC ¶ 97.)   There is no allegation that this report concluded that Barclays' representations to clients were false—nor any allegation that this report provided specific contradictory information to a Barclays employee who later made misstatements.  *In re PXRE Grp., Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 536, 547 (S.D.N.Y. 2009) (dismissing claims where defendants were not alleged to have "access to information that *specifically* informed them of the alleged flaws" in their statements).   In fact, this audit report was issued *after* all but two of the alleged misstatements regarding LX.  (*See* AC ¶¶ 122, 124, 142, 144, 151, 163, 167, 171.)[33]  "For obvious reasons, a showing of recklessness cannot be premised on information that was not reasonably available to the speaker at the time of the alleged misrepresentations."  *Foley* v. *Transocean Ltd.*, 861 F. Supp. 2d 197, 213-14 (S.D.N.Y. 2012).[34]

       ***Analysis of Order Routing Data***.   To the extent that plaintiffs allege "scienter" based on an analysis of order-routing data purportedly conducted by confidential witnesses (AC

---

[33]     The only purported misstatements regarding LX that post-dated this report were a general statement by Mr. White "regarding Barclays' 'transparency'" (AC ¶¶ 183-84), and a "Frequently Asked Questions" document allegedly posted on Barclays' website in June 2014, the same time the "truth" was allegedly revealed (AC ¶¶ 192-195).

[34]     As the Amended Complaint acknowledges (AC ¶¶ 17, 19), both Mr. Diamond and Mr. Lucas had left Barclays long before this audit report was prepared.

¶ 108), this allegation fails for the same reason.  Plaintiffs do not allege that the "analysis" pre-dated any alleged public misstatements related to order routing.  *Foley*, 861 F. Supp. 2d at 213-14; *Wachovia*, 753 F. Supp. 2d at 352.  And the confidential witnesses' analysis only found that Barclays frequently routed orders to LX, which does not specifically contradict Barclays' statement that it routed orders to trading venues based on likelihood of fill.  In light of LX's size and liquidity (AC ¶¶ 59-60), it is not surprising that LX often would offer the greatest likelihood of fill.  *Cf. In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 252 (S.D.N.Y. 2005) (existence of "other models" that yielded different results was insufficient to allege scienter without "allegations about who created these 'other models,' when they were created, for what purpose, using what methodology and assumptions"); *Okla. Firefighters Pension & Ret. Sys.* v. *Student Loan Corp.*, 951 F. Supp. 2d 479, 502 (S.D.N.Y. 2013) ("vague references" to data on default rates "fail[ed] to specify how, if at all, those rates contradicted or revealed infirmities in defendants' loan loss estimation methodology").

       ***Discussions of Confidential Marketing Materials***.  Plaintiffs also attempt to allege scienter based on internal emails in which Barclays employees discussed the marketing flyer titled "Liquidity Profiling—Protecting Clients in the Dark."  (*See* AC ¶ 79-83.)  No Individual Defendant is alleged to have seen, let alone participated in creating or disseminating, this flyer.  Moreover, these allegations are irrelevant because plaintiffs do not allege that the purportedly misleading flyer was ever made public, let alone communicated to them.  Nor is there any allegation that Barclays ever represented the flyer as a comprehensive depiction of the trading in LX following the removal of the Tradebot bubble.  And even if this email conversation had been relevant, it would not support an inference of scienter because it reflects nothing more

than a good-faith internal discussion about how clients would understand the undated "sample" chart.  (*See* AC ¶ 80; Ex. 4 (June 2013 Tear Sheet).)

