**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BARBARA STROUGO, Individually and on Behalf of All Others Similarly Situated, :<br><br>Plaintiff(s), :<br><br>v. :<br><br>BARCLAYS PLC, BARCLAYS CAPITAL, INC., ROBERT DIAMOND, ANTONY JENKINS, CHRISTOPHER LUCAS, TUSHAR MORZARIA, and WILLIAM WHITE, :<br><br>Defendants. : | **Case No. 14-cv-5797 (SAS)** |

<u>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**</u>

# TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ................................................................. 1

II.  STATEMENT OF FACTS ...................................................................... 4

    A.   During the Class Period, Barclays Was Marre by a Culture of
        Greed That Top Management Vowed to But Did Not Reform ..............................4

    B.   In the Meantime, Barclays Was Determined to Make its Dark Pool
        the Largest in the United States ........................................................6

    C.   To Propel to the Top, Barclays Lied About LX's Transparency and
        Safeguards ..........................................................................8

III. STANDARD OF REVIEW ...................................................................... 9

IV.  ARGUMENT .................................................................................. 10

    A.   Plaintiffs Are Permitted to Borrow the Damning Allegations From the NYAG
        Complaint ........................................................................... 10

    B.   The Complaint Pleads Actionable Misrepresentations and Omissions ............... 12

        1.   Defendants' Statements Regarding the Implementation of
            the Salz Report Are Actionable ................................................12

            a.   Barclays' Stated Commitment to Implement the
                Salz Recommendations Bank-wide Renders
                Barclays' Statements About Such Implementation
                Actionable ...........................................................12

            b.   Defendants' Remaining Arguments Have No Merit ...................18

        2.   Defendants' Statements About LX Are Actionable.................................22

            a.   Defendants' False and Misleading Statements
                About LX's Transparency and Safeguards Were
                Material to Investors ................................................22

            b.   Barclays' Statements About LX's Transparency and
                Safeguards Were False and Misleading........................27

    C.   The Complaint Adequately Alleges Scienter........................................ 33

i

1.      Defendant White ...................................................................................... 34

2.      Defendants Diamond, Jenkins, Lucas, and Morzaria ............................... 36

3.      Defendants Had a Motive to Commit Fraud............................................. 40

4.      Corporate scienter .................................................................................... 41

D.      The Complaint Properly Pleads Loss Causation as to the June 27 Telegraph
        Article ............................................................................................................. 41

E.      The Complaint States a Claim Under Section 20(a) ............................................. 43

V.      CONCLUSION ............................................................................................................ 44

## TABLE OF AUTHORITIES

**Cases**                                                                                                   **Pages**

*380544 Canada, Inc.* v. *Aspen Technology, Inc.*,
    544 F. Supp. 2d 199 (S.D.N.Y. 2008).................................................................................... 11

*Asher* v. *Baxter Int'l Inc., et al.*,
    377 F.3d 727 (7th Cir. 2004) ............................................................................................ 22

*Atlas* v. *Accredited Home Lenders Holding Co.*,
    556 F. Supp. 2d 1142 (S.D. Cal. 2008)............................................................................. 25

*AUSA Life Ins. Co.* v. *Ernst & Young*,
    206 F.3d 202 (2d Cir. 2000)............................................................................................. 23

*Basic* v. *Levinson*,
    485 U.S. 224 (1988) ......................................................................................................... 27

*Bell Atlantic Corp.* v. *Twombly*,
    550 U.S. 544 (2007) ........................................................................................................... 9

*Boca Raton Firefighters & Police Pension Fund* v. *Bahash*,
    506 F. App'x. 32 (2d Cir. 2012) ................................................................................ 18, 44

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund* v. *Transocean Ltd.*,
    866 F. Supp. 2d 223 (S.D.N.Y. 2012)............................................................................. 41

*C.D.T.S. No 1* v. *UBS AG*,
    2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013) ................................................................ 18

*City of Brockton Ret. Sys.* v. *Avon Products, Inc.*,
    2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014)................................................................. 17

*City of Monroe*,
    399 F.3d 651 (6th Cir. 2005) ........................................................................................... 12

*City of Pontiac Gen. Emps' Ret. Sys.* v. *Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012).............................................................................. 33

*City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*,
    752 F.3d 173 (2d Cir. 2014).............................................................................................. 18

*Cortec Indus., Inc.* v. *Sum Holding L.P.*,
    949 F.2d 42 (2d Cir. 1991)............................................................................................... 44

*ECA, Local 134 IBEW Joint Pension Trust of Chi.* v. *JP Morgan Chase Co.*,

553 F.3d 187 (2d Cir. 2009)..................................................................... 18, 23

*Freudenberg* v. *E\*Trade Fin. Corp.*,
   712 F.Supp.2d 171 (S.D.N.Y. 2010).................................................. 17

*Ganino* v. *Citizens Utils. Co.*,
   228 F.3d 154 (2d Cir. 2000)............................................................ 22, 23

*Geinko* v. *Padda*,
   2002 WL 276236 (N.D. Ill, Feb. 26, 2002) ...................................... 12

*Grossman* v. *Novell, Inc.*,
   120 F.3d 1112 (10th Cir. 1997) ........................................................ 20

*Gusinsky* v. *Barclays PLC*,
   944 F. Supp. 2d 279 (S.D.N.Y. 2013).............................................. 18

*Halliburton Co.* v. *Erica P. John Fund Inc.*,
   134 S. Ct. 2398 (2014)................................................................... 25, 26

*Halperin* v. *eBankerUSA.com, Inc.*,
   295 F.3d 352 (2d Cir. 2002)........................................................... 29, 30

*Homeward Residential, Inc.* v. *Sand Canyon Corp.*,
   298 F.R.D. 116 (S.D.N.Y. 2014) ...................................................... 11

*IBEW Local 90 Pension Fund* v. *Deutsche Bank AG*,
   2013 WL 1223844 (S.D.N.Y. March 27, 2013) ................................ 41

*In re Advanced Lighting Techs., Inc.*,
   2000 U.S. Dist. LEXIS 20628 (N.D. Ohio June 6, 2000).................. 36

*In re Air Disaster at Lockerbie, Scotland*,
   144 F.R.D. 618 (E.D.N.Y. 1992) ...................................................... 12

*In re Am. Int'l Group, Inc. 2008 Sec. Litig.*,
   741 F. Supp. 2d 511 (S.D.N.Y. 2010).............................................. 21

*In re Ashanti Goldfields Sec. Litig.*,
   184 F.Supp.2d 247 (E.D.N.Y. 2002) ................................................ 34

*In re Ashworth Sees. Litig.*,
   2002 U.S. Dist. LEXIS 14971 at \*37 (S.D. Cal. 2001) ...................... 36

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,

324 F. Supp. 2d 474 (S.D.N.Y. 2004) ............................................................ 37

*In re Australia and New Zealand Banking Group Ltd Secs Litig.*,
2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009) .......................................... 18

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
851 F. Supp. 2d 746 (S.D.N.Y. 2012)................................................. 10, 11

*In re Bear Stearns Cos., Inc. Sec., Deriv., and ERISA Litig.*,
763 F. Supp. 2d 423, 495 (S.D.N.Y. 2011) ........................................... 21

*In re BP P.L.S. Sec. Litig*,
843 F. Supp. 2d 712 (S.D. Tex. 2012) ........................................... *passim*

*In re Bristol Myers Squibb Co. Sec. Litig*.,
586 F. Supp. 2d 148 (S.D.N.Y. 2008)..................................................... 42

*In re Comshare Inc. Secs. Litig.*,
183 F.3d 542 (6th Cir. 1999) ................................................................. 36

*In re Daou Sys., Inc., Sec. Litig.*,
411 F.3d 1006 (9th Cir.2005) ................................................................ 43

*In re Gentiva Sec's Litig.*,
932 F. Supp.2d 352 (E.D.N.Y. 2013) ................................................... 18

*In re Goldman Sachs Group, Inc. Sec. Litig.*,
2014 WL 2815571 (S.D.N.Y. June 23, 2014) ....................................... 17

*In re JPMorgan Chase & Co. Sec. Litig.*,
2007 WL 4531794 (N.D. Ill. Dec. 18, 2007) ....................................... 40

*In re LDK Solar Sec. Litig.*,
584 F. Supp. 2d 1230 (N.D. Cal. 2008) ................................................ 40

*In re Massey Energy Co. Sec. Litig.*,
883 F. Supp. 2d 597 (S.D. Va. 2012)..................................................... 17

*In re Moody's Corp. Sec. Litig*.,
599 F. Supp. 2d 493 (S.D.N.Y. 2009)..................................................... 41

*In re NTL Inc. Sec. Litig.*,
347 F. Supp. 2d 15 (S.D.N.Y. 2004).................................................. 17, 20

*In re Omnicom Group, Inc. Sec Litig.*,

597 F.3d 501 (2d Cir. 2010).................................................................... 43

*In re OSG Sec. Litig.*,
12 F. Supp. 3d 619 (S.D.N.Y. 2014)................................................. 10

*In re Parmalat Sec. Litig.*,
375 F. Supp. 2d 278 (S.D.N.Y. 2005)............................................... 44

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
930 F. Supp. 68 (S.D.N.Y. 1996) ..................................................... 22

*In re Refco, Inc. Sec. Litig.*,
503 F. Supp. 2d 611 (S.D.N.Y. 2007)............................................... 37

*In re Res. Am. Sec. Litig.*,
2000 WL 1053861 (E.D. Pa. July 26, 2000)..................................... 41

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001)................................................................ 33

*In re Sears, Roebuck Co.Sec. Litig.*,
291 F.Supp.2d 722 (N.D. Ill. 2003) ................................................. 34

*In re Syncor Int'l Corp. Sec. Litig.*,
239 Fed. Appx. 318 (9th Cir. 2007).................................................. 17

*In re Vivendi Universal, S.A. Sec. Litig.*,
381 F. Supp. 2d 158 (S.D.N.Y. 2003)............................................... 42

*In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*,
694 F. Supp. 2d 1192 (W.D. Wash. 2009).................................. 37, 38

*In re Winstar Commc'ns*,
2006 WL 473885 (S.D.N.Y Feb. 27, 2006)...................................... 42

*In re Xerox Corp. Sec. Litig.*,
165 F. Supp. 2d 208 (D. Conn. 2001)............................................... 17

*Janbay* v. *Canadian Solar, Inc.*,
2012 WL 1080306 (S.D.N.Y. March 30, 2012) ............................... 43

*Landesbank Baden-Wurttemberg* v. *RBS Holdings USA, Inc.*,
14 F. Supp. 3d 488 (S.D.N.Y. 2014)................................................. 10

*Lapin* v. *Goldman Sachs Grp., Inc.*,

506 F. Supp. 2d 221 (S.D.N.Y. 2006) ................................................................. 18

*Lormand* v. *U.S. Unwired, Inc.*,
   565 F.3d 228 (5th Cir. 2009) ........................................................................... 22

*Matrixx*,
   131 S.Ct. 1309 (2011) ...................................................................................... 28

*McMahan & Co.* v. *Wherehouse Entm't Inc.*,
   900 F.2d 576 (2d Cir. 1990) ....................................................................... 28, 29

*Meyer* v. *Jinkosolar Holdings Co., Ltd.*,
   2014 WL 3747181 (2d Cir. July 31, 2014) ...................................................... 21

*Miller* v. *Thane Int'l., Inc.*,
   519 F.3d 879 (9th Cir. 2008) ........................................................................... 25

