**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ X

BARBARA STROUGO, Individually and on
Behalf of All Others Similarly Situated,

               Plaintiffs,

               -against-

BARCLAYS PLC, BARCLAYS CAPITAL INC.,
ROBERT DIAMOND, ANTONY JENKINS,
CHRISTOPHER LUCAS, TUSHAR
MORZARIA, and WILLIAM WHITE,

               Defendants.

------------------------------------------------------------ X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/24/15
```

**OPINION AND ORDER**

**14-cv-5797(SAS)**

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.   INTRODUCTION

Plaintiffs bring this putative class action on behalf of themselves and all others similarly situated against Barclays PLC and Barclays Capital Inc. (collectively, "Barclays"), and Robert Diamond, Antony Jenkins, Christopher Lucas, Tushar Morzaria, and William White (the "Individual Defendants" and, together with Barclays, "defendants").  The putative class consists of all persons and entities who purchased Barclays PLC's American Depositary Shares ("ADSs") between August 2, 2011 and June 25, 2014 and were allegedly damaged thereby.

On June 25, 2014, the New York State Office of the Attorney General ("NYAG") brought a lawsuit against Barclays under New York's Martin Act,

alleging that Barclays concealed information about the operation of its "dark pool" — marketed as Barclays' Liquidity Cross or LX — a private trading venue where investors can trade stocks with near anonymity.  Borrowing heavily from the complaint in the NYAG action, plaintiffs allege that the success of LX was accomplished through false representations about its transparency and safeguards. Contrary to these representations, Barclays not only allowed aggressive high frequency traders ("HFTs") in its dark pool, but it sought them out and gave them the information they needed to take advantage of other traders.

Plaintiffs allege that Barclays intentionally falsified marketing materials and made other false statements about the safeguards of LX to increase its market share.  But the fraud at LX is only the latest in a series of scandals that have marred Barclays' reputation.  Plaintiffs emphasize that as a result of these prior scandals, Barclays vowed change.  Thus, plaintiffs seek to hold defendants liable for the statements Barclays made about changing its governance related to conduct and reputation, as well as the statements made about LX.

Plaintiffs assert violations of section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder against all defendants, and violations of section 20(a) of the Exchange Act against the Individual Defendants.  Defendants move under Federal Rule of Civil Procedure

12(b)(6) to dismiss the Amended Complaint ("Complaint") on the grounds that: (1) plaintiffs cannot rely on allegations copied from the NYAG complaint without investigation; (2) plaintiffs fail to plead any material misrepresentations; (3) plaintiffs fail to plead facts giving rise to a strong inference of scienter; (4) plaintiffs are not entitled to recover losses based on an article published several days after the filing of the NYAG action because they have not pleaded loss causation as to that article; and (5) plaintiffs' section 20(a) claims for control person liability must be dismissed because plaintiffs have failed to adequately allege a primary violation of section 10(b) or control on the part of the Individual Defendants.  For the following reasons, defendants' motion is GRANTED solely to the extent that the section 20(a) claims are dismissed as to Individual Defendants Lucas and Morzaria, and is otherwise DENIED (except insofar as the alleged misstatements regarding Barclays' general business practices and risk controls and in response to the Salz report are deemed inactionable, and plaintiffs may not seek damages arising from the June 27 Telegraph article).

## II.   BACKGROUND[1]

Barclays PLC is a financial services company based in England.  Its indirect subsidiary, Barclays Capital Inc., has its primary offices in New York City,

---

[1]     The facts below are taken from the Consolidated Amended Complaint for Violations of the Federal Securities Laws ("Compl.").

and operates Barclays LX.[2]  Robert Diamond was Barclays PLC's Chief Executive

Officer from January 2011 until July 3, 2012; in August 2012, he was replaced by

Antony Jenkins.  Christopher Lucas was Barclays PLC's Finance Director from

April 2007 until August 2013; in October 2013, Tushar Morzaria assumed that

role.  William White is the Head of Equities Electronic Trading at Barclays Capital

Inc.[3]

### A.    Dark Pools and HFTs

A "dark pool" is "an [Alternative Trading System ("ATS")] that does

not display quotations or subscribers' orders to any person or entity, either

internally within an ATS dark pool or externally beyond an ATS dark pool (other

than to employees of the ATS)."[4]  "Dark pools were first established to avoid large

block orders from influencing financial markets and to ensure trading privacy.

Trading in dark pools is conducted away from public exchanges purportedly so the

trades remain anonymous."[5]  As a result, investors can trade on an ATS with a

---

[2]      *See* Compl. ¶¶ 15-16.

[3]      *See id.* ¶¶ 17-21.

[4]      *Id.* ¶ 40 (quotation marks omitted).

[5]      *Id.*  By contrast, "when an investor places a sell order on a 'lit' venue, such as the New York Stock Exchange, the exchange immediately broadcasts the price and quantity that the investor is seeking to sell.  In response to the supply of shares for sale, the market price may drop."  Defendants' Memorandum of Law in

lower risk of moving the market price. "About 15% of U.S. equity-trading volume is transacted in dark pools, more than triple levels of five years ago."[6]

HFTs use high-speed computers to make large numbers of trades within fractions of a second in order to profit from small changes in the prices of securities. Some HFTs "gauge supply and demand and recognize movements in market sentiment before other traders."[7] HFTs can use this information to "trade ahead" of the investor who placed the order. That is, HFTs can buy shares ahead of an investor seeking to purchase shares at market price and then sell those shares to that investor at a somewhat higher price. The identification of the order, the purchase, and the sale all take place within fractions of a second.[8] "As of 2009, studies suggested HFT trading accounted for 60%-73% of all U.S. equity trading volume."[9]

### B.    The Libor Scandal and the Salz Report

In 2012 Barclays agreed to pay roughly five hundred million dollars to regulators to settle allegations that it manipulated Libor rates from 2005 through

---

Support of Their Motion to Dismiss the Amended Complaint ("Def. Mem."), at 5.

[6]    Compl. ¶ 40.

[7]    *Id.* ¶ 42.

[8]    *See id.*

[9]    *Id.* ¶ 43.

2009.  One form of manipulation was that traders were able to influence their colleagues on the Libor desk by making requests by email to misstate Libor — either upwards or downwards — so that the traders could earn profits for their clients.  Regulators believed that Barclays lacked specific internal controls and procedures that would have enabled management to discover the false reporting of Libor rates.[10]

In July 2012, Barclays commissioned Sir Anthony Salz, a prominent lawyer and former chairman of the BBC, to review its practices "with a view to providing a comprehensive roadmap for cultural change at the bank."[11]  Salz issued his report on April 3, 2013.  The report made a number of findings, including that: "Barclays' bankers were engulfed in a culture of 'edginess' and had a 'winning at all costs' attitude"; pay "contributed significantly to a sense among a few that they were somehow unaffected by the rules"; "[s]ignificant failings developed in the organization as it grew"; "[t]he business practices for which Barclays has rightly been criticized were shaped predominantly by its culture[], which rested on uncertain foundations"; and "[t]here was no sense of common purpose in a group that had grown and diversified significantly in less than two decades."  Over all,

---

[10]     *See id.* ¶¶ 24-26.

