# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BARBARA STROUGO, Individually and on Behalf of All Others Similarly Situated,<br><br>      Plaintiff(s),<br><br>    v.<br><br>BARCLAYS PLC, BARCLAYS CAPITAL, INC., ROBERT DIAMOND, ANTONY JENKINS, CHRISTOPHER LUCAS, TUSHAR MORZARIA, and WILLIAM WHITE,<br><br>      Defendants. | **Case No. 14-cv-5797 (SAS)** |

# PLAINTIFFS' MEMORANDUM IN SUPPORT OF
# MOTION FOR CLASS CERTIFICATION

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT .................................................................................................1

STATEMENT OF FACTS .....................................................................................................3

PROCEDURAL HISTORY.....................................................................................................7

ARGUMENT...........................................................................................................................7

    I.    THE CLASS SHOULD BE CERTIFIED PURSUANT TO FEDERAL RULE
        OF CIVIL PROCEDURE 23....................................................................................7

        The Rule 23(a) Requirements.......................................................................................9

            1.    The Proposed Class Is So Numerous That Joinder of All Members Is
                  Impracticable..............................................................................................9

            2.    Questions of Law or Fact Are Common to the Class ......................................10

            3.    Plaintiffs' Claims Are Typical of the Class ....................................................11

            4.    Plaintiffs Will Fairly and  Adequately Protect the Interests of the Class..........13

        The Requirements of Rule 23(b)(3) Are Satisfied .........................................................13

            1.    Common Questions of Law and Fact Predominate .........................................13

                  a.    The Fraud-on-the-Market Presumption Applies to the Claims.................14

                  b.    Reliance Is Also Presumed Under *Affiliated Ute*......................................22

            2.    A Class Action Is Superior to Other Available Methods for the Fair and
                  Efficient Adjudication of the Controversy.......................................................22

    II.    POMERANTZ SATISFIES THE RULE 23(g) PREREQUISITES FOR
        APPOINTMENT AS CLASS COUNSEL....................................................................24

CONCLUSION.......................................................................................................................25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*AAL High Yield Bond Fund v. Ruttenberg*,
    229 F.R.D. 676 (N.D. Ala. 2005) ........................................................................... 17

*Affiliated Ute Citizens of Utah v. United States*,
    92 S. Ct. 1456 (1972) ............................................................................................. 22

*Amchem Products, Inc., v. Windsor*,
    117 S. Ct. 2231 (1997) ........................................................................................ 7, 13

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
    133 S. Ct. 1184 (2013) .................................................................................. 2, 3, 8, 9

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
    222 F.3d 52 (2d Cir. 2000) ..................................................................................... 13

*Basic Inc. v. Levinson*,
    108 S. Ct. 978 (1988) ......................................................................................... 15, 16

*Blackie v. Barrack*,
    524 F.2d 891 (9th Cir. 1975) ............................................................................. 11, 14

*Board of Trustees of the AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*,
    269 F.R.D. 340 (S.D.N.Y. 2010) .............................................................................. 8

*Califano v. Yamasaki*,
    99 S. Ct. 2545 (1979) ............................................................................................... 2

*Cammer v. Bloom*,
    711 F. Supp. 1264 (D.N.J. 1989) ....................................................... 16, 17, 19, 20

*Castillo v. Envoy Corp.*,
    206 F.R.D. 464 (M.D. Tenn. 2002) ................................................................ *passim*

*Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care,*
    *L.L.C.*,
    504 F.3d 229 (2d Cir. 2007) ..................................................................................... 9

*Cordes & Co. Fin. Services, Inc. v. A.G. Edwards & Sons, Inc.*,
    502 F.3d 91 (2d Cir. 2007) ..................................................................................... 22

*Cromer Fin. Ltd. v. Berger*,
    205 F.R.D. 113 (S.D.N.Y. 2001) ............................................................................ 15

*Darquea v. Jarden Corp.*,
No. 06 Civ. 722, 2008 WL 622811 (S.D.N.Y. Mar. 6, 2008) ................................. 8

*Dietrich v. Bauer*,
192 F.R.D. 119 (S.D.N.Y. 2000) ......................................................................... 10

*Dirks v. Clayton Brokerage Co. of St. Louis Inc.*,
105 F.R.D. 125 (D. Minn. 1985) ......................................................................... 22

*Dura Pharmaceuticals, Inc. v. Broudo*,
125 S. Ct. 1627 (2005) ...................................................................................... 14

*Dura-Bilt Corp. v. Chase Manhattan Corp.*,
89 F.R.D. 87 (S.D.N.Y. 1981) ............................................................................ 14

*Erica P. John Fund v. Halliburton Co.*,
131 S. Ct. 2179 (2011) ................................................................................... 9, 14

*Gen. Tel. Co. of Southwest v. Falcon*,
102 S. Ct. 2364 (1982) ...................................................................................... 11

*Haddock v. Nationwide Fin. Services, Inc.*,
262 F.R.D. 97 (D. Conn. 2009) .......................................................................... 10

*Halliburton Co. v. Erica P. John Fund, Inc.*,
134 S. Ct. 2398 (2014) ................................................................................ 15, 16

*In re Accredo Health, Inc. Sec. Litig.*,
No. 03 Civ. 2216, 2006 WL 1716910 (W.D. Tenn. Apr. 19, 2006) ....................... 18

*In re Agent Orange Prod. Liab. Litig. MDL No. 381*,
818 F.2d 145 (2d Cir. 1987) ............................................................................... 10

*In re Baldwin-United Corp. Litig.*,
122 F.R.D. 424 (S.D.N.Y. 1986) ........................................................................ 12

*In re Beacon Assoc. Litig.*,
282 F.R.D. 315 (S.D.N.Y. 2012) ........................................................................ 14

*In re Blech Sec. Litig.*,
187 F.R.D. 97 (S.D.N.Y. 1999) ......................................................................... 2, 9

*In re Countrywide Fin. Corp. Sec. Litig.*,
273 F.R.D. 586 (C.D. Cal. 2009) ........................................................................ 16

*In re Fed. Home Loan Mtge. Corp. (Freddie Mac) Sec. Litig.*,
281 F.R.D. 174 (S.D.N.Y. 2012) ........................................................................ 17

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   245 F.R.D. 147 (S.D.N.Y. 2007) ............................................................ 11

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   574 F.3d 29 (2d Cir 2009)........................................................................ 11

*In Re Groupon, Inc. Sec. Litig.*,
   No. 12 Civ. 2450, 2014 WL 5245387 (N.D. Ill. Sept. 23, 2014) .......... 15

*In re Groupon, Inc. Sec. Litig.*,
   No. 12-cv-2450, 2015 WL 1043321 (N.D. Ill. March 5, 2015)............... 16

*In re Ind. Energy Holdings PLC Sec. Litig.*,
   210 F.R.D. 476 (S.D.N.Y. 2002) ...................................................... 2, 7, 8

*In re Longtop Fin. Tech. Ltd. Sec. Litig.*, No. 11 Civ. 3658,
   2013 WL 3486990 (S.D.N.Y. July 11, 2013) ........................................ 12

*In re Merck & Co., Inc., Sec., Deriv. & ERISA Litig.*,
   MDL No. 1658 (SRC), 2013 WL 396117 (D.N.J. Jan. 30, 2013) .......... 15

