UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
                                    :

BARBARA STROUGO, Individually and on Behalf of  :
All Others Similarly Situated,                        :
                                      :

                     Plaintiff(s),        :

            -against-          :      Civil Action No.:
                                  :      1:14-cv-05797-SAS
BARCLAYS PLC, BARCLAYS CAPITAL INC.,    :
ROBERT DIAMOND, ANTONY JENKINS,      :
CHRISTOPHER LUCAS, TUSHAR MORZARIA, and  :
WILLIAM WHITE,                        :
                                  :

                 Defendants.      :

                                  :

------------------------------------------------------------------x

 

**DEFENDANTS' MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

 

September 11, 2015

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT .................................................................................1

BACKGROUND .....................................................................................................4

LEGAL STANDARD ..............................................................................................6

ARGUMENT .........................................................................................................7

I.      PLAINTIFFS CANNOT ESTABLISH RELIANCE ON A CLASS-WIDE
        BASIS .........................................................................................................7

        A.      The Alleged Misstatements Did Not Affect the Price of Barclays'
                ADS .................................................................................................8

                1.      The Undisputed Evidence Shows That None of the Alleged
                        Misstatements Resulted in a Statistically Significant Price Increase ........ 8

                2.      Plaintiffs Cannot Argue That the Alleged Misstatements
                        "Maintained" Existing Price Inflation, Because No Alleged
                        Misstatement Prior to Barclays' Statements About the LIBOR
                        Settlement Could Have Impacted the Price of Barclays' ADS ................. 9

                3.      Plaintiffs' Own Purported Expert Provides a Probable Explanation
                        for the June 26, 2014 Drop in Barclays' ADS Price Based on
                        Factors Unrelated to the Alleged Misstatements ..................................... 11

                4.      As a Matter of Law, the Undisputed Evidence Ruling Out Price
                        Inflation Attributable to the Alleged Misstatements Establishes
                        That the Alleged Misstatements Had No Impact on Barclays' ADS
                        Price ................................................................................................. 14

        B.      Plaintiffs Fail to Meet Their Burden of Proving Market Efficiency ...................17

                1.      Plaintiffs' Evidence of Market Efficiency Is Fatally Flawed ................. 18

II.     PLAINTIFFS FAIL TO MEET THEIR BURDEN OF SHOWING THAT
        DAMAGES CAN BE CALCULATED ON A CLASS-WIDE BASIS .......................20

III.    IF THIS COURT CERTIFIES ANY CLASS, THE CLASS PERIOD
        SHOULD ALSO BE DEFINED TO BEGIN NO EARLIER THAN
        FEBRUARY 14, 2013 ................................................................................25

CONCLUSION ....................................................................................................25

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Affiliated Ute Citizens of Utah* v. *United States*,
  406 U.S. 128 (1972) .................................................................................................................... 7

*Amgen, Inc.* v. *Conn. Ret. Plans & Trust Funds*,
  133 S. Ct. 1184 (2013) ........................................................................................................ 2, 11

*Basic Inc.* v. *Levinson*,
  485 U.S. 224 (1988) ......................................................................................................... *passim*

*Cammer* v. *Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) ..................................................................................... 17, 18

*Carpenters Pension Trust Fund of St. Louis* v. *Barclays PLC*,
  2015 WL 5000849 (S.D.N.Y. Aug. 20, 2015) ................................................................ *passim*

*Charron* v. *Pinnacle Grp. N.Y. LLC*,
  269 F.R.D. 221 (S.D.N.Y. 2010) ........................................................................................... 25

*City of Livonia Emps.' Ret. Sys.* v. *Wyeth*,
  284 F.R.D. 173 (S.D.N.Y. Sept. 18, 2012) ........................................................................... 15

*Comcast Corp.* v. *Behrend*,
  133 S. Ct. 1426 (2013) ............................................................................................ 4, 7, 21, 24

*Dura Pharm., Inc.* v. *Broudo*,
  544 U.S. 336 (2005) ............................................................................................................... 11

*Fogarazzo* v. *Lehman Bros., Inc.*,
  263 F.R.D. 90 (S.D.N.Y. 2009) ............................................................................................. 15

*George* v. *China Auto. Sys., Inc.*,
  2013 WL 3357170 (S.D.N.Y. July 31, 2013) ........................................................................ 17

*Gortat* v. *Capala Bros., Inc.*,
  2010 WL 1423018 (E.D.N.Y. Apr. 9, 2010) ......................................................................... 25

*Griffith* v. *Fordham Fin. Mgmt., Inc.*,
  2015 WL 1097327 (S.D.N.Y. Mar. 12, 2015) ....................................................................... 21

*Halliburton Co.* v. *Erica P. John Fund, Inc.*,
  134 S. Ct. 2398 (2014) ...................................................................................................... *passim*

*Houser* v. *Pritzker*,
  28 F. Supp. 3d 222 (S.D.N.Y. 2014)......................................................................25

*IBEW Local 90 Pension Fund* v. *Deutsche Bank AG*,
  2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013) ...................................................7, 17

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
  265 F.R.D. 157 (S.D.N.Y. 2010) ....................................................................15

*In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.*,
  281 F.R.D. 134 (S.D.N.Y. 2012) ....................................................................15

*In re Barclays Liquidity Cross & High Frequency Trading Litig.*,
  2015 WL 5052538 (S.D.N.Y. Aug. 26, 2015) .................................................5, 22

*In re ConAgra Foods, Inc.*,
  2015 WL 1062756 (C.D. Cal. Feb. 23, 2015)..................................................24

*In re Credit Suisse First Boston Corp. (Lantronix, Inc.) Analyst Sec. Litig.*,
  250 F.R.D. 137 (S.D.N.Y. 2008) ...................................................12, 15, 16, 17

*In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*,
  281 F.R.D. 174 (S.D.N.Y. 2012) ....................................................................18

*In re Initial Pub. Offering Sec. Litig.*,
  471 F.3d 24 (2d Cir. 2006)................................................................................6

*In re Moody's Corp. Sec. Litig.*,
  274 F.R.D. 480 (S.D.N.Y. 2011) .........................................................8, 14, 15, 16

*In re Omnicom Grp. Sec. Litig.*,
  541 F. Supp. 2d 546 (S.D.N.Y. 2008).............................................................24

*In re POM Wonderful LLC*,
  2014 WL 1225184 (C.D. Cal. Mar. 25, 2014).................................................24

*In re Sadia, S.A. Sec. Litig.*,
  269 F.R.D. 298 (S.D.N.Y. 2010) ....................................................................15

*In re SLM Corp. Sec. Litig.*,
  2012 WL 209095 (S.D.N.Y. Jan. 24, 2012) ...................................................15

*Jacob* v. *Duane Reade, Inc.*,
  293 F.R.D. 578 (S.D.N.Y. 2013) ....................................................................24

*McIntire* v. *China MediaExpress Holdings, Inc.*,
  38 F. Supp. 3d 415 (S.D.N.Y. 2014).........................................................10, 15

*Miles* v. *Merrill Lynch & Co. (In re Initial Pub. Offering Sec. Litig.)*
　　471 F.3d 24 (2d Cir. 2006)...................................................................................15

*Roach* v. *T.L. Cannon Corp.*,
　　778 F.3d 401 (2d Cir. 2015)..................................................................................24

*Strougo* v. *Barclays PLC*,
　　2015 WL 1883201 (S.D.N.Y. Apr. 24, 2015).............................................. *passim*

*Teamsters Local 445 Freight Div. Pension Fund* v. *Bombardier Inc.*,
　　546 F.3d 196 (2d Cir. 2008)..................................................................8, 17, 18

*Turnbow* v. *Life Partners, Inc.*,
　　2013 WL 3479884 (N.D. Tex. July 9, 2013).........................................................22

*Wallace* v. *IntraLinks*,
　　302 F.R.D. 310 (S.D.N.Y. 2014) ..........................................................................15

**Rules**

Fed. R. Civ. P. 23 ....................................................................................... *passim*

## PRELIMINARY STATEMENT

In their Second Amended Complaint ("SAC"), Plaintiffs allege that Barclays and its employee, Bill White,[1] made various material misstatements concerning Barclays' Alternative Trading System called Liquidity Cross ("LX"). Plaintiffs contend they were injured on June 25, 2014, when the New York Attorney General ("NYAG") sued Barclays for alleged misstatements about LX, leading to a decline in the price of Plaintiffs' holdings of Barclays' American Depository Shares ("ADS").