        **C.**    **Because the Amended Complaint Fails to Plead Scienter as to the Individual Defendants, it Fails as to Barclays as Well.**

        The Amended Complaint clearly fails to allege scienter as to any of the Individual Defendants.  Remarkably, other than Mr. White, none of the Individual Defendants is alleged to have made any statements, attended any meetings, or taken any action regarding LX.  And with respect to Mr. White, again, plaintiffs allege no facts suggesting that he (or any defendant) had any motive to defraud—or could have defrauded—Barclays PLC *ADS holders* with his statements about LX directed towards Barclays' *clients*.  (*See supra* Section III.A.)  Thus, the Amended Complaint also fails to allege scienter attributable to Barclays:  "[a] corporation's scienter necessarily derives from the state of mind of its employees."  *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d at 281.  In some cases, a plaintiff may allege scienter attributable to a corporation without identifying a specific employee by alleging that the statement is of such obvious and "'dramatic'" falsity that it would have to "'have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.'"  *Teamsters Local*, 531 F.3d at 195-96 (quoting *Makor Issues & Rights, Ltd.* v. *Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008)).  But no false statements are properly alleged here at all, to say nothing of statements that are so blatantly false that defendants must have known of their falsity, particularly given the miniscule part of Barclays' overall revenue that LX provided.  Because plaintiffs fail to allege scienter for any employee, and because the statements are not "blatantly false," no state of mind can be imputed to Barclays.  *Russo* v. *Bruce*, 777 F. Supp. 2d, 505, 527 n.5 (S.D.N.Y. 2011); *Plumbers & Pipefitters Local Union No. 719 Pension Trust Fund* v. *Conseco Inc.*, 2011 WL 1198712, at *23-24 (S.D.N.Y. Mar. 30, 2011).

**IV.   THE AMENDED COMPLAINT FAILS TO PLEAD LOSS CAUSATION AS TO THE JUNE 27 TELEGRAPH ARTICLE.**

Plaintiffs allege that two "disclosures" corrected Barclays' alleged misstatements: (i) the NYAG complaint filed on June 25, 2014 and a press release issued by the NYAG that same day (AC ¶¶ 116, 195);[35] and (ii) an article published in the Telegraph (a newspaper in London) on June 27, 2014 that reported that a single financial analyst "estimated" that Barclays might pay £300 million to settle the NYAG case (AC ¶¶ 119, 197).  Even if this Court permits any of plaintiffs' allegations to survive, it should dismiss plaintiffs' claim for losses supposedly incurred on June 30, 2014 (the next trading day after June 27, 2014) as a result of the Telegraph article.  Plaintiffs allege no facts suggesting that there was any "causal link between the alleged misconduct [*i.e.*, Barclays' earlier misrepresentations about LX] and the economic harm ultimately suffered by the plaintiff [*i.e.*, losses incurred on June 30, 2014]."  *Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005).  Plaintiffs can show a causal link by alleging either (i) "that the market reacted negatively to a corrective disclosure of the fraud," or (ii) "that the loss was . . . caused by the materialization of [a] risk concealed by the fraudulent statement."  *Carpenters*, 750 F.3d at 232-33.  Either theory requires allegations that a "misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."  *Lentell*, 396 F.3d at 173.

Plaintiffs make no allegations that anything "concealed" from the market was revealed by the June 27, 2014 Telegraph article (and they certainly do not make such an allegation with particularity).   And as of June 30, 2014—the next trading day after the

---

[35]    If the Court permits any of plaintiffs' allegations to survive Barclays' motion to dismiss (it should not), Barclays will seek to demonstrate at a later stage that this price drop was a reaction to the fact that Barclays was being sued by a regulator—not an indication that the stock price had previously been inflated by purported misrepresentations about LX.

publication of the article when plaintiffs allege their loss—the market had already reacted to the purported "corrective disclosure" of the NYAG complaint, which ended any conceivable purported fraud.  (AC ¶ 195.)  Subsequent price movements on June 30, reflecting normal market variations and price discovery, are not actionable.  *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d at 283 (corrective disclosure must "possess a sufficient nexus to a prior misstatement such that it reveals at least part of the falsity of that misstatement"); *see also Dura*, 544 U.S. at 347.