*No. 84 Employer-Teamster Joint Council Pension Trust Fund* v. *America West Holding, Co.*,
   320 F.3d 920 (9th Cir. 2003) ........................................................................... 23

*Novak* v. *Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ....................................................................... 33, 34

*Oran* v. *Stafford*,
   226 F.3d 275 (3d Cir. 2000) ............................................................................ 23

*Pension Comm. of Univ. of Montreal Pension Plan* v. *Banc of Am. Sec., LLC*,
   446 F. Supp. 2d 163 (S.D.N.Y. 2006) .............................................................. 43

*Reese* v. *BP Exploration*,
   643 F.3d 681 (9th Cir. 2011) ........................................................................... 22

*Schottenfeld Qualified Assoc.* v. *Workstream, Inc.*,
   2006 WL 4472318 (S.D.N.Y. May 4, 2006) .................................................... 22

*SEC* v. *Das*,
   2010 WL 4615336 (D. Neb. Nov. 4, 2010) ...................................................... 23

*SEC* v. *Pace*,
   173 F. Supp. 2d 30 (D.D.C. 2001) ................................................................... 24

*Slayton* v. *Am. Express Co.*,
   604 F.3d 758 (2d Cir. 2010) ............................................................................ 21

*Stratte-McClure* v. *Morgan Stanley*,

784 F. Supp.2d 373 (S.D.N.Y. 2011) .................................................................. 18

*Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008) ................................................................... 34, 36

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ................................................................................ 9, 33

*United States* v. *Hatfield*,
    724 F. Supp. 2d 321 (E.D.N.Y. 2010) ......................................................... 24

*United States* v. *Nacchio*,
    519 F.3d 1140 (10th Cir. 2008) ................................................................... 23

*Washtenaw County Employees Retirement System* v. *Avid Technology, Inc.*,
    28 F. Supp. 3d 93 (D. Mass. 2014) .............................................................. 40

## **Statutes**

15 U.S.C. § 78u-4(b)(2)(A) ................................................................................ 33

## **Regulations**

17 CFR § 240.10b-5(b) ...................................................................................... 28

Lead Plaintiff Mohit Sahni and plaintiff Joseph Waggoner ("Plaintiff" or "Plaintiffs") respectfully submit this memorandum of law in opposition to the motion to dismiss Plaintiffs' Consolidated Amended Complaint for Violations of the Federal Securities Laws filed by defendants Barclays PLC, Barclays Capital Inc. (together, "Barclays" or the "Company"), Robert Diamond, Antony Jenkins, Christopher Lucas, Tushar Morzaria, and William White (together, the "Individual Defendants") (collectively, "Defendants").

## I.     PRELIMINARY STATEMENT

Recently Barclays has been marred by a series of unprecedented scandals involving, among other matters, the manipulation of the London Interbank Offered Rates ("LIBOR" or "Libor"), the premier benchmark for interest rates worldwide, for which the company was fined over $450 million; the manipulation of gold prices, for which the company was fined $43.8 million; and the manipulation of the foreign-exchange market.   The Libor scandal was particularly damaging for Barclays, with regulators implicating senior executives in a "widespread" fraud.  Barclays lacked the appropriate internal controls and procedures that would have uncovered the fraud, such as periodic reviews of potentially fraudulent communications. An independent review of Barclays' practices commissioned by the Company and covering all business units without exception found that Barclays' bankers had a "winning at all costs" attitude, with an "over-emphasis" on short-term financial performance.   Barclays' pay culture rewarded money-making above all and led to "reputational damage and a loss of public trust."

Facing withering criticism, Barclays vowed change. Commanded by its newly-minted CEO, Barclays claimed to have made bank-wide changes "to strengthen the governance relating to conduct and reputation" and "increase transparency and conduct business in the right way."

"The pursuit of profit that is achieved in ways inconsistent with [values of integrity] will not be tolerated." Yet, Barclays never changed.

The conduct at issue involves Barclays' "dark-pool" (marketed as Barclays' Liquidity Cross, or LX), a private trading venue where investors can trade stocks with near anonymity. During the Class Period, Barclays' dark pool catapulted into the financial stratosphere, becoming the number one U.S. dark pool with market share growth of 33% per year.  Barclays accomplished this goal ("We will not be happy until we are number one") through false representations about the dark pool's transparency and safeguards.  Barclays touted LX as a safe trading venue "built on transparency," with "built in safeguards to manage toxicity [of aggressive traders]" who victimize investors trading in the dark pool by trading ahead of anticipated purchase and sell orders, thereby rapidly capitalizing on proprietary information regarding trading patterns.  Contrary to those representations, not only did Barclays allow aggressive traders to trade in its dark pool, it proactively wooed them with perks purposefully designed to provide them with a competitive advantage over traditional traders.

On June 25, 2014, the New York State office of the Attorney General ("NYAG") commenced a lawsuit against Barclays under the New York Martin Act, alleging that Barclays concealed material information regarding the operation of its dark pool.  The complaint cites a litany of internal documents and emails, as well as statements by Barclays former employees with intimate knowledge of the dark pool, revealing among other things that Barclays intentionally "*falsified marketing materials*" about the safeguards of LX to grab the number one spot and add to Barclays' prestige. One such presentation intentionally deleted from its list of market participants the largest and very toxic participant in Barclays' dark pool, Tradebot. Scheming emails reveal Barclays' fraudulent intent to conceal the existence of Tradebot. A Vice

2

President in charge of marketing the dark pool stated: "I had always liked the idea that we were being transparent, *but happy to take liberties if we can all agree*" (emphasis added). Barclays' Head of Product Development agreed: "I think the accuracy [of the chart] is secondary to [the] objective" of showing clients that Barclays monitors the trading in its dark pool, and "so if you want to move/kill certain [traders], it doesn't really matter." Barclays' Head of Equities Sales responded: "Yes! U smart." According to an amended complaint filed recently by the NYAG's office, this doctored analysis was displayed on Barclays' website from October 2012 until the filing of the NYAG complaint, *when Barclays immediately deleted it*. (*See* Exhibit A attached hereto, at ¶123).

Just recently, the Wall Street Journal reported that Barclays is refusing to cooperate in important aspects with the NYAG's investigation into the activity of high-speed traders in its dark pool.  *See* WSJ, January 21, 2015, "N.Y. Attorney General:  Barclays Isn't Cooperating with Dark-Pool Probe."  In an amended complaint, NYAG Eric Schneiderman said that Barclays had defied subpoenas seeking the testimony under oath of the two top executives running the bank's Equities Electronic Division, which overseas its dark pool.  The amended complaint names the executives who participated in the LX scheme—William White, Head of Electronic Ttrading (a defendant in this action), and David Johnsen, Head of Product Development—and alleges that they were directly involved in, and oversaw, much of the fraudulent activity in the dark pool.  The amended complaint also alleges that Barclays *falsely represented to the public and to the New York state court* that it had barred a high-frequency trading firm from its dark pool in June 2012.

II.     **STATEMENT OF FACTS**

A.      **During the Class Period, Barclays Was Marre by a Culture of Greed That Top Management Vowed to But Did Not Reform**

Barclays' culture of winning at all costs permeated all facets of its business and spread amongst its top echelon.  ¶25.[1]  For example, in 2012 Barclays agreed to pay roughly $500 million to U.S. and British authorities to settle allegations that it manipulated Libor, a key benchmark for interest rates worldwide, continuously from 2005 through 2009.  *Id*.  That probe also claimed the scalp of Barclays' CEO Robert Diamond, and raised questions regarding the conduct of Barclays' senior managers and compliance officers.  The U.K. Financial Services Authority ("FSA") concluded that derivatives traders requested false submissions in the Libor and Euribor setting process, as they were "motivated by profit and sought to benefit Barclays' trading positions." *Id*. The FSA found the misconduct to be "serious and widespread." *Id*.  The U.S. government also implicated senior executives at Barclays in its settlement. *Id*. The lack of specific internal controls, particularly in reviewing email communications, was one of the failures cited by a Commodity Futures Trading Commission ("CFTC") regulatory order implementing its share of the Barclays settlement. ¶26. "Appropriate daily supervision of the desk by the supervisors, as well as periodic review of the communications, should have discovered the conduct. However, Barclays lacked specific internal controls and procedures that would have enabled Barclays' management or compliance to discover this conduct." *Id*.

Plagued by the Libor scandal, in July 2012 Barclays commissioned an independent review of its practices, "with a view to providing a comprehensive roadmap for cultural change

---

[1] Unless otherwise noted, citations in the form "¶ __" refer to paragraphs in the Consolidated Amended Complaint ("Complaint" or "Compl."), Dkt. No. 20.

at the bank." ¶28. The aim "was to understand whether or not there was any underlying cultural root cause to each of those events and, if so, what change needed to be made to prevent them from recurring in the future." *Id*. The review was carried out by Sir Anthony Salz, a prominent lawyer and former chairman of the BBC. *Id*. On April 3, 2013, Salz issued a 244-page report (the "Report"), finding that Barclays' bankers were engulfed in a culture of "edginess" and had a "winning at all costs" attitude. *Id*. Pay "contributed significantly to a sense among a few that they were somehow unaffected by the rules." *Id*. Salz found that "[s]ignificant failings developed in the organization as it grew." *Id*. "[T]he business practices for which Barclays has rightly been criticized were shaped predominantly by its cultures, which rested on uncertain foundations." *Id*. The result, according to the report, was a "strong drive to win," particularly as the bank became increasingly dominated by the investment banking business, which possessed a strong culture of winning. *Id*. This meant there was an "over-emphasis" on short-term financial performance, reinforced by a bonus and pay culture that rewarded money-making over serving the public interest. *Id*. There was also a sense that senior management did not want to hear bad news. *Id*. "Barclays was sometimes perceived as being within the letter of the law but not within its spirit," the review said, describing "an institutional cleverness." *Id*. The Report found that "the absence of a common purpose or common set of values has led to conduct problems, reputational damage and a loss of public trust." ¶29.

Salz made 34 formal recommendations to "provide a valuable road map for the future." ¶30 (*See* Exhibit B attached hereto). These recommendations included taking concrete step related to conduct, reputational, and operational risk. Salz recommended, for example, that "Barclays should ensure its conduct, reputational and operational risk framework includes the articulation of a tangible risk appetite statement and mechanisms to ensure that conduct,

reputational and operational risk are fully factored into business decisions and governance."  Salz also recommended that Barclays "should promote and safeguard the trust in which it is held" and "should state clearly [its] purpose and report regularly on how it is fulfilling that purpose." The scope of the review's recommendations "*is global and spans all businesses within Barclays without exception*" (emphasis added). *Id*. Barclays committed to implement in full each and every recommendation in the Salz report "as part of [Barclays'] determination to regain the trust of all of Barclays' shareholders."  ¶32. Barclays claimed that it did not stand idly by during the seven months over which the review was conducted.  Instead, led by its new Chairman and CEO, Defendant Jenkins, Barclays claims to have made changes starting in 2012 through a so-called "Transform Programme" designed to "*deliver the fundamental cultural, financial and performance changes necessary" to gain the public trust* (emphasis added).  ¶33. The changes were said *to cover the entire bank*. *Id*.  Barclays represented that "[i]n the spirit of transparency and rebuilding trust, Barclays will publish updates on [its] progress in [its] implementation programme." *Id*. In 2013, Barclays also introduced the Enterprise Risk Management Framework, which set out a framework and approach *applicable to the whole bank, all employees, and all types of risk*. ¶34. According to Barclays, "*to strengthen the governance relating to conduct and reputation matters, Conduct Risk and Reputation Risk were recategorized as Principal Risks in 2013 with Executive Committee sponsorship from the Principal Risk Owner, the Head of Compliance." Id*. (emphasis added).