[11]     *Id.* ¶ 28.

there was a "strong drive to win," which led to an "over-emphasis" on short-term financial performance, reinforced by a bonus and pay culture that rewarded money-making over serving the public interest.  There was also a sense that senior management did not want to hear bad news.  And "Barclays was sometimes perceived as being within the letter of the law but not within its spirit," on account of "an institutional cleverness."[12]

Salz made thirty-four recommendations intended to "provide a valuable road map for [Barclays'] future."  For example, Salz recommended that "Barclays [] ensure its conduct, reputational and operational risk framework includes the articulation of a tangible risk appetite statement and mechanisms to ensure that conduct, reputational and operational risk are fully factored into business decisions and governance."  Salz's recommendations were meant to be "global and span all businesses within Barclays without exception."[13]

Barclays' new chairman, Sir David Walker, described the Salz report as "an insightful, rigorous, and, crucially, independent view of how Barclays could improve," which was "informed by unprecedented access to the bank and its

---

[12]    *Id.*

[13]    *Id.* ¶ 30.

7

people."[14]  Barclays committed to implement in full each recommendation in the Salz report as part of Barclays' determination to regain the trust of all of Barclays' shareholders.[15]

Indeed, Barclays claimed to have made changes starting in 2012 through the "Transform Programme," which was designed to "deliver the fundamental cultural, financial and performance changes necessary" to gain the public trust.[16]  Barclays represented that "[i]n the spirit of transparency and rebuilding trust, Barclays will publish updates on [its] progress in [its] implementation programme."  Barclays "aim[ed] to have the majority of all the [Salz] recommendations fully implemented by 2015."[17]  Even so, as reported on May 23, 2014 by Reuters, Barclays was fined $43.8 million "for failures in internal controls that allowed a trader to manipulate the setting of gold prices, just a day after the bank was fined for rigging Libor interest rates in 2012."[18]

## C.    Barclays LX

In 2009, Barclays LX was the tenth largest dark pool in the United

---

[14]    *Id.* ¶ 31.

[15]    *See id.* ¶ 32.

[16]    *Id.* ¶ 33.

[17]    *Id.*

[18]    *Id.* ¶ 37.

States.  Becoming the largest dark pool became the principal goal of Barclays'

Equities Electronic Trading division.  Barclays LX was referred to internally as

"The Franchise" and growing the pool was "not only central to driving profits for

the division, but also an imprimatur of prestige."[19]  Barclays identified the "market

share value of attracting more [order] flow" into its dark pool at between thirty-

seven and fifty million dollars per year.[20]

          In order to grow the dark pool, Barclays had to increase the number of

orders that it, acting as broker, executed in LX.  This required that Barclays route

more client orders into the dark pool, and ensure that there was sufficient liquidity

to fill those orders.  To meet this need, Barclays charged White with attracting

HFTs into the dark pool.[21]  As a result of "false and misleading statements and

marketing materials," LX became one of the top two largest dark pools in the

United States by January 2013.[22]

          At the same time, White attributed "LX's success to Barclays'

commitment to being transparent regarding Barclays' operations, how Barclays

---

[19]    *Id.* ¶ 52.

[20]    *Id.* ¶ 54 (alterations in original).

[21]    *See id.* ¶¶ 56-57.

[22]    *Id.* ¶ 59.

9

routes client orders, and the kinds of counterparties traders can expect to deal with when trading in the dark pool."[23]  According to White, transparency was "the one issue that we really took a stance on" and "[t]ransparency on multiple levels is a selling point for our entire equities franchise."[24]  To convince the market of the safety of trading in its dark pool, Barclays promoted a service called "Liquidity Profiling."  Barclays represented that Liquidity Profiling allowed it to monitor the "toxicity" of the trading behavior in its dark pool and to "hold traders accountable if their trading was aggressive, predatory, or toxic."[25]  Barclays also said its team "quickly responds with corrective action when adverse behavior is detected."[26]  And Barclays claimed it would refuse clients access to the dark pool if they engaged in aggressive or "toxic" trading strategies.[27]

However, LX was a magnet for HFTs.  According to the Complaint, Barclays never refused a client access, and applied "overrides" to a number of traders in the dark pool, assigning safe Liquidity Profiling ratings to traders that

---

[23]     *Id.* ¶ 61.

[24]     *Id.* ¶¶ 61, 181, 183.

[25]     *Id.* ¶ 65 (quotation marks and alterations omitted).

[26]     *Id.* ¶ 67 ("[Barclays claimed that b]y identifying aggressive behavior, we can take corrective action with clients who exhibit opportunistic behavior in the pool.").

[27]     *Id.*

should have been rated as toxic.  The Complaint alleges that Barclays knew that its Liquidity Profiling tool was ineffective.  One former director explained that Barclays "purports to have a toxicity framework that will protect you when everybody knows internally that that thing is done manually with outliers removed and things are classified only if they feel like it."[28]  Another former director described Liquidity Profiling as "a scam."[29]

### D.    Disclosure

The NYAG commenced its lawsuit on June 25, 2014.  On news of the lawsuit, Barclays' ADSs fell 7.38 percent on heavy volume.[30]  On June 27, 2014, the Telegraph, a newspaper in London, reported that a financial analyst "estimated" that Barclays might pay three hundred million pounds to settle the NYAG case.[31]  On June 30, the next trading day, Barclays' stock dropped an additional one-and-a-half percent on heavily traded volume of over eleven million shares.[32]

---

[28]    *Id.* ¶ 98 (alterations omitted).

[29]    *Id.*

[30]    *See id.* ¶ 6.

[31]    *See id.* ¶¶ 119, 197.

[32]    *See id.* ¶ 197.  In addition, the scandals at Barclays continued.  On July 29, 2014, the Wall Street Journal reported that banking regulators threatened to install government monitors inside Barclays' United States offices after concluding that the bank may have manipulated the foreign-exchange market.  In an article published on November 7, 2014, the Wall Street Journal reported that as

## III.   STANDARD OF REVIEW

### A.   Rule 12(b)(6) Motion to Dismiss

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must "accept[] all factual allegations in the complaint as true and draw[] all reasonable inferences in the plaintiff's favor."[33]  The court may consider "the complaint, [] any documents attached thereto or incorporated by reference and documents upon which the complaint relies heavily,"[34] as well as "legally required public disclosure documents filed with the SEC[] . . . ."[35]

The court evaluates the sufficiency of the complaint under the "two-pronged approach" suggested by the Supreme Court in *Ashcroft v. Iqbal*.[36]  Under the first prong, a court may "begin by identifying pleadings that, because they are

---

part of a proposed settlement related to the foreign-exchange manipulation, regulators "are likely to criticize [Barclays] for allegedly failing to appropriately supervise their foreign-exchange employees and lacking sufficient internal controls." *Id.* ¶ 38.