*In re NASDAQ Market-Makers Antitrust Litig.*,
   169 F.R.D. 493 (S.D.N.Y. 1996) ............................................................ 14

*In re Oxford Health Plans, Inc.*,
   191 F.R.D. 369 (S.D.N.Y. 2000) ............................................................ 11

*In re Prudential Sec. Inc. Ltd. Partnerships Litig.*,
   163 F.R.D. 200 (S.D.N.Y. 1995) ............................................................ 10

*In re SCOR Holding (Switzerland) AG Litig.*,
   537 F.Supp. 2d 556 (S.D.N.Y. 2008).............................................. 11, 23

*In re Sumitomo Copper Litig.*,
   182 F.R.D. 85 (S.D.N.Y. 1998) .............................................................. 11

*In re Visa Check/MasterMoney Antitrust Litig.*,
   280 F.3d 124 (2d Cir. 2001).................................................................... 13

*In re Vivendi Universal, S.A.*,
   242 F.R.D. 76 (S.D.N.Y. 2007) ......................................................... 9, 23

*In re Winstar Communications Sec. Litig.*,
   290 F.R.D. 437 (S.D.N.Y. 2013) ............................................................ 16

*In re WorldCom, Inc. Sec. Litig.*,
   219 F.R.D. 267 (S.D.N.Y. 2003) ....................................................... *passim*

*In re Xcelera.com Sec. Litig.*,
    430 F.3d 503 (1st Cir. 2005)............................................................. 16, 18

*Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*,
    967 F.2d 742 (2d Cir. 1992)..................................................................... 22

*Local 703, I.B. of T. Grocery & Food Employees Welfare Fund v. Regions Fin. Corp.*,
    No. 12 Civ. 14168, 2014 WL 3844070 (11th Cir. Aug. 6, 2014)................... 17, 18

*Marisol A. v. Giuliani*,
    126 F.3d 372 (2d Cir. 1997)..................................................................... 9

*Maywalt v. Parker & Parsley Petroleum Co.*,
    147 F.R.D. 51 (S.D.N.Y. 1993) ................................................................ 3

*Menkes v. Stolt-Nielsen S.A.*,
    270 F.R.D. 80 (D. Conn. 2010)........................................................ 9, 10, 23

*Padilla v. Maersk Line, Ltd.*,
    271 F.R.D. 444 (S.D.N.Y. 2010) .............................................................. 14

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
    446 F. Supp. 2d 163 (S.D.N.Y. 2006)....................................................... 14

*Phillips Petroleum Co. v. Shutts*,
    105 S. Ct. 2965 (1985)......................................................................... 2, 8

*Schleicher* v. *Wendt*,
    618 F.3d 679 (7th Cir. 2010) .................................................................. 16

*Simpson v. Specialty Retail Concepts*,
    823 F. Supp. 353 (M.D.N.C. 1993) .......................................................... 17

*Stengle v. American Italian Pasta Co.*,
    No. 05 Civ. 0725, 2005 U.S. Dist. LEXIS 43816 (W.D. Mo. Dec. 19. 2005) ...... 24

*Teamsters Local 445 Frgt. Div. Pension Fund v. Bombardier Inc.*,
    546 F.3d 196 (2d Cir. 2008).................................................................. 8, 17

*Teamsters Local 445 Frgt. Div. Pension Fund v. Bombardier, Inc.*,
    Fed. Sec. L. Rep. P. 93,935 (S.D.N.Y. Aug. 1, 2006) ............................... 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    127 S. Ct. 2499 (2007)........................................................................... 23

*UFCW Local 1776 v. Eli Lilly and Co.*,
    620 F.3d 121 (2d Cir. 2010)................................................................... 14

*Wagner v. Barrick Gold Corp.*,
   251 F.R.D. 112 (S.D.N.Y. 2008) ................................................................................ 9, 11

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011) ...................................................................................................... 8

FEDERAL STATUTES

15 USC § 78j(b) ...................................................................................................................... 7

15 USC § 78t(a) ...................................................................................................................... 7

FEDERAL RULES

FEDERAL RULE OF CIVIL PROCEDURE 23 ................................................................. passim

FEDERAL REGULATIONS

17 CFR 240.10b-5 .................................................................................................................. 7

Lead Plaintiff Mohit Sahni and Plaintiff Joseph Waggoner (collectively, "Plaintiffs") submit this memorandum in support of their motion for class certification pursuant to Federal Rule of Civil Procedure 23.  Plaintiffs seek certification of the following Class:

> All purchasers of Barclays American Depositary Shares ("ADSs") during the period from August 2, 2011 through and including June 25, 2014 (the "Class Period"), excluding Defendants, officers and directors of Barclays, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

Plaintiffs also seek appointment as Class Representatives and the appointment of Pomerantz LLP ("Pomerantz") as Class Counsel.  Lead Plaintiff Mohit Sahni retired on July 1, 2015 from York University in Toronto, Canada, where he served as Director of Information Technology.  He holds a Bachelor of Science degree from the University of Delhi and has worked in Canada in the field of Information Technology since 1974.  During his career in the field of Information Technology, Mr. Sahni worked for IBM, 3M and the Ministry of the Attorney General, where he headed its Information Technology Office.  Plaintiff Joseph Waggoner is currently employed by Service Press in Newington, Connecticut as an account representative.  He has been in the printing and publishing industry in Connecticut since 1988.  Mr. Waggoner is a graduate of the Connecticut Military Academy where he was given a commission in the Connecticut Army National Guard in 1981.  Mr. Waggoner served as a commissioned officer in the CTARNG for four years and another two years in the Army Reserve.

## PRELIMINARY STATEMENT

This lawsuit is a textbook example of a case warranting class action treatment.  Plaintiffs seek to prove that, like other Class members, they were injured by a common course of misconduct—the issuance of knowingly false and misleading material statements and omissions by Barclays PLC and Barclays Capital, Inc. ("Barclays" or the "Company") and the Individual

1

Defendants[1] (collectively, "Defendants") during the Class Period (August 2, 2011 – June 25, 2014), concerning Barclays' dark pool. The questions of law and fact relevant to the merits— issuance of false and misleading statements, reliance, materiality, scienter, loss causation and economic loss—are identical for each and every member of the putative class. Indeed, class action treatment is especially appropriate because many members of the putative class have relatively small losses, making it unfair and inefficient to force them to vindicate their claims individually.

The Supreme Court recently reiterated the importance of private enforcement of federal securities laws: "Congress, the Executive Branch, and this Court . . . have recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the Securities and Exchange Commission." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1201 (2013). *See also In re Blech Sec. Litig.*, 187 F.R.D. 97, 102 (S.D.N.Y. 1999) ("[I]t is well recognized that private enforcement of the securities laws is a necessary supplement to government regulation.").