In its April 24, 2015 Order, this Court dismissed certain of the alleged misstatements, holding that Barclays' statements about its business practices and risk controls were inactionable "puffery" and that certain statements about LX were not available to the public and so Plaintiffs could not have relied on them. This Court declined to dismiss other alleged misstatements about LX because, in this Court's view, those statements could have been material to investors given Barclays' statements about restoring its integrity in the wake of the announcement of its June 27, 2012 settlement with government regulators related to the London Interbank Offered Rate ("LIBOR").

In their motion for class certification, Plaintiffs contend they can prove (i) reliance on a class-wide basis under the "fraud on the market" presumption, because Barclays' ADS supposedly traded efficiently during the putative class period of August 2, 2011 through June 25, 2014 ("putative class period"), and (ii) damages on a class-wide basis, because

---

[1] The defendants remaining in the case are Barclays PLC and Barclays Capital Inc. (together, "Barclays" or the "Bank") and Robert Diamond, Antony Jenkins, and William White (together with Barclays, "Defendants"). Plaintiffs are lead plaintiff Mohit Sahni and named plaintiff Joseph Waggoner (together, "Plaintiffs").

Barclays' alleged fraud caused a single-day decline in Barclays' ADS price of $1.16.[2]  In doing so, Plaintiffs ignore the significant limitations put on their case by this Court's April 24 Order and fail to otherwise meet their burden to "*prove*—not simply plead—that their proposed class satisfies each requirement of [Federal] Rule [of Civil Procedure] 23."  *Halliburton Co.* v. *Erica P. John Fund, Inc.* (*Halliburton II*), 134 S. Ct. 2398, 2412 (2014) (emphasis in original).

      *First*, even if Plaintiffs could show that Barclays' ADS traded in an efficient market during the putative class period (*but see infra* at 17-20), Defendants are able to rebut the presumption by "sever[ing] the link between the alleged misrepresentation and the price received (or paid) by the plaintiff[s]."  *Halliburton II*, 134 S. Ct. at 2415 (quotation and alterations omitted).  Under the April 24 Order, Barclays' alleged misstatements about LX could have been material—and thus affected the price of Barclays' ADS—only *after* the Bank made statements about restoring its reputation after the June 27, 2012 LIBOR settlement.  But the undisputed evidence—as put forth and confirmed by Plaintiffs' own purported expert, Dr. Nye—shows that *none* of the alleged misstatements after that date (or even during the putative class period) resulted in a statistically significant increase in Barclays' ADS price.  (*See infra* at 8-9.)

      Recognizing this fatal flaw in their allegations, Plaintiffs now contend that the alleged misstatements "simply maintained the market's understanding" of LX that was purportedly developed at some unspecified time *prior* to the putative class period.  But this Court's April 24 Order makes clear that no price inflation could have occurred from alleged misstatements made prior to June 27, 2012, because such statements about LX were immaterial and thus, "by definition, [did] not affect market price."  *Amgen Inc.* v. *Conn. Ret. Plans & Trust*

---

[2]     Plaintiffs' putative expert, Dr. Zachary Nye, examined both Barclays' ADS and common stock and found no material differences between them.  (Report of Zachary Nye, Ph.D. (Dkt. # 57-1) ("Nye Report") ¶¶ 18-22.)  This Opposition focuses solely on Barclays' ADS, which are the only Barclays securities at issue in this action.

*Funds*, 133 S. Ct. 1184, 1195 (2013).  Accordingly, Plaintiffs have proposed a putative class period that begins *prior* to any alleged misstatements that could have been material, and the undisputed evidence shows that Barclays' ADS price did not increase as a result of any alleged misstatement thereafter.  "Price maintenance" thus does not fit with the theory of Plaintiffs' case.

*Second*, even if the evidence did not rule out price impact under Plaintiffs' theory of liability, Plaintiffs fail to meet their burden of proving that the market for Barclays' ADS was efficient in the first place.  Plaintiffs' sole support for their claim of market efficiency is the report and testimony of Dr. Nye who, among other things, performed an event study comparing the returns on Barclays' ADS on particular dates with news about Barclays released on those dates.  But, as shown in the expert report of Professor Chris James—which Defendants submit along with this motion, *see* Ex. A[3]—Dr. Nye's testimony suffers from significant methodological flaws that render unreliable his conclusion that the market for Barclays' ADS was efficient.  For example, Dr. Nye provides no cogent explanation for how or why he chose a majority of the dates he analyzed in his event study, which analyst reports or news articles he considered concerning those dates, or how he applied those analyst reactions to determine whether the price movement of Barclays' ADS was consistent with information about pre-existing market expectations.  Thus, Dr. Nye's report appears to rely on a process designed to find market efficiency from the outset.

*Third*, Plaintiffs have failed to put forth a methodology for measuring damages on a class-wide basis that comports with their theory of fraud.  Indeed, Plaintiffs seek to attribute *all* damages supposedly suffered following the NYAG's lawsuit to price inflation caused by Barclays' purported misrepresentations concerning LX.  But Plaintiffs' expert concedes that

---

[3]      Unless otherwise specified, all references to "Ex." are to exhibits to the Declaration of Jeffrey T. Scott, dated September 11, 2015 and filed herewith ("Scott Declaration").

other factors—such as the mere fact that Barclays was sued by a regulator—contributed to the fall in price of Barclays' ADS, and offers no methodology for disaggregating the effects of these other factors.  This failure is particularly stunning given this Court's explicit distinction in its April 24 Order between losses caused by "the particular fraud alleged" as opposed to those caused by "the fact that Barclays was being sued by a regulator."  Indeed, the failure to offer a methodology for disentangling damages caused by the alleged fraud from other damages is what doomed plaintiffs' motion for class certification in *Comcast Corp.* v. *Behrend*, 133 S. Ct. 1426 (2013).  Moreover, Plaintiffs' expert concedes that the value of the alleged misstatements would have varied throughout the putative class period, as (i) Barclays allegedly undertook different actions at different times that supposedly made its statements about LX misleading, and (ii) the perception about risks concerning dark pools changed over time.  Yet Plaintiffs offer no proposal for how to measure the differences in damages that such variance would have created.

   *Fourth*, even if this Court were to grant certification, any class period should begin no earlier than February 14, 2013, *i.e.*, the date of the first alleged misstatement about LX that post-dates Barclays' stated commitment to restoring its integrity after the LIBOR settlement because, under this Court's April 24 Order, there can be no earlier alleged material misstatement.