Moreover, speculation by analysts about the size of a possible fine based on already alleged misconduct cannot "reveal any 'truth' about an alleged fraud," and thus cannot come close to serving as a corrective disclosure.  *Janbay*, 2012 WL 1080306, at *16; *see also In re Omnicom Grp.*, 597 F.3d at 512 ("What appellant has shown is a negative characterization of already-public information.  A negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions." (citations omitted)).  For these reasons, any claim for losses based on the June 27, 2014 Telegraph article must be dismissed for lack of loss causation.

## V. THE AMENDED COMPLAINT FAILS TO PLEAD CONTROL PERSON LIABILITY UNDER SECTION 20(A).

As demonstrated above, the Amended Complaint fails to allege a primary violation of Section 10(b); it therefore fails to state a claim against any of the Individual Defendants under Section 20(a).  *See Special Situations Fund III QP, L.P.* v. *Deloitte Touche Tohmatsu CPA, Ltd.*, 2014 WL 3605540, at *24 (S.D.N.Y. July 21, 2014) ("It is axiomatic that liability for a Section 20(a) violation is derivative of liability for a Section 10(b) violation.").

Plaintiffs' Section 20(a) claims should also be dismissed for the independent reason that, as demonstrated above (*see supra* Section III.B), the Amended Complaint fails to

allege that any defendant "culpably participated" in any wrongdoing—that is, acted with recklessness with respect to any misstatement.  *See Special Situations Fund*, 2014 WL 3605540, at *25 (ruling that, to plead Section 20(a) liability, plaintiff must allege "particularized facts of the *controlling person's* conscious misbehavior or recklessness") (quoting *Lapin* v. *Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 246 (S.D.N.Y. 2006)); *see also SEC* v. *First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996).[36]

## CONCLUSION

For the foregoing reasons, the Amended Complaint should be dismissed with prejudice.

---

[36]     Nor does the Amended Complaint adequately allege that any Individual Defendant exercised "control" over any statement other than one he actually made or signed.  *See, e.g.*, *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 166-67 (S.D.N.Y. 2012) (dismissing Section 20(a) claim because alleged control person "must not only have control over the primary violator, but have control over the transaction in question" (quotations omitted)); *Rubinstein* v. *Skyteller, Inc.*, 48 F. Supp. 2d 315, 323 (S.D.N.Y. 1999) ("Officer or director status alone . . . is not enough to establish control person liability.").  For example, the Amended Complaint does not allege any facts giving rise to a plausible inference that any of the Individual Defendants other than Mr. White had "control" over Mr. White's statements (all of which are inactionable, in any event (*see supra* Section II.B)).  Likewise, Mr. White is not alleged to have "controlled" any of the alleged misstatements made by the other Individual Defendants or Barclays PLC (all of which are also inactionable, in any event (*see supra* Section II.A)).  *See, e.g.*, *Teamsters Local 445 Freight Div. Pension Fund* v. *Bombardier Inc.*, 2005 WL 2148919, at *15 & n.210 (S.D.N.Y. Sept. 6, 2005) (dismissing Section 20(a) claim against director of subsidiary where there was no "specific allegation of control," and noting that plaintiffs "surely did not mean to allege that the directors of the subsidiaries controlled the parent corporation").  In fact, nowhere in Counts I and II of the Amended Complaint do plaintiffs even attempt to differentiate among which defendant is responsible for which misstatement.  (*See* AC ¶¶ 208-223.)  This alone is fatal to the Amended Complaint.

Dated: January 20, 2015                    Respectfully submitted,
          New York, New York


/s/ Jeffrey T. Scott
Jeffrey T. Scott (scottj@sullcrom.com)
David H. Braff (braffd@sullcrom.com)
Matthew A. Schwartz
(schwartzmatthew@sullcrom.com)
Andrew H. Reynard (reynarda@sullcrom.com)
John J. Hughes, III (hughesj@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

Brent J. McIntosh (mcintoshb@sullcrom.com)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C.  20006-5215
Telephone:  (202) 956-7500
Facsimile:  (202) 293-6330

*Attorneys for Defendants*