       B.     **In the Meantime, Barclays Was Determined to Make its Dark Pool the Largest in the United States**

As recently as 2009, Barclays LX was languishing in 10th place among its U.S. dark pool peers.  ¶51. That was just not good enough for Barclays.  Barclays wanted to propel to the very

top.  *Id.* Being the largest dark pool in the United States became a principal goal of Barclays' Equities Electronic Trading division. *Id.* This strategy was not only central to driving profits for the division, but also an imprimatur of prestige. *Id.* Barclays' dark pool was referred to internally as "The Franchise." *Id.* Bill Bell, the head of electronic and program distribution at Barclays who reported to Defendant White, put Barclays' goal bluntly: "*We will not be happy until we are number one.*" ¶52. As reflected in the NYAG Complaint, Barclays also identified the "market share value of attracting more [order] flow" into its dark pool. ¶54. Internal Barclays documents valued this growth opportunity at between $37 and $50 million per year. *Id.* To grow its dark pool, Barclays had to increase the number of orders that Barclays, acting as a broker, executed in the dark pool.  ¶56. This required Barclays to send more of its clients' orders into the dark pool, and to make sure that there was sufficient liquidity in the dark pool to fill those orders. *Id.* To meet that need, Barclays looked to attract high frequency traders to its dark pool. *Id.*

Barclays tasked Defendant White with spearheading that effort. ¶57. White is credited with overhauling Barclays' algorithms, building a smart order router ("SOR"), the centerpiece of the desk's electronic trading, and making modifications to the LX dark pool itself.  *Id.*  A key hire by Defendant White in 2012 was Dave Johnsen, whom he tasked with helping run the electronic trading desk at Barclays. ¶58. Johnsen was a former senior executive at Goldman Sachs Group Inc.'s dark pool.  *Id.* According to FINRA's BrokerCheck, Wall Street's self-regulator, Johnsen had been fired in 2012 by Goldman Sachs for "concerns relating to the performance of his supervisory responsibilities." *Id.* But at Barclays, Johnsen flourished: he became White's right-hand man, running the day-to-day operations of Barclays' LX. *Id.*

Barclays' efforts to market its dark pool were hugely successful. ¶59. Through false and misleading statements and marketing materials, Barclays LX eventually moved into second place in January 2013, and later in the year, based on published volumes, ascended to the top. *Id.*

C. **To Propel to the Top, Barclays Lied About LX's Transparency and Safeguards**

Defendant White attributed LX's success to Barclays' commitment to being transparent regarding Barclays' operations, how Barclays routes client orders, and the kinds of counterparties traders can expect to deal with when trading in the dark pool. According to White, transparency was "the one issue that we really took a stance on . . .*Transparency on multiple levels is a selling point for our entire equities franchise."* (emphasis added). ¶¶65, 181, 183. Barclays' efforts to convince the market of the safety of trading in its dark pool relied, in large part, on a service Barclays calls "Liquidity Profiling." ¶65. This tool purportedly allowed Barclays to monitor the "toxicity" of the trading behavior taking place in its dark pool and, as Barclays claimed, "hold [traders] accountable" if their trading was "aggressive," "predatory," or "toxic." ¶¶65-66. Barclays touted Liquidity Profiling as a "sophisticated surveillance framework, helping to protect you from predatory trading . . . our team proactively monitors the behavior of individual participants and quickly responds with corrective action when adverse behavior is detected." ¶67. Liquidity Profiling "improve[s] the overall quality of [Barclays' dark pool because] High-alpha takers [*i.e.*, high frequency traders] can be held accountable . . . transparency means that aggressive flows will be quickly identified by the Barclays ATS team." *Id.* "By identifying aggressive behavior, we can take corrective action with clients who exhibit opportunistic behavior in the pool." *Id.* Barclays publicly represented that it would "refuse a client access" to the dark pool if they engaged in aggressive or "toxic" trading strategies. *Id.*

Contrary to Barclays' widely-disseminated assurances, however, LX was a magnet for high frequency traders.  For example, contrary to Barclays' claim that it uses Liquidity Profiling to police its dark pool, and will "refuse a client access" if its trading is toxic, Barclays has never prohibited a single trader from participating in its dark pool, regardless of its toxicity level. ¶91. Moreover, Barclays has applied "overrides" to a number of traders in the dark pool, assigning safe Liquidity Profiling ratings to certain traders that should have been rated as toxic. ¶93. Barclays justified these "overrides" as being in Barclays' own economic interest, noting that "it is our darkpool, after all." *Id*. Barclays knew that its Liquidity Profiling tool was ineffective. ¶97. As reflected in the NYAG Complaint, in an internal document dated December 2013, Barclays recognized that "Liquidity Profiling reviews may not be completed for all clients, may rely on inaccurate information and results and rationale for profiling changes may not be evidenced; *leading to reputational damage as the service . . . may not function as advertised to clients*." *Id*. As stated by one former Barclays Director in the Equities Electronic Trading division, Barclays "purport[s] to have a toxicity framework that will protect you when everybody knows internally that that thing is done manually with outliers removed and things are classified [only] if they feel like it." ¶98. Another former Director described Liquidity Profiling as "a scam." *Id*.

## III.     STANDARD OF REVIEW

A court considering a motion to dismiss under the PSLRA should assess the complaint "in its entirety" and all of the allegations "holistically," accepting all factual allegations as true and construing those allegations in the light most favorable to the plaintiff.  *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 326 (2007).  The pleading need only contain "[f]actual allegations . . . [sufficient] to raise a right to relief above the speculative level."  *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 556 (2007).

IV.     **ARGUMENT**

A.     **Plaintiffs Are Permitted to Borrow the Damning Allegations From the NYAG Complaint**

Faced with overwhelming evidence of fraud, Defendants demand that this Court strike Plaintiffs' allegations or give them zero weight because they are premised on the unadjudicated complaint brought by the NYAG.  This Court has rejected similarly improper requests and should do so again here.  Just recently, this Court held in no uncertain terms that a plaintiff is permitted for pleading purposes to use factual allegations from such proceedings.  *See In re OSG Sec. Litig.*, 12 F. Supp. 3d 619 (S.D.N.Y. 2014) (Scheindlin, J.). There, the Court permitted plaintiffs to amend their complaint to add factual allegations from another lawsuit to plead elements of a claim.  The Court reasoned that "it would make little sense to strike references to pleadings in ongoing actions" when the Second Circuit made clear that even settlements (which trigger protections and other policy concerns) are admissible to prove elements of a plaintiff's claim. *Id*. at 621. Other courts in this district have applied this indubitable logic to permit allegations premised upon other lawsuits or regulatory proceedings. *See*, *e.g.*, *Landesbank Baden-Wurttemberg v. RBS Holdings USA, Inc.*, 14 F. Supp. 3d 488, 497 (S.D.N.Y. 2014) (Gardephe, J.) ("It makes little sense to say, as Defendants urge, 'that information from such a study—which [Plaintiffs' Complaint] could unquestionably rely on if it were mentioned in a news clipping or public testimony—is immaterial simply because it is conveyed in an unadjudicated complaint.'") (citing *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 768 n. 24 (S.D.N.Y. 2012)) (Swain, J.) (Although "some courts in this district have stretched the holding in *Lipsky* to mean that any portion of a pleading that relies on unadjudicated allegations in another complaint is immaterial under Rule 12(f)[,] [n]either Circuit

10

precedent nor logic supports such an absolute rule."); *Homeward Residential, Inc.* v. *Sand Canyon Corp.*, 298 F.R.D. 116, 125-126 (S.D.N.Y. 2014) (Torres, J.) ("This Court will consider the allegations incorporated from the *Cambridge Place* complaint.").

Here, permitting Plaintiffs to borrow allegations from the NYAG's complaint is particularly warranted because the borrowed facts derive from a highly credible complaint based on a mountain of facts obtained from corroborating confidential informants and documents. *See*, *e.g.*, *Homeward Residential*, 298 F.R.D. at 126 (rejecting a Rule 11 challenge where "the statements contain their own indicia of reliability. The quotes are from a number of different employees (not from one possible disgruntled or vindictive employee), who worked in different geographic areas and in different positions throughout the company. Because they report a consistent pattern of behavior, the Court has more faith in their accuracy"); *Bear Stearns*, 851 F. Supp. 2d at 768 n.24 (complaints containing detailed factual information are appropriate for borrowing); *380544 Canada, Inc.* v. *Aspen Technology, Inc.*, 544 F. Supp. 2d 199, 224-225 (S.D.N.Y. 2008) (Keenan, J.) (same). Here, the NYAG's extensive investigation was "aided significantly by a number of high-level former Barclays insiders, each of whom was in a position to observe much of the conduct described in the Complaint. These witnesses provided meaningful assistance to the Attorney General's investigation." Compl. pg. 1. Counsel for Plaintiffs has contacted one of the attorneys who signed the NYAG complaint to verify the allegations in the Complaint; at this stage of the proceedings, Plaintiffs are not able to gain access to the government's confidential informants. Defendants do not allege—nor do they provide one iota of evidence—that the NYAG is somehow incentivized to misuse or

mischaracterize the statements given by these cooperating witnesses.  There is no credible objection to Plaintiffs' pleading of facts contained in the NYAG complaint.[2]

### B.    The Complaint Pleads Actionable Misrepresentations and Omissions

A misrepresentation or omission is actionable when it "pertain[s] to material information that the defendant had a duty to disclose." *City of Monroe*, 399 F.3d 651, 669 (6th Cir. 2005). "[A] duty to affirmatively disclose may arise when there is . . . an inaccurate, incomplete, or misleading prior disclosure." *Id.*  The Complaint alleges numerous material misstatements and omissions made by Defendants during the Class Period which, for the Court's convenience, are grouped into two categories: Defendants' commitment to implement the recommendations in the Salz report across all of Barclays' businesses, including LX; and Defendants' touting of LX as a market model for transparency.

### 1.    Defendants' Statements Regarding the Implementation of the Salz Report Are Actionable

#### a.  Barclays' Stated Commitment to Implement the Salz Recommendations Bank-wide Renders Barclays' Statements About Such Implementation Actionable

As alleged, Salz made 34 formal recommendations to "provide a valuable road map for the future," whose scope "*is global and spans all businesses within Barclays without exception.*"

¶30.  Barclays committed to implement in full each and every recommendation to *all businesses*

---

[2] *Geinko* v. *Padda*, 2002 WL 276236 (N.D. Ill, Feb. 26, 2002), a non-binding case on which Defendants rely, is distinguishable. There, unlike here, the court noted that "significantly," the plaintiffs had failed to contact the attorneys in the other case. *Id*. at *6 n.8.  Moreover, as explained above, the facts alleged here contain their own indicia of reliability.  In any event, the holding of *Geinko* cannot be reconciled with the long-standing rules governing pleadings under the Federal Rules of Civil Procedure. *See, e.g., In re Air Disaster at Lockerbie, Scotland,* 144 F.R.D. 618, 621 (E.D.N.Y. 1992) (denying motion for Rule 11sanctions, stating "parties and their attorneys may base their complaints and their requests for discovery on ... hearsay reports and statements of others until such time, if ever, as they are satisfied that the statements and other evidence are not competent or are otherwise untrustworthy").  Defrauded investors are not limited to pleading information personally known to them through first hand observations only.