[33]   *Grant v. County of Erie*, 542 Fed. App'x 21, 23 (2d Cir. 2013).

[34]   *Building Indus. Elec. Contractors Ass'n v. City of New York*, 678 F.3d 184, 187 (2d Cir. 2012) (quotation marks omitted).

[35]   *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007).

[36]   *See* 556 U.S. 662, 678–79 (2009).

12

no more than conclusions, are not entitled to the assumption of truth."[37]  For

example, "[t]hreadbare recitals of the elements of a cause of action, supported by

mere conclusory statements, do not suffice."[38]  Under the second prong of *Iqbal*,

"[w]hen there are well-pleaded factual allegations, a court should assume their

veracity and then determine whether they plausibly give rise to an entitlement for

relief."[39]  A claim is plausible "when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."[40]  "The plausibility standard is not akin to a probability

requirement" because it requires "more than a sheer possibility that a defendant has

acted unlawfully."[41]

### B.    Heightened Pleading Standard Under Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA")

Private securities fraud claims are subject to a heightened pleading

standard.  *First*, Rule 9(b) requires plaintiffs to allege the circumstances

constituting fraud with particularity.  However, "[m]alice, intent, knowledge, and

---

[37]    *Id.* at 679.

[38]    *Id.* at 678.

[39]    *Id.* at 679.

[40]    *Id.* at 678.

[41]    *Id.* (quotation marks omitted).

other conditions of a person's mind may be alleged generally."[42]

   *Second*, the PSLRA provides that, in actions alleging securities fraud, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[43]

### C. Leave to Amend

   Whether to permit a plaintiff to amend its complaint is a matter committed to a court's "sound discretion."[44]  Federal Rule of Civil Procedure 15(a) provides that leave to amend a complaint "shall be freely given when justice so requires."[45]  "When a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint."[46]  In particular, it is the usual practice to grant at least one chance to plead fraud with greater specificity when a complaint is dismissed under Rule 9(b).[47]  Leave to amend should be denied, however, where

---

[42] Fed. R. Civ. P. 9(b).

[43] 15 U.S.C. § 74u-4(b)(2).

[44] *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).

[45] Fed. R. Civ. P. 15(a).

[46] *Hayden v. County of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999).

[47] *See ATSI,* 493 F.3d at 108.

the proposed amendment would be futile.[48]

## IV.   APPLICABLE LAW

### A.   Section 10(b) of the Exchange Act and Rule 10b-5

Section 10(b) of the Exchange Act prohibits using or employing, "in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance. . . ."[49]  Rule 10b-5, promulgated thereunder, makes it illegal to "make any untrue statement of a material fact or to omit to state a material fact . . . in connection with the purchase or sale of any security."[50]  To sustain a claim for securities fraud under Section 10(b), "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."[51]

### 1.   Material Misstatements or Omissions

---

[48]   *See Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 87-88 (2d Cir. 2002).

[49]   15 U.S.C. § 78j(b).

[50]   17 C.F.R. § 240.10b-5.

[51]   *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

In order to satisfactorily allege misstatements or omissions of material fact, a complaint must "state with particularity the specific facts in support of [plaintiffs'] belief that [defendants'] statements were false when made."[52] "[A] fact is to be considered material if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell [securities] . . . ."[53] Mere "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."[54]

Certain statements are protected by the PSLRA's safe harbor provision and the bespeaks caution doctrine. Under the safe harbor provision, a forward-looking statement is non-actionable when it is "accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading."[55] "To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants

---

[52]     *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004) (internal quotation marks omitted).

[53]     *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92-93 (2d Cir. 2010) (internal quotation marks omitted).

[54]     *Id.  Accord Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000).

[55]     *Slayton v. American Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (emphasis in original).

must demonstrate that their cautionary language was not boilerplate and conveyed

substantive information"[56] identifying "important factors that could cause actual

results to differ materially from those in the forward-looking statements."[57]

Moreover, statements are not protected where defendants "had no basis for their

optimistic statements and already knew (allegedly) that certain risks had become

reality."[58]  The applicability of the immateriality prong of the safe harbor

"necessarily depends on all relevant circumstances."[59]  Under the judicially created

bespeaks caution doctrine, "alleged misrepresentations . . . are deemed immaterial

as a matter of law [if] it cannot be said that any reasonable investor could consider

them important in light of adequate cautionary language. . . ."[60]  Statements may

also be deemed immaterial as merely vague expressions of optimism or puffery.[61]

---

[56]    *Id.* at 772.

[57]    15 U.S.C. § 78u-5(c)(1)(A).

[58]    *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 629 (S.D.N.Y. 2003).  *Accord Gabriel Capital, L.P. v. NatWest Fin., Inc.*, 122 F. Supp. 2d 407, 419 (S.D.N.Y. 2000) (observing that the bespeaks caution doctrine "does not apply where a defendant knew that its statement was false when made").

[59]    *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009).

[60]    *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002).

[61]    *See ECA*, 553 F.3d at 206; *In re Gildan Activewear, Inc.*, 636 F. Supp. 2d 261, 274 (S.D.N.Y. 2009); *In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 34 (S.D.N.Y. 2004).

17

Liability under the actual knowledge prong of the safe harbor "attaches only upon proof of knowing falsity" — a showing of recklessness is insufficient.[62]  Lastly, pleadings based on fraud by hindsight are not actionable as a matter of law.[63]

### 2.    Scienter

The required level of scienter under Section 10(b) is either "intent to deceive, manipulate, or defraud"[64] or "reckless disregard for the truth."[65]  Plaintiffs may meet this standard by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."[66]  Under the latter theory, plaintiffs must allege that the defendants have engaged in "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so

---

[62]    *Slayton*, 604 F.3d at 773.

[63]    *See Caiafa v. Sea Containers, Ltd.*, 525 F. Supp. 2d 398, 410-11 (S.D.N.Y. 2007).

[64]    *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976).

[65]    *South Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) ("By reckless disregard for the truth, we mean 'conscious recklessness — *i.e.*, a state of mind *approximating actual intent*, and *not merely a heightened form of negligence*.'") (quoting *Novak v. Kasaks,* 216 F.3d 300, 308 (2d Cir. 2000)).

[66]    *ATSI*, 493 F.3d at 99 (citing *Ganino v. Citizens United Co.*, 228 F.3d 154, 168-69 (2d Cir. 2000)).

obvious that the defendant must have been aware of it."[67]  "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation."[68]  An inference of scienter "must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."[69]

### 3.    Loss Causation

A securities fraud plaintiff is required to "prove both transaction causation (also known as reliance) and loss causation."[70]  Loss causation is "the proximate causal link between the alleged misconduct and the plaintiff's economic

---

[67]     *Kalnit v. Eichler,* 264 F.3d 131, 142 (2d Cir. 2001) (quotation marks and citations omitted).