The Supreme Court has also identified the suitability of class certification in such instances, *Califano v. Yamasaki*, 99 S. Ct. 2545, 2557 (1979); *see, e.g., Phillips Petroleum Co. v. Shutts,* 105 S. Ct. 2965, 2973 (1985) ("most of the plaintiffs would have no realistic day in court if a class action were not available."); *see also In re Ind. Energy Holdings PLC Sec. Litig.*, 210 F.R.D. 476, 479 (S.D.N.Y. 2002) (Class action treatment is "particularly appropriate" for securities fraud claims, and under such circumstances courts should err in favor of certifying a

---

[1] "Individual Defendants" refers collectively to defendants Robert Diamond, Antony Jenkins, and William White.

class), and has warned against imposing restrictions on certification of federal securities claims where it is not mandated by the text of Rule 23. *See*, *e.g.*, *Amgen*, 133 S. Ct. at 1202 ("We have no warrant to encumber securities-fraud litigation by adopting an atextual requirement of precertification proof of materiality that Congress, despite its extensive involvement in the securities field, has not sanctioned."). Indeed, "the Second Circuit . . . has explicitly noted its preference for class certification in securities cases and the importance of such certification for small securities holders located throughout the country." *Maywalt v. Parker & Parsley Petroleum Co.*, 147 FRD 51, 54 (S.D.N.Y. 1993) (citations omitted); *see also In re WorldCom, Inc. Sec. Litig.*, 219 FRD 267, 304 (S.D.N.Y. 2003) (finding that, absent class certification, the burden and expense on individual investors of litigating independent actions against well financed defendants would leave most investors "without any recourse").

As detailed below, this action satisfies all the requirements for class certification under Rule 23(a) — numerosity; commonality; typicality; and adequacy of representation. This action also satisfies the two core requirements for certification under Rule 23(b)(3): predominance of common questions of law or fact and superiority of a class action over other available methods for adjudication. Thus, class certification is warranted.

<u>**STATEMENT OF FACTS**</u>

**A.      A Culture of Greed Permeated All Aspects of Barclays' Business**

Recently, Barclays has been marred by a series of unprecedented scandals involving, among other matters, the manipulation of the London Interbank Offered Rates ("LIBOR" or "Libor"), the premier benchmark for interest rates worldwide, for which the company was fined over $450 million; the manipulation of gold prices, for which the company was fined $43.8

million; and the manipulation of the foreign-exchange market.  Compl. ¶2.[2]  The Libor scandal was particularly damaging for Barclays, with regulators implicating senior executives in a "widespread" fraud.  *Id.* An independent review of Barclays' practices commissioned by the Company and covering all business units without exception found that Barclays' bankers had a "winning at all costs" attitude, with an "over-emphasis" on short-term financial performance. *Id.* Barclays' pay culture rewarded money-making above all and led to "reputational damage and a loss of public trust."  *Id.*

Facing withering criticism, Barclays vowed change.  ¶3.  Commanded by its newly-minted CEO, Barclays claimed to have made bank-wide changes "to strengthen the governance relating to conduct and reputation" and "increase transparency and conduct business in the right way." *Id.*  "The pursuit of profit that is achieved in ways inconsistent with [values of integrity] will not be tolerated."  *Id.*  Yet, Barclays never changed.  *Id.*

**B.    Barclays Was Determined to Make Its Dark Pool the Largest in the United States and Lied to Accomplish That Goal**

The conduct at issue involves Barclays' "dark-pool" (marketed as Barclays' Liquidity Cross, or LX), a private trading venue where investors can trade stocks with near anonymity. ¶4.  During the Class Period, Barclays' dark pool catapulted into the financial stratosphere, becoming the number one U.S. dark pool with market share growth of 33% per year.  *Id.* Barclays accomplished this goal ("We will not be happy until we are number one") through false representations and omissions of material information about the dark pool's transparency and safeguards.  *Id.*  Barclays touted LX as a safe trading venue "built on transparency," with "built in safeguards to manage toxicity [of aggressive traders]" who victimize investors trading in the dark pool by trading ahead of anticipated purchase and sell orders, thereby rapidly capitalizing

---

[2] All references to "Compl." are to the *Consolidated Second Amended Complaint for Violations of the Federal Securities Laws*, filed with the Court on May 27, 2015.  (Dkt. #43).

on proprietary information regarding trading patterns. *Id*. Contrary to those representations, not only did Barclays allow aggressive traders to trade in its dark pool, it proactively wooed them with perks purposefully designed to provide them with a competitive advantage over traditional traders. *Id*.

On June 25, 2014, the New York State office of the Attorney General ("NYAG") commenced a lawsuit against Barclays under the New York Martin Act, alleging that Barclays concealed material information regarding the operation of its dark pool. ¶5. A litany of internal documents and emails, as well as statements by Barclays former employees with intimate knowledge of the dark pool, reveal among other things that Barclays intentionally "*falsified marketing materials*" about the safeguards of LX to grab the number one spot and add to Barclays' prestige. *Id*. One such presentation intentionally deleted from its list of market participants is the largest and very toxic participant in Barclays' dark pool, Tradebot. *Id*. Scheming emails reveal Barclays' fraudulent intent to conceal the existence of Tradebot. *Id*. A Vice President in charge of marketing the dark pool stated: "I had always liked the idea that we were being transparent, *but happy to take liberties if we can all agree*" (emphasis added). *Id*. Barclays' Head of Product Development agreed: "I think the accuracy [of the chart] is secondary to [the] objective" of showing clients that Barclays monitors the trading in its dark pool, and "so if you want to move/kill certain [traders], it doesn't really matter." *Id*. Barclays' Head of Equities Sales responded: "Yes! U smart." *Id*. This doctored analysis was prominently displayed on Barclays' website from October 2012 until the filing of the NYAG complaint, *when Barclays immediately deleted it*. ¶133.

Throughout the Class Period, Barclays consistently assured the public that its dark pool was a model of transparency and integrity. *See*, *e.g.*, ¶¶63-73. Indeed, Barclays claimed that "transparency on multiple levels is a selling point for our entire equities franchise . . . We always come back to transparency as the key driver. . . . " ¶183. In reality, however, LX was a magnet for high frequency traders. ¶74. For example, contrary to Barclays' claim that it uses Liquidity Profiling to police its dark pool, and will "refuse a client access" if its trading is toxic, Barclays

has never prohibited a single trader from participating in its dark pool, regardless of its toxicity level. ¶91. Moreover, Barclays has applied "overrides" to a number of traders in the dark pool, assigning safe Liquidity Profiling ratings to certain traders that should have been rated as toxic. ¶93. Barclays justified these "overrides" as being in Barclays' own economic interest, noting that "*it is our darkpool, after all*." *Id*. Barclays knew that its Liquidity Profiling tool was ineffective. ¶97. As reflected in the NYAG Complaint, in an internal document dated December 2013, Barclays recognized that "Liquidity Profiling reviews may not be completed for all clients, may rely on inaccurate information and results and rationale for profiling changes may not be evidenced; *leading to reputational damage as the service . . . may not function as advertised to clients*." *Id*. As stated by one former Barclays Director in the Equities Electronic Trading division, Barclays "purport[s] to have a toxicity framework that will protect you when *everybody knows internally that that thing is done manually with outliers removed and things are classified [only] if they feel like it*." ¶98. Another former Director described Liquidity Profiling as "*a scam*." *Id*.

Defendants' false and misleading statements regarding Barclays' transparency and safeguards maintained the price of Barclays' securities at levels that reflected investor confidence in the integrity of the Company.  ¶113.  Having chosen to tout Barclays' LX, Defendants had a duty to provide truthful and relevant information about Barclays' dark pool. ¶115.  Were Defendants honest about the workings of the dark pool and the level of "transparency" surrounding its operations, Barclays' securities would have traded at a substantially lower price. *Id*.  The stock was maintained at an artificially inflated level until June 25, 2014, when news about Barclays' lack of integrity and transparency was revealed to the public by means of a complaint brought by the New York Attorney General, which detailed Barclays' fraud regarding the operations and transparency of LX.  ¶116.  On this news, Barclays' shares fell 7.38% on June 26, 2014—the biggest decline since June 2012.  ¶118.