## BACKGROUND

   Plaintiffs allege two different types of misstatements.  *First*, Plaintiffs allege that Barclays' statements during the putative class period concerning its risk controls and general commitment to transparency and compliance were false in light of Barclays' alleged misconduct concerning LX.  (*See, e.g.*, SAC ¶¶ 130, 149, 176, 186, 188.)  In its April 24 Order, this Court held that all of these alleged misstatements were inactionable "puffery," because they were too general to be relied upon by a reasonable investor.  *Strougo* v. *Barclays PLC*, 2015 WL 1883201,

at *7-9 (S.D.N.Y. Apr. 24, 2015) ("April 24 Order").  *Second*, Plaintiffs allege that certain Barclays statements concerning LX were false or misleading.[4]  Although Plaintiffs do not in every instance identify the precise dates of the alleged misstatements, a review of the documents referenced in the SAC demonstrates that the alleged public misstatements concerning LX occurred on the following dates:

(i)      **August 1, 2011** (*Traders Magazine* article (SAC ¶¶ 122-23; Ex. 2);

(ii)     **June 18, 2012** (American Enterprise Institute ("AEI") presentation (SAC ¶¶ 72, 124-28; Ex. 3));

(iii)    **February 14, 2013** (Barclays' website (SAC ¶¶ 142-43));[5]

(iv)     **March 8, 2013** (*Markets Media* article (SAC ¶¶ 64, 144-45; Ex. 4));

(v)      **March 14, 2013** (*Markets Media* article (SAC ¶¶ 67, 151-52; Ex. 5));

(vi)     **April 1, 2013** (*Traders Magazine* article (SAC ¶¶ 163-64; Ex. 6));

(vii)    **May 20, 2013** (*Markets Media* article (SAC ¶¶ 69, 165-68; Ex. 7));

(viii)   **May 21, 2013** (*The Trade News* article (SAC ¶¶ 169-70; Ex. 8));

(ix)     **June 6, 2013** (*HedgeWeek* articles (SAC ¶¶ 68, 89, 171-74; Ex. 9));

(x)      **July 29, 2013** ("Key facts and H12013 business highlights" (SAC ¶¶ 178-79));

(xi)     **November 12, 2013** (letter from Barclays to the SEC (SAC ¶¶ 70, 180-82; Ex. 10));

---

[4]      In its April 24 Order, this Court dismissed allegations concerning statements Barclays made about LX in private marketing materials, holding that "Plaintiffs cannot rely on the 'fraud on the market' presumption of reliance [with respect to those statements] because they cannot plausibly allege that the statements contained in these materials were intended to affect the price for Barclays ADSs or even that they reached the market."  2015 WL 1883201, at *9 n.105.  In *In re Barclays Liquidity Cross & High Frequency Trading Litigation*, the Honorable Judge Jesse M. Furman recently dismissed claims based on these same materials.  2015 WL 5052538, at *19-26 (S.D.N.Y. Aug. 26, 2015).

[5]      With respect to the alleged misstatements that were posted to Barclays' website, the affidavit of Michael Page, sworn to on September 9, 2015 and filed herewith, explains that the dates such alleged misstatements were posted were those that are set forth herein.

**(xii)    February 20, 2014** (*Markets Media* article (SAC ¶¶ 50, 61, 183-84; Ex. 11)); and

**(xiii)   June 23, 2014** (Barclays' website (SAC ¶¶ 192-94)).

This Court held that these alleged misstatements related solely to a business unit—LX—that accounted for approximately "0.1 percent of Barclays PLC's total revenue," "far below the five percent threshold" that the Second Circuit has employed for assessing materiality. 2015 WL 1883201, at *10 & n.119.  Nevertheless, this Court held that it could not rule these alleged misstatements immaterial as a matter of law, because Barclays' statements concerning its commitment to "restoring its integrity" following the June 27, 2012 announcement of the LIBOR settlement[6] could have rendered statements about LX material to the extent that statements about LX "call[ed] into question the integrity of the company as a whole." *Id.* at *10 (citing Compl. ¶ 138 (quotation omitted)).[7]

## LEGAL STANDARD

To certify a class, the Court must "receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met." *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006).  In addition to proving under

---

[6]    Plaintiffs allege that Barclays made statements about restoring its "integrity" from December 31, 2012 onwards.  (*See, e.g.*, SAC ¶¶ 3, 134, 138, 153.)

[7]    Barclays respectfully disagrees with this Court's ruling that these LX-specific statements could have been material as a matter of law, because nothing in the content of those statements could have misled investors about the integrity of Barclays as a company, as opposed to about specific aspects of LX.  Moreover, this Court's April 24 Order dismissed as immaterial alleged misstatements about "restoring Barclays' reputation following the LIBOR scandal," finding that such statements were "generic," "aspirational," and "too open-ended," and that there were no well-pleaded facts showing that Barclays was not dedicated to restoring its reputation despite any alleged misconduct concerning LX, which generates less than .1% of Barclays' revenue.  April 24 Order, 2015 WL 1883201, at *7-8.  Accordingly, Barclays respectfully submits that none of the alleged misstatements is actionable, and reserves its rights to challenge the materiality of those statements throughout this action.

Rule 23(a) that "there are questions of law or fact common to the class," Plaintiffs must satisfy the more demanding standard of Rule 23(b)(3) by proving that "questions of law or fact common to class members predominate over any questions affecting only individual members." *IBEW Local 90 Pension Fund* v. *Deutsche Bank AG*, 2013 WL 5815472, at *17 (S.D.N.Y. Oct. 29, 2013). Certification is proper "only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of" Rule 23 are met. *Comcast*, 133 S. Ct. at 1432 (internal quotations omitted).

## ARGUMENT

### I.   PLAINTIFFS CANNOT ESTABLISH RELIANCE ON A CLASS-WIDE BASIS.

In order to meet the Rule 23(b)(3) requirement that common issues predominate, Plaintiffs must establish reliance on a class-wide basis—otherwise, "[e]ach plaintiff would have to prove reliance individually, so common issues would not 'predominate' over individual ones[.]" *Halliburton II*, 134 S. Ct. at 2416. In a case involving affirmative misrepresentations such as this one, class-wide reliance may be presumed based on the so-called fraud-on-the-market theory articulated by the Supreme Court in *Basic Inc.* v. *Levinson*, 485 U.S. 224 (1988). Plaintiffs seek to establish class-wide reliance using that presumption here.[8]

There are four prerequisites to invoking the *Basic* presumption—publicity, materiality, market efficiency and market timing—and, besides materiality, the burden is on plaintiffs to prove each of them prior to class certification by a preponderance of the evidence.

---

[8]    Plaintiffs also invoke the *Affiliated Ute* presumption of reliance (*see* Motion at 22), which is applicable to cases primarily involving omissions. *See Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128, 153-54 (1972) ("Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery."). Because Plaintiffs allege that Barclays made a number of affirmative misstatements concerning LX and the Bank's commitment to restoring its integrity, the *Affiliated Ute* presumption does not apply. *See Carpenters Pension Trust Fund of St. Louis* v. *Barclays PLC*, 2015 WL 5000849, at *19-20 (S.D.N.Y. Aug. 20, 2015) ("*Carpenters*").

*See Halliburton II*, 134 S. Ct. at 2412; *Teamsters Local 445 Freight Div. Pension Fund* v. *Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008) (holding that "preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements").

Applicability of the *Basic* presumption, however, does not establish class-wide reliance, as Defendants may rebut the presumption through evidence that the alleged misstatements did not affect the market price of the defendant company's securities. *Halliburton II*, 134 S. Ct. at 2414-15. Such evidence "severs the link between the alleged misrepresentation and the price received (or paid) by the plaintiff." *Id.* at 2415 (alteration omitted).