*within Barclays without exception* "as part of [Barclays'] determination to regain the trust of all of Barclays' shareholders." ¶30-32.  Barclays represented that it did not stand idly by during the seven months over which the review was conducted, but instead claimed to have adopted changes starting in 2012 through a "Transform Programme" designed to "*deliver the fundamental cultural, financial and performance changes necessary*" to gain the public trust. ¶33.  Defendant Jenkins professed that, with the introduction of Barclays' *bank-wide* Purpose and Values program designed to ensure that Barclays acts fairly, ethically, and honestly, "the rules have changed" at Barclays.  ¶134.  In 2013, Barclays also announced the introduction of a so-called Enterprise Risk Management Framework purportedly designed "to strengthen the governance relating to conduct and reputation matters."  Pursuant to this framework, Conduct Risk and Reputation Risk were categorized as Principal Risks in 2013, with Executive Committee sponsorship from the Head of Compliance. ¶34.

Vowing concrete changes following the Salz recommendations, during the Class Period Barclays embarked on a marketing campaign designed to clean up its reputation and regain the public's trust.  To that end, Barclays made a series of statements directly addressing these purported changes.  For example, Barclays represented that "the rules have changed" and that Barclays has promulgated [the] Purpose and Values standards ensuring that Barclays acts "fairly, ethically, and honestly" (¶134); that Barclays' new Purpose and Values standards "apply consistently across all businesses and serve as the basis against which the performance of every colleague and every business across the organisation will be assessed and rewarded" (¶138); that "Barclays is changing" as it "ha[s] set out clear [non-financial] commitments" to "provide greater disclosure and transparency around our financial performance; [and] embed our [P]urpose and [V]alues [of integrity] across Barclays" (¶140); that Barclays implemented the

Transform Program to drive the "fundamental changes to how [Barclays] run[s] [its] business" and that Barclays "introduc[ed] . . . bank-wide Purpose and [integrity] Values" (¶153); that Barclays was "establishing a consistent set of practices across Barclays to ensure that [the Company] restore, enhance and protect the trust that is so vital to the long-term success of [its] business, driven by a dedicated team and incorporating best practices from other industries," that Barclays is "committed to implementing the [Salz] Review's recommendation to regain the trust of all of Barclays' stakeholders," that the "Purpose and [integrity] Values are standards which will guide our decision-making and against which all employees will be assessed and rewarded" (¶155); that Barclays' new risk culture and control framework "will also be strengthened by actions to reinforce a control and compliance culture throughout the bank" and that "implementation of the framework will incorporate mechanisms to ensure that conduct, reputational and operational risks are fully factored into business decisions and governance" (¶157); and that "Barclays' Investment Bank adopted new processes for effectively learning from mistakes in 2012 following an internal review," which "allow[s] Barclays to understand and address underlying root causes of issues and apply lessons learned more broadly."   (¶159).  *See similarly* ¶¶130, 147, 149, 153, 161, 176, 186, 189.

Defendant White echoed this mantra repeatedly when he touted LX's transparency, proclaiming that "the biggest theme of the [2013] year was transparency.  [Transparency was] the one issue that we really took a stance on . . . We felt that with the regulatory environment and the concerns about market structure, we would take a very strong position on market transparency, and I think that's what resonates loudest as we look at achievements of last year . . . . LX Liquidity Profiling analyzes each interaction in the dark pool, allowing us to monitor the behavior of individual participants.  This was a very significant step because it was important to

provide transparency not only by reporting our overall volumes, but also by providing clients with transparency about the nature of counterparties in the dark pool and how the control framework works. *Transparency on multiple levels is a selling point for our entire equities franchise . . .*" ¶183. Defendants seek to trivialize these misrepresentations as nothing more than "inactionable puffery," but none of the cases on which they rely helps their cause. Far from being "generalized" statements on which no reasonable investor could rely, these statements are tethered to Barclays' outright commitment for change and the implementation of the Salz recommendations following the Libor scandal.

The well-reasoned decision in *In re BP P.L.S. Sec. Litig*, 843 F. Supp. 2d 712 (S.D. Tex. 2012) involves strikingly analogous facts and therefore is highly instructive. There, plaintiffs brought 10(b) fraud claims against various BP entities and individual defendants based *inter alia* on false and misleading statements regarding BP's commitment to safety. The complaint alleged that BP had a troubled safety record that tarnished its corporate image. In light of its safety failures, BP commissioned an independent review of BP's safety procedures, which was headed by former Secretary of State James Baker (the "Baker Panel"). The Baker Panel reviewed those procedures and published a report (the "Baker Report"). The Baker Report cited organizational problems as the root cause of BP's safety failures, concluding that BP management did not place process safety at its core of values. As here, the Baker Report issued ten recommendations for implementation by BP, including that BP "should use the lessons from the Texas City tragedy and from the [Baker] Panel's report to transform the company into a recognized industry leader in process safety management." On these facts, the court had no difficulty finding actionable statements such as: "We continue to implement the roadmap provided to ourselves and the industry by the excellent work of the Baker Panel. BP remains absolutely committed to taking

15

these lessons and becoming a world leader in process safety"; "When I took over as group chief executive, the immediate task was to restore the integrity and efficiency of BP's operations. I set out three priorities: safety, people and performance"; "Our intense focus on process safety continues. We are making good progress in addressing the recommendations of the Baker Panel and have begun to implement a new Operating Management System across all of BP's operations"; the "tragic [Texas City refinery] accident has changed in a profound and fundamental way our approach to safety and operations integrity—providing a safe working environment is a paramount responsibility, and our first and foremost priority."

Just as here, defendants argued that those statements were puffery. The court slapped down that characterization. Instead, it found those statements to be "*of a different vein*" because they referred to BP's progress following the Texas City explosion and the Baker Panel's findings:

> *The Baker Panel recommendations did not leave BP with a "squishy" mandate*. To the contrary, the Panel's number one recommendation, titled, "Process Safety Leadership," required BP's corporate management to "demonstrate their commitment to process safety by articulating a clear message on the importance of process safety *and matching that message both with the policies they adopt and the actions they take.*" BP clearly embraced the first portion of the Baker Report's mandate. In an effort to "articulate a clear message" with respect to process safety, [] BP executives reeled off the "safety is our number one priority" catchphrase at every turn. *But Plaintiffs' allegations raise a triable issue as to whether BP followed through on the latter portion of the Baker Panel's recommendation, which required BP to match the message with policies and actions.* Following the release of the Baker Report and the clear roadmap for improvement contained therein, BP launched what effectively amounted to a public relations campaign to resuscitate the Company's image with respect to process safety.

*Id*. (emphasis in original and emphasis added).

The court explained that the statements challenged by plaintiffs were "part of that campaign" and "inundated the market with the image that BP was making significant progress on process safety." Precisely for this reason, the statements became actionable. So too here,

Barclays committed to implement in full each and every recommendation in the Salz report "to regain the trust of all of Barclays' shareholders." Barclays repeatedly "pledged to increase transparency and conduct [its] business in the right way, as set out in [its] values." So too here, Plaintiffs' allegations state a triable issue based on whether Barclays "matched the message with policies and actions."[3]

*BP* and other decisions demolish Defendants' argument that "it is black letter law" that Barclays' statements here are inactionable puffery. *See, e.g., In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 604, 614, 617-618 (S.D. Va. 2012) (where following miner deaths and ensuing litigation defendants sought to restore the company's reputation and image by announcing that it had a strong commitment to the safety of its miners and that it had begun "safety improvement initiatives," finding actionable in that context statements professing the company's commitment to and focus on safety); *In re Goldman Sachs Group, Inc. Sec. Litig.*, No. 10-cv-3461, 2014 WL 2815571, at *4-5 (S.D.N.Y. June 23, 2014) ("Goldman's representations about its purported controls for avoiding conflicts were directly at odds with its alleged conduct" and the "statements about business practices were directly related to the subject of the fraud"); *City of Brockton Ret. Sys.* v. *Avon Products, Inc.,* No. 11-cv-4665, 2014 WL

---

[3] Defendants assert that the securities laws do not require them to disclose corporate misconduct or uncharged criminal conduct. (Defs' Br. at 20). But where a corporation speaks in half-truths, even about internal mismanagement, those statements may give rise to a securities fraud claim. *In re NTL Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 27 (S.D.N.Y. 2004); *In re Xerox Corp. Sec. Litig.*, 165 F. Supp. 2d 208, 218 (D. Conn. 2001) ("The gravamen of the plaintiffs' complaint is that the defendants failed to disclose, and made false and misleading statements concerning, the impact on the company of the internal corporate mismanagement, and these actions artificially inflated the price of Xerox common stock. Thus, the plaintiffs' claim is actionable under Section 10(b)."). Moreover, by attributing LX's success solely to legitimate practices, Defendants implicitly (and falsely) warranted that there were no illegal practices contributing to that success. *See In re Syncor Int'l Corp. Sec. Litig.*, 239 Fed. Appx. 318, 320 (9th Cir. 2007); *see similarly Freudenberg* v. *E*Trade Fin. Corp.*, 712 F.Supp.2d 171, 180 (S.D.N.Y. 2010).

17

4832321, at *16 (S.D.N.Y. Sept. 29, 2014) ("A reasonable investor could interpret Avon's statements about its allegedly elaborate internal controls operation as reflecting concrete steps that Avon had taken in this area, and might rely upon these statements as a guarantee that such steps had, in fact, been implemented"); *Lapin* v. *Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 240-41 (S.D.N.Y. 2006) (the Second Amended Complaint does more than identify rosy predictions or vague statements about Goldman's integrity; Goldman stated that such integrity "was at the heart" of its business and attempted to distinguish itself from other institutions based on its "truly independent investment research" while it allegedly knew the contrary was true).[4]

### b. Defendants' Remaining Arguments Have No Merit

Defendants brazenly claim that the alleged false and misleading statements cited above are not in fact false and misleading because they do not refer specifically to LX or Liquidity

---

[4] While Defendants' string of case citations is impressive for its length (Defs' Br. at 18-20), it falls short on substance. Those cases bear no resemblance to the facts alleged here. None involve statements that can be measured against specific metrics or other mandates; none raise a triable issue as to whether the companies matched their messages to adopt specific recommendations with policies and actions—the crux of what makes Plaintiffs' statements actionable. *See City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173 (2d Cir. 2014) (statements that were not made in connection with recommendations from a report or investigation the company committed to implement but that were "aspirational" and "general" were inactionable puffery); *ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009) (statements not tied to a mandate outlined in a company report or investigation that the company committed to implement were puffery because they were "so general" that a reasonable investor would not rely on them); *In re Gentiva Sec's Litig.*, 932 F. Supp.2d 352 (E.D.N.Y. 2013) (same); *Boca Raton Firefighters & Police Pension Fund* v. *Bahash*, 506 F. App'x. 32 (2d Cir. 2012) (statements that were not tethered to a report or investigation with recommendations the company committed to implement but that instead were "general" were inactionable puffery); *Stratte-McClure* v. *Morgan Stanley*, 784 F. Supp.2d 373 (S.D.N.Y. 2011) (same); *Gusinsky* v. *Barclays PLC*, 944 F. Supp. 2d 279 (S.D.N.Y. 2013) (same); *C.D.T.S. No 1* v. *UBS AG*, 2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013) (the "litany of general statements" that were not made in response to a report or investigation containing recommendations the company committed to implement and that were, moreover, made at the time when the banking sector was experiencing enormous losses in 2009-2010, were aspirational puffery); *In re Australia and New Zealand Banking Group Ltd Secs Litig.*, 2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009) (same).