[68]     *Novak,* 216 F.3d at 308.

[69]     *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 314 (2007).  *Accord Sawabeh Info. Servs. Co. v. Brody*, 832 F. Supp. 2d 280, 295 (S.D.N.Y. 2011) (noting that "the tie . . . goes to the plaintiff" (quotation marks and citations omitted)).

[70]     *ATSI*, 493 F.3d at 106.  Defendants do not dispute transaction causation.

harm."[71]  "A misrepresentation is 'the proximate cause of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations . . . .'"[72]  Therefore, "to plead loss causation, the complaint[] must allege facts that support an inference that [defendant's] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud."[73]

## B.  Section 20(a) of the Exchange Act

Section 20(a) of the Exchange Act creates a cause of action against "control persons" of the primary violator.[74]  "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the

---

[71]  *Id.* at 106-07 (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005); *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005)). *Accord Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157 (2d Cir. 2007).

[72]  *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010) (quoting *Lentell*, 396 F.3d at 173) (emphasis in original).

[73]  *Lentell*, 396 F.3d at 175.

[74]  *See* 15 U.S.C. § 78t(a).

controlled person's fraud."[75]  Where there is no primary violation, there can be no "control person" liability under Section 20(a).[76]

## V.   DISCUSSION

### A.   Plaintiffs Are Entitled to Rely on Allegations from the NYAG Complaint

Defendants argue that under Rule 11 of the Federal Rules of Civil Procedure, the Court should strike plaintiffs' allegations or give them no weight because "they are entirely (and impermissibly) premised on an unadjudicated complaint brought by the NYAG . . . without any investigation by plaintiffs as to their truth or falsity."[77]  However, permitting plaintiffs to borrow allegations from the NYAG's complaint is warranted at this stage in the litigation.  The facts are derived from a credible complaint based on facts obtained after an investigation.[78]  In addition, counsel for plaintiffs have indicated that they have reached out to attorneys at the NYAG to verify the allegations in the Complaint.

---

[75]   *ATSI*, 493 F.3d at 108.

[76]   *See id.  See also In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 297-98 (S.D.N.Y. 2006).

[77]   Def. Mem. at 15.

[78]   *See, e.g.*, *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 768 n.24 (S.D.N.Y. 2012) (stating that complaints containing detailed factual information may be appropriate for borrowing).

While there is no basis to strike the Complaint at this time, plaintiffs have an ongoing obligation under Rule 11.  Plaintiffs should amend the Complaint to eliminate any allegations that are false or inaccurate.[79]  At that time, plaintiffs should also describe the independent investigations they have done to verify the allegations in the Complaint.

### B.    Barclays' Statements Regarding Its Business Practices and Risk Controls Are Not Actionable Misstatements

#### 1.    General Statements Regarding Business Practices and Risk Controls

Defendants argue that Barclays' statements about its business practices and risk controls are too general to be actionable.[80]  This includes statements such as "Barclays has clear risk management objectives, and a well-established strategy and framework for managing risk[,]" "[a]nother key focus over 2013 and the coming years is rebuilding the trust that customers, clients, and stakeholders have in our organisation[, and w]e have pledged to increase transparency and conduct our business in the right way, as set out in our values."[81]

As courts in this Circuit routinely hold, such "general statements about

---

[79]    *See, e.g.*, Def. Mem. at 15-16 (describing allegations copied from NYAG action that are factually incorrect).

[80]    *See id.* at 17-22.

[81]    Compl. ¶¶ 130, 176, 190.

reputation, integrity, and compliance with ethical norms are inactionable 'puffery,'

meaning that they are 'too general to cause a reasonable investor to rely upon

them.'"[82]  The alleged misstatements based on general business practices and risk

controls contained in paragraphs 130, 134, 137, 138, 140, 147, 149, 176, 185-186,

and 190 are not actionable because they are too general to have been relied upon by

a reasonable investor.[83]

### 2.   Statements Responding to the Salz Report

Plaintiffs argue that statements following the Salz report are actionable

---

[82]   *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752
F.3d 173, 183 (2d Cir. 2014) (quoting *ECA*, 553 F.3d at 206).  *Accord ECA*, 553
F.3d at 206 (stating that "[n]o investor would take such statements [about integrity
and risk management] seriously in assessing a potential investment, for the simple
fact that almost every investment bank makes these statements"); *Boca Raton
Firefighters & Police Pension Fund v. Bahash*, 506 Fed. App'x 32, 37 (2d Cir.
2012) (holding that statements regarding a company's "dedication towards
transparent and independent decision-making" are too "generic [and] indefinite" to
form the basis of a fraud claim).

[83]   *See Gusinsky v. Barclays PLC*, 944 F. Supp. 2d 279, 288-89
(S.D.N.Y. 2013), *aff'd in part and rev'd in part on other grounds sub nom.
Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236
(2d Cir. 2014) (holding that statements substantially similar to the ones at issue
here are actionable puffery, including statements such as "Barclays has clear risk
management objectives and a well-established strategy to deliver them, through
core risk management processes" and "Barclays is committed to operating within a
strong system of internal control that enables business to be transacted and risk
taken without exposing itself to unacceptable potential losses or reputational
damage," which closely resemble paragraphs 130, 147, 149, 176, and 186 of the
Complaint).

because they address a specific problem — restoring Barclays' reputation following the LIBOR scandal.[84]  In making this argument, plaintiffs rely heavily on *In re BP P.L.S. Securities Litigation*.[85]  In that case, shareholders argued that the Deepwater Horizon explosion supported the claim that BP's statements about its implementation of safety measures following several earlier oil refinery accidents were false or misleading.  The statements in *BP* were actionable because the Deepwater Horizon disaster was "so similar to prior disasters — the culmination of corner-cutting, overlooked and disregarded warnings, a lack of oversight, a failure to train employees properly, and long overdue maintenance — that it raised a genuine question as to whether BP was truly making the progress it claimed."[86]  The court applied those facts to the principle that "[a] repeated utterance, even on a promise of progress, can become misleading where repetition becomes a statement of current and ongoing compliance."[87]

---

[84]     Plaintiffs' Opposition to Defendants' Motion to Dismiss the Amended Complaint ("Pl. Opp."), at 12-18 (arguing that following the Salz report, which made thirty-four "formal recommendations, . . . Barclays embarked on a marketing campaign designed to clean up its reputation and regain the public's trust").  The alleged misstatements made in response to the Salz report are found at paragraphs 153, 155, 157, 159, and 161 of the Complaint.

[85]     843 F. Supp. 2d 712 (S.D. Tex. 2012).

[86]     *Id.* at 758.

[87]     *Id.* at 759.