6

## PROCEDURAL HISTORY

This action was commenced with a complaint filed on July 28, 2014, asserting securities fraud claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 USC § 78j(b), 15 USC § 78t(a), and Rule 10b-5 promulgated thereunder (17 CFR 240.10b-5).  (Dkt. #1)

Several motions were filed for appointment of Lead Plaintiff.  (Dkts. #4, 7).  On October 2, 2014, the Court appointed Mohit Sahni as Lead Plaintiff.  (Dkt. #11)

Plaintiffs filed an Amended Class Action Complaint on December 15, 2014. (Dkt. # 20). On January 20, 2015, Defendants moved to dismiss the Amended Class Action Complaint on the basis that it fails to adequately plead falsity, materiality, scienter, and loss causation. (Dkts. #28, 29, 30).  On April 24, 2015, the Court largely denied Defendants' motion to dismiss and granted Defendants' motion solely to the extent that the section 20(a) claims are dismissed as to the Individual Defendants Lucas and Morzaria.  (Dkt. #38).  The Court directed Lead Plaintiff to file an amended complaint to comply with Plaintiffs' obligations under Rule 11.  *Id*.  On May 27, 2015, Plaintiffs filed a Second Amended Complaint setting forth Plaintiffs' Rule 11 compliance. (Dkt. #43).

## ARGUMENT

## I.    THE CLASS SHOULD BE CERTIFIED PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23

To certify a putative class, the Court must determine whether four threshold requirements of Fed. R. Civ. P. 23(a) are met: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.  *Amchem Products, Inc.*, *v. Windsor*, 117 S. Ct. 2231, 2245 (1997). In addition, the Court must determine whether the action is maintainable under Fed. R. Civ. P. 23 (b)(1), (2) or (3).  *Id*. at 614.  Class actions promote judicial economy by aggregating small

claims into one lawsuit. "Class actions . . . permit the plaintiffs to pool claims which would be uneconomical to litigate individually.  [M]ost of the plaintiffs would have no realistic day in court if a class action were not available." *Phillips Petroleum Co. v. Shutts*, 105 S. Ct. at 2973. "The preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements." *Teamsters Local 445 Frgt. Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).

It is well settled that "[t]here is a strong public policy in favor of private enforcement of the nation's securities laws."  Thus, Courts in the Second Circuit have repeatedly acknowledged that "[b]ecause of the usefulness of class actions in addressing allegations of securities fraud, the class certification requirements of Rule 23 are to be construed liberally."  *Darquea v. Jarden Corp.*, No. 06 Civ. 722, 2008 WL 622811, at *4 (S.D.N.Y. Mar. 6, 2008) (citation omitted); *see also Board of Trustees of the AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 269 F.R.D. 340, 345 (S.D.N.Y. 2010) (Scheindlin, J.) ("Rule 23 is given liberal rather than restrictive construction, and courts are to adopt a standard of flexibility.") (citations omitted).  In a securities fraud action, if a court is in doubt as to whether to certify a class action, it should err in favor of certification.  *See In re Ind. Energy Holdings PLC Sec. Litig.*, 210 F.R.D. at 479.

While courts must conduct a "rigorous analysis" to determine whether the elements of Rule 23 have been satisfied, *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011), Rule 23 is not a "license to engage in free-ranging merits inquiries at the class certification stage." *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013).  "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  *Id*. at 1195. Accordingly, while it is appropriate to consider whether a securities market was efficient to

support a presumption of reliance, it is not appropriate to delve into merits issues such as scienter, materiality or loss causation. *See*, *e.g.*, *Erica P. John Fund v. Halliburton Co.*, 131 S. Ct. 2179, 2186 (2011) ("*Halliburton I*"); *see also Amgen*, 133 S. Ct. at 1193-94.

**The Rule 23(a) Requirements**

**1.     The Proposed Class Is So Numerous That
Joinder of All Members Is Impracticable**

Rule 23(a)(1) requires that the class be so numerous that joinder of all members would be "impracticable." Impracticable does not mean impossible, but only that the difficulty of joining all class members make use of the class action appropriate. *Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244-45 (2d Cir. 2007). Further, a plaintiff need not allege the exact number or identity of class members. *See In re Blech Sec. Litig.*, 187 F.R.D. at 103. "Joinder is generally presumed to be impracticable when a putative class exceeds 40 members." *Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 90 (D. Conn. 2010), *citing Marisol A. v. Giuliani*, 126 F.3d 372 (2d Cir. 1997). "[I]n securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 83 (S.D.N.Y. 2007) (collecting cases) (citation omitted); *accord Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 116 (S.D.N.Y. 2008).

A review of publicly-available information reveals that during the Class Period, at year-end 2011, 2012, and 2013, there were approximately 12.2 billion, 12.2 billion, and 16.1 billion Barclays ordinary shares outstanding, and approximately, 96.9 million, 122.5 million, and 113.5 million ADSs outstanding. (*See* Declaration of Emma Gilmore ("Gilmore Decl.") Exhibit ("Ex.") A, Expert Report of Zachary Nye, PH.D. ("Nye Report"), at Ex. 3). Although Plaintiffs

have not at this time ascertained the precise number of potential Class members, they believe that there are many hundreds, if not thousands, of geographically dispersed members of the proposed Class.  The precise identity of the members can be readily identified from the Company's books and records.  Clearly, the proposed Class consists of a sufficient number of persons (*i.e.*, more than 40) to make joinder impracticable.  *See Menkes*, 270 F.R.D. at 90.

### 2.    Questions of Law or Fact Are Common to the Class

The Rule 23(a)(2) requirement that "there are questions of law or fact common to the class" is a "low hurdle" that is "easily surmounted."  *See In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 163 F.R.D. 200, 206 n.8 (S.D.N.Y. 1995).  *See also Dietrich v. Bauer*, 192 F.R.D. 119, 124 (S.D.N.Y. 2000) (commonality requirement "has been applied permissively by courts in the context of securities fraud litigation").  Commonality "is established so long as the plaintiffs can identify some unifying thread among the [class] members' claims." *Haddock v. Nationwide Fin. Services, Inc.*, 262 F.R.D. 97, 116 (D. Conn. 2009), *vacated and remanded sub nom. Nationwide Life Ins. Co. v. Haddock*, 460 Fed. Appx. 26 (2d Cir. 2012).  Even a single common legal or factual question will suffice.  *See In re Agent Orange Prod. Liab. Litig. MDL No. 381*, 818 F.2d 145, 166-67 (2d Cir. 1987).

Common issues are prevalent in this case, including:

- whether Defendants violated the federal securities laws by their acts as alleged in the Complaint;
- whether Defendants' statements to the investing public during the Class Period misrepresented or omitted material facts about the business, operations and transparency of Barclays' dark pool;
- whether the Individual Defendants caused Barclays to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of Barclays ADS during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

In comparable situations, courts have consistently found the commonality requirement to have been satisfied.  *See, e.g., In re SCOR Holding (Switzerland) AG Litig.*, 537 F Supp. 2d 556 (S.D.N.Y. 2008); *Wagner*, 251 F.R.D. at 116; *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 245 F.R.D. 147, 157-158 (S.D.N.Y. 2007), *order aff'd in part, vacated in part,* 574 F.3d 29 (2d Cir. 2009).  Indeed, here, like all Section 10(b) cases, the commonality of the shareholders' claims is self-evident:

> Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions, and that the issue may profitably be tried in one suit.

*Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975) (citations omitted).

### 3.   <u>Plaintiffs' Claims Are Typical of the Class</u>

Rule 23(a)(3) mandates that the claims of the representative plaintiff be typical of the claims of the class.  The Supreme Court has acknowledged that the "commonality and typicality requirements of Rule 23(a) tend to merge."  *Gen. Tel. Co. of Southwest v. Falcon*, 102 S. Ct. 2364, 2373 n.13 (1982). "Typicality does not require that the situations of the named representatives and the class members be identical." *In re Oxford Health Plans, Inc.*, 191 F.R.D. 369, 375 (S.D.N.Y. 2000) (citation omitted); *see also In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 94 (S.D.N.Y. 1998).

A plaintiff's claim is typical if it arises from "the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F3d 29, 35 (2d Cir 2009).  In other words:

> Because this inquiry focuses on the nature of the claims asserted, factual differences involving the date, type and manner of the purchase, the investors' perception of the transaction, or even the information furnished to him at the time

will not destroy typicality if each class member was the victim of the same material omissions and the same consistent course of conduct.

*In re Baldwin-United Corp. Litig.*, 122 F.R.D. 424, 428 (S.D.N.Y. 1986) (citations omitted); *see also In re Longtop Fin. Tech. Ltd. Sec. Litig.*, No. 11 Civ. 3658, 2013 WL 3486990, at *2 (S.D.N.Y. July 11, 2013) (Scheindlin, J.) ("Lead Plaintiffs' claims are typical of the Class. Lead Plaintiffs purchased Longtop ADSs during the Class Period at prices allegedly inflated by defendants' misrepresentations and omissions concerning Longtop's financial condition. The arguments advanced by Lead Plaintiffs with respect to defendants' liability are the same arguments that other Class members would bring in support of their claims.").

In this case, typicality is satisfied because:

1) Lead Plaintiff Mohit Sahni purchased 300 ADSs of Barclays on May 9, 2013; 400 ADSs on May 13, 2013; 200 ADSs on May 15, 2013; 750 ADSs on May 17, 2013; 500 ADSs on May 23, 2013; 500 ADSs on June 11, 2013; 500 ADSs on June 28, 2013; 500 ADSs on September 19, 2013; and 375 ADSs on October 4, 2013, for a total of 4,025 ADSs, which he held through the end of the Class Period. (*See* Dkt. #9-2). Plaintiff Joseph Waggoner purchased 61 ADSs of Barclays on June 13, 2014, which he held through the end of the Class Period.

2) Plaintiffs claim that Defendants knowingly issued false and misleading statements and omitted from disclosure material facts concerning the business, operations, and transparency of Barclays' dark pool. Proof of these allegations is common to all Class Members because Defendants' statements were uniformly made to all Class Members and the material misrepresentations and omissions equally affected all Class Members;

3) Defendants' state of mind when making the false and misleading statements (*i.e.*, scienter) is not a plaintiff-specific inquiry; and

4) The question of whether the market price of the Company's stock was artificially inflated during the Class Period due to the alleged misstatements and omissions involves no individualized issues.

Plaintiffs' claims are typical of those of the Class. The conduct that injured Plaintiffs also injured the other Class Members. Similarly, the injury that Plaintiffs suffered is similar to that suffered by other Class Members.

4.      **Plaintiffs Will Fairly and**
        **Adequately Protect the Interests of the Class**

The Rule 23(a)(4)'s requirement that "the representative parties will fairly and adequately protect the interests of the class" is unquestionably met. The focus of a court's inquiry is "whether: 1) plaintiff's interests are antagonistic to other class members; and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000) (citation omitted). This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products, Inc.*, 117 S. Ct. at 2250 (citation omitted). It is important to emphasize that "the conflict that will prevent a plaintiff from meeting the Rule 23(a)(4) prerequisite must be fundamental, and speculative conflict should be disregarded at the class certification stage." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001) (citations omitted). Here, Lead Plaintiff "possess[es] the same interest and suffer[ed] the same injury as the class members," *Amchem Products, Inc.*, 117 S. Ct. at 2250-51, and no actual or potential conflicts exist.

Appointment of Pomerantz LLP as Class Counsel also militates in favor of Plaintiffs' adequacy to represent the Class. Pomerantz has extensive experience in the field of securities litigation. *See* www.pomerantzlaw.com. Moreover, Lead Counsel's vigorous pursuit of the Class' interests is well documented in their advancement of the Class' claims before this Court, including, *inter alia*, in their defeat of the Defendants' motion to dismiss.

**The Requirements of Rule 23(b)(3) Are Satisfied**

Rule 23(b)(3) requires that common questions of law or fact predominate over individual questions and that a class action is superior to other available methods of adjudication.

1.      **Common Questions of Law and Fact Predominate**

"Predominance is a test readily met in certain cases alleging consumer or securities fraud. . . ." *Amchem Products, Inc.*, 117 S. Ct. at 2250. "Class-wide issues predominate if

resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *See UFCW Local 1776 v. Eli Lilly and Co.*, 620 F.3d 121, 131 (2d Cir. 2010); *see also Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 99 (S.D.N.Y. 1981) ("[T]o allow various secondary issues of plaintiff's claim to preclude certification of a class would render the rule an impotent tool for private enforcement of the securities laws.").   For example, it is well-established that where liability can be proved class-wide, individualized proof of damages does not defeat predominance. *See, e.g., Blackie*, 524 F.2d at 905; *Padilla v. Maersk Line, Ltd.*, 271 F.R.D. 444, 450 (S.D.N.Y. 2010); *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 514 (S.D.N.Y. 1996).   Indeed, "[c]ourts routinely find the elements of scienter, materiality and causation to be common issues in federal securities cases."   *In re Longtop*, at *2 (S.D.N.Y. July 11, 2013).

> a.   **The Fraud-on-the-Market Presumption Applies to the Claims**

Plaintiffs will prove, on a common basis, the elements of their Sections 10(b)[3] and 20(a) claims.[4]   "Whether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011) ("*Halliburton I*").[5]   Here, reliance (or transaction causation) will be

---

[3] The elements of a claim for securities fraud under Section 10(b) are: (1) a material omission or misrepresentation; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura Pharmaceuticals, Inc. v. Broudo*, 125 S. Ct. 1627, 1631 (2005).

[4] In addition to an underlying Section 10 violation by a controlled entity, Section 20(a) liability requires control of the primary violator by the defendant. *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 190 (S.D.N.Y. 2006) (Scheindlin, J.). Control can be proved class-wide.   *See, e.g., In re Beacon Assoc. Litig.*, 282 F.R.D. 315, 333 (S.D.N.Y. 2012).

[5] Aside from reliance and damages (as to which individual issues do not defeat predominance), courts routinely find that the other elements can be proved with common evidence. *See In re*

established on a common basis under the "fraud-on-the-market" theory.  As explained in *Basic Inc. v. Levinson*, 108 S. Ct. 978 (1988):

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.

*Id.* at 989 (citation omitted, alterations in the original).  The Court further explained:

> An investor, who buys or sells stock at the price set by the market does so in reliance on the integrity of that price.  Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action.