**A.    The Alleged Misstatements Did Not Affect the Price of Barclays' ADS.**

**1.    The Undisputed Evidence Shows That None of the Alleged Misstatements Resulted in a Statistically Significant Price Increase.**

A lack of price movement on each alleged misstatement date is direct evidence that the alleged misstatements did not have an impact on a company's securities. *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 492 (S.D.N.Y. 2011) ("Defendants contend that there is no link between the misrepresentations and the price of [defendants'] stock because there is no statistically significant change in [defendants' stock's] value when any alleged misrepresentation was made. Such a showing would rebut the [*Basic*] presumption."). Here, the results of Dr. Nye's regression analysis demonstrate that, on each of the alleged misstatement dates, there was no statistically significant increase in the price of Barclays' ADS. (*See* Nye Report, Ex. 12A (setting forth the results of Dr. Nye's regression analysis for each trading date in the putative class period).) Dr. Nye conceded this issue at his deposition: "I have looked at [the alleged misstatement dates] . . . [a]nd I don't believe there [was] a significant price change . . . net of

market industry effects for any of those dates." (*See* Nye Tr. at 265:11-266:14;[9] *see also id.* at 161:16-162:10.)[10]

In Dr. Nye's view, the lack of a statistically significant price increase on any of these dates was consistent with an efficient market, because none of the alleged misstatements—including the earliest one, on August 2, 2011—"chang[ed] expectations one way or the other" and, therefore, were not in and of themselves "value relevant." (*Id.* at 160:6-17, 232:9-23; *see also id.* at 276:23-277:25 ("Given it's my understanding that [the August 1, 2011 *Traders Magazine* article] [was] not necessarily new information [in] August [2011] . . . , I wouldn't think it would influence [Barclays'] stock price on this day.").)  Defendants' expert, Professor James, also opines that, if accepted, Dr. Nye's event study shows that there was no statistically significant price increase on any of the alleged misstatement dates. (James Report ¶ 74.)

### 2. Plaintiffs Cannot Argue That the Alleged Misstatements "Maintained" Existing Price Inflation, Because No Alleged Misstatement Prior to Barclays' Statements About the LIBOR Settlement Could Have Impacted the Price of Barclays' ADS.

Given the lack of any statistically significant price increase on any of the alleged misstatement dates, Plaintiffs and their expert are forced to posit that the alleged misstatements simply "maintained" inflation in the price of Barclays' ADS that arose at some undefined time *prior* to the putative class period.  (*See* Motion at 6 ("Defendants' false and misleading statements regarding Barclays' transparency and safeguards maintained the price of Barclays'

---

[9]    Relevant excerpts of the transcript of Dr. Nye's August 11, 2015 deposition are attached to the Scott Declaration as Exhibit 1.

[10]    Further, the Nye Report itself specifically examined one of the alleged misstatement dates—November 12, 2013—and concluded that there was a "statistically insignificant Company-specific return" on that date (Nye Report, Ex. 11, at 28), and that the alleged misstatement did not contain "unexpected, new material information," and so would not have been expected to—and, in fact, did not—"impact the stock price upon its disclosure."  (Nye Tr. at 159:20-160:5, 281:5-12.)

securities at levels that reflected investor confidence in the integrity of the Company . . . [until] Barclays' shares fell 7.38% on June 26, 2014."); Nye Tr. at 161:2-162:22, 232:24-233:9 ("[The alleged misstatements] simply maintained the market's understanding of Barclays LX and its strategy, goals, and intended risks" that was developed prior to the beginning of the proposed class period in 2011).) Although he admitted that he was unaware of the precise date (*id.* at 163:23-25), Dr. Nye testified that the market's understanding about LX would have been established *prior* to the beginning of the putative class period, when Barclays began marketing LX sometime before August 2011 (*see id.* at 162:11-163:22, 286:6-17, 287:7-17), and that the alleged price inflation would have entered Barclays' ADS price at that time (*id.* at 232:24-233:9).

Plaintiffs' theory of price maintenance, however, is foreclosed by this Court's April 24 Order. In a typical maintenance case, an alleged misstatement maintains the effect of an earlier misstatement or omission. *See, e.g.*, *McIntire* v. *China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 434-35 (S.D.N.Y. 2014) (alleged misstatements confirmed market expectations created by earlier alleged misstatement). Here, Plaintiffs and their expert claim the inflation that allegedly was maintained would have been established in 2011, *prior* to the beginning of the putative class period.[11] But there can be no dispute that a misrepresentation or omission about LX occurring *prior* to the putative class period *could not have affected the price of Barclays' ADS* because, as this Court recognized in its April 24 Order, 2015 WL 1883201, at *10, it was only Barclays' response to the LIBOR settlement announced on June 27, 2012—a date well into

---

[11]    (*See* Nye Tr. at 232:24-233:9 ("[T]heoretically speaking, [the alleged price inflation would have entered the price of Barclays' ADS] . . . at the point [Barclays] marketed the LX in a way that promised to filter out high frequency predatory trading, and also the point [at] which they disclosed that orders would be routed fairly rather than disproportionately to LX."); *id.* at 286:18-23 ("I can't remember the date that operations began, . . . but that would be the time that [information about] the parameters and . . . how they were touting [LX] . . . was available to investors [in 2011], and that would have been reflected in the market price.").)

the putative class period—that could have rendered the alleged misstatements about LX material, and thus created inflation in Barclays' ADS price.  (*See supra* at 6.)  Any alleged misstatements about LX *prior* to the June 27, 2012 LIBOR settlement *could not* have implicated Barclays' efforts to "restore its integrity"—the sole basis for this Court's determination that statements about LX could possibly be material (April 24 Order, 2015 WL 1883201, at *10)—and so could not have had *any* impact on the price of Barclays' ADS.  *See Amgen*, 133 S. Ct. at 1195 ("[I]mmaterial information, by definition, does not affect market price.").[12]

### 3. Plaintiffs' Own Purported Expert Provides a Probable Explanation for the June 26, 2014 Drop in Barclays' ADS Price Based on Factors Unrelated to the Alleged Misstatements.

In addition to showing that none of the alleged misstatements resulted in a statistically significant increase in Barclays' ADS price, Plaintiffs' own evidence sets forth a probable explanation for the June 26, 2014 decline in Barclays' ADS price unrelated to the correction of any alleged misstatement.  Although a decline in a company's stock price may in some cases support an inference of price impact, the mere fact of such a decline does not necessarily imply stock price inflation based on alleged fraud.  *See Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336, 342-43 (2005).  Where, as here, Plaintiffs have posited no theory of fraud that could have created price inflation, the June 26, 2014 decline in Barclays' ADS price cannot establish price impact.  Moreover, the evidence shows that the June 26, 2014 decline likely was

---

[12]    That pre-LIBOR alleged misstatements could not have affected Barclays' ADS price accords with Dr. Nye's testimony that statements about LX around the time of its inception would not have been expected to affect Barclays' ADS price, "because [LX was] just not a big enough business[.]"  (Nye Tr. at 164:2-16; *see also* April 24 Order, 2015 WL 1883201, at *10 & n.119 (finding that, based on Plaintiffs' allegations and publicly available documents, "LX accounted for 0.1 percent of Barclays PLC's total revenue").)  Indeed, according to Dr. Nye himself, it was only "in light of . . . [Barclays'] scandals . . . from 2012 on" that the alleged misstatements about LX could have been value relevant.  (Nye Tr. at 164:17-24.)

caused by factors unrelated to the alleged misstatements.[13]

   *First*, Dr. Nye acknowledges that the disclosure of government investigations can, by itself, result in a statistically significant decline in Barclays' ADS price.  This is fully consistent with the Court's April 24 Order.  (*See* April 24 Order, 2015 WL 1883201, at *10 n.121.)  In fact, Dr. Nye relies on the disclosure of two government investigations to support his conclusion that a statistically significant decrease in Barclays' ADS price on October 31, 2012 was consistent with that which would have been expected in an efficient market.  (Nye Report, Ex. 11, at 16.)[14]  And Plaintiffs themselves concede that mere concerns about regulatory fines can result in stock price movement, as the SAC specifically alleged that a news article published three days after the NYAG's complaint was filed that merely speculated about the size of the fine Barclays could face caused Barclays stock price to drop by 1.5%.  (SAC ¶ 197.)