Profiling (Defs' Br. at 21), but this argument is easily dispatched.  Throughout the Class Period, Defendants represented and reinforced the commitment to implement the Salz recommendations *across the entire bank*. ¶33. This fact is undisputed.  Barclays did not single out for exclusion from its Transform Programme the electronic segment of its investment banking business. Indeed, the scope of Salz' review and recommendation was "global and spans all businesses within Barclays without exception." ¶30. Barclays' Chairman explained in Barclays' public filings that "it is imperative that [Barclays' corporate governance framework] is supported by the right culture, values and behaviours, both at the top and *throughout the entire organization*." ¶32. In similar vein, Defendant White proclaimed that "transparency on multiple levels is a selling point *for our entire equities franchise*." ¶183.  Accordingly, Defendants' argument has no merit.

With respect to statements about risk controls, Defendants also attempt to take refuge via their indiscriminate use of boiler-plate language, claiming that statements such as internal controls are "designed to manage rather than eliminate" risks *ipso facto* absolve them from liability.  (Defs' Br. at 21-22).  Defendants do not deign to argue that such language protects them from liability under the safe-harbor provision because it is evident that the challenged statements are not forward looking.  *See*, *e.g.*, ¶150 ("*Barclays operates within a robust system of internal control that seeks to ensure that business is transacted and risk taken without exposure to unacceptable potential losses or reputational damage*.").  Rather, Defendants appear to argue that this type of "exculpatory" language renders their statements immaterial as a matter of law (and not false or misleading) because, in light of that language, no reasonable investor would rely on their misstatements. But why would Defendants repeatedly proclaim that Barclays' internal controls for managing reputational damage are robust were it not something

19

they recognized investors would consider significant?  Why would Defendants trumpet, as part of their Transform Programme, that Barclays introduced the Enterprise Risk Management Framework, a framework applicable to the whole bank, employees, and all types of risk, "to strengthen the governance relating to conduct and reputation matters?"  Why would Defendants announce that "Conduct Risk and Reputation Risk were categorized as Principal Risks in 2013 with Executive Committee sponsorship from the Principal Risk Owner, the Head of Compliance?"  Taken together in the context in which they were made (as even Defendants agree they should be taken), those misstatements were unquestionably material, false, and misleading where, as here, Barclays set off a feverish campaign to restore its tarnished reputation.  The Complaint alleges that Barclays did not have a robust system of internal controls to manage reputational damage but instead lacked specific internal controls and procedures, including in reviewing email communications that would have enabled it to discover the fraudulent conduct in its dark pool, equities electronic trading division, and that despite being levied unprecedented fines for having participated in fraudulent activity relating to the Libor scandal, key Barclays employees were still engaging in illicit activities subjecting Barclays to significant legal and regulatory scrutiny. ¶150. In this context, Barclays' proclamations that it has established "robust" system of internal controls to manage "reputational damage" are actionable.

In a footnote, Defendants also claim that many of the alleged misstatements, such as Barclays' pledge to increase transparency, were forward-looking statements protected by the safe-harbor provision.  (Defs' Br. at 22 fn. 19).  First, Defendants do not—and cannot—contend that the PSLRA safe harbor immunizes them from liability for their material omissions, because the PSLRA safe harbor is available only for *affirmative* statements. *See In re NTL Inc. Sec. Litig.,* 347 F. Supp. 2d 15, 35 (S.D.N.Y. 2004); *Grossman* v. *Novell, Inc.,* 120 F.3d 1112, 1123

(10th Cir. 1997).  Second, the purported language Barclays cites as cautionary ("forward-looking statement proviso" and the statement that "the impact on Barclays . . .of competition and regulatory matters in which Barclays is or may in the future become involved cannot always be predicted" was clearly vague and boilerplate.  It is black-letter law that "[c]autionary language must be extensive and specific.  A vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation." *Slayton* v. *Am. Express Co.*, 604 F.3d 758, 772 (2d Cir. 2010).  Here, neither the proviso nor the general statement about competition and regulatory matters addressed what the specific risks were that related to Barclays' pledge to increase transparency and fix its reputation, particularly with respect to LX.  For example, Barclays should have warned that, even with its adoption of the Enterprise Risk and Management Framework, LX remained at risk of manipulation, and that Barclays' revamped  internal controls did not ensure that communications of high-level employees in that division were subject to periodic reviews.  Accordingly, Barclays' false and misleading statements do not warrant the safe-harbor protection. *See*, *e.g.*, *Meyer* v. *Jinkosolar Holdings Co., Ltd.*, 13-cv-616, 2014 WL 3747181 (2d Cir. July 31, 2014) ("A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability . . . One cannot . . . disclose . . . a business's peculiar risk of fire, the installation of a comprehensive sprinkler system to reduce fire danger, and omit the fact that the system has been found to be inoperable, without misleading investors"); *In re Bear Stearns Cos., Inc. Sec., Deriv., and ERISA Litig.*, 763 F. Supp. 2d 423, 495 (S.D.N.Y. 2011) (even "warnings of specific risks . . . do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described") (quoting *In re Am. Int'l Group, Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 531

21

(S.D.N.Y. 2010)); *Schottenfeld Qualified Assoc. v. Workstream, Inc.,* No. 05 Civ. 7092, 2006 WL 4472318, at *3 (S.D.N.Y. May 4, 2006) (finding insufficient cautionary language that "refers to the most general of economic risks"); *In re Prudential Sec. Inc. Ltd. P'ships Litig.,* 930 F. Supp. 68, 72 (S.D.N.Y. 1996) (cautionary language must "precisely address" the substance of the specific statement that is at issue); *Lormand* v. *U.S. Unwired, Inc*., 565 F.3d 228, 246-47 (5th Cir. 2009) (cautionary language not meaningful where warning did not "disclose the specific risks and their magnitude"); *Asher* v. *Baxter Int'l Inc., et al*., 377 F.3d 727, 734 (7th Cir. 2004) (Easterbrook, J.) ("For all we can tell, the major risks Baxter objectively faced when it made its forecasts were exactly those that, according to the complaint, came to pass, yet the cautionary statement mentioned none of them").

Third and significantly, "[a] repeated utterance, even on a promise of progress, can become misleading where repetition becomes a statement of current and ongoing compliance." *In re BP P.L.C. Sec. Litig.*, 843 F. Supp. 2d 712, 758-59 (S.D. Tex. 2012) (citing *Reese* v. *BP Exploration*, 643 F.3d 681, 691 (9th Cir. 2011) (instructing that even a promise or forward-looking statement can become an inaccurate assertion as to a matter of past or existing fact if repeated filing creates an "impression of a state of affairs that differs in a material way from one that actually exists") (citations omitted). Here, as in *BP*, Defendants repeatedly claimed that they were implementing Salz's recommendations. Here, as in *BP*, those statements are actionable.

## 2. Defendants' Statements About LX Are Actionable

### a. Defendants' False and Misleading Statements About LX's Transparency and Safeguards Were Material to Investors

Assessments of materiality are questions of fact that ordinarily are inappropriate for resolution by motion to dismiss. *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 162 (2d Cir. 2000)

("a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance").   Yet, Defendants demand that the Court find as a matter of law that their repeated lies about LX's transparency and safeguards were decidedly immaterial to a reasonable investor simply because LX's revenues fall below a numerical 5% threshold.  (Defs' Br. at 23-25).   This argument should be swiftly rejected.   The law is beyond dispute that both quantitative and *qualitative* factors are considered in evaluating the materiality of a misstatement or omission. *See ECA, Local 134 IBEW Joint Pension Trust of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187, 203-04 (2d Cir. 2009) ("both quantitative and qualitative factors must be considered in determining materiality"). "Various 'quantitative factors may cause misstatements of quantitatively small amounts to be material." *Ganino* v. *Citizens Utilities Co.*, 228 F.3d 154, 162-63 (2d Cir. 2000). The Second Circuit has expressly rejected the application of a numerical or percentage benchmark in order to determine the materiality of a company's financial misstatement, instead holding that materiality must be assessed in context, and both quantitative and qualitative factors must be analyzed.  *Id.* (quoting SEC Staff Accounting Bulletin ("SAB") No. 99, 64 Fed. Reg. 45150, 45152 (1999)); *see also United States* v. *Nacchio*, 519 F.3d 1140, 1163 (10th Cir. 2008) (same).

Materiality can be evidenced by such things as a drop in stock price, *see*, *e.g.*, *No. 84 Employer-Teamster Joint Council Pension Trust Fund* v. *America West Holding Co.*, 320 F.3d 920, 935 (9th Cir. 2003); *Oran* v. *Stafford*, 226 F.3d 275, 285 (3d Cir. 2000) (Alito, J.), or the fact that investors place great emphasis on management integrity, *see*, *e.g.*, *SEC* v. *Das*, 2010 WL 4615336, at *8 (D. Neb. Nov. 4, 2010) ("[i]nvestors may base their investment decisions, at least in part, on factors such as . . . management ethics and accountability).  *See also AUSA Life*

23

*Ins. Co.* v. *Ernst & Young*, 206 F.3d 202, 237 (2d Cir. 2000) (finding that, had the truth been told, the plaintiffs would have realized management's lack of credibility so that consequences of the dishonesty are within the zone of proximate cause); *SEC* v. *Pace*, 173 F. Supp. 2d 30, 33 (D.D.C. 2001) ("[i]nvestors have a right to know—and would reasonably consider it important— when the head of a publicly-owned company is stealing any quantity of money"); *United States* v. *Hatfield*, 724 F. Supp. 2d 321, 328 (E.D.N.Y. 2010) (same).  The literature also supports recognition of investors' presumptive right to rely on the integrity of management in the conduct of corporate affairs, a presumption that was clearly misplaced with Barclays, given its culture of greed and dishonesty. *See* Donald C. Langevoort, *Basic at Twenty: Rethinking Fraud-on-the-Market*, 151 Wis. L. Rev.151 n.140 (2009) ("Presumably, most stock-price declines that follow a surprise revelation of fraud reflect not only the truth with respect to the specific facts misrepresented or omitted but also a readjustment in expectations regarding other matters on which management was previously thought credible.").

Here, the decline in Barclays' share prices was clearly caused by the revelation of the LX scheme, which dealt a further blow to Barclays' reputation.  On news of the NYAG lawsuit, Barclays' securities fell 7.38% on extraordinarily heavy volume. ¶6.  Such a stock price reaction in and of itself evidences materiality.  Moreover, the false and misleading statements related to Barclays' LX were particularly material where, as here, Barclays had embarked on an aggressive public campaign to fix its tarnished reputation.  Indeed, as Barclays' new Chairman put it in the Company's 2012 Annual Report: "*it is imperative that [Barclays' corporate governance framework] is supported by the right culture, values and behaviours, both at the top and throughout the entire organisation.*" ¶32. Striking a similar note, Defendant White touted Barclay's purported transparency as a key selling point to investors: "For us, the biggest theme

24

of the [2013] year was transparency.  It was an important topic throughout the year, and it remains a core element of our strategy.  [Transparency was] one issue that we really took a stance on.  We felt that with the regulatory environment and the concerns about market structure, we would take a very strong position on market transparency, and I think that's what resonates loudest as we look at achievements of last year . . . LX Liquidity Profiling analyzes each interaction in the dark pool, allowing us to monitor the behavior of individual participants . . . Transparency on multiple levels is a selling point for our entire equities franchise." ¶183. Given the frequency of these statements, Defendants obviously believed they were important to investors at the time the statements were made.  *See Miller* v. *Thane Int'l., Inc.*, 519 F.3d 879, 888 (9th Cir. 2008) ("context and manner of presentation" matter and holding that repeated references to a subject can affect its meaning); *Atlas* v. *Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1155 (S.D. Cal. 2008) (frequency of defendants' statements shows they are "among the most important information looked to by investors.").