However, the Complaint does not permit the same inference with respect to Barclays.  Barclays' statements regarding the Salz report did not directly reference LX, had not become a statement of current and ongoing compliance, and lacked the requisite specificity.  The allegations fail to connect the statements made in response to the Salz report to the alleged fraud at LX.  Plaintiffs contend that these statements relate to LX because Barclays "represented and reinforced the commitment to implement the Salz recommendations *across the entire bank*"[88] and that recommendations were focused on avoiding reputational risks.  But these links are too tenuous to support liability under the securities laws.   If they did,

> then every individual who purchased the stock of a company that was later discovered to have broken any law could theoretically sue for fraud.  This is precisely what the Second Circuit sought to avoid when it declined to "'bring within the sweep of federal securities laws many routine representations made by investment institutions.'"[89]

While courts have held that fraud is adequately alleged "where statements touting risk management [are] . . . juxtaposed against detailed factual

---

[88]    Pl. Opp. at 19 (emphasis in original).

[89]    *Gusinksy*, 944 F. Supp. 2d at 289-90 (quoting *Bahash*, 506 Fed. App'x at 37 (quoting *ECA*, 553 F.3d at 206)).  *Accord In re Australia & N.Z. Banking Grp. Ltd. Sec. Litig.*, No. 08-cv-11278, 2009 WL 4823923, at *14 (S.D.N.Y. Dec. 14, 2009) (finding statements not false or misleading where the "[alleged] fraud consisted of ANZ's misrepresentation of its 'equity finance practices'" but "[t]hose practices . . . are not the subject of the representations cited in the Complaint").

descriptions of the Company's woefully inadequate or non-existent credit risk procedures,"[90] plaintiffs have failed to "demonstrate with specificity why and how" the statements here are false or misleading.[91]   The most specific allegation is that Barclays did not implement certain "specific" controls, such as reviewing email communications.  However, neither the Salz report nor Barclays' response to it mention reviewing email communications or any other specific controls.

The Complaint also generally alleges that the purported fraud at LX renders false Barclays' statements that its new risk culture and control framework "will also be strengthened by actions to reinforce a control and compliance culture throughout the bank" and that "implementation of the framework will incorporate mechanisms to ensure that conduct, reputational and operational risks are fully factored into business decisions and governance."[92]   Likewise the alleged fraud at LX is claimed to make false the statement that Barclays is "committed to robust oversight in the form of a world-class compliance function" and that it "will reinforce a culture of compliance throughout the bank via a combination of training,

---

[90]      *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 190 (S.D.N.Y. 2010).

[91]      *Rombach*, 164 F.3d at 174.

[92]      Compl. ¶ 157.

discussion forums and performance management."[93]

But the fact that White lied about the "transparency and safeguards of its dark pool in a quest to boost profits" does not support an inference that Barclays was not in fact committed to making changes or adopting a consistent set of practices.[94]  The problem is that the Complaint does not set forth specific allegations that suggest that the conduct of Barclays' Equities Electronic Trading division — an entity contributing approximately 0.1 percent of Barclays' revenue — is "representative of [Barclays' compliance efforts in its other divisions], or material to the company's overall financial condition."[95]  Thus, unlike in *BP*, the Complaint fails to link Barclays' efforts to address its past misconduct with the fraud at LX;

---

[93]     *Id.* ¶ 161.

[94]     The word "transparency" has several meanings.  In Barclays' response to the Salz report, Barclays indicates in the introduction that "[t]his report is our response to those recommendations and strives to outline our approach to implementing each of those in a clear and transparent fashion."  *Id.* ¶ 153.  Barclays also represented that "[i]n the spirit of transparency and rebuilding trust, Barclays will publish updates on [its] progress in [its] implementation programme."  *Id.* ¶ 33.  The Complaint also states that Barclays' 2013 Annual Report disclosed that "[a]nother key focus over 2013 and the coming years is rebuilding the trust that customers, clients, and stakeholders have in our organisation.  We have pledged to increase transparency and conduct our business in the right way, as set out in our values."  *Id.* ¶ 190.  The first two statements refer to being open about implementing the Salz recommendations.  The Complaint does not allege that Barclays failed to be open about this process.  The meaning of transparency in the last statement, which is paradigmatic puffery, is unclear.

[95]     *Rombach*, 164 F.3d at 174.

and unlike in *Freudenberg v. E\*Trade Financial Corporation*, the Complaint fails

to detail the lack of controls that made the fraud at LX possible.[96]

Moreover, Barclays never said that it had completed implementation of

the Salz recommendations.  To the contrary, Barclays stated that it "*aim[ed]* to have

---

[96]     This case is also different from *In re Barrick Gold Sec. Litig.*, No. 13-cv-3851, 2015 WL 1514597, at \*13-14 (S.D.N.Y. Apr. 1, 2015), in which Barrick was required to establish internal controls that provide assurances regarding the achievement of objectives.  In that case, Barrick certified that its internal controls were effective, the fraud was directly related to a failure of those controls, and the fraud occurred at a key company project.  *See also City of Brockton Ret. Sys. v. Avon Prods., Inc.*, No. 11-cv-4665, 2014 WL 4832321, at \*16 (S.D.N.Y. Sept. 29, 2014) ("A reasonable investor could interpret Avon's statements about its allegedly elaborate internal controls operation as reflecting concrete steps that Avon had taken in this area, and might rely upon these statements as a guarantee that such steps had, in fact, been implemented."); *In re Goldman Sachs Group, Inc. Sec. Litig.*, No. 10-cv-3461, 2014 WL 2815571, at \*4-5 (S.D.N.Y. June 23, 2014) ("Goldman's representations about its purported controls for avoiding conflicts were directly at odds with its alleged conduct.  For instance, Goldman represented that '[w]e have extensive procedures and controls that are designed to . . . address conflicts of interest' and 'we increasingly have to address potential conflicts of interest, including situations where our services to a particular client or our own proprietary investments or other interests conflict, or are perceived to conflict, with the interest of another client. . . .'  Meanwhile, Goldman is alleged to have sold financial products to clients despite clear and egregious conflicts of interest — indeed, where its 'services to a particular client' . . .  and its 'own proprietary investments' . . . 'conflict[ed] with the interest of [the] other client[s]' investing in those deals.") (citations omitted); *In re UBS AG Sec. Litig.*, No. 07-cv-11225, 2012 WL 4471265, at \*36 (S.D.N.Y. Sept. 28, 2012) (distinguishing statements that were mere puffery from "qualitative assurances and affirmative guarantees regarding . . . specific steps [the Defendant] had taken to achieve particular results").

the *majority* of all the [Salz report] recommendations implemented *by 2015*."[97]  But plaintiffs commenced this action in July of 2014, based on earlier conduct. Accordingly, no reasonable investor could believe that Barclays' statements in response to the Salz report were "a statement of current and ongoing compliance."[98]

Finally, it is well settled in this Circuit that it is the generic nature of the statement that makes it puffery, and this quality is not typically altered by context.[99]  Statements that Barclays' "new risk culture and control framework 'will also be strengthened by actions to reinforce a control and compliance structure'" or describing Barclays' "world-class compliance function" are nearly identical to statements that have been held to be non-actionable puffery by courts in this

---

[97]     Compl. ¶ 33 (emphasis added).