*Id.* at 992.  Indeed, as the Supreme Court explained, "it is hard to imagine that there ever is a buyer or seller who does not rely on market integrity.  Who would knowingly roll the dice in a crooked crap game?"  *Id*. at 991 (quotations omitted).  The Supreme Court recently reaffirmed that *Basic*'s ruling was based on "the fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'"  *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2410 (2014) ("*Halliburton II*").  Accordingly, "[i]n a securities fraud class action, the fraud-on-the-market doctrine makes it rather easy for a lead plaintiff to establish that common questions predominate over individual ones."  *In Re Groupon, Inc. Sec. Litig.*, No. 12 Civ. 2450, 2014 WL 5245387, at

---

*Merck & Co., Inc., Sec., Deriv. & ERISA Litig.*, MDL No. 1658 (SRC), 2013 WL 396117, at *12 (D.N.J. Jan. 30, 2013) ("Defendants' liability will depend on the same evidence relating to the materiality of the misstatements and omissions at issue and Defendants' state of mind in making such statements or failing to disclose certain information . . . In addition . . . loss causation for the putative class is also capable of proof through common evidence. Each class member's claim for relief is based on the same corrective disclosures . . . "); *Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 127 (S.D.N.Y. 2001) ("With one exception, [reliance] there is no dispute that each element necessary to establish liability . . . is common to the class . . . The proof for the claims of misrepresentation or omission, materiality, and [Defendant's] scienter are all based on a common nucleus of facts and a common course of conduct").

*2 (N.D. Ill. Sept. 23, 2014) (citing *Basic*, 485 U.S. at 247 (1988) and *Schleicher v. Wendt*, 618 F.3d 679, 682 (7th Cir. 2010)).   The fraud-on-the-market presumption does not require a *perfectly* efficient market.   *In re Groupon, Inc. Sec. Litig.*, No. 12-cv-2450, 2015 WL 1043321, at *11 (N.D. Ill. March 5, 2015), citing *Halliburton*, 134 S.Ct. at 2410 ("Debates about the precise *degree* to which stock prices accurately reflect public information are thus largely beside the point.") (emphasis in original).

To invoke the fraud-on-the market-presumption, "plaintiffs must demonstrate that (1) the alleged material misstatements were publicly known, (2) that the security traded on an efficient market, and (3) that the plaintiff purchased his shares between the time the misleading statement was made and the time the truth was revealed." *In re Winstar Communications Sec. Litig.*, 290 F.R.D. 437 (S.D.N.Y. 2013).  Lead Plaintiff can demonstrate all three.

In *Cammer v. Bloom*, 711 F. Supp. 1264, 1276 (D.N.J. 1989), the court set forth certain factors to use to determine whether the market for any stock is open and efficient: (1) whether there "existed an average weekly trading volume during the class period in excess of a certain number of shares," to wit, 1% for a "substantial presumption" of efficiency, 2% turnover for a "strong presumption" (*Id.* at 1293); (2) whether "a significant number of securities analysts followed and reported on [the] company's stock during the class period"; (3) whether the company's stock "had numerous market makers";[6] (4) whether "the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met"; and (5) whether "empirical facts show[ ] a cause and effect relationship between unexpected corporate events or financial

---

[6] A market maker is one who helps establish a market for securities by reporting bid-and-asked quotations (the price a buyer will pay for a security and the price a seller will sell a security) and who stands ready to buy or sell at these publicly quoted prices. *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 515 (1st Cir. 2005); *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 613-614 (C.D. Cal. 2009).

releases and an immediate response in the stock price." *Id.* at 1284-87.   The so-called *Cammer* factors, however, are not exclusive, and a plaintiff "is not required to show the existence of each of these factors" to establish market efficiency.   *AAL High Yield Bond Fund v. Ruttenberg*, 229 F.R.D. 676, 683 (N.D. Ala. 2005) (citations omitted); *see also Simpson v. Specialty Retail Concepts*, 823 F. Supp. 353, 355 (M.D.N.C. 1993).   "At the class certification stage, the securities' trading record may create certain rebuttable legal presumptions about market efficiency.   If, for example, a security is listed on the NYSE, AMEX, NASDAQ, or a similar national market, the market for that security is presumed to be efficient." *Teamsters Local 445 Frgt. Div. Pension Fund v. Bombardier, Inc.*, Fed. Sec. L. Rep. P. 93,935 (S.D.N.Y. Aug. 1, 2006), *aff'd sub nom. Teamsters Local 445 Frgt. Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196 (2d Cir. 2008).

The Second Circuit has held that "the most important *Cammer* factor is the 'cause and effect' factor—evidence that unexpected corporate events or releases caused an immediate response in the price of a security.   This is 'the essence of an efficient market and the foundation for the fraud on the market theory.'"   *In re Fed. Home Loan Mtge. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 178 (S.D.N.Y. 2012) , *quoting Teamsters Local 445 Frgt. Div. Pension Fund*, 546 F.3d at 207, *quoting Cammer*, 711 F. Supp. at 1287.   The *Teamsters* court stated:

> Without the demonstration of such a causal relationship, it is difficult to presume that the market will integrate the release of material information about a security into its price. An event study that correlates the disclosures of unanticipated, material information about a security with corresponding fluctuations in price has been considered prima facie evidence of the existence of such a causal relationship.

*Teamsters Local 445*, 546 F.3d at 207-208.

In the wake of *Halliburton II*, however, courts have recognized that a finding of market efficiency does not "always require[] proof that the alleged misrepresentations had an immediate effect on the stock price."   *Local 703, I.B. of T. Grocery & Food Employees Welfare Fund v. Regions Fin. Corp.*, No. 12 Civ. 14168, 2014 WL 3844070, at *5 (11th Cir. Aug. 6, 2014). Even given the importance of the cause-and-effect analysis, a flexible approach to market

17

efficiency must be maintained because "[e]ven the *Cammer* court itself did not establish such a strict evidentiary burden at the class certification stage." *Id.* Indeed, the greatest takeaway from *Halliburton II* is the Court's affirmance that there is no single "mandatory analytical framework" for analyzing market efficiency, and district courts have "flexibility to make the fact-intensive inquiry on a case-by-case basis." *Id.* at *3. The *Regions* court explained this flexible approach to market efficiency:

> [W]e have indeed defined some features of an efficient market: high-volume trading activity facilitated by people who analyze information about the stock or who make trades based upon that information. These are factors District Courts therefore know to look for when analyzing the markets for securities of established companies like Regions. However, even these general signs of an efficient market may not be required for a finding of an efficient market in every case. Stocks that trade on a smaller scale, or that are not widely followed, might trade on an efficient market. It is up to the District Courts to consider the nature of the market on a case-by-case basis to decide whether the totality of the circumstances supports a finding of market efficiency.

*Id.* at *4.