   *Second*, Dr. Nye relied on analyst reports and news stories as the *sole evidence* of how the market perceived the significance of information such that Barclays' ADS price would (or would not) be affected, and *all* of the analyst reports and news stories cited in Dr. Nye's

---

[13] Although this Court has held that "[l]oss causation has no logical connection to the facts necessary to establish the efficient market predicate to the fraud-on-the-market theory[,]" *Carpenters*, 2015 WL 5000849, at *4 n.44, whether a company's stock price declined due to factors other than the truth of alleged misstatements being disclosed is relevant to whether the alleged misstatements had any price impact.  *See, e.g., In re Credit Suisse First Boston Corp. (Lantronix Inc.) Analyst Sec. Litig.*, 250 F.R.D. 137, 147-48 (S.D.N.Y. 2008) (rejecting plaintiff's argument that the fact of a stock drop "itself provide[d] a *prima facie* showing of market impact," and finding that the stock drop was caused by other factors).  As the Supreme Court acknowledged in *Halliburton II*, defendants may prove the absence of price impact through "any showing" of admissible proof, "even though such proof is also highly relevant at the merits stage."  *Halliburton II*, 134 S. Ct. at 2415-17.

[14] Dr. Nye made clear in his deposition that the disclosure of these investigations caused, at least in part, the statistically significant decline in Barclays' ADS price on that date.  (Nye Tr. at 188:12-15.)  That was because, as Dr. Nye testified, the investigations (i) could "directly impact [Barclays'] ability to generate revenues," (ii) "creat[ed] . . . a litigation cost," and (iii) entailed a risk that Barclays' "reputation could be hindered."  (*Id.* at 189:18-190:11.)

report attribute the June 26 decline in Barclays' ADS price to factors *other than* concern about Barclays' alleged misconduct related to LX or Barclays' attempts to restore its "integrity."

The Nye Report cites five analyst reports concerning the NYAG complaint filed June 25, 2014 and the June 26, 2014 decline in Barclays' ADS price: one each from Canaccord Genuity Limited ("Canaccord Genuity"), Deutsche Bank Markets Research ("Deutsche Bank"), Royal Bank of Canada Capital Markets ("RBC"), Morgan Stanley Research Europe ("Morgan Stanley"), and Jefferies Equity Research ("Jefferies"). (*See* Nye Report, Ex. 11, at 35.) Canaccord Genuity focused on the strength of the NYAG's case against Barclays and the size of the fine Barclays was expected to face. (Ex. 12 at 1.)[15] Deutsche Bank focused on increasing regulatory pressure and litigation risk in the high frequency trading space following Michael Lewis' *Flashboys*. (Ex. 12 at 2.) RBC focused on potential litigation costs and ongoing litigation risk. (Ex. 12 at 3.)[16] Morgan Stanley focused on factors including "the possible size of the fine, the potential impact on bank capital, the potential impact on Barclays' ambitions to sustain and grow its Equities revenues." (Ex. 12 at 4.)[17] And Jefferies focused on the "business impact" of losing clients given the overhang of litigation, as well as the size of a potential fine. (Ex. 12 at 5.) *Not one* of these reports mentions any of the purported misstatements alleged in the SAC, let alone connects such alleged misstatements with Barclays' efforts to restore its integrity.

---

[15]     Canaccord described the allegations against Barclays as "not flattering." Dr. Nye testified that this phrase "connote[d] reputational damage." (Nye Tr. at 255:17-24.)

[16]     RBC noted that the NYAG lawsuit had the potential to "drag on [tangible book value ("TBV")] growth and capital generation." Dr. Nye testified that this, too, referred to "reputational damage." (*See* Nye Tr. at 257:12-25.)

[17]     Dr. Nye testified that this was also a reference to reputational damage. (Nye Tr. at 258:19-259:5.)

Dr. Nye nevertheless implausibly attributes the June 26, 2014 decline in Barclays' ADS price *exclusively* to the purported truth of the alleged misstatements being disclosed.  (Nye Report ¶ 74.)  But this is entirely at odds with Dr. Nye's own event-study methodology that mere announcements of regulatory investigations into Barclays conduct affected Barclays' ADS price on October 31, 2012.  (*See supra* at 12.)  Similarly, Dr. Nye's reliance on analyst reports and news stories, if applied consistently, demonstrates that the market reacted to other factors—*i.e.*, the size of the fine Barclays might face, the heightened litigation risks, and the potential impact on bank capital and implications for Barclays' equities business—on the purported corrective disclosure day, and placed *no* importance on Barclays' statements about transparency in LX or the Bank's efforts to restore its integrity, as they said *nothing* about those issues.

> **4.    As a Matter of Law, the Undisputed Evidence Ruling Out Price Inflation Attributable to the Alleged Misstatements Establishes That the Alleged Misstatements Had No Impact on Barclays' ADS Price.**

Where, as here, the facts and undisputed evidence contradict plaintiffs' theory about how alleged inflation entered a company's stock price (*see supra* at 9-11), courts in this Circuit have not hesitated to find the *Basic* presumption rebutted and that class certification must be denied.  For example, in *In re Moody's Corp. Sec. Litig.*, the undisputed evidence showed that there was no statistically significant increase in Moody's stock price on the date of any alleged misstatement.  274 F.R.D. 480, 492 (S.D.N.Y. 2011).  Just as Dr. Nye does here, plaintiffs' expert testified that the lack of a statistically significant price increase on any alleged misstatement date did not mean that the alleged misstatements had no price impact because the alleged misstatements maintained "what the market had come to expect and reflected the status quo."  *Id.* at 492.  As a result, plaintiffs' expert testified, "one would not [have] expect[ed] to observe a substantial change in value when these statements were made."  *Id.* at 493.  The court found that this testimony represented a concession that there was "*no* link between the price of

[Moody's] stock and any of the alleged misrepresentations," which undermined the premises supporting the fraud-on-the-market theory.  *Id.* (emphasis in original).  The court therefore held that defendants had met their burden of rebutting the *Basic* presumption.  *Id.*

Similarly, in *In re Credit Suisse*, both parties agreed that "there were no statistically significant abnormal market returns" on any of the alleged misstatement dates.  250 F.R.D. at 143.  Plaintiffs and their expert attempted to explain the lack of contemporaneous price movement by arguing that the alleged misstatements were "confirmatory" and "maintained" the price of Lantronix's stock.  *Id.* at 144 & n.16.  The court found that plaintiffs' "price maintenance theory [was] patently deficient under *Miles* [v. *Merrill Lynch & Co. (In re Initial Pub. Offering Sec. Litig.)*], which held that Rule 23 determinations must be based on 'relevant facts.'"  *Id.* (citing *Miles*, 471 F.3d 24, 41 (2d Cir. 2006) (emphasis in original)).[18]