Particularly in this context, Defendants' assertion that Plaintiffs do not allege that they or any other Barclays' investors reviewed or considered any of the alleged misstatements at issue in making their decision to invest in Barclays (Defs' Br. at 24-25) rings hallow.  Plaintiffs are entitled to the fraud-on-the-market presumption of reliance.  *Halliburton Co.* v. *Erica P. John Fund Inc.* ("Halliburton II"), 134 S. Ct. 2398 (2014).  The presumption, which is based on the efficient capital market hypothesis, assumes that material public information in an efficient market is reflected in a security's price, and investors therefore necessarily rely on all such information when they purchase or sell securities in an efficient market. *Id*. at 2408. Here, Barclays' "the rules have changed" mantra was reiterated and reinforced through Defendant White.  White made countless statements to widely-circulated publications directly targeting the

purchasing decision makers, claiming that Barclays has put "transparency" at the "core" of the bank's "strategy."  The Complaint describes how White made statements to Traders Magazine, HedgeWeek, and Markets Media, publications widely-followed by the investment community, including portfolio managers. ¶73. For example, the Complaint alleges that Traders Magazine describes itself as "the industry's leading source of information for the Institutional Trading Community on the buy and sell side since 1967" and is "read by C-Level Executives, Senior Management, Head Traders, Managing Directors, Partners and Portfolio Managers...directly reach[ing] the purchasing decision makers." *Id*. The same is true for HedgeWeek, self-described as "the largest online news publisher serving institutional investors/wealth managers and their investment managers/advisers across all asset classes," which "attracts approximately 158,000 monthly unique visitors to global fund media websites per month and has around 53,000 registered subscribers to its daily newsletters." *Id*. Likewise, Markets Media describes itself as a publisher whose "editorial mission is to cover the complex interrelationship among key decision makers at hedge funds, exchanges, and pension funds, plus professionals like broker-dealers, money managers, service providers and regulators in an ever-evolving marketplace." *Id*. Defendant White also marketed LX heavily at a June 2012 event sponsored by the American Enterprise Institute, which serves the public through research and education on the most important issues of the day.  ¶72.  AEI has over 40,000 followers on the social media platform Twitter and a public Facebook page that is "liked" by over 100,000 individuals or entities.  *Id*. Accordingly, Defendant White's statements were publicly disseminated and incorporated in Barclays' share price.  *See*, *e.g.*, *In re BP P.L.C. Sec. Litig.*, 843 F. Supp. 2d 712, 763-64 (S.D. Tex. 2012) ("The court agrees with Plaintiffs that, for purposes of pleading reliance in a fraud on the market case, there is no material difference between pleading that the [document] was

'available to the public' or 'publicly filed' and alleging that a document was 'publicly disseminated.'" (quoting *Basic* v. *Levinson*, 485 U.S. 224, 246, n.24 (1988) ("[W]e need only believe that market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.").  Moreover, during the Class Period, dark pools were already known by regulators and the market to be particularly risky, making them the subject of increased public scrutiny.  ¶¶49-50.

      b.    Barclays' Statements About LX's Transparency and Safeguards Were False and Misleading

In an effort to propel LX to the very top, throughout the Class Period Barclays embarked on a mission to mislead the market about the transparency and safeguards of its dark pool. Defendants touted Liquidity Profiling as a "sophisticated surveillance framework, helping to protect [investors] from predatory trading…our team proactively monitors the behavior of individual participants and quickly responds with corrective action when adverse behavior is detected." *See*, *e.g.*, ¶¶67, 144, 151. Defendants claimed that Barclays "can improve the overall quality of LX liquidity: passive liquidity providers can be identified and encouraged, high alpha traders can be held accountable, e.g., by demanding liquidity providing strategies, or by refusing a client access, [and] natural selection—transparency means aggressive flows will tend to be suppressed by clients." ¶127. Indeed, Defendants touted publicly that *"[t]he number-two ranking [of Barclays LX] is a reflection of the success of [its transparency and safeguards] and the strength of our entire equity franchise*." ¶163; *see similarly* ¶¶122, 125, 142, 163, 165, 167, 169, 171, 173, 183, 193.  These statements were materially false and misleading because:

- Barclays did not in fact protect clients from aggressive high frequency trading activity, did not restrict predatory traders' access to other clients, nor did it eliminate traders who continued to behave in a predatory manner (¶¶75-98);

27

- Barclays in fact favored high frequency traders over more traditional investors trading in the dark pool, and selectively provided high frequency traders with information about Barclays' dark pool that was not otherwise available to traditional investors (¶¶99-103);
- Barclays did not monitor client orders continuously (¶92);
- Barclays applied "overrides" to several traders in the dark pool, assigning safe Liquidity Profiling ratings to certain traders that should have been rated as toxic (¶¶93-94); and
- Barclays' "Liquidity Profiling" tool did not apply to a significant portion of the trading activity in Barclays' dark pool (¶95).

Faced with factual allegations overwhelmingly reflecting the falsity of Barclays' statements, Defendants concoct a strawman argument that there was "no inconsistency" between what Defendants said publicly and what was in fact taking place inside LX. (Defs' Br. at 29-33). As they see it, Barclays "never represented to investors" that it would "eliminate [aggressive] traders," or that "Barclays did not respond to 'aggressive' trading in ways other than 'eliminat[ing] traders,'" or that Barclays "ever told clients or ADS holders that Liquidity Profiling was being applied to every category of trading activity." Defendants boldly argue that only by uttering these specific statements can they be liable for securities fraud. But this preposterous position has no basis in law. To the contrary, the law requires disclosure when necessary "to make . . . statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx*, 131 S.Ct. 1309, 1321-22 (2011) (citing 17 CFR § 240.10b-5(b)). In *McMahan & Co. v. Wherehouse Entm't Inc.,* 900 F.2d 576, 579 (2d Cir. 1990), the Second Circuit held that "the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *Id.* The Court explained that "[t]he central issue . . . is not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have mislead a reasonable investor . . . Some statements, although literally accurate, can become, through their context and manner of

presentation, devices which mislead investors." *Id*. "[U]pon choosing to speak, one must speak truthfully about material issues." *Id*. Thus, the relevant inquiry "is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." *Halperin v. eBankerUSA.com, Inc.,* 295 F.3d 352, 357 (2d Cir. 2002). Here, Defendants' statements are actionable as literally false or as misleading half-truths or omissions. Defendants attributed their LX success squarely to the fact that it operated with transparency. By touting LX's transparency in order to lure unsuspecting investors, Defendants made this very topic the polestar of their deceitful campaign. Accordingly, Defendants' failure to speak truthfully about how LX operated rendered those statements actionable. Defendants claim that Barclays never told investors that it would eliminate aggressive traders, but Barclays constantly touted that its LX includes a "sophisticated surveillance" that identifies "aggressive behavior" so that Barclays "can take corrective action." As explained above, these and similar statements were false and misleading. For example, Barclays has never prohibited a single trader from participating in its dark pool, regardless of its toxicity level. Barclays also applied "overrides" to toxic traders. Defendants also claim that White explicitly disclosed that there was aggressive trading in LX, via a Barclays presentation slide made at the June 18, 2012 AEI conference, which indicated that approximately 14% of the trading was aggressive. But the Complaint alleges that in early 2013, Barclays claimed that the trading in its dark pool was 9% aggressive and that in March 2014 Barclays revised marketing materials to make them even more favorable to Barclays, claiming that only 6% of the trading in its dark pool was aggressive. ¶85. In reality, however, Barclays itself categorized approximately 25% of orders taking liquidity in its dark pool as aggressive. ¶88.

And, in an internal document prepared on the basis of information supplied by Barclays, a high frequency trading firm summarized the data it received from Barclays and concluded that the LX trading activity was 50% good, 50% aggressive—a far cry from the numbers publicly trumpeted by Barclays. *Id*. Moreover, the NYAG amended complaint relates that in August 2012 (merely two months after Defendant White's AEI conference), Barclays conducted an "Execution Aggressiveness" analysis of the trading in its dark pool. (NYAG Compl. ¶129). That analysis was circulated via email to key personnel in the Equities Electronic Trading division and found that between 25% and 30% of all activity in LX was "aggressive." This is *double* the amount Defendants represented at the AEI conference and provides just one more example of Barclays' chicanery.

Barclays also failed to disclose that, contrary to its public representations that it has implemented safeguards against high predatory traders, in reality it was *actively recruiting* such traders by wooing them with perks not available to traditional traders. ¶¶99-103. For example, Barclays permitted these predators to trade in LX at no cost and gave them cross-connection speed advantage over slower-moving counterparties. *Id*. These maneuvers were directly at odds with Barclays' assurances that it had implemented safeguards to manage toxicity. Defendants claim that the allegation that Barclays favored high-frequency traders is not actionable because "there is no allegation that Barclays did not provide the same information and cross-connections to any client who asked for those services" and no "allegation that Barclays ever told any client or ADS holder" that it would not make this information available to traditional traders (Defs' Br. at 32, fn.26). But the Complaint alleges in no uncertain terms that, to lure high frequency traders to LX, Barclays provided them with information it did not provide traditional traders. For example, as described by a former senior-level director in the Equities Trading division, Barclays

"would invite the high frequency firms in.  They would trade with the buy side.  The buy side would pay the commissions.  The high frequency firms would pay basically nothing.  They would make their money off of manipulating the price.  Barclays would make their money off the buy side.  And the buy side would totally be taken advantage of because they got stuck with the bad trade . . . this happed over and over again."  ¶99.

Defendants also assert that their failure to disclose that Liquidity Profiling does not apply to orders routed to the dark pool via Barclays' proprietary algorithms is not an actionable omission because, as they see it, there is no need to profile such orders as they do not pose the same threat as orders of aggressive traders.  (Defs' Br. at 32).   This is untrue.  Senior Barclays employees publicly represented that orders sent through Barclays' algorithms were protected by Liquidity Profiling.  On June 6, 2013, Defendant White gave an interview which was published in HedgeWeek representing that Barclays "ha[s] an algorithm and a scoring methodology that basically creates a liquidity spectrum . . . as we are able to restrict HFTs interacting with our clients we're getting the better half of their order flow." ¶171.  The NYAG amended complaint provides further examples confirming the falsity of Defendants' statements.  It alleges that in a written "Reference Guide" first given to Barclays' sales staff in late 2011, Barclays set forth a number of "Frequently Asked Questions." In response to the question "How has your algorithmic offering adapted to efficiently facilitate execution with the increase in high frequency trading over the last several years"?, Barclays directed its sales staff to "[p]lease see question 1 regarding liquidity profiling."  (NYAG amended compl. ¶¶60-61; 58-59, 62-69). Also actionable is Defendants' failure to disclose that Liquidity Profiling only protects traders when they *provide* liquidity but does not protect traders when they *take* liquidity. ¶95. While Defendants claim that "takers " are considered the "aggressive" party in a trade and thus have no

31

need for protection from "providers" (Defs' Br. at 32), Defendants' omission contradicted Barclays' representations that Liquidity Profiling allowed clients to choose their trading counterparties, regardless of whether that counterparty is "providing" or "taking" liquidity.