[98]     *BP*, 843 F. Supp. 2d at 759.

[99]     *See UBS AG*, 752 F.3d at 183 ("It is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are 'too general to cause a reasonable investor to rely upon them.'  This is particularly true where, as here, the statements are explicitly aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should.'  Plaintiffs' claim that these statements were knowingly and verifiably false when made does not cure their generality, which is what prevents them from rising to the level of materiality required to form the basis for assessing a potential investment.") (quoting *ECA*, 553 F.3d at 206); *Bahash*, 506 Fed. App'x at 37 (explaining that "[t]he 'puffery' designation . . . stems from the generic, indefinite nature of the statements at issue, not their scope").

Circuit.[100]

   As already noted, Barclays' statements are not only generic, but are for the most part aspirational.  However, the statements that purport to describe what Barclays had already accomplished are also "too open-ended and subjective to constitute a guarantee" that fraudulent conduct would not again occur at Barclays.[101] This applies to the statements that "Barclays' Investment Bank adopted new processes for effectively learning from mistakes in 2012 following an internal review," which "allow[s] Barclays to understand and address underlying root causes of issues and apply lessons learned more broadly."[102]  Accordingly, the alleged misstatements made in response to the Salz report are inactionable puffery.

### C. The Misrepresentations Regarding LX

   According to plaintiffs, "[i]n an effort to propel LX to the very top, . . .

---

   [100] *See, e.g.*, *C.D.T.S. No. 1*, No. 12-cv-4924, 2013 WL 6576031, at *4-5 (S.D.N.Y. Dec. 13, 2013) (holding that statements regarding the bank's new "controlled and disciplined risk culture" were inactionable puffery); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 370 (E.D.N.Y. 2013) (holding that statements regarding a bank's "best-of-class" compliance program were puffery).  Likewise, the court in *BP* dismissed as puffery many generalized statements similar to those at issue here.  For example, the court dismissed statements BP made about its "commitment to safety" and its "progress" towards improving its safety, noting that "general 'progress' is simply too illusory a metric" to be actionable.  843 F. Supp. 2d at 757.

   [101] *UBS AG*, 752 F.3d at 186.

   [102] Compl. ¶ 159.

Barclays embarked on a mission to mislead the market about the transparency and safeguards of its dark pool."[103]  Barclays "touted Liquidity Profiling as a 'sophisticated surveillance framework, helping to protect [clients] from predatory trading . . . .'"[104]  And White stated in trade journals and in a comment letter to the Financial Industry Regulatory Authority that, with respect to LX, "the biggest theme of the [2013] year was transparency," and that "Barclays[] belie[ves] that transparency is not only important but benefits both our clients and the market."[105]

White also said in trade journals and in presentation slides he used at the American Enterprise Institute conference that Barclays "monitors client orders

---

[103]     Pl. Opp. at 27.

[104]     *Id.* (quoting Compl. ¶ 67).

[105]     Compl. ¶¶ 165, 169, 181, 183.  The Complaint states that a certain Liquidity Landscape Chart misrepresented the extent of trading by HFTs on LX because Tradebot, one of the largest participants in the pool, was not included in the chart.  *See id.* ¶¶ 132-133.  The Complaint also alleges that Barclays gave some clients confidential marketing materials that described factors Barclays considered in assigning the Liquidity Profiling ratings that clients could use to block aggressive counterparties, but that Barclays did not disclose several features.  *See id.* ¶¶ 45-46, 64, 93, 123, 128, 143, 145.  However, plaintiffs do not allege that these documents were disclosed publicly or to Barclays ADS holders.  Plaintiffs cannot rely on the "fraud on the market" presumption of reliance because they cannot plausibly allege that the statements contained in these materials were intended to affect the price for Barclays ADSs or even that they reached the market.  *See Stoneridge Inv. Partners, LLC*, 552 U.S. at 159.  The same holds true for plaintiffs' allegations regarding latency arbitrage and the internalization statistic.  *See* Compl. ¶¶ 102, 109-112.

continuously" on LX, has "controls" and "safeguards to manage toxicity" on LX and "can take corrective action" if necessary.  Further, White stated that by "understanding the characteristics of flow at the client level, Barclays can improve the overall quality of LX liquidity: . . . high alpha takers [*i.e.*, aggressive traders] can be held accountable, e.g., by demanding liquidity providing strategies, or by refusing a client access."[106]  Plaintiffs allege that these statements were misleading because Barclays did not disclose that it did not eliminate traders who behaved in a predatory manner, did not restrict predatory traders access to LX, did not monitor client orders continuously, and did not apply Liquidity Profiling to some trading activity in LX.[107]  In fact, plaintiffs allege, Barclays encouraged predatory traders to enter LX.

In addition, slides White used at the AEI conference indicated that Barclays' order router would "send[] orders to . . . venues with the greatest likelihood of fill."[108]  And White told trade journals that Barclays' order router "constantly examines market conditions in real time and adjusts its order-handling

---

[106]    Compl. ¶¶ 122, 127, 144, 151, 163.

[107]    *See id.* ¶¶ 123, 128, 143, 145, 152, 164, 167, 172, 194.

[108]    *Id.* ¶ 125.

strategy immediately."[109]  Plaintiffs contend that these statements were misleading because Barclays did not disclose that an "internal analysis" found that orders unfilled on LX were "routed disproportionately to other trading venues based on where Barclays had been most profitable" and that client orders were routed to LX at a "high rate."[110]

### 1.     The Complaint Adequately Pleads Materiality

Defendants argue that plaintiffs have not alleged "any facts suggesting that statements about LX could have been material to any investor in Barclays PLC."[111]  According to defendants, "[t]he bare fact that Barclays' ADS price dropped after the NYAG sued Barclays does not suffice to show materiality because the stock drop could reflect the market's reaction to additional regulatory scrutiny of Barclays — rather than a reaction to the correction of prior alleged misstatements about LX."[112]

Materiality is a fact-intensive inquiry that is ordinarily inappropriate for resolution on a motion to dismiss.[113]  As defendants correctly note, the Second

---

[109]    *Id.* ¶ 163.

[110]    *Id.* ¶¶ 105, 108.

[111]    Def. Mem. at 23.

[112]    *Id.*

[113]    *See Ganino*, 228 F.3d at 162.