Here, as set forth in Exs. 11-12 to Dr. Nye's Report, the event study conducted by Dr. Nye of the prices for Barclays' ADSs and Barclays' ordinary shares traded on the London Stock Exchange ("LSE") during the Class Period demonstrates a cause and effect relationship between unexpected Company-specific news and the market price for Barclays' stock, indicating that Barclays' stock traded on an efficient market. *See, e.g.*, *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 512-514 (1st Cir. 2005); *In re Accredo Health, Inc. Sec. Litig.*, No. 03 Civ. 2216, 2006 WL 1716910, *5 (W.D. Tenn. Apr. 19, 2006); *Castillo v. Envoy Corp.*, 206 F.R.D. 464, 470 (M.D. Tenn. 2002). Earnings-related news announcements provide an easily identifiable and objective set of events to examine for price impact purposes, and have been shown in the academic finance literature to impact stock prices. Nye Report ¶ 59. Dr. Nye's event study shows a cause-and-effect relationship between earnings-related announcements and Barclays' ADSs and London stock prices during the Class Period. ¶¶ 60-68. Dr. Nye describes in detail each of his selected event dates and discusses how the observed price reactions are consistent with those expected in

an efficient stock market.  Ex. 11.  Dr. Nye's event study found that a strong cause-and-effect relationship existed between the Company's earnings-related disclosure and the resulting price movements: 100% of the Company's material, unexpected earnings-related disclosures resulted in a statistically significant price reaction for Barclays' stock.

Dr. Nye's additional analysis of price impact further cements a finding of market efficiency.  ¶¶74-75.  As the Supreme Court recently held in *Halliburton II*, "market efficiency is an indirect proxy for "price impact."  ¶75.  "Price impact can be shown either by an increase in price following a fraudulent public statement or a decrease in price, following a revelation of the fraud."  ¶74.  As alleged in the Complaint, the first corrective disclosure occurred on June 25, 2014 at 4:00 PM ET, when the New York Attorney General issued a press release announcing a lawsuit against Barclays arising from Barclays' false and misleading statements and omissions about the operation, business, and transparency of Barclays' dark pool.  *Id*.  The NYAG also held a conference that day discussing the lawsuit.  *Id*.  Upon this unexpected news, Barclays' shares experienced a statistically significant Company-specific price decline on June 26, 2014: the residual return for the ADSs was -7.2% (with a *t*-statistic of -5.7); the residual return for the London shares was -6.3% (with a *t*-statistic of -5.0).  *Id*.  Trading volume on June 26, 2014 was approximately 28.3 million for the ADSs and 646.1 million for the London shares, which is over 7 times and 4.5 times the average daily trading volume during the Class Period for the ADS and London shares, respectively.  *Id*.  Dr. Nye identified no confounding negative events that would have contributed to the Company-specific stock price decline on June 26, 2014.

Barclays' securities also easily meet the other *Cammer* factors, providing compelling evidence that the market for Barclays' securities during the Class Period was efficient:

> **Trading Volume:** Under *Cammer*, "turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption."[7]  Nye Report ¶31.  During the Class Period, Barclays ADSs issued

---

[7] *Cammer*, 711 F. Supp. at 1293.

and outstanding ranged from approximately 87 million to 133 million shares. The total number of ordinary shares issued and outstanding ranged from approximately 13.2 billion to 16.4 billion shares. The average weekly share trading volume as a percentage of shares outstanding, excluding weeks not entirely contained within the Class Period, was 17.7% for Barclays ADSs and 5.2% for Barclays London Shares. ¶31. Accordingly, the average weekly reported trading volume for Barclays stock exceeds the 2% "strong presumption" of market efficiency set out by *Cammer*. *Id.*

Dr. Nye also analyzed the annualized turnover ratios for Barclays ADSs and Barclays London shares. Based on 133.4 million ADSs outstanding at the end of the Class Period, and a total of 16.4 billion ordinary shares outstanding at the end of the Class Period, Barclays' total trading volume on U.S. and non-U.S. exchanges during the Class Period implies an annualized turnover ratio of 725.15% for Barclays ADS and 224.25% for Barclays London Shares. ¶32. By comparison, the average annualized turnover ratio for all stocks listed on the NYSE in 2011, 2012, 2013, and 2014 was: 86%, 67%, 58%, and 57%, respectively. ¶33. Thus, the annualized turnover ratio for Barclays ADSs was more than 8 times greater than the average for all stocks listed on the NYSE during the Class Period. *Id.* The annualized turnover ratio for Barclays London shares was more than 2 times greater than the average for all stocks listed on the NYSE during the Class Period. *Id.*

The high trading volumes and high annualized turnover ratios observed during the Class Period support a conclusion that both Barclays ADSs and Barclays London shares traded in an efficient market during that time. ¶34.

***Analyst Coverage***: During the Class Period, many renowned investment firms followed and published research reports on Barclays, including: BofA Merrill Lynch (19 reports); Canaccord Genuity (20 reports); Citigroup (110 reports); Deutsche Bank Equity Research (78 reports); Evolution Securities (6 reports); Jefferies (10 reports); JPMorgan (61 reports); Morgan Stanley (31 reports); Numis Securities (25 reports); RBC Capital Markets (27 reports); Royal Bank of Scotland (17 Reports); and UBS Equities (55 reports) (¶37). A total of over 700 analyst reports for Barclays were issued during the Class Period. In addition to these research reports, during the Class Period financial and other information pertinent to Barclays was further disseminated to investors via media coverage, investor conferences, trade magazines, public presentations by Barclays, and SEC filings. ¶38. Barclays' coverage by securities analysts, the amount of reporting on Barclays during the Class Period of Barclays by securities analysts, and the amount of reporting on Barclays indicate that Company-specific news was widely disseminated to investors, thereby facilitating the incorporation of such information into the market price of Barclays ADSs and Barclays London shares. Accordingly, this factor supports a conclusion that Barclays ADSs and Barclays London shares traded in an efficient market throughout the Class Period. ¶40.

20

***Market Makers and Potential for Arbitrage***:  The listing of a security on a major stock exchange such as the NYSE or the NASDAQ weighs in favor of a finding of market efficiency.  ¶43.  During the Class Period, Barclays ADSs were listed and traded on the NYSE, which uses a single designated market-maker ("DMM") to maintain a competitive and efficient market for the securities assigned to them.  ¶42.  The London Stock Exchange also employs registered market makers who must follow that exchange's rules associated with the role, including the basic requirement "to make prices and deal either on the order book, off the order book or both."  ¶44.

The level of short interest, the high degree of institutional ownership and the tightness of bid/ask spreads for Barclays ADSs also indicate that arbitrage activity was prevalent during the Class Period.   ¶45.   The existence of arbitrageurs, sophisticated investors who can act rapidly to take advantage of pricing discrepancies, ensuring that market prices reflect all public information, further indicates that Barclays' shares traded in an efficient market.  *Id*.  During the Class Period, arbitrageurs were not constrained in their ability to short shares of Barclays ADSs.  ¶47.  For stocks listed on NYSE, the average short interest as a percentage of total shares outstanding was 3.17% during the Class Period.  In comparison, the average short interest for Barclays ADSs was 6.95% of total shares outstanding during the Class Period.  *Id*.

Additionally, for the quarters ended in the Class Period, institutional holdings of Barclays ADSs ranged from 63.7% to 90.2% of shares available and over 200 institutional investors held Barclays ADSs at the end of each quarter during the Class Period.  ¶49.  Institutional holdings of Barclays London shares ranged from 48.9% to 67.9% of shares available and over 500 institutional investors held Barclays London shares at the end of each quarter during the Class Period.  *Id*.  Additionally, the fact that institutional holdings were more than 9 times the short interest in Barclays ADSs indicates that short selling was not constrained during the Class Period.  *Id*.