---

[18]   Indeed, *no* court in this Circuit has found a defendant's price impact rebuttal evidence to be insufficient and certified a class where, as here, (i) the evidence showed that alleged misstatements did not result in a statistically significant price increase, and (ii) the facts and evidence ruled out a valid price maintenance theory.  *Cf., e.g.*, *Carpenters*, 2015 WL 5000849, at *11 (certifying class where "[p]rice maintenance fit[] the theory of plaintiffs' case"); *Wallace* v. *IntraLinks*, 302 F.R.D. 310, 317-18 (S.D.N.Y. 2014) (certifying class where there was no indication that alleged misstatements or omissions did not inflate or maintain inflation of stock price); *McIntire*, 38 F. Supp. 3d at 434 (finding that defendant did not meet "burden to prove that its alleged misstatements did not improperly maintain [the] already-inflated stock price"); *City of Livonia Emps.' Ret. Sys.* v. *Wyeth*, 284 F.R.D. 173, 182 (S.D.N.Y. 2012) (finding that "the fact that the stock price remained consistent could, in fact, indicate inflation" in omissions case); *In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.*, 281 F.R.D. 134, 142-43 (S.D.N.Y. 2012) (certifying class where market reacted to corrective disclosure and there was no indication that alleged misstatements or omissions did not inflate or maintain inflation of stock price); *In re SLM Corp. Sec. Litig.*, 2012 WL 209095, at *5-6 (S.D.N.Y. Jan. 24, 2012) (same); *In re Sadia, S.A. Sec. Litig.*, 269 F.R.D. 298, 316 (S.D.N.Y. 2010) (certifying class where defendants "failed to . . . prov[e] by a preponderance of the evidence that there would have been *no* impact on price as a result of the failure to disclose information") (emphasis in original); *In re Am. Int'l Grp., Inc. Sec. Litig.*, 265 F.R.D. 157, 181-88 (S.D.N.Y. 2010) (certifying class where there was no indication that alleged misstatements or omissions did not inflate or maintain inflation of stock price), *vacated on other grounds against one group of defendants*, 589 F.3d 229 (2d Cir. 2012); *Fogarazzo* v. *Lehman Bros., Inc.*, 263 F.R.D. 90, 106 (S.D.N.Y. 2009) (defendants failed to

(*footnote continued*)

The approach taken by the courts in *Moody's* and *Credit Suisse* is consistent with guidance from the Supreme Court in *Halliburton II*.  In holding that defendants in putative securities fraud class actions "must be afforded an opportunity before class certification to defeat the [*Basic*] presumption through evidence that an alleged misrepresentation did not actually affect the market price of the [defendant's] stock," *Halliburton II*, 134 S. Ct. at 2417, the Supreme Court cautioned against ignoring "direct, . . . salient evidence" bearing on whether the requirements of Rule 23 have been met, *id.* at 2416.  An example of such evidence, the Court reasoned, was an event study offered for the purpose of arguing market efficiency but which showed that an alleged misstatement had no impact on a defendant's stock price.  *See id.* at 1415.

Moody's* and *Credit Suisse* are also consistent with this Court's decision in *Carpenters*, 2015 WL 5000849 (S.D.N.Y. Aug. 20, 2015).  In granting plaintiffs' motion for class certification, this Court found that plaintiffs' theory that Barclays' LIBOR submissions contained material omissions that "deceive[d] the market about the rate at which Barclays truly believed it could borrow funds to counter perceptions about its well-documented liquidity problems" was consistent with a theory of price maintenance.  *Id.* at *11 (quotations omitted).  Because this Court found that "plaintiffs' theory . . . that the false LIBOR submissions artificially maintained [Barclays'] stock price" was consistent with no statistically significant price increases on any alleged misstatement dates, it held that Barclays failed to meet its burden of rebutting the *Basic* presumption.  *Id.* at *17-18.  Although Barclays respectfully disagrees with *Carpenters*,[19] it is distinguishable from this case, where Plaintiffs' theory that the alleged

---

*(footnote continued)*
rebut plaintiffs' expert's evidence that challenged analyst reports had a statistically significant effect on price).

[19]     Barclays has filed a Rule 23(f) petition concerning various aspects of *Carpenters*.

misstatements maintained price inflation engendered by statements made *prior* to the putative class period does not fit with this Court's April 24 Order upholding the legal sufficiency of Plaintiffs' allegations related to materiality solely on the basis of Barclays' post-LIBOR-settlement efforts to restore its integrity.  In light of Plaintiffs' "patently deficient" theory of price maintenance, *Credit Suisse*, 250 F.R.D. at 145, the lack of price movement on the alleged misstatement dates confirms that the misstatements had no impact on Barclays' ADS price.

**B.     Plaintiffs Fail to Meet Their Burden of Proving Market Efficiency.**

Even if this Court holds that Defendants have failed to show a lack of price impact due to the alleged fraud, Plaintiffs "have not proven market efficiency by a preponderance of the evidence."  *George* v. *China Auto. Sys., Inc.*, 2013 WL 3357170, at *13 (S.D.N.Y. July 3, 2013); *accord Deutsche Bank*, 2013 WL 5815472, at *21 ("Plaintiffs bear the burden of proving market efficiency—defendants do not.").  "In analyzing market efficiency, courts generally have turned to a series of factors most notably set forth in *Cammer* v. *Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989)."  *Deutsche Bank*, 2013 WL 5815472, at *20.  "The factors are:  (1) the average weekly trading volume of the securities at issue; (2) the number of securities analysts reporting on or following the securities; (3) the extent to which market makers traded in the securities; (4) the extent to which the issuer was/is eligible to file an SEC Registration Form S–3; and (5) the demonstration of a cause and effect relationship between the unexpected, material disclosures and changes in the securities' price."  *Id.*

Chief among these factors is the demonstration of a cause and effect relationship between unexpected disclosures and changes in the securities' price.  Absent "such a causal relationship, it is difficult to presume that the market will integrate the release of material information about a security into its price."  *Teamsters Local 445 Freight Div. Pension Fund* v. *Bombardier Inc.*, 546 F.3d 196, 207 (2d Cir. 2008).  "Without evidence of the prompt effect of

unexpected news on market price, the market cannot be called efficient." *In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 182 (S.D.N.Y. 2012).   Although this Court found in *Carpenters* that, "in the ordinary case of a high volume stock followed by a large number of analysts and traded on a national exchange," *Cammer* factor five is not dispositive, *Carpenters*, 2015 WL 5000849, at *10, Barclays respectfully submits that proof of a cause and effect relationship between unexpected, material disclosures and changes in a defendant's stock price is necessary to prove market efficiency, *see Teamsters*, 546 F.3d at 207 (*Cammer* factor five is the "essence of an efficient market and the foundation for the fraud on the market theory"), and that, for the reasons set forth below, Plaintiffs have failed to meet that burden.

### 1.    Plaintiffs' Evidence of Market Efficiency Is Fatally Flawed.

Plaintiffs' sole evidence in support of their claim of market efficiency is the testimony of Dr. Nye, who examined each of the factors set forth in *Cammer*, as well as three additional factors—market capitalization, public float and autocorrelation—and opined that the market for Barclays' ADS was efficient.  (Nye Report ¶ 6.)