Similarly false and misleading are Barclays' allegations with respect to monitoring client orders. Defendants claim that Plaintiffs are "conflating" the concept of "monitor[ing] client orders continuously" with the concept of "regularly updat[ing] the ratings of its traders" (Defs' Br. at 31), but it is Defendants who paint a misleading picture. Defendants represented that through LX, Barclays is "constantly monitoring flow quality" and that "by understanding the characteristics of flow at the client level, Barclays can improve the overall quality of LX liquidity . . . high alpha traders can be held accountable . . . " ¶127. Contrary to this representation, Barclays had not regularly updated the ratings of its traders, so traders have often been categorized in ways that did not reflect their aggressive trading activity. ¶92. A reasonable investor would have been misled by these half-truths. Barclays also misrepresented how it routes client orders to benefit its clients. Barclays publicly claimed that its "dynamic router minimizes information leakage" and "uses predictive liquidity models to prevent information leakage by sending orders to the minimal number of venues with the greatest likelihood of fill." *See*, *e.g.*, ¶125. In reality, however, Barclays did not route client orders to venues with the largest likelihood of fill, in the best interest of its clients. Instead, Barclays selectively routed orders to trading venues that benefitted Barclays. Barclays routed client orders to its own dark pool first, regardless of the likelihood of fill or information leakage. After having been routed to Barclays' dark pool, unfulfilled orders where then routed disproportionately to other trading venues based on where Barclays had been most profitable over the previous twenty days. To conceal Barclays' high internalization rates, Defendants went so far as to instruct several directors in the

32

electronic trading division to withhold or doctor the amounts. ¶¶104-112. Defendants ignore most of these detailed allegations of falsity and instead grasp on a statement in a *non-public* document that supposedly informed an electronic trading firm that "10-15% of [order] flow will by-pass LX." Barclays does not explain how this one document alters the total mix of misinformation dumped on the market.

### C.    The Complaint Adequately Alleges Scienter

Plaintiffs alleging a violation of Section 10(b) of the Exchange Act must plead "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," *i.e.* scienter. 15 U.S.C. § 78u-4(b)(2)(A). Plaintiffs may "plead scienter by (a) alleging facts demonstrating that defendants had both the motive and an opportunity to commit fraud or (b) otherwise alleging facts to show strong circumstantial evidence of defendants' conscious misbehavior or recklessness." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001) (citing *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000)). When evaluating whether a complaint adequately pleads scienter, "[t]he inquiry is…whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007) (emphasis in original). Indeed, "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences[.]" *Id.* at 324 (quotation and citation omitted). While the court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff," *id.*, "at the motion to dismiss stage, a tie on scienter goes to the plaintiff [.]" *City of Pontiac Gen. Emps' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) ("*Lockheed*"). Since *Tellabs,* the Second Circuit has similarly re-affirmed that a

33

plaintiff may establish *scienter* by alleging facts showing that defendants "(1) benefited in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; *or* (4) failed to check information they had a duty to monitor." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.,* 531 F.3d 190, 194 (2d Cir. 2008) (quoting *Novak v. Kasaks,* 216 F.3d 300, 311 (2d Cir. 2000)).

### 1.     Defendant White

Defendant White's scienter is beyond serious contention.  As Managing Director and Head of the Equities Electronic Trading at Barclays, Defendant White was the driving force behind the Company's goal to be the number one dark pool in America. ¶¶21, 52.  White overhauled Barclays' algorithms, built a smart order router ("SOR"), the centerpiece of the desk's electronic trading, and made modifications to the LX dark pool itself. ¶57. White hired David Johnsen, the former Goldman dark pool senior executive who had been fired for concerns relating to the performance of his supervisory responsibilities, to help him run LX. *Id.* ¶58. As head of LX, throughout the Class Period, White campaigned heavily for LX.  ¶72. White made a presentation on behalf of Barclays at a June 2012 ALI event (¶¶72, 124); White gave interviews for Traders Magazine (¶¶122, 163); White gave interviews for Markets Media (¶¶144, 151, 183); White gave interviews for HedgeWeek (¶171); and White sent a letter on November 12, 2013 to the SEC on behalf of Barclays purporting to aggressively support transparency in ATS, singling out LX as a model of transparency for the overall market (¶181).  As part of this marketing campaign, White held himself to the public as intimately knowledgeable about LX's functions and purported transparency.  These facts cement a finding of scienter.  *In re Ashanti Goldfields Sec. Litig.*, 184 F.Supp.2d 247, 270 (E.D.N.Y. 2002) (defendant's public statements regarding

34

company's investments demonstrate personal knowledge of those investments); *See*, *e.g.*, *In re Sears, Roebuck Co.Sec. Litig.*, 291 F.Supp.2d 722, 727 (N.D. Ill. 2003) ("Logically, defendants in their positions would be expected to have knowledge of the facts regarding the credit card portfolio at the time they were making statements about the portfolio or signing off on SEC filings.  Plaintiffs have sufficiently alleged facts leading to a 'strong inference' of scienter.")

Moreover, as the Head of the Equities Electronic Trading division, Defendant White knew facts or had access to information confirming that Defendants' public statements about LX were false and misleading.  The Complaint pleads a plethora of facts that directly discredit White's public statements, including specific documents to which White had access as Head of Equities Electronic Trading and the executive in charge of LX:

- A falsified analysis purporting to show the extent of high frequency trading in its dark pool, which the Complaint alleges Barclays publicized. Compl. ¶¶ 75-84, 132). *This analysis remained in circulation during the Class Period. According to the amended NYAG complaint, this doctored analysis was displayed on Barclays' website from October 2012 until the filing of the NYAG's initial complaint, after which it was swiftly removed by Barclays. David Johnsen, White's right-hand man, played a direct role in the doctored analysis.* (NYAG amended compl. at ¶¶119, 123)
- An internal document dated December 13, 2013, where Barclays recognized that Liquidity Profiling "reviews were sporadic and sometimes not performed" for months at a time, becoming "stale and inaccurate." (¶¶92, 94)
- A January 16, 2014 analysis provided to senior leaders in the Equities Electronic Trading division discussing over a dozen high frequency trading firms engaged in significant activity in Barclays' dark pool, to whom Barclays never denied access. (¶91)
- A former Barclays Director in the Equities Electronic Trading division informed the government that Barclays "purport[s] to have a toxicity framework that will protect you when everybody knows internally that that thing is done manually with outliers removed and things are classified [only] if they feel like it." Corroborating this Director's account, another former Director in the division described Liquidity Profiling as "a scam." (¶98)

*See similarly* (¶¶85-88, 101-103, 105-108, 112).  Indeed, the informants place Defendant White squarely at the top of the fraudulent scheme.  For example, the Complaint alleges that several Barclays directors were instructed to withhold or alter findings in a trading analysis prepared by

35

Barclays on October 2013, which reflected high Barclays internalization rates for LX.   One director who refused to withhold the information from the client was fired by Defendant White, and another director designed.   (¶¶109-111).[5]   Evidence of direct participation in the fraudulent scheme strengthens the inference of scienter.   *See, e.g., Teamsters Local*, 531 F.3d at 194 (2d Cir. 2008) (scienter established where a defendant "engage[s] in deliberately illegal behavior"); *In re Ashworth Secs. Litig.,* 2002 U.S. Dist. LEXIS 14971 at *37 (S.D. Cal. 2001) (plaintiffs sufficiently alleged scienter where certain individual defendants actively participated in and directed the improper revenue recognition and inventory accounting); *In re Advanced Lighting Techs., Inc.,* 2000 U.S. Dist. LEXIS 20628, *22 (N.D. Ohio June 6, 2000) (distinguishing *In re Comshare Inc. Secs. Litig.,* 183 F.3d 542 (6th Cir. 1999) and concluding the defendants acted with scienter because they "themselves engaged in fraudulent revenue recognition").

At a minimum, Defendant White failed to check information he had a duty to monitor as the head and marketing promoter of LX.   On these facts, scienter is abundantly plead.   *See Teamsters Local*, 531 F.3d at 194 (2d Cir. 2008).

Significantly, White utterly fails to articulate a single non-culpable inference for his fraudulent conduct—none exists.   White's silence should be deemed a concession.[6]

### 2.   Defendants Diamond, Jenkins, Lucas, and Morzaria

"Scienter may be found where there are specific allegations of various reasonable available facts, or 'red flags,' that should have put the officers on notice that the public

---

[5] The NYAG amended complaint explains that it was Defendant White who fired this senior Director. NYAG amended compl. ¶88.
[6] The NYAG has reported as recently as January 21, 2015 that Barclays has defied subpoenas seeking the testimony of Defendant White and his lieutenant, David Johnsen, the two individuals who were directly involved in, and oversaw, much of the fraudulent activity.

statements were false." *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007); *see also In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 496 (S.D.N.Y. 2004) (same). At different points during the Class Period, Defendants Diamond, Jenkins, Lucas, and Morzaria occupied senior executive positions at Barclays (¶¶18-20). At the time of the Salz review and throughout the implementation of its recommendations, Defendant Jenkins was the Chief Executive Officer of Barclays PLC while Defendants Lucas and Morzaria were Finance Directors. Through their public statements, Defendants Jenkins, Lucas, and Morzaria became Barclays' spokespersons and the champions for Barclays' purported reforms. *See, e.g.*, ¶¶134, 138, 140, 147, 149, 153, 186, 188, 190. Led by Jenkins, Barclays announced that these changes started in 2012 through the creation of the Transform Programme designed to "deliver the fundamental cultural, financial and performance changes necessary" to regain the public trust. ¶33. Defendant Jenkins met regularly with members of the Business Practices Review Committee, who oversaw the progress of the Salz Review. ¶35. These facts alone are sufficient to plead scienter. *See, e.g.*, *In re BP P.L.C. Sec. Litig.*, 843 F. Supp. 2d at 783 (CEO's "own actions as the spokesperson and champion for BP's reform efforts weigh strongly in favor of the inference that [CEO] paid special attention to BP's process safety efforts or, at the least, was reckless in not doing so while continuing to publicly tout improvements."); *see also In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*, 694 F. Supp. 2d 1192, 1209-1210 (W.D. Wash. 2009) (finding a strong inference of scienter as to statement about risk management where defendant was responsible for overseeing risk management). As champions for a changed Barclays, Defendants Jenkins, Lucas, and Morzaria were responsible for and had a duty to monitor Barclays' purported transformation. This duty was particularly heightened in light of Salz' findings that, among other things, exposed Barclays' investment banking division of

having a "strong drive to win" at all costs, and reported that a survey of 9,000 Barclays employees found that 70% had a high degree of skepticism that Barclays would change. ¶36.