33

Circuit follows the quantitative and qualitative factors set forth in SEC Staff

Accounting Bulletin No. 99 ("SAB No. 99").[114]  Under the quantitative factor, the

SEC considers the financial magnitude of the misstatement.  The "use of a

percentage as a numerical threshold, such as 5%, may provide the basis" for

determining whether an alleged misstatement could be material.[115]  Under the

qualitative factor, the SEC considers: (1) whether there was a concealment of an

unlawful transaction; (2) the significance of the misstatement in relation to the

company's operations; and (3) management's expectation that the misstatement will

result in a significant market reaction.[116]  At the same time, the Second Circuit has

"consistently rejected a formulaic approach to assessing the materiality of an

alleged misrepresentation."[117]  Thus, to plead materiality a plaintiff must

specifically identify qualitative factors demonstrating a substantial likelihood that a

reasonable shareholder would think that the addition of that fact "significantly

alter[s] the 'total mix' of information made available."[118]

---

[114]    *See* SAB No. 99, 64 Fed. Reg. 45150, 45150-52 (1999).

[115]    *ECA*, 553 F.3d at 204 (quotation marks omitted).

[116]    *See id.*

[117]    *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 485 (2d Cir.
2011).

[118]    *Id.  Accord ECA*, 553 F.3d at 198 ("While SAB No. 99 does not
change the standard of materiality, we consider the factors it sets forth in

Plaintiffs' allegations and publicly available documents indicate that LX's revenue in relation to the overall revenue of Barclays PLC is far below the five percent threshold.[119]  Despite this, the Complaint adequately alleges materiality. Barclays had staked its "long-term performance" on restoring its integrity.[120]  As alleged, the specific misstatements about LX — which include touting its safety while secretly encouraging predatory behavior — call into question the integrity of the company as a whole.  For this reason, it is inappropriate to focus only on the revenue stream of LX when assessing the quantitative factor.  Likewise, SAB No. 99 permits consideration of market reaction in instances where management expects "that a known misstatement may result in a significant positive or negative market reaction."  Drawing all reasonable inference in plaintiffs' favor, the Complaint adequately alleges Barclays' past scandals, its efforts to restore its reputation, and,

---

determining whether the misstatement significantly altered the 'total mix' of information available to investors.").

[119]    Plaintiffs allege that LX reflected a revenue "growth opportunity" of "between $37 and $50 million per year."  Compl. ¶ 54.  Barclays' annual income from 2011 and 2013 was between twenty-five and roughly thirty-three billion pounds.  *See* 3/9/14 Barclays PLC, 2013 Annual Report (Form 20-F).  That means that LX accounted for 0.1 percent of Barclays PLC's total revenue.

[120]    Compl. ¶ 138 (Jenkins stated that "I believe Barclays will only be a valuable business if it is a values-driven business.  We must operate to the highest standards if our stakeholders are to trust us and bring their business to Barclays. Our long-term performance depends on it.").

most significantly, misrepresentations that go to the heart of the firm's integrity and

reputation.  Accordingly, I cannot conclude as a matter of law that there is *not* a

"substantial likelihood that a reasonable shareholder would consider [the

misrepresentations about LX] important in deciding how to [act]."[121]

### 2.    The Complaint Pleads Scienter as to White

To state a claim for securities fraud, the "scienter allegations must give

rise to a strong inference of fraudulent intent."[122]  "A plaintiff can establish this

intent either (a) by alleging facts to show that defendants had both motive and

opportunity to commit fraud, or (b) by alleging facts that constitute strong

circumstantial evidence of conscious misbehavior or recklessness."[123]

### a.    Motive and Opportunity

The Complaint does not allege that any Individual Defendant other

than White knew about the LX product, much less that they intended to mislead

---

[121]    *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quotation marks
omitted).  This holding does not foreclose defendants from attempting to
demonstrate at a later stage that the price drop was not a reaction to the particular
fraud alleged but to the fact that Barclays was being sued by a regulator.  Nor does
it preclude defendants from attempting to demonstrate lack of materiality on other
grounds, including that the alleged misstatements were not in fact false or
misleading.

[122]    *Kalnit*, 264 F. 3d at 138 (quotation marks omitted).

[123]    *Id.* (quotation marks omitted).

ADS holders with regard to that product.  Accordingly, the allegations in the

Complaint are insufficient to allege scienter based on motive as to these defendants.

          Plaintiffs contend that White was motivated by the potential

profitability of LX and that "improving LX to be the most successful ATS was also

an imprimatur of prestige."[124]  However, it is well settled in this Circuit that general

allegations of a profit or prestige motive are insufficient to allege scienter.[125]  The

problem is that "plaintiffs' motive allegations [are] too generalized to demonstrate

defendants' concrete and personal benefit from the alleged fraud."[126]  Furthermore,

"the facts alleged must support an inference of an intent to defraud the plaintiffs

rather than some other group."[127]  At most, the allegations relate to White's motive

---

[124]    Pl. Opp. at 40.

[125]    *See ECA*, 553 F.3d at 201 (holding that "the allegation that [defendants] had the requisite motive because they received bonuses based on corporate earnings and higher stock prices does not strengthen the inference of fraudulent intent"); *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008); *Kalnit*, 264 F.3d at 139-40 ("Insufficient motives, we have held, can include (1) the desire for the corporation to appear profitable and (2) the desire to keep stock prices high to increase officer compensation.  On the other hand, we have held motive sufficiently pleaded where plaintiff alleged that defendants misrepresented corporate performance to inflate stock prices while they sold their own shares.") (citations omitted); *Chill v. General Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996).

[126]    *Kalnit*, 264 F.3d at 140 (quotation marks omitted).

[127]    *ECA*, 553 F.3d at 198 (citing *Kalnit*, 264 F.3d at 140-41).

to defraud clients of LX, not ADS holders.

### b. Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness

Where a plaintiff cannot show motive, circumstantial evidence of conscious misbehavior or recklessness will suffice.   But "the strength of the circumstantial allegations must be correspondingly greater" in the absence of motive.[128]  Plaintiffs argue that Individual Defendants Diamond, Jenkins, Lucas, and Morzaria had knowledge because they "occupied senior executive positions at Barclays" and "[a]s champions for a changed Barclays, [they] were responsible for and had a duty to monitor Barclays' purported transformation."[129]  However, "[c]ourts in this Circuit have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight."[130]  And the Complaint has not "specifically identified any reports or statements that would have come to light in a reasonable investigation and that would have demonstrated the falsity of the alleged misleading statements."[131]

---

[128]     *Id.* at 199 (quotation marks omitted).

[129]     Pl. Opp. at 37.

[130]     *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010).

[131]     *Teamsters Local 445*, 531 F.3d at 196.  Plaintiffs argue that "Jenkins met regularly with members of the Business Practices Review Committee," but

Plaintiffs also contend that Individual Defendants Diamond, Jenkins, Lucas, and Morzaria acted with scienter because they "should have been particularly diligent" once they were on notice that dark pools were subject to manipulation.[132]  And plaintiffs contend that these same defendants were reckless because they were not sufficiently "diligent in ensuring that Barclays was implementing sufficient internal controls and procedures designed to prevent fraud."[133]  But these allegations are far too general to give rise to a strong inference in the absence of a motive.

On the other hand, there is strong circumstantial evidence of conscious misbehavior or recklessness on the part of White.  Not only was White the source of many of the allegedly false allegations about LX, but he was the head of Equities Electronic Trading at Barclays, "the driving force behind the Company's goal to be the number one dark pool," and he "held himself [out] to the public as intimately knowledgeable about LX's functions and purported transparency."[134]

---

there is no allegation that this Committee presented any information contradicting the public statements about LX or otherwise raised red flags about the implementation of LX.  Pl. Opp. at 37.

[132]    Pl. Opp. at 38.

[133]    *Id.* at 39.

[134]    *Id.* at 34.

For instance, in February 2014, Barclays' dark pool was named the "Best Dark Pool" by an industry publication.  White attributed its growth to "Barclays' commitment to being transparent about how Barclays operates, how Barclays routes client orders, and the kinds of counterparties traders can expect to deal with when trading in the dark pool."  White stated that transparency was "the one issue that we really took a stance on . . . We always come back to transparency as the key driver — letting [clients] know how we're interacting with their flow and what type of flow they're interacting with."  In addition, he stated that "[t]ransparency on multiple levels is a selling point for our entire equities franchise."[135]  At the same time, a former Barclays Director in the Equities Electronic Trading division informed the government that Barclays "purport[s] to have a toxicity framework that will protect you when *everybody knows internally* that the thing is done manually with outliers removed and things are classified only if they feel like it."[136]  Corroborating this Director's account, another former Director in the division described Liquidity Profiling as "a scam."

---

[135]     Compl. ¶ 61; *see also id.* ¶ 64 (in March 2013, defendant White stated that Barclays' dark pool "is an integral part of our electronic trading offering, providing clients with enhanced execution quality . . . built on transparency and preventing information leakage. We have built in safeguards to manage toxicity, and to help our institutional clients understand how to manage their interactions with high-frequency traders.").

[136]     *Id.* ¶ 98 (emphasis added).

These allegations are sufficient to create a strong inference of "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."[137]  Given the alleged nature of the fraud — whereby Barclays was touting the safety of LX while at the same time courting predatory firms — the common knowledge within the group about the fraud, and the importance of Barclays' reputation to the company's continuing success,[138] White either knew or should have known that the disclosure of the fraud would harm shareholders.

### 3.    Scienter of the Corporate Defendants

"'When the defendant is a corporate entity, . . . the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter.'"[139]  Here, White is a management-level employee and his scienter is properly imputed to Barclays.

---

[137]    *ECA*, 553 F.3d at 198.

[138]    *See, e.g.*, Compl. ¶ 138.

[139]    *Carpenters Pension Trust Fund of St. Louis, St. Clair Shores Police & Fire Ret. Sys. v. Barclays PLC*, No. 12-cv-5329, 2014 WL 5334053, at *2 (S.D.N.Y. Oct. 20, 2014) (quoting *Teamsters Local 445*, 531 F.3d at 195).  In this context, "it is possible to raise the required inference [of scienter] with regard to a corporate defendant without doing so with regard to a specific individual defendant."  *Id.* (quotation marks omitted).

### D.    Loss Causation as to the June 27 Telegraph Article

Defendants contend that the Court should dismiss any claim for losses allegedly incurred on June 30, 2014, as a result of the June 27 Telegraph report. Defendants argue that because the article does not reveal a new fraud, the Complaint does not adequately plead loss causation.  Defendants also assert that the market had already reacted to the corrective disclosure of the NYAG complaint, and the only information added in the June 27 article was speculation about the size of a possible fine.[140]  A review of the article supports the defendants' arguments.  The analyst's speculation about the size of a possible fine and the opinion about the relative importance of the scandal do not reveal any new truth about the alleged fraud.[141]

### E.    Control Person Liability

The Complaint adequately pleads a primary violation as to Barclays and White.  It also pleads that White and Individual Defendants Diamond, the

---

[140]    *See* Def. Mem. at 42-43.

[141]    *See Janbay v. Canadian Solar, Inc.*, No. 10-cv-4430, 2012 WL 1080306, at *16 (S.D.N.Y. Mar. 30, 2012) (stating that "the raising of questions and speculation by analysts and commentators does not reveal any 'truth' about an alleged fraud") (citing *In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d at 510 holding that "negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure")).

former CEO, and Jenkins, who replaced Diamond as CEO in August 2012 and continues to hold that position, are control persons for purposes of section 20(a). Although Individual Defendants Lucas and Morzaria, who were both Finance Directors, would likely have had control over statements in Barclays' SEC filings, none of the actionable statements remaining in the case were in those filings. Accordingly, the Complaint does not adequately allege a section 20(a) claim against Individual Defendants Lucas and Morzaria.

### F.   Leave to Replead

Plaintiffs request leave to amend in the event any portion of defendants' motion is granted.  Leave to amend should be freely given "when justice so requires."[142]  However, plaintiffs already had an opportunity to amend their claims and had notice of defendants' anticipated defenses prior to the filing of this motion to dismiss.[143]  Moreover, any further amendment would be futile.  The alleged misstatements about Barclays' business practices and internal controls and in response to the Salz report are too general to be actionable; and, because these statements are not actionable, there is no basis for section 20(a) liability against

---

[142]   Fed. R. Civ. P. 15(a)(2).

[143]   *See* Individual Rules and Procedures of Judge Shira A. Scheindlin, Rule IV.B (stating that parties must exchange letters prior to bringing a motion to dismiss to "attempt to eliminate the need for [the] motion[]").

Individual Defendants Lucas and Morzaria.

## VI.    CONCLUSION

For the foregoing reasons, defendants' motion is GRANTED solely to the extent that the section 20(a) claims are dismissed as to Individual Defendants Lucas and Morzaria, and is otherwise DENIED (except insofar as the alleged misstatements regarding Barclays' general business practices and risk controls and in response to the Salz report identified herein are deemed inactionable and plaintiffs may not seek damages based on the June 27 Telegraph article).  Plaintiffs shall amend the Complaint within thirty days to comply with their obligations under Rule 11 as noted in section IV.A of this Opinion and Order.  The Clerk of the Court is directed to close this motion (Docket No. 28).  A conference is scheduled for May 5, 2015 at 4:30 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            April 24, 2015

44

**- Appearances -**

**For Plaintiffs**:

Jeremy A. Lieberman, Esq.
Emma Gilmore, Esq.
Pomerantz LLP
600 Third Avenue, 20th Floor
New York, New York 10016
(212) 661-1100

Patrick V. Dahlstrom, Esq.
Pomerantz LLP
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
(312) 377-1181

**For Defendants:**

Jeffrey T. Scott, Esq.
David H. Braff, Esq.
Matthew A. Schwartz, Esq.
Andrew H. Reynard, Esq.
John J. Hughes, III, Esq.
Sullivan & Cromwell LLP
125 Broad St.
New York, New York 10004
(212) 558-4000