Moreover, during the Class Period, the bid/ask spreads on Barclays ADSs and on Barclays London Shares were comparable to or narrower than those of stocks listed on the NYSE and the LSE, and is further evidence that the market for Barclays stock was efficient during that time.  ¶51.  The bid/ask spread on Barclays ADSs was $0.02/$0.01, while the NYSE sample average/median had a corresponding $0.02/0.01 bid/ask spread.  ¶50.  The bid/ask spread on Barclays London Shares was 0.08p/0.05p, while the LSE sample average/median bid/ask spread was 3.53p/3.12p.  *Id*.

***Ability to File a Form S-3***:  The ability to file a Form S-3 (Form F-3 for foreign issuers in the U.S.) is an indicator of market efficiency.  ¶¶52-54.  Barclays filed Form F-3ASR ("automatic shelf registration statement of securities of well-known seasoned issuers") before and during the Class Period (on May 3, 2011 and on May 2, 2014).  ¶55.  Additionally, Barclays' subsidiary, Barclays Bank,

filed Form F-3ASR during the Class Period on July 19, 2013. *Id.* That Barclays was eligible to file Form F-3 during the Class Period further indicates that the market for its stock was efficient during the Class Period. *Id.*

These facts conclusively demonstrate that Barclays' securities traded in an efficient market during the Class Period and that the alleged fraud impacted the price of Barclays' securities. Plaintiffs and the Class are therefore entitled to the presumption of reliance under the fraud-on-the-market doctrine.

### b.    Reliance Is Also Presumed Under *Affiliated Ute*

In *Affiliated Ute Citizens of Utah v. United States*, 92 S. Ct. 1456 (1972), the Supreme Court held that reliance is presumed where "a plaintiff's claim is based on a defendant's failure to disclose material information." *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742, 748 (2d Cir. 1992). In such circumstances, individual reliance need not be proven. Instead, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [its] decision." *Affiliated Ute*, 406 U.S. at 131. Here, reliance may be presumed under *Affiliated Ute* based on Defendants' omissions of material information including, *inter alia*, Barclays "overriding" certain Liquidity Profiling ratings, Barclays giving perks and other systematic advantages to high-frequency traders, and Barclays' failure to apply the protections of Liquidity Profiling to a significant portion of the trading in its dark pool.

### 2.    A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of the Controversy

"Rule 23(b)(3) requires that a class action be superior to other methods of handling litigation." *Dirks v. Clayton Brokerage Co. of St. Louis Inc.*, 105 F.R.D. 125, 136 (D. Minn. 1985). "Together with predominance, the superiority requirement 'ensures that the class will be certified only when it would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Cordes & Co. Fin. Services, Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 104 (2d Cir. 2007). Class treatment is often deemed superior in

"negative value" cases, in which each individual class member's interest in the litigation is less than the anticipated cost of litigating individually.  *Menkes*, 270 F.R.D. at 100. Courts have universally recognized the superiority of class actions in cases alleging securities fraud.  *See supra* at 2.  The following factors are relevant to the superiority assessment:

> A) the class members' interests in individually controlling the prosecution . . . of separate actions; B) the extent and nature of any litigation concerning the controversy already begun by . . . class members; C) the desirability . . . of concentrating the litigation of the claims in the particular forum; and D) the likely difficulties to be encountered in managing a class action.

Fed. R. Civ. P. 23(b)(3).  These factors weigh in favor of class certification in this case.

The members of the proposed Class have little incentive to pursue individual actions. The costs and expenses of such actions, when weighed against the individual recoveries obtainable, would be prohibitive.  *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. at 304 (finding superiority requirement met when "[f]ew individuals could even contemplate proceeding with this litigation in any context other than through their participation in a class action, given the expense and burden that such litigation would entail," particularly when many of the putative plaintiffs have suffered economic loss of *de minimus* value); *In re Vivendi Universal, S.A.*, 242 F.R.D. at 92.  A class action is not only an essential mechanism for investors to redress the injuries they suffered because of defendants' misconduct, it will also facilitate the vindication of the statutory objective of a fair, orderly, trustworthy, and reliable securities market.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2508 n.4, (2007) ("Nothing in the [PSLRA], we have previously noted, casts doubt on the conclusion 'that private securities litigation is an indispensable tool with which defrauded investors can recover their losses'—a matter crucial to the integrity of domestic capital markets.") (citations omitted).

Moreover, there are hundreds, if not thousands, of Class members.  "Litigating each case separately would be wasteful, and result in delay and an inefficient expenditure of judicial resources."  *In re SCOR Holding (Switzerland) AG Litig.*, 537 F. Supp. 2d at 579.  It would also "risk disparate results among those seeking redress."  *Id.*  Finally, there is no reason to expect any

difficulties in managing this case as a class action. Indeed, class actions of this size and complexity are common.

## II.     POMERANTZ SATISFIES THE RULE 23(g) PREREQUISITES FOR APPOINTMENT AS CLASS COUNSEL

Rule 23(g)(1)(A) sets forth the factors a court must consider in appointing Class Counsel, including:

> (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources counsel will commit to representing the class.

Under these criteria, the Pomerantz firm is eminently qualified.

The Pomerantz firm was established in 1940 by the late Abraham L. Pomerantz, the recognized "Dean of the Class Action Bar" and a "pioneer in the class action/derivative field."[8] The firm has litigated securities fraud cases under federal and state laws for seventy-five years, on behalf of institutional and individual investors in both class and individual actions, and has set important precedents. Courts have routinely acknowledged Pomerantz' securities litigation strengths. For example, in *Stengle v. American Italian Pasta Co.*, the court appointed Pomerantz as Lead Counsel, remarking that the firm: "has significant experience (and has been extremely effective) litigating securities class actions, employs several highly qualified attorneys, and possesses ample resources to effectively manage the class litigation and protect the class's interests." No. 05 Civ. 0725, 2005 U.S. Dist. LEXIS 43816, at *27 (W.D. Mo. Dec. 19. 2005). The National Law Journal ("NLJ") named Pomerantz to the Plaintiffs' Hot List Hall of Fame for 2013. The Firm was recognized for its work representing plaintiffs in securities litigation and ERISA-related actions.[9]

---

[8] N.Y.L.J. (Aug. 1, 1983). *See also* Robert J. Cole, *Class Action Dean*, NAT'L L.J. (Sept. 25, 1978).

[9] "The Plaintiffs' Hot List." National Law Journal (Mar. 3, 2014).

Here, Lead Counsel have effectively used their experience to vigorously pursue the interests of all Class members, including filing a factually detailed Complaint, mounting a successful defense of the Complaint in response to the Defendants' motion to dismiss, and conducting further proceedings following that denial.

## **CONCLUSION**

For the reasons stated herein, Plaintiffs respectfully request that the Court issue an Order: (1) certifying this action pursuant to Rule 23 as a class action and certifying the Class defined herein; (2) appointing the Proposed Class Representatives as the Class Representatives; (3) appointing Lead Counsel as Class Counsel; and (4) granting such other and further relief as the Court may deem just and proper.

Dated:  July 24, 2015                                Respectfully submitted,

**POMERANTZ LLP**

/s/ Jeremy A. Lieberman
Jeremy A. Lieberman
Emma Gilmore
Tamar A. Weinrib
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100

**POMERANTZ LLP**
Patrick V. Dahlstrom
Joshua B. Silverman
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181

*Lead Counsel for Plaintiffs and the Class*