Dr. Nye acknowledged in his deposition that *Cammer* factor five—a causal relationship between unexpected disclosures and stock price changes—is the only "direct test" of market efficiency.  (Nye Tr. at 75:2-19.)  According to Dr. Nye, the other factors he considered represent "indirect test[s] of efficiency," which "examine whether market conditions *promote* efficiency."  (Nye Report ¶ 25 (emphasis added).)  To assess whether Barclays' ADS price responded to unexpected disclosures about the Bank, Dr. Nye performed an event study covering 38 dates from within the putative class period.  (*Id.* ¶¶ 56-68.)  For each date, Dr. Nye examined the abnormal return (if any) on Barclays' ADS price and compared it to news about Barclays released on that date.   Dr. Nye's event study uses subjective, scientifically unsupportable methods that ensure that Dr. Nye's interpretation of news disclosed on the event study dates

leads to a conclusion of market efficiency.

*First*, Dr. Nye "fails to consistently evaluate consensus expectations on earnings event days." (James Report ¶ 26.)  The Nye Report employs no consistent methodology for determining whether news was (i) surprising, or, conversely, (ii) in line with expectations. (*See id*.)  Unlike academic studies, which develop objective measures for what constitutes an earnings surprise, Dr. Nye relies only on his subjective opinion to make his determinations. (*See id*. ¶¶ 26-30.)  For example, Dr. Nye characterized the news on April 26, 2012, a day on which analysts noted Barclays' announcement of quarterly adjusted profits before tax that were significantly better (about 22.5%) than the consensus forecast, as "mixed but generally in line with expectations." (*See id*. ¶ 26.)  Dr. Nye also treats earnings-related surprises of similar magnitude differently—the Nye Report concludes that profits before tax of 5% better than consensus forecasts on August 2, 2011 were "generally in line with market consensus" (Nye Report, Ex. 11, at 3-4), but earnings on April 24, 2013 that were 2% short of estimates are interpreted as a "slight miss" (*id.* at 20-22).  In both instances, Dr. Nye's conclusions led him to find market efficiency.

Similarly, the Nye Report studiously ignores certain consensus forecasts that are inconsistent with the market's reaction.  For example, in examining the statistically significant *increase* in Barclays' ADS price on February 10, 2012, Nye discusses various earnings expectations, but omits to discuss, as described in a Deutsche Bank analyst report that Nye cites, that Barclays' financial results were *below* consensus expectations. (*See* James Report ¶ 29.)

*Second*, the Nye Report fails to consider all of the relevant news on the days examined. (*See* James Report ¶¶ 32-37.)[20]  Although Dr. Nye identifies 761 analyst reports

---

[20]     Conversely, many of the days selected by Dr. Nye fail to contain *any* value relevant news and thus add nothing to the analysis. (*See* James Report ¶¶ 49-50.)

during the putative class period, he only examined 117 of them and does not explain how he chose which reports to consider and which to ignore.  (*See* Nye Report, Exs. 6 & 11; *see also* James Report ¶ 32.)  Similarly, Dr. Nye considers certain types of information as potentially value relevant on certain days, but does not consider the same type of information to be value relevant on other days.  (*See* James Report ¶¶ 33-37.)  For example, the Nye Report concludes that a statistically significant positive return on February 10, 2012 was consistent with positive commentary by analysts on Barclays' financial performance, but fails to discuss a negative analyst report cited on the same day.  (*See id.* ¶ 35.)  In essence, Dr. Nye "omits select analyst commentary . . . that contradicts his conclusions, calling into question whether he has considered the total mix of information on each day."  (*Id.* ¶ 38.)

*Finally*, Dr. Nye provides no economic evidence for why the industry index that he selected for his event study is superior to other indices that he could have chosen or that he considered.  (*See* James Report ¶¶ 39-47.)  Dr. Nye's own materials show that he considered an alternative industry index, the use of which would have changed the event study's conclusions on a number of days (going from 9 statistically significant days to 7 such days) and decreased the evidence (even by Dr. Nye's standards) of efficiency.  (*See id.* ¶¶ 41-47.)

These fatal flaws in Dr. Nye's event study methodology render unreliable his conclusion that Barclays' ADS price "reflected the information disclosed to the market, and promptly responded to material, unexpected news."  (Nye Report ¶ 68.)  Plaintiffs have thus failed to prove that the market for Barclays' ADS was efficient.

## II.   PLAINTIFFS FAIL TO MEET THEIR BURDEN OF SHOWING THAT DAMAGES CAN BE CALCULATED ON A CLASS-WIDE BASIS.

As this Court recently held, *Comcast* requires Plaintiffs to show that "their theory of liability matches their theory of damages and [that] individualized damages issues will not

predominate." *Carpenters*, 2015 WL 5000849, at *21.  To do so, Plaintiffs must:  (i) propose a method to isolate the amount of loss, if any, caused by the alleged misstatements (as opposed to the other company-specific factors that had price impact); and (ii) propose a method to account for the individualized questions with respect to damages arising from the variable value of the alleged misstatements through the putative class period.  Because Plaintiffs' damages framework "does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Comcast*, 133 S. Ct. at 1433.

Plaintiffs fail to show that loss causation and damages can be proven on a class-wide basis in a way consistent with the theory of liability alleged in the SAC.  *See id.* at 1430-31, 1433-34.  As the Supreme Court explained in *Comcast*, because Plaintiffs are "entitled only to damages resulting from" the misstatements alleged, any method of proving damages "must measure only those damages attributable to that theory." *Id.* at 1433.  The Nye Report *does not even attempt* to model damages in this case.  (*See* Nye Report ¶ 76.)  Instead, Dr. Nye seeks to demonstrate that damages are susceptible to common proof by offering a vague, "general economic framework." (*Id.*)  Not only is this "framework" wholly inadequate to demonstrate by a preponderance of the evidence that damages can be established by common proof, *see Griffith* v. *Fordham Fin. Mgmt., Inc.*, 2015 WL 1097327, at *5 (S.D.N.Y. Mar. 12, 2015), it improperly incorporates losses that could not have been caused by the conduct for which Defendants are purportedly liable.  That is the same flaw that the Supreme Court identified in *Comcast*.

The Nye Report suggests that damages, in the form of price inflation, may be calculated simply by "analyzing the change in [Barclays' ADS] price caused by [the] corrective disclosure."  (Nye Report ¶ 78.)  This simplistic approach fails to account for a number of complexities raised by the facts alleged in this case.

*First*, as Dr. Nye recognizes, Plaintiffs allege multiple, distinct schemes. (*See* Nye Tr. at 235:22-236:10.)  For example, Plaintiffs allege that Barclays both (i) concealed the amount of aggressive high-frequency trading in LX, and (ii) inappropriately over-routed client orders into LX. (*See* SAC ¶¶ 85-88, 104-12.)  If Plaintiffs are able to prevail on claims related only to some of these allegations,[21] Dr. Nye's damages framework would inappropriately include losses for which Defendants are not liable. (*See* James Report ¶¶ 55-64.)[22]

*Second*, the misstatements alleged by Plaintiffs became public at different times and thus would have impacted the price of Barclays' ADS at different times (assuming they had any price impact at all).  Because, for example, Barclays did not implement LX's Liquidity Profiling feature until January 2012, representations regarding that feature could not have inflated the price of Barclays shares until that time. (*See* James Report ¶ 73.)  Thus, based on Plaintiffs' own allegations, the price paid by putative class members that purchased Barclays' ADS before January 2012 were less inflated by Defendants' alleged misstatements than the price paid by a putative class member that purchased after that time.  Because Dr. Nye's framework does not account for this incremental growth and time-varying impact of price inflation caused by the alleged misstatements, it cannot determine appropriate damages for putative class members who purchased at different times in the putative class period. (*See id*. ¶ 67-74.)

*Third*, Dr. Nye does not propose a method for evaluating the varying value of the alleged misstatements over the putative class period.  As Professor James explains, "the

---

[21]    Indeed, Judge Furman recently dismissed claims—virtually identical to the ones here—that Barclays misled LX customers about the "aggressiveness" of traders in LX .  *In re Barclays Liquidity Cross & High Frequency Trading Litig.*, 2015 WL 5052538, at *20-21.

[22]    *See, e.g.*, *Turnbow* v. *Life Partners, Inc.*, 2013 WL 3479884, at *17-18 (N.D. Tex. July 9, 2013) (denying class certification because plaintiffs failed to show that "damages are capable of measurement on a class-wide basis," and "[n]umerous factors that affect the amount of damages, if any, to any given class member [we]re not accounted for in [plaintiff's expert's] formula").

magnitude of the impact that any allegations would have had on Barclays' ADS price would depend on the prevailing environment in which the alleged misrepresentations were made, how that environment evolved during the putative class period, as well as changes in information relevant to the allegations." (James Report ¶ 75.) Factors that potentially could have impacted the value of the misstatements alleged in this case include disclosure of regulatory investigations into LX and the growing public scrutiny of equities trading business practices. (*See id.* ¶¶ 75-85.) Dr. Nye admits that it is "common in securities litigation" for price inflation to vary across the putative class period (Nye Tr. at 237:15-19), but he provides no method of adjusting for this variance (James Report ¶¶ 75-76). Although Dr. Nye claims that "the daily level of price inflation can be calculated throughout the [putative] Class Period," he never specifies how, if at all, such a calculation could be done. (Nye Report ¶ 79.) When pressed on this issue in his deposition, Dr. Nye still could not explain how it could be done (*see* Nye Tr. at 237:22-238:18), and instead referred obliquely to a purported technique he called a "ribbon" (*id.*). Dr. Nye claims that this technique has been used in "countless" cases, but he could not explain what a "ribbon" is or how it analyzes daily price inflation due to misstatements. (*Id.*) Such a conclusory assurance falls well short of the showing by a preponderance of the evidence required of Plaintiffs to demonstrate that common issues will predominate in this litigation.

*Finally*, Dr. Nye's method attributes all of the loss in Barclays' ADS price on the day that the NYAG's complaint was announced to a corrective disclosure of the information allegedly concealed by Defendants. But this ignores the fact that other factors contributed to the price drop that day that are not recoverable as damages under Plaintiffs' theory of liability in this case. Although Dr. Nye concedes that the mere announcement of a regulatory action "can be value relevant" (Nye Tr. at 148:23-149:7), he offers no method for evaluating the loss caused by

-23-

the announcement of the NYAG's action.  (*See* James Report ¶¶ 86-92.)  Similarly, Dr. Nye does not propose how to distinguish reputational losses from losses caused by the purported truth about Barclays' LX business practices revealed by the NYAG.  (*See* Nye Report *passim*.)  Thus, Plaintiffs' framework improperly "assume[s] that 100% of [the] price difference was attributable to [Barclays'] alleged misrepresentations."  *In re POM Wonderful LLC*, 2014 WL 1225184, at \*5 (C.D. Cal. Mar. 25, 2014); *accord In re ConAgra Foods, Inc.*, 2015 WL 1062756, at \*67 (C.D. Cal. Feb. 23, 2015) (plaintiffs "fail[ed] to provide an acceptable damages methodology that isolates and quantifies damages associated with plaintiffs' specific theory of liability").  Such an approach does not comport with Plaintiffs' theory of liability because the Second Circuit "requires the disaggregation of confounding factors . . . to establish that the alleged misrepresentations actually caused Plaintiffs' loss."  *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008).  Accordingly, Dr. Nye's framework cannot "purport[] to serve as evidence of damages in this class action."  *Comcast*, 13 S. Ct. at 1433.

Although the failure to propose a method for proving damages on a class-wide basis is not automatically fatal to class certification, in a securities class action, it would make no sense to certify a class of "many hundreds, if not thousands, of geographically dispersed members of the proposed Class" (Motion at 10) who would each have to prove damages on an individual basis.  *See Roach* v. *T.L. Cannon Corp.*, 778 F.3d 401, 408 (2d Cir. 2015) (failure to posit a method for proving class-wide damages "must [be] consider[ed] in deciding whether issues susceptible to generalized proof 'outweigh' individual issues").  And if this Court does conclude that a class should be certified, it should be for liability purposes only.[23]

---

[23]      *See Jacob* v. *Duane Reade, Inc.*, 293 F.R.D. 578, 592 (S.D.N.Y. 2013) (certifying a class as to liability, but not damages, where a single "formula" for calculating damages was "not capable of classwide proof," and holding that "the method by which . . . damages are calculated

*(footnote continued)*

III.   **IF THIS COURT CERTIFIES ANY CLASS, THE CLASS PERIOD SHOULD ALSO BE DEFINED TO BEGIN NO EARLIER THAN FEBRUARY 14, 2013.**

Even if this Court finds that class certification is warranted, the class should be defined so as to be consistent with the theory underlying Plaintiffs' allegations. *See, e.g.*, *Gortat* v. *Capala Bros., Inc.*, 2010 WL 1423018, at *7-8 (E.D.N.Y. Apr. 9, 2010) (narrowing proposed class definition to conform to legal theory capable of supporting claim), *aff'd*, 568 F. App'x 78 (2d Cir. 2014). "A district court is not bound by the class definition proposed in the complaint, and is empowered to carve out an appropriate class." *Charron* v. *Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221, 229 (S.D.N.Y. 2010) (quotations omitted).

Here, as set forth *supra* at 10-11, any alleged misstatements that were made prior to Barclays' June 27, 2012 LIBOR-related settlement could not have been material as a matter of law, because they could not have "call[ed] into question the integrity of the company as a whole" after the Bank's announced commitment to restoring its integrity. *See* April 24 Order, 2015 WL 1883201, at *10. Accordingly, any putative class period must be defined to begin only upon Barclays' first alleged misstatement *after* the June 27, 2012 LIBOR settlement. Here, the first alleged misstatement following Barclays' LIBOR settlement related to LX—and thus the first plausibly actionable misstatement—was made on February 14, 2013. (*See* SAC ¶¶ 142-43.) Any putative class period should thus be defined to begin no earlier than February 14, 2013.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for class certification should be denied or, in the alternative, defined to begin no earlier than February 14, 2013.

---

(*footnote continued*)

may not serve as an afterthought in the class certification analysis, as whenever damages calculations require significant degrees of individualized proof, defendants are entitled to respond to and address such variances—in fact, due process requires it"); *Houser* v. *Pritzker*, 28 F. Supp. 3d 222, 252-54 (S.D.N.Y. 2014).

Dated: September 11, 2015
      New York, New York

Respectfully submitted,


/s/ Jeffrey T. Scott
Jeffrey T. Scott (scottj@sullcrom.com)
David H. Braff (braffd@sullcrom.com)
Matthew A. Schwartz
(schwartzmatthew@sullcrom.com)
Andrew H. Reynard (reynarda@sullcrom.com)
John J. Hughes, III (hughesj@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588

Brent J. McIntosh (mcintoshb@sullcrom.com)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C.  20006-5215
Telephone:  (202) 956-7500
Facsimile:  (202) 293-6330

*Attorneys for Defendants*