The Transform Programme applied to all aspects of Barclays' businesses without exception. ¶¶30-34. Indeed, with respect to its dark pool, a business segment acutely subject to manipulation, the Individual Defendants should have been particularly diligent.  As detailed in the Complaint, the magnifying glass had been on HFT for years, with the SEC intensely scrutinizing this practice since 2009 amid concerns that it was placing less-savvy investors at a disadvantage. ¶49. In 2009, Mary Schapiro, the SEC Chairwoman, asked her staff to investigate the impact of automated dark pools for their lack of transparency:  "This lack of transparency has the potential to undermine public confidence in the equity markets, particularly if the volume of trading activity in dark pools increases substantially."  *Id*.  Accordingly, the SEC would be taking a "serious look at what regulatory actions may be warranted in order to respond to the potential investor protection and market integrity concerns raised by dark pools.  *Id*.  During the Class Period, FINRA also increased its focus on dark pools.  *Id*.   Accordingly, Defendants Diamond, Jenkins, Lucas, and Morzaria were put on notice that LX was particularly at risk of being manipulated and, at a minimum, acted with recklessness.   Indeed, Defendant White conceded that Barclays focused like a laser on convincing the market that LX was a model of integrity: "For us, the biggest theme of the [2013] year was transparency . . . We felt that with the regulatory environment and the concerns about market structure, we would take a very strong position on market transparency, and I think that's what resonates loudest as we look at achievements of last year . . . LX Liquidity Profiling analyzes each interaction in the dark pool, allowing us to monitor the behavior of individual participants. . . ." ¶183.

38

Further cementing Defendants Jenkins, Lucas, and Morzaria's scienter is the fact that *Barclays wrote a letter to the SEC* purporting to support a proposal by FINRA to increase transparency in ATS trading. ¶¶70, 180-182)[7]. In that letter, Barclays lauded LX as a model for market transparency: *how we operate LX "demonstrate[s] our belief that transparency benefits not only our clients, but the market overall."* (emphasis added). Barclays told the SEC that FINRA's proposal "will complement the Commission's recent initiatives regarding transparency and analysis of market structure, which [Barclays] similarly support[s]"—leaving no room for doubt that these defendants were aware of LX's inner workings or were, at a minimum, reckless in failing to ensure that the information dumped on the market was truthful and accurate.

As early as 2012, Defendants Jenkins, Lucas, and Morzaria were also aware that Barclays lacked the specific internal controls necessary to prevent or detect fraudulent conduct. For example, in connection with Barclays' settlement for its manipulation of Libor, the CFTC found that proper internal controls, particularly in reviewing email communications, "would have enabled Barclays' management or compliance to discover the conduct." ¶26. The Libor manipulation was "serious and widespread" and involved high-level executives. ¶25. The persistent lack of internal controls also allowed Barclays employees to manipulate the setting of gold prices and the foreign-exchange market. ¶¶37-38. Having been aware of previous significant weaknesses in the Company's internal controls, Defendants should have been particularly diligent in ensuring that Barclays was implementing sufficient internal controls and procedures designed to prevent fraud, particularly with respect to a segment so easily subject to

---

[7] The letterhead contained the following identifications: Barclays (which Barclays uses as a symbol for Barclays PLC), Barclays.com (which is the website for Barclays PLC), and Barclays Capital Inc. ¶180.

manipulation.  *See Washtenaw County Employees Retirement System* v. *Avid Technology, Inc.*, 28 F. Supp. 3d 93, 114 (D. Mass. 2014) (stating that "[a]nother fact that contributes to the strong inference of scienter comes from Avid's systemic failure to maintain adequate internal control…[t]aken together with [other factors], the consistent failure as to the internal controls makes the scienter inference more compelling").   Defendants' recklessness is even more appalling in light of the fact that Barclays' dark pool drew early alarms, with trading firms and employees raising concerns to top executives about high-speed traders in Barclays' dark pool long before the NYAG sued Barclays. ¶74.

### 3.    Defendants Had a Motive to Commit Fraud

As detailed in the Complaint, Barclays was determined to make its dark pool the best in the United States ("We will not be happy until we are number one"). ¶¶51-62.  This strategy was not only central to driving profits for the division, but also an imprimatur of prestige.  *Id*. Barclays' dark pool was referred internally as "The Franchise." Through Defendants' treacherous campaign, LX eventually propelled to the top.  Barclays was quick to tout this fact on its website: "key facts and H1 2013 business highlights . . . Barclays LX US is ranked #1…" *Id*. According to the NYAG Complaint, in an internal document, Barclays instructed its employees that "[a]ggregating [order] flow into Barclays LX *has strategic and economic value for the entire Equities business*" (emphasis added).[8]  ¶53. While motive is not required to plead scienter, it adds one more piece to the scienter puzzle.  *See*, *e.g.*, *In re LDK Solar Sec. Litig.*, 584

---

[8] Contrary to Defendants' assertion, Plaintiffs allege more than the desire to earn fees which, in any event, combined with other factual allegations, strengthens the inference of scienter.  *See*, *e.g.*, *In re JPMorgan Chase & Co. Sec. Litig.*, No. 06-cv-4674, 2007 WL 4531794, at *8 (N.D. Ill. Dec. 18, 2007) (motive "to increase [] incentive compensation and to guild [sic] reputation are important considerations" in the scienter analysis).

F. Supp. 2d 1230, 1247 (N.D. Cal. 2008) (finding motive to succeed in "highly competitive" industry sufficient); *In re Res. Am. Sec. Litig.*, No. 98-cv-5446, 2000 WL 1053861, at *8 (E.D. Pa. July 26, 2000) (finding an inference of scienter from defendant's "desire to maintain [a] competitive position" in the industry in which it operates).

### 4. Corporate scienter

"There is no formulaic method or seniority prerequisite for employee scienter to be imputed to the corporation, but scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants." *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 515-16 (S.D.N.Y. 2009). Accordingly, each of the Individual Defendants' scienter is imputed to Barclays.

### D. The Complaint Properly Pleads Loss Causation as to the June 27 Telegraph Article

The Complaint's loss causation allegations are evaluated under Rule 8's notice pleading standard. *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 244-246 (S.D.N.Y. 2012). While "[p]leading loss causation is an essential element of a claim . . . [it] is not meant to impose a great burden on plaintiffs." *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 1223844, at *12 (S.D.N.Y. March 27, 2013). The Complaint pleads loss causation with respect to two events: (i) the filing of the NYAG Complaint on June 25, 2014, which resulted in a steep decline of Barclays' stock by 7.38%; and (ii) the publication of a report by the Telegraph on June 27, 2014, stating that Barclays' dark pool fine "could top Libor" and that while the "size of any potential fine is difficult to judge, [it is] estimated at more than £300m by analyst[s]." On this additional news, on June 30, the next trading day, Barclays' stock dropped an additional 1.5% on extraordinarily high trading volume

41

of over 11 million shares. ¶¶195-198.  Defendants do not challenge the first event but claim that the Telegraph report fails to satisfy loss causation because it added nothing new to the market, which had already reacted to the corrective disclosure of the NYAG complaint, and is mere speculation about the size of a possible fine. (Defs' Br. at 42-43).  Defendants are wrong.

First, the Telegraph added new information to the market: it foretold that the magnitude of Barclays' wrongdoing was larger than what the market had already appreciated.   The Telegraph warned that the dark pool fine "could top Libor" and estimated it to be gigantic.  The decline in Barclays' stock price did not "reflect[] normal market variations and price recovery," as Defendants claim, but was triggered by the disclosure that Barclays will be slapped with a huge fine. That the plunge in Barclays' shares was caused by this revelation is palpable, since over 11 million shares traded that day compared to just 5.8 million shares (about half that amount) the previous trading day.   Indeed, the NYAG amended complaint and Barclays' refusal to cooperate with the NYAG investigation are evidence that Barclays' troubles run deeper, as indicated by the Telegraph article.   In any event, courts have cautioned that a truth on the market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a Section 10(b) complaint at the pleadings stage.  *See*, e.g., *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 181 (S.D.N.Y. 2003).  Second, the law is clear that a given disclosure need not emanate from a particular source, "take a particular form [,] or be of a particular quality." *In re Winstar Commc'ns*, 01-cv-3014, 2006 WL 473885, at *14 (S.D.N.Y Feb. 27, 2006).  Loss causation may be grounded in disclosures couched as opinions, or in other statements that are not "verifiably truthful" at the time they are made." *Id.  See also In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 162-166 (S.D.N.Y. 2008) (finding it "clear from a pleading and plausibility standard" that the loss causation requirement was satisfied via three corrective disclosures: the

42

announcement of a criminal investigation by the Justice Department regarding the company's proposed settlement of a patent infringement litigation; the announcement that federal regulators had rejected the proposed settlement agreement, which plaintiffs hypothesized was a result of defendants' fraudulent misconduct in settlement negotiations; and analyst reports opining on the company's disclosed settlement terms); *In re Daou Sys., Inc., Sec. Litig.,* 411 F.3d 1006, 1026 (9th Cir.2005) (holding loss causation sufficiently pled where analyst reports specifically noted, "[y]ou have got to question whether they are manufacturing earnings").[9]

## E.    The Complaint States a Claim Under Section 20(a)

"To comply with Rule 8, plaintiffs need not provide anything more than sufficient notice to permit defendants to answer."  *Pension Comm. of Univ. of Montreal Pension Plan* v. *Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 190 (S.D.N.Y. 2006) (Scheindlin, J.). "Naked allegations of control . . . will typically suffice to put a defendant on notice of the claims against her."  *Id*. "Under Rule 8, a claim '[may] not be dismissed on the ground that it is conclusory or fails to allege facts.'" *Id*. at 191. (citations omitted). Contrary to Defendants' arguments (Defs' Br. at 43-44), (1) Plaintiffs have pled a primary violation by each of the Defendants, and (2) culpable participation is not an element of a Section 20(a) claim; rather, it is an affirmative defense.  *See id*. ("the statutory language places "the burden . . .on defendants . . . to 'exculpate' themselves by

---

[9] *In re Omnicom Group, Inc. Sec Litig.*, 597 F.3d 501 (2d Cir. 2010), on which Defendants rely, is procedurally and factually distinct.  That case was decided at the summary judgment stage, where Plaintiffs had the benefit of "extensive discovery" and the opportunity to proffer an event study analysis by an expert witness.  *Id*. at 508-509.  Factually, the corrective disclosures did not reveal any "new" information because the facts underlying the alleged fraud had been disclosed and reflected in the company's share price one year before the corrective disclosure.  *Id*. at 511-513.  Similarly, in *Janbay* v. *Canadian Solar, Inc.*, 2012 WL 1080306 (S.D.N.Y. March 30, 2012), the analyst report did not satisfy loss causation because it was "unrelated" to the fraud alleged and, in any event, "did not correspond with a drop in [the company's] stock price."  *Id*. at *16.

proving either good faith or due diligence."); *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 307-10 (S.D.N.Y. 2005) (same).[10]  Also sufficient are Plaintiffs' allegations of control.  ¶¶218-223.  The Complaint states a Section 20(a) claim.

## V.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss in its entirety.  If the Court grants the motion, however, Plaintiffs respectfully request leave to amend to correct any perceived deficiencies.[11]

Dated:  February 17, 2015

Respectfully submitted,

**POMERANTZ LLP**

*/s/Jeremy A. Lieberman*
Jeremy A. Lieberman
Emma Gilmore
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
Email: egilmore@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

---

[10] Assuming, *arguendo*, that culpable participation is an element of a §20(a) claim, Plaintiffs' scienter allegations, discussed *supra* at 34-42, demonstrate Defendants' culpable participation.
[11] *See Cortec Indus., Inc.* v. *Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead").