UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

BARBARA STROUGO, Individually and on
Behalf of All Others Similarly Situated,

                    Plaintiffs,

             -against-

BARCLAYS PLC, BARCLAYS CAPITAL INC.,
ROBERT DIAMOND, ANTONY JENKINS,
CHRISTOPHER LUCAS, TUSHAR
MORZARIA, and WILLIAM WHITE,

                  Defendants.

------------------------------------------------------------- X

**OPINION AND ORDER**

**14-cv-5797(SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I. INTRODUCTION

Before the Court is plaintiffs' motion for class certification pursuant to Federal Rule of Civil Procedure 23. Plaintiffs bring claims for violations of section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder against two corporate defendants — Barclays PLC and Barclays Capital Inc. (collectively "Barclays") — and one individual defendant — William White.[1] On April 24, 2015, this Court issued an Opinion and Order on defendants' motion to dismiss pursuant to Federal Rule of Civil

---

[1]     In addition, plaintiffs bring claims under section 20(a) of the Exchange Act against individual defendants White, Robert Diamond, and Antony Jenkins.

Procedure 12(b)(6) (the "April 2015 Order").[2]  While I denied defendants' motion to dismiss the section 10(b) claims, I deemed two of the three categories of statements to be inactionable.[3]

The misstatements remaining in the case concern the operation of Barclays' "dark pool," known as Barclays' Liquidity Cross or LX, a private trading venue where investors can trade stocks with near anonymity.  For example, "White attributed [LX's] growth to Barclays' commitment to being transparent about how Barclays operates, how Barclays routes client orders, and the kinds of counterparties traders can expect to deal with when trading in the dark pool."[4] According to plaintiffs, however, Barclays both concealed the amount of aggressive high-frequency trading in LX, and inappropriately over-routed client orders into LX, making White's statement false.[5]  On June 25, 2014, the New York State Office of the Attorney General ("NYAG") brought a lawsuit against Barclays under New York's Martin Act, alleging that Barclays concealed information about

---

[2]      *See Strougo v. Barclays PLC*, 105 F. Supp. 3d 330 (S.D.N.Y. 2015). For purposes of this Opinion and Order, familiarity with the April 2015 Order — including the general background and facts alleged in the Second Amended Complaint ("Complaint") — is assumed.

[3]      *See id.* at 336.

[4]      *See* Complaint ¶ 61.

[5]      *See id.* ¶¶ 85-88, 104-112.

the operation of LX.[6]  On news of the lawsuit, Barclays PLC's American

Depositary Shares ("Barclays ADS") fell 7.38 percent on heavy volume.[7]

The putative class consists of all persons and entities who purchased

Barclays ADS between August 2, 2011 and June 25, 2014 and were allegedly

damaged thereby.  To be certified, a putative class must demonstrate that it

satisfies all four of the requirements of Rule 23(a) and one of the categories of

Rule 23(b) of the Federal Rules of Civil Procedure.  In this case, plaintiffs seek

certification based on Rule 23(b)(3).  For the following reasons, plaintiffs' motion

for class certification is GRANTED.

## II.    LEGAL STANDARD[8]

"Rule 23 does not set forth a mere pleading standard.  A party seeking

class certification must affirmatively demonstrate [its] compliance with the Rule —

that is, [it] must be prepared to prove that there are *in fact* sufficiently numerous

---

[6]      *See id.* ¶ 5.

[7]      *See id.* ¶ 6.

[8]      Rule 23(a) requires that the class be so numerous that joinder of all
members is impracticable, there are questions of law or fact common to the class,
the claims or defenses of the representative parties are typical of the claims or
defenses of the class, and the representative parties will fairly and adequately
protect the interests of the class.  There is no dispute that plaintiffs have satisfied
these requirements, and after careful review of the record I find that each has been
satisfied.  Thus, under Rule 23(a)(4), Lead Plaintiffs Mohit Sahni and Joseph
Waggoner are appointed as Class Representatives.

3

parties, common questions of law or fact, etc."[9]  Under Rule 23(b)(3), certification is appropriate where "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and class litigation "is superior to other available methods for the fair and efficient adjudication of the controversy."

> The matters pertinent to these findings include the class members' interests in individually controlling the prosecution or defense of separate actions; the extent and nature of any litigation concerning the controversy already begun by or against class members; the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and the likely difficulties in managing a class action.[10]

The predominance inquiry focuses on whether "a proposed class is 'sufficiently cohesive to warrant adjudication by representation.'"[11]  It is akin to, but ultimately "a more demanding criterion than," the "commonality inquiry under Rule 23(a)."[12]  Class-wide issues predominate "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy

---

[9]    *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (emphasis in original).

[10]    Fed. R. Civ. P. 23(b)(3)(A)-(D).

[11]    *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 133 S. Ct. 1184, 1196 (2013) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).

[12]    *In re Nassau County Strip Search Cases*, 461 F.3d 219, 225 (2d Cir. 2006) (citing *Amchem*, 521 U.S. at 623-24).

can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."[13]  The Second Circuit has emphasized that "Rule 23(b)(3) requires that common questions predominate, not that the action include only common questions."[14]

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action."[15]  To sustain a claim for securities fraud under section 10(b), "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."[16]

Defendants opposing class certification often challenge a plaintiff's

---

[13]     *Catholic Healthcare W. v. U.S. Foodservice Inc. (In re U.S. Foodservice Inc. Pricing Litig.)*, 729 F.3d 108, 118 (2d Cir. 2013) (internal citations omitted).

[14]     *Brown v. Kelly*, 609 F.3d 467, 484 (2d Cir. 2010).

[15]     *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011) ("*Halliburton I*").

[16]      *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

claim of reliance.[17]  By the same token, it is well settled that if proof of individual reliance were required, it would be impossible to meet the predominance requirement.[18]  The predominance requirement is typically met in securities fraud class actions by plaintiffs' invocation of one of two presumptions developed by the Supreme Court that obviate the need to prove reliance on an individual basis.[19] These are the "*Basic* presumption" of reliance in fraudulent misrepresentation cases, and the "*Affiliated Ute* presumption" of reliance in fraudulent omission cases.

Issues and facts surrounding damages have rarely been an obstacle to

---

[17]     Reliance is typically the only ground on which to challenge predominance because section 10(b) claims will almost always arise from a common nucleus of facts surrounding the fraudulent misrepresentation of material facts and the causal relationship between the correction of that misrepresentation and the price of the security.

[18]     *See Halliburton I*, 131 S. Ct. at 2185 ("Requiring proof of individualized reliance from each member of the proposed plaintiff class effectively would prevent such plaintiffs from proceeding with a class action, since individual issues would overwhelm the common ones.") (internal quotation marks and alterations omitted).

[19]     *See Basic Inc. v. Levinson*, 485 U.S. 224, 241 (1988) (establishing rebuttable presumption of reliance in fraudulent misrepresentation cases); *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 154 (1972) (establishing presumption of reliance in fraudulent omission cases).

establishing predominance in section 10(b) cases.[20]  In *Comcast Corp. v. Behrend*,[21] the Supreme Court held, in the context of an antitrust claim, that class certification is appropriate only when class-wide damages may be measured based on the theory of injury asserted by the plaintiffs.  The Second Circuit has rejected a broad reading of *Comcast*:

> *Comcast* [ ] did not hold that a class cannot be certified under Rule 23(b)(3) simply because damages cannot be measured on a classwide basis.  *Comcast's* holding was narrower.  *Comcast* held that a model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury; but the Court did not hold that proponents of class certification must rely upon a classwide damages model to demonstrate predominance. . . . .
>
> To be sure, *Comcast* reiterated that damages questions should be considered at the certification stage when weighing predominance issues, but this requirement is entirely consistent with our prior holding that "the fact that damages may have to be ascertained on an individual basis is . . . a factor that we must consider in deciding whether issues susceptible to generalized proof 'outweigh' individual issues." *McLaughlin* [*v. American Tobacco Co.*], 522 F.3d [215,] 231 [2d Cir. 2008].  The Supreme Court did not foreclose the possibility of class certification under Rule 23(b)(3) in cases involving individualized

---

[20]    *See, e.g.*, *In re Fogarazzo v. Lehman Bros., Inc.*, 263 F.R.D. 90, 109 (S.D.N.Y. 2009) ("'[T]he fact that damages must be calculated on an individual basis is no impediment to class certification.'") (quoting *Klay v. Humana*, 382 F.3d 1241, 1260-61 (11th Cir. 2004)) (citing *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 429 (4th Cir. 2003)) ("The possibility that individualized inquiry into Plaintiffs' damages claims will be required does not defeat the class action because common issues nevertheless predominate.")).

[21]    133 S. Ct. 1426 (2013).

damages calculations.[22]

Thus, "[p]redominance is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."[23]  And "the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification."[24]

## III.   APPLICABLE LAW[25]

---

[22]    *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407-08 (2d Cir. 2015) (internal citations omitted) (citing *In re Deepwater Horizon*, 739 F.3d 790, 817 (5th Cir. 2014) (construing the "principal holding of *Comcast* [as being] that a 'model purporting to serve as evidence of damages . . . must measure only those damages attributable to th[e] theory' of liability on which the class action is premised" (ellipsis and second alteration in original) (quoting *Comcast*, 133 S. Ct. at 1433)); *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 799 (7th Cir. 2013) (construing *Comcast* as holding only "that a damages suit cannot be certified to proceed as a class action unless the damages sought are the result of the class-wide *injury* that the suit alleges" (emphasis in original)); *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (interpreting *Comcast* to hold that class-action plaintiffs "must be able to show that their damages stemmed from the defendant's actions that created the legal liability"); *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d at 123 n.8 (stating that "[p]laintiffs' proposed measure for damages is thus directly linked with their underlying theory of classwide liability . . . and is therefore in accord with the Supreme Court's recent decision in *Comcast*")).

[23]    *Id.* at 405 (internal quotation marks omitted).

[24]    *Id.* (internal quotation marks omitted).

[25]    In this section, I incorporate without citation large portions of my opinion in *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 310

### A.    The Presumption of Reliance for Omissions

The Supreme Court has held that a presumption of reliance may apply in section 10(b) cases in which plaintiffs have alleged that defendants failed to disclose information.  In *Affiliated Ute Citizens of the State of Utah v. United States*, the Court held that where a plaintiff's fraud claims are based on omissions, reliance may be satisfied so long as the plaintiff shows that defendants had an obligation to disclose the information and the information withheld is material.[26] This presumption may be rebutted by evidence that even if the material facts had been disclosed, a plaintiff's decision to enter into the transaction would have been the same.[27]

### B.    The Presumption of Reliance for Misrepresentations

### 1.    The *Basic* Presumption

The Supreme Court has also held that a presumption of reliance may apply in section 10(b) cases in which plaintiffs have alleged that defendants made fraudulent misrepresentations.  In *Basic v. Levinson*, the Supreme Court recognized that plaintiffs are typically entitled to a rebuttable presumption based on the

---

F.R.D. 69 (S.D.N.Y. 2015).

[26]    *See* 406 U.S. at 154.

[27]    *See, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. 81, 93 (S.D.N.Y. 2009).

"fraud-on-the-market" theory.[28]  Under this theory, "'the market price of shares traded on well-developed markets reflect all publicly available information, and, hence, any material misrepresentations.'"[29]  To invoke the *Basic* presumption, a plaintiff must prove that: (1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed.[30]

### 2.    The *Basic* Presumption at Class Certification

The *Basic* presumption does not relieve plaintiffs of the burden of proving predominance under Rule 23(b)(3).[31]  Plaintiffs can establish predominance at the class certification stage by satisfying the prerequisites of the *Basic* presumption.[32]  The first three prerequisites — publicity, materiality, and market efficiency — are directed at "price impact" — "whether the alleged

---

[28]    *See* 485 U.S. at 241.

[29]    *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2413 (2014) ("*Halliburton II*") (quoting *Basic*, 485 U.S. at 246).

[30]    *See id.* (citing *Basic*, 485 U.S. at 248, n.27).

[31]    *See id.* at 2412.

[32]    *See id.*  However, in *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, the Supreme Court held that materiality does not need to be proven before a class can be certified, but is instead left to be addressed at the merits stage. *See* 133 S. Ct. at 1195-96.

misrepresentation affected the market price in the first place."[33]  "In the absence of price impact, *Basic*'s fraud-on-the-market theory and presumption of reliance collapse."[34]  Significantly, however, the Supreme Court made clear in *Halliburton II* that plaintiffs are not required to prove price impact directly to invoke the *Basic* presumption.  Rather, market efficiency, publicity, and materiality serve as a proxy for price impact.[35]  Furthermore, in *Halliburton I* the Supreme Court held that a securities fraud plaintiff need not establish loss causation — *i.e.*, that plaintiffs' damages were caused by the fraud and nothing else — in order to certify a class.  In so holding, the Supreme Court explained that loss causation was not an element of reliance.[36]

Halliburton II held that defendants may submit price impact evidence prior to class certification for the purpose of rebutting the *Basic* presumption.  This is because "an indirect proxy should not preclude direct evidence when such evidence is available."[37]  Thus, "any showing that severs the link between the alleged misrepresentation and the price received (or paid) by the plaintiff will be

---

[33]     *Halliburton II*, 134 S. Ct. at 2414 (internal quotation marks omitted).

[34]     *Id.* (quotation marks, alterations, and citations omitted).

[35]     *See id.* at 2414-15.

[36]     *See Halliburton I*, 131 S. Ct. at 2185-86.

[37]     *Halliburton II*, 134 S. Ct. at 2415.

sufficient to rebut the presumption of reliance because the basis for finding that the fraud had been transmitted through market price would be gone."[38]

### 3.    Market Efficiency

Under *Basic* and its progeny, a market is efficient when the prices of securities incorporate most public information such that they respond reasonably promptly to new material information.[39]  As clarified in *Halliburton II*, the *Basic* court did not adopt any particular theory of market efficiency.[40]  Instead, the *Basic*

---

[38]    *Id.* at 2415-16 (internal quotation marks and alterations omitted).

[39]    *See Halliburton II*, 134 S. Ct. at 2410 ("Debates about the degree to which stock prices accurately reflect public information" are "largely beside the point.").  The "debates" referred to in *Halliburton II* were "among economists about the degree to which the market price of a company's stock reflects public information about the company — and thus the degree to which an investor can earn an abnormal, above-market return by trading on such information." *Id.* (citing Brief for Financial Economists as Amici Curiae ("Amici Br."), at 4-10 (describing the debate)).  As explained by the Financial Economists, "while the proposition that market prices respond relatively promptly to material information about a stock is true if the ["semi-strong" version of the efficient markets hypothesis ("SSEMH")] is true, it does not depend on the SSEMH being true.  The SSEMH entails that the market price instantly (or at least very quickly) and fully incorporates all publicly available information about a stock.  It does not even tolerate modest lags or other anomalies." *See* Amici Br. at 5.

[40]    *See Halliburton II*, 134 S. Ct. at 2410.  Halliburton had argued that the Supreme Court should overrule *Basic* in part because "overwhelming empirical evidence now suggests that capital markets are not fundamentally efficient" because "public information is often not incorporated immediately (much less rationally) into market prices." *Id.* at 2409 (internal quotation marks omitted).  While Halliburton did not argue that capital markets are always inefficient, "in its view, *Basic*'s fundamental error was to ignore the fact that efficiency is not a binary, yes or no question." *Id.* (internal quotation marks omitted).

presumption is based "on the fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'"[41]  Thus, a finding of market efficiency does not "always require[] proof that the alleged misrepresentations had an immediate effect on the stock price."[42]  Likewise, "[t]hat the price of a stock may be inaccurate does not detract from the fact that false statements affect it, and cause loss, which is all that *Basic* requires."[43]  In short, the fact that *Basic* does not require that stocks reflect all public information within a specific time-frame — except that most information must be assimilated reasonably promptly — affects the required proof of the relationship between stock price movement and unexpected news.

### 4. Proving Market Efficiency

In an efficient market there are "[l]arge numbers of rational and intelligent investors," and "[i]mportant current information" that is "almost freely

---

[41]   *Id.* at 2410 (quoting *Basic*, 485 U.S. at 247, n.24).

[42]   *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1256 (11th Cir. 2014).

[43]   *Halliburton II*, 134 S. Ct. at 2410 (internal quotation marks and alterations omitted).

available to all participants . . . ."[44]  Because it is difficult to test for these

requirements directly, courts use a variety of factors to evaluate whether a market

for securities is efficient.

　　　　In *Cammer v. Bloom*, the court enumerated five factors that are

frequently used to determine whether a market is efficient.[45]  These factors are (1)

the average weekly trading volume; (2) the number of analysts who follow the

stock; (3) the existence of market makers and arbitrageurs; (4) the ability of the

company to file Securities Exchange Commission ("SEC") Form S-3;[46] and (5)

evidence of share price response to unexpected news.  In *Krogman v. Sterritt*, the

court added three factors.  *First*, the court noted that investors tend to be more

interested in companies with higher market capitalizations, thus leading to more

---

[44]　　Paolo Cioppa, *The Efficient Capital Market Hypothesis Revisited: Implications of the Economic Model for the United States Regulator*, 5 Global Jurist Advances 1, 5-6 (2005).  The first component does not require that all investors be rational and intelligent, merely that there be enough rational, intelligent investors to outweigh any irrational actions.  *See id.* at 5.

[45]　　*See* 711 F. Supp. 1264, 1283-87 (D.N.J. 1989).

[46]　　*See generally* Cioppa, 5 Global Jurist Advances at 28 ("The SEC's three tiered system recognized that markets for different securities in the United States are efficient to different degrees.  Essentially, moving from the S1 filers to the S3 filers, the more widely traded and followed the issuing company and the longer it has traded, the more efficient the market for it and the less information it must disclose in its registration statements.").

efficiency.[47]  *Second*, the court determined that a small bid-ask spread indicated that trading in the stock was inexpensive, suggesting efficiency.[48]  *Third*, the court looked to the percentage of shares that were available to the public.  Because insiders are more likely to have private information, if substantial portions of shares are held by insiders, the price is less likely to reflect only the total of all public information.[49]

### a.    Average Weekly Trading Volume

High volume suggests efficiency "because it implies significant investor interest in the company.  Such interest, in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information."[50]  *Cammer* supposes that turnover of two percent or more of outstanding shares would justify a strong presumption of efficiency, while turnover of one percent would justify a substantial presumption.[51]

### b.    Number of Securities Analysts

---

[47]     *See* 202 F.R.D. 467, 478 (N.D. Tex. 2001).

[48]     *See id.*

[49]     *See id.*

[50]     *Cammer*, 711 F. Supp. at 1286.

[51]     *See id.* (citing Bromberg & Lowenfels, 4 Securities Fraud and Commodities Fraud § 8.6 (Aug. 1988)).

*Cammer* recognizes that a stock covered by a "significant number of analysts" is more likely to be efficient because such coverage implies that investment professionals are following the company and making buy/sell recommendations to investors.[52]

### c.   Existence of Market Makers and Arbitrageurs

*Cammer* explained that "[t]he existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level."[53]  *Krogman* further explained that the mere number of market makers, without more, is essentially meaningless; "what is important is 'the volume of shares that they committed to trade, the volume of shares they actually traded, and the prices at which they did so.'"[54]  One study has found that the number of market makers is not correlated with the efficiency of the market.[55]  Nevertheless, this factor can provide reasonable

---

[52]   *Id.*

[53]   *Id.* at 1286-87.

[54]   *Krogman*, 202 F.R.D. at 476 (quoting *O'Neil v. Appel*, 165 F.R.D. 479, 501-02 (W.D. Mich. 1996)).

[55]   *See* Dr. Allen Michel et al., 24 Am. Bankr. Inst. J. 58, 60 (2005) (citing Brad Barber et al., *The Fraud–on–the–Market Theory and the Indicators of Common Stocks' Efficiency*, 19 J. Corp. L. 285, 286 (1994)).

guidance in determining whether the *Basic* presumption applies.

### d.     Eligibility to File Form S-3

The SEC permits a company to file Form S-3 when, in the SEC's judgment, the market for shares in the company is reasonably efficient at processing information.[56]  *Cammer* emphasized the SEC's statement that the Form S-3 is "'*predicated on the Commission's belief that the market operates efficiently for these companies* [that file Form S-3s]*, i.e., that the disclosure in Exchange Act reports and other communications by the registrant, such as press releases, has already been disseminated and accounted for by the market place.*'"[57]  Deferring to the SEC's expertise in this area, I agree that this factor provides a strong indication of efficiency.

### e.     *Cammer* 5

*Cammer* 5 — empirical evidence of price changes in response to

---

[56]     *See Cammer*, 711 F. Supp. at 1284 (observing that the SEC permits seasoned issuers to incorporate by reference because "'[t]o the extent that the market accordingly acts efficiently, and this information is adequately reflected in the price of a registrant's outstanding securities, there seems little need to reiterate this information in a prospectus in the context of a distribution'") (quoting SEC Securities Act Release No. 6235, 45 Fed. Reg. 63,693 (1980)).

[57]     *Id.* (quoting SEC Securities Act Release No. 6331, 46 Fed. Reg. 41,902 (1981) (emphasis in original).

17

unexpected information — is often highly probative of efficiency.[58]  However,

there is no consensus as to how quickly share prices must change to justify a

finding of efficiency.

Cammer 5 is often proven with an event study.  An event study is "a

statistical regression analysis that examines the effect of an event . . . on a

dependent variable, such as a company's stock price."[59]  An event study has four

parts: defining the event (e.g.,  an earnings announcement), establishing the

announcement window (i.e., the period over which stock price changes are

calculated), measuring the expected return of the stock, and computing the

abnormal return (which is the actual return minus the expected return).

Performing the third step, "requires the expert to isolate the effect of

the event from other market, industry, or company-specific factors simultaneously

affecting the company's stock price."[60]  "A large abnormal stock price movement

occurring at the same time the market receives news about an event suggests that

---

[58]    See id. at 1287 (stating that "it would be helpful to a plaintiff seeking
to allege an efficient market to allege empirical facts showing a cause and effect
relationship between unexpected corporate events or financial releases and an
immediate response in the stock price" and noting that this factor is "the essence of
an efficient market and the foundation for the fraud on the market theory").

[59]    Michael J. Kaufman & John M. Wunderlich, Regressing: The
Troubling Dispositive Role of Event Studies in Securities Fraud Litigation, 15
Stan. J. L. Bus. & Fin. 183, 190 (2009) (internal quotation marks omitted).

[60]    Id. at 192.

the event caused the abnormal price movement."[61]

> In sum:

> [A]n event study is similar to a medical experiment in which there is a control group and a treatment group. The control group provides the benchmark against which the treatment group is compared to determine if the event being studied had any effect. In a securities setting, the control group is established by modeling the normal relationship of a stock's price movements to movements of a market and/or industry index. The difference between the stock price movement we actually observe and the movement we expected to observe (i.e. the difference between the treatment and the control group) that occurs upon the release of a particular piece of information is called the excess price movement of the stock at the time of the event. This excess price movement is tested for statistical significance to see whether the result is unusual or unlikely to be explained by the normal random variations of the stock price.[62]

In most scientific work, the level needed to obtain a statistically significant result is set at a five percent level of confidence, which means that there is no more than a five percent chance that the observed relationship is purely random.

---

[61]   *Id.* at 193 (internal quotation marks omitted).

[62]   *Id.* at 193-94 (internal quotation marks omitted).  *Accord In re Federal Home Mortg. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 178 (S.D.N.Y. 2012) (explaining, in a case that pre-dates *Halliburton II*, that in an event study "[t]he actual price of the security during the event is compared against the expected price, which is calculated based on the security's historical relationship to a market index.  This historical relationship is measured over a 'control period.'  The difference between the stock's actual price and the expected price is defined as an 'abnormal return.'  A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. Econ. Lit. 13, 14-16 (1997).  In an efficient market, stock prices should show statistically significant abnormal returns on days in which unexpected, material information is released into the market.").

###### f.    Other Factors

The markets for companies with higher market capitalizations and shares with a smaller bid-ask spread are more likely to be efficient.[63]  The percentage of shares available to the public generally bears a direct relationship to efficiency.[64]  A put-call parity relationship between the share price and the prices of the put and call options written on the share indicates that the market for the stock and the options written on the stock are efficient.[65]  In an efficient market, stock returns follow what is known as a "random walk," meaning that investors cannot use past stock price movements to predict the next day's stock price movement.[66]

In addition, some courts have held that if "'a security is listed on the NYSE . . . or a similar national market, the market for that security is [often]

---

[63]    *See Krogman*, 202 F.R.D. at 478.

[64]    *See id.*

[65]    Arbitrageurs correct put-call disparities by engaging in short-sales. When short-selling bans restrict an arbitrageur's ability to exploit put-call disparities, these constraints may cause the stock to be overpriced.  Thus, short-selling constraints may result in inefficiency.

[66]    *See generally* Eugene F. Fama and Kenneth R. French, *Permanent and Temporary Components of Stock Prices*, 96 Journal of Political Economy 2 (1988).

presumed to be efficient.'"[67]  While other courts have been reluctant to conclude that a stock was traded efficiently solely because it was traded on the NYSE or NASDAQ, most courts in this Circuit agree that such listing is a good indicator of efficiency.[68]  Courts in other circuits have reached the same conclusion.[69]

---

[67]     *Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 119 (S.D.N.Y. 2008) (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, No. 05 Civ. 1898, 2006 WL 2161887, at *5 (S.D.N.Y. Aug. 1, 2006)).  *Accord Stevelman v. Alias Research*, No. 91 Civ. 682, 2000 WL 888385, at *4 (D. Conn. June 22, 2000) ("For stocks . . . that trade on a listed exchange such as NASDAQ, [the] reliance element of a 10b-5 cause of action is presumed.").

[68]     *See Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 183 (S.D.N.Y. 2008) ("[N]o argument can be made that the [NYSE] is not an efficient market."); *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 296 n.133 (S.D.N.Y. 2008) ("[T]he federal courts are unanimous in their agreement that a listing on the NASDAQ or a similar national market is a good indicator of efficiency"); *RMED Int'l v. Sloan's Supermarkets*, 185 F. Supp. 2d 389, 404-05 (S.D.N.Y. 2002) ("Indeed, research has failed to reveal any case where a stock traded on the AMEX was found not to have been traded in an open and efficient market. . . .  Rather, to the contrary, numerous courts have held that stocks trading on the AMEX are almost always entitled to the presumption.") (citations omitted).

[69]     *See In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 634 (3d Cir. 2011) ("[T]he listing of a security on a major exchange such as the NYSE or the NASDAQ weighs in favor of a finding of market efficiency."); *In re Merck & Co., Inc. Sec. Litig.*, MDL No. 1658, 2013 WL 396117, at *11 (D.N.J. Jan. 30, 2013) (finding efficiency where stock traded on the NYSE, without employing a *Cammer* analysis, because the NYSE is "consistently recognized by courts — including the Third Circuit and other United States Court of Appeals — as . . . well suited for application of the fraud on the market theory"); *In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 250 (N.D. Cal. 2013) ("[D]efendant [has not] identified any authority, binding or otherwise, that has held that common shares traded on the NASDAQ are not traded in an efficient market."); *Lumen v. Anderson*, 280 F.R.D. 451, 459 (W.D. Mo. 2012) (noting that *Basic* itself recognized the NYSE was an efficient market"); *Cheney v. Cyberguard Corp.*, 213

In unusual circumstances, courts in this Circuit have found that securities traded on major exchanges are not traded on an efficient market.[70]  In *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, the stock at issue was a global registered share, which unlike common stock or ADS, trade globally on various markets, and only a small percentage of those shares traded on the NYSE.[71]  And in *In re Federal Home Mortgage Corporation (Freddie Mac) Securities Litigation*, the securities were "a limited series of preferred shares, which are traded in patterns significantly different from the trading patterns typical of common shares."[72]

---

F.R.D. 484, 498 (S.D. Fla. 2003) ("NASDAQ . . . is more likely than not to be considered an efficiently traded market"); *Levine v. SkyMall, Inc.*, No. 99 Civ. 166, 2002 WL 31056919, at *5 (D. Ariz. May 24, 2002) ("Although not dispositive, the fact that SkyMall stock is traded on the NASDAQ stock market's National Market System also contributes to finding that the market is efficient."); *Appel*, 165 F.R.D. at 504 (stating that "[t]he market system upon which a particular stock trades provides some insight as to the likelihood that the market for that stock is efficient").

[70]     *See generally IBEW Local 90 Pension Fund v. Deutsche Bank AG*, No. 11 Civ. 4209, 2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013) (holding that market efficiency had not been established in a case in which the security at issue traded on the NYSE); *Freddie Mac*, 281 F.R.D. 174 (same).

[71]     *See* 2013 WL 5815472, at *3-4 (noting that only two percent of the global registered shares traded on the NYSE).

[72]     *In re Computer Sci. Corp. Sec. Litig.*, 288 F.R.D. 112, 120 (E.D. Va. 2012).  In addition, the *Freddie Mac* court explicitly required proof of efficiency at the semi-strong level.  *See* 281 F.R.D. at 177 ("The fraud on the market theory is based on the semi-strong form of market efficiency.").

## IV.   DISCUSSION

In order to meet the Rule 23(b)(3) requirement that common issues predominate, plaintiffs must establish reliance on a class-wide basis.[73]  Plaintiffs argue that they are entitled to both the *Affiliated Ute* and *Basic* presumptions of reliance.  I consider the applicability of each presumption in turn.  I then address defendants' arguments regarding damages and the scope of the Class.  I conclude with the appointment of Class Counsel.

### A.   The *Affiliated Ute* Presumption of Reliance Applies

Plaintiffs are entitled to the *Affiliated Ute* presumption.  Defendants contend that the *Affiliated Ute* presumption of reliance only applies to cases "primarily involving omissions."[74]  They argue that "[b]ecause Plaintiffs allege that Barclays made a number of affirmative misstatements concerning LX and the Bank's commitment to restoring its integrity, the *Affiliated Ute* presumption does not apply."[75]

However, a case could be made that it is the material omissions, not

---

[73]     *See Halliburton II*, 134 S. Ct. at 2416.

[74]     Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification ("Def. Opp."), at 7 n.8 (citing *Affiliated Ute*, 406 U.S. at 153-54 ("Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery.")).

[75]     *Id.*

the affirmative statements, that are the heart of this case.[76]  In the April 2015 Order

I explained that the Complaint's materiality allegations were sufficient because

"the specific misstatements about LX — which include touting its safety while

secretly encouraging predatory behavior — call into question the integrity of the

company as a whole."[77]  As discussed in the April 2015 Order, the revenue of LX

relative to Barclays' overall business is fractional.[78]  While that fact makes it

debatable whether investors would have considered affirmative statements about

LX material, it appears far more likely that investors would have found the omitted

conduct material.  Thus, the existence of "affirmative misrepresentations does not

at this stage in the litigation preclude [plaintiffs] from relying on the *Affiliated Ute*

presumption."[79]

---

[76]     Under Rule 10b-5 it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . ."  17 C.F.R. § 240.10b-5.  Thus, omissions cases include statements.

[77]     *Strougo*, 105 F. Supp. 3d at 349.  The concealed conduct includes "Barclays giving perks and other systemic advantages to high-frequency traders, and Barclays' failure to apply the protections of Liquidity Profiling to a significant portion of the trading in its dark pool."  Reply Memorandum of Law in Further Support of Plaintiffs' Motion for Class Certification ("Reply Mem."), at 3 n.3.

[78]     *See Strougo*, 105 F. Supp. 3d at 349 n.119.

[79]     *Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 270 (S.D.N.Y. 2014).  *Accord City of Livonia Emps' Ret. Sys. v. Wyeth*, 284 F.R.D. 173, 182 (S.D.N.Y. 2012) (holding that both the *Affiliated Ute* and *Basic*

Defendants argue that the *Affiliated Ute* presumption does not apply for the additional reason that defendants did not have a duty to disclose that they "were engaged in illegal conduct."[80]  While it is true that there is no general duty to disclose illegal conduct, "a duty to disclose uncharged criminal conduct does arise if it is necessary to ensure that a corporation's statements are not misleading."[81] Accordingly, plaintiffs are entitled to the *Affiliated Ute* presumption to establish reliance for purposes of class certification.

**B.  Plaintiffs Are Entitled to the *Basic* Presumption of Reliance**

**1.  The Market for Barclays ADS Was Efficient**

Of the four requisites to invoking the *Basic* presumption — publicity, materiality, market efficiency, and market timing — only market efficiency is at issue.  Defendants concede that plaintiffs have established four of the five *Cammer* factors and all three *Krogman* factors.  According to defendants, however,

---

presumptions applied in case "primarily about omissions").

[80]  Tr. at 14:13-20 [Jeffrey T. Scott, defendants' attorney] ("With respect to this duty of disclosure, there is no such thing.  We addressed this in *Carpenters*. In that case, they argued we had a duty to disclose that we were engaged in LIBOR manipulation and tell the world we were engaged in illegal conduct.  Second Circuit precedent says a bank doesn't — or a company doesn't have an obligation to disclose it's engaged in wrongful conduct. So that is not a claim that is in the case.").

[81]  *In re Sanofi Sec. Litig.*, No. 14 Civ. 9624, 2016 WL 93866, at *10 (S.D.N.Y. Jan. 6, 2016) (citing cases).

plaintiffs failed to demonstrate *Cammer* 5, and without *Cammer* 5, plaintiffs

cannot meet their burden of proving market efficiency by a preponderance of the

evidence.[82]  Defendants recognize that I rejected the same argument — that

establishing *Cammer* 5 was necessary to demonstrate efficiency — with respect to

the same stock in *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*.[83]

My view has not changed,[84] and in the interim additional courts have reached the

---

[82]      *See, e.g.*, Def. Opp. at 17-20; 11/5/15 Hearing Transcript ("Tr.") at
23:8-17 [Jeffrey T. Scott, defendants' attorney] ("[Defendants'] arguments on
efficiency are based on the fact that [plaintiffs] haven't shown cause and effect.  If
you don't show cause and effect, it is really hard to show that for that particular
stock, new material information was impounded into the stock price. And [the]
report [of plaintiffs' expert, Dr. Zachary Nye, Ph.D.,] is flawed from top to bottom.
It is not consistent with the standards used in the field of economics.  It wouldn't
be accepted in a peer-reviewed journal.  Frankly, that evidence shouldn't even
come in with respect to efficiency.  That is why we argue there is no evidence of
cause and effect here.").  Although defendants argue that Dr. Nye's report should
not come in as evidence, defendants have not made a motion to exclude his report
pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms.,
Inc.*, 509 U.S. 579 (1993).

[83]      *See* Def. Opp. at 18 ("Although this Court found in *Carpenters* that, in
the ordinary case of a high volume stock followed by a large number of analysts
and traded on a national exchange, *Cammer* factor five is not dispositive, Barclays
respectfully submits that proof of a cause and effect relationship between
unexpected, material disclosures and changes in a defendant's stock price is
necessary to prove market efficiency, and that, for the reasons set forth below,
Plaintiffs have failed to meet that burden.") (internal quotation marks and citations
omitted).  While *Carpenters* also concerned Barclays ADS, the class period in that
case was from July 10, 2007 to June 27, 2012, as compared with the minimally
overlapping period of August 2, 2011 through June 25, 2014 in the present case.

[84]      *See Carpenters*, 310 F.R.D. at 83-86.  Following the issuance of the
*Carpenters* decision, Barclays petitioned the Second Circuit for review pursuant to

same conclusion.[85]

As a threshold matter, the Second Circuit has never adopted a definitive test for market efficiency and explicitly declined to do so in *Teamsters Local 445 Fright Division Pension Fund v. Bombardier*.[86] While the Second Circuit endorsed the use of the *Cammer* factors in *Bombardier*, it has not required their use or held that any one of them is dispositive. A substantially similar approach has been taken by the Courts of Appeals for the First, Third, Fourth,

--------

Rule 23(f). While the petition was pending, the parties reached a settlement, and jointly requested a stay of the petition, which was granted. A fairness hearing relating to the settlement is scheduled for March 14, 2016. Accordingly, the *Carpenters* opinion has not been subjected to appellate review.

[85] *See Forsta AP-Fonden v. St. Jude Med., Inc.*, --- F.R.D. ----, No. Civ. 12-3070, 2015 WL 9308224, at *7 (D. Minn. Dec. 22, 2015) ("There is no doubt that empirical evidence of a cause-and-effect relationship is helpful for a finding of market efficiency, but Defendants' arguments go too far. '[H]elpful' does not mean "determinative." A plaintiff's shortfall on the fifth *Cammer* factor alone does not outweigh, as here, showings on many other relevant factors.") (collecting cases); *In re NII Holdings, Inc. Sec. Litig.*, --- F.R.D. ----, No. 14 Civ. 227, 2015 WL 7283110, at *9 (E.D. Va. Nov. 17, 2015) (holding that because defendants had neither rebutted plaintiff's expert's findings nor offered evidence that the market was not efficient, that "even if the fifth *Cammer* factor were considered weak, the evidence offered in support of the other *Cammer* factors as well as the non-*Cammer* factors is more than sufficient to demonstrate by a preponderance of the evidence that the stocks and bonds at issue traded in an efficient market.").

[86] *See* 546 F.3d 196, 205 n.11 (2d Cir. 2008) ("This Court has not adopted a test for the market efficiency of stocks or bonds, and we do not do so here.").

Fifth, and Eleventh Circuits.[87]

Likewise, there would be no need for a five factor test — or

consideration of the other factors described earlier in part III.B. — if one factor

were dispositive in every context.  Not surprisingly, no court has adopted a per se

rule that any one *Cammer* factor is dispositive.[88]  The majority of courts have used

the *Cammer* factors as "an analytical tool rather than as a checklist."[89]  Thus,

numerous courts have found market efficiency in the absence of an event study or

---

[87]    *See In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 18 (1st Cir. 2005)
("While we agree . . . that the [*Cammer*] factors considered by the district court
were relevant to the issue of market efficiency, these factors are not exhaustive.");
*In re DVI*, 639 F.3d at 634 n.16 ("We have noted the *Cammer* factors may be
instructive depending on the circumstances."); *Gariety v. Grant Thornton, LLP*,
368 F.3d 356, 368 (4th Cir. 2004) (citing *Cammer* for the proposition that, "to
determine whether a security trades on an efficient market, a court should consider
factors such as, among others, whether the security is actively traded, the volume
of trades, and the extent to which it is followed by market professionals"); *Unger v.
Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005) ("[T]his list [of eight factors,
including the five *Cammer* factors,] does not represent an exhaustive list, and in
some cases one of the above factors may be unnecessary."); *Regions Fin. Corp.*,
762 F.3d at 1257 (same).

[88]    Not even the *Cammer* court considered the fifth factor necessary,
stating only that "it *would be helpful* to a plaintiff seeking to allege an efficient
market . . . ." *Cammer*, 711 F. Supp. at 1287 (emphasis added).

[89]    *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 159 (S.D.N.Y. 2012)
(citing *Unger*, 401 F.3d at 325).  *Accord Bombardier*, 546 F.3d at 210 ("We
conclude [ ] that the district court properly used the *Cammer* factors as an
'analytical tool[.]'") (quoting *Unger*, 401 F.3d at 325).

where the event study was not definitive.[90]

Furthermore, requiring a plaintiff to submit proof of market reactions — and to do so with an event study — ignores Supreme Court precedent as well as practical considerations.  Event studies test for a degree of efficiency that may not be required.  In *Halliburton II*, the Supreme Court reaffirmed that the fraud on the market presumption is based "on the fairly modest premise" that "market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices."[91]  "That the . . . price [of a stock] may be inaccurate does not detract from the fact that false statements

---

[90]      *See Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 448 (S.D.N.Y. 2013) (holding that although plaintiff's expert "was unable to complete a formal event study" due to lack of data, the expert had demonstrated efficiency by "select[ing] five days on which news was released that she thought might be material, and qualitatively analyz[ing] the change in the price of Winstar bonds relative to the price change of the Lehman U.S. Bond Composite Index (a market-wide bond index composed of investment grade government, agency, corporate and mortgage-backed bonds)" and finding that on two of those days the price changed in response to news); *Aranaz v. Catalyst Pharm. Partners Inc.*, 302 F.R.D. 657, 669 (S.D. Fla. 2014) (finding market efficient for common stock even though expert had not performed an event study and implicitly finding that empirical evidence of the stock price change on the corrective disclosure date satisfied *Cammer* 5); *In re Computer Sci. Corp. Sec. Litig.*, 288 F.R.D. at 120 (rejecting the argument that plaintiffs had failed to establish market efficiency because they had not submitted an event study); *Smilovits v. First Solar, Inc.*, 295 F.R.D. 423, 437 (D. Ariz. 2013) (holding that where *Cammer* 1, 2, and 4 weighed in plaintiffs' favor, *Cammer* 3 was partially unsatisfied, and *Cammer* 5 did not favor either the plaintiffs or the defendants, plaintiffs' evidence was sufficient to establish market efficiency by a preponderance of the evidence).

[91]      *Halliburton II*, 134 S. Ct. at 2410.

affect it, and cause loss," which is "all that *Basic* requires."[92]   Yet, event studies are designed to test the hypothesis "that publicly available information is impounded immediately into stock prices such that an investor cannot earn abnormal profits by trading on the information after its release."[93]   The failure of an event study to show immediate impoundment does not necessarily indicate whether the market is efficient for purposes of the *Basic* presumption.

In academic research, event studies are almost exclusively conducted across a large swath of firms.[94]   The notion that event studies are the paramount tool for testing market efficiency comes from multi-firm event studies, and courts have generally not distinguished between the power of multi-firm and single firm event studies.   However, when the event study is used in a litigation to examine a single firm, the chances of finding statistically significant results decrease dramatically.[95]   "[T]he event study technique improves as the number of firms in

---

[92]      *Id.*

[93]      Sanjai Bhagat & Roberta Romano, *Event Studies and the Law: Part I: Technique and Corporate Litigation*, 4 Am. L. & Econ. Rev. 141, 142 (2002).

[94]      *See* Alon Brav and J.B. Heaton, *Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias* at 3 ("Importing a methodology that economists developed for use with multiple firms into a single firm context creates three substantial difficulties: low statistical power, confounding effects, and bias.").

[95]      *See* Bhagat & Romano, 4 Am. L. & Econ. Rev. at 149 ("An important question is can an event study be conducted with just one firm, that is, is a sample

the sample increase, as the number of days in the announcement window decrease, and as the alternative of a larger abnormal return is considered against the null hypothesis of zero abnormal return."[96]   The following example from the literature highlights the problems inherent in placing too much emphasis on event studies to measure market efficiency:

> [i]n a sample size of twenty-five companies, the probabilities of detecting an abnormal return (or an effect on the stock price) of 0.5%, 1% and 2% is 24%, 71% and 100% respectively.  But if the sample size is increased to 100 companies, the probabilities of detecting an abnormal return of 0.5%, 1%, and 2% is 71%, 94%, and 100% respectively.  Thus, there is significant difference in detecting an abnormal return, or effect on the stock price,

------

size of one acceptable? This question is especially relevant in court cases or regulatory injunctions involving only one firm. Conceptually, a sample of one is a rather small sample but this by itself does not invalidate the event study methodology.  However, the statistical power with a sample of one is likely to be quite low.  First, the variability of (abnormal) returns of a portfolio with just one stock in it is significantly higher than a portfolio with even a few, say five, stocks in it. Any standard finance or investment textbook will have a graph depicting the sharp drop in variance of portfolio returns as the number of stocks in the portfolio increases from one, to five, to ten; after about fifty stocks in the portfolio the decrease in variance is quite small. Second, it is plausible that the announcement period return of an announcing firm will be affected by other information unrelated to the event under study. If a sample of one is considered, it is quite difficult to determine the separate effects on firm value of the announcement and of the unrelated information item(s). If the sample has several firms, then the effect on firm value of such unrelated information is likely to cancel out.  As the sample size increases the effect on firm value of such unrelated information (goes to zero) becomes less and less significant.").

[96]      *Id.* at 148.

depending on the size of the event study.[97]

A further problem is that in any particular case it may not be possible to conduct an event study that looks at the relationship between the stock price and unexpected news.  For example, there may only be a few — or perhaps no — unexpected events in a given class period that can be tested.[98]  This could be because of the short length of the class period, a long period of uninteresting news, or because the company has withheld the unexpected information.[99]  As just discussed, the corollary of this is that event studies become increasingly unreliable when the period they cover increases.[100]

For all these reasons, a plaintiff attempting to demonstrate market efficiency through an event study will often face an onerous task, whether or not the market is efficient.  However, indirect evidence of market efficiency — including that a stock trades in high volumes on a large national market and is

---

[97]    Kaufman & Wunderlich, 15 Stan. J. L. Bus. & Fin. at 232-33.

[98]    *See Regions Fin. Corp.*, 762 F.3d at 1257 ("In any given case there may be no unexpected disclosures during the period at all, because the company is withholding that information.").

[99]    It is true that different event study methodologies may be used in the absence of unexpected news.  In *Freddie Mac* the methodology was simply to look at news days versus non-news days and to determine whether there were substantially more statistically significant returns on news days than non-news days.  *See* 281 F.R.D. at 179-80.

[100]    *See* Bhagat & Romano, 4 Am. L. & Econ. Rev. at 148.

followed by a large number of analysts — will typically be sufficient to satisfy the

*Basic* presumption on class certification.[101]  In such cases there is no need to

demonstrate efficiency through a direct test, such as an event study.  Of course, if

---

[101]      *See, e.g.*, *Regions Fin. Corp.*, 762 F.3d at 1255 ("[T]he market for a stock is generally efficient when millions of shares change hands daily and [when there is] a critical mass of investors and/or analysts who study the available information and influence the stock price through trades and recommendations.") (internal quotation marks omitted); *Fogarazzo v. Lehman Bros., Inc.*, 232 F.R.D. 176, 185 n.75 (S.D.N.Y. 2005) ("Defendants do not dispute that RSL was traded on an efficient market.  Moreover, RSL shares were traded on the NASDAQ National Market . . . were traded at high volumes during the class period . . . [and were] extensively followed by analysts and received extensive media attention.") (internal quotation marks omitted, alterations in original); *In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65, 107 (S.D.N.Y. 2004) (holding that "the record in this case contains several strong indications that the market in which the focus stocks traded was efficient.  Three facts stand out as particularly probative: first, all the focus stocks were traded on the NASDAQ National Market; second, the focus stocks were traded actively at high volumes throughout the class period; and third, the focus stocks were the subjects of numerous analyst reports and extensive media coverage. Under any conceivable test for market efficiency, these three facts are sufficient to meet plaintiffs' Rule 23 burden.").  *See also Smilovits*, 295 F.R.D. at 431 ("In keeping with *Basic* and the other cases cited in the first paragraph of this section, the Court concludes that the trading of First Solar stock on NASDAQ — a major, well-developed stock exchange — weighs in favor of finding market efficiency.  Defendants have not identified any authority, binding or otherwise, that has held that common shares traded on the NASDAQ are not traded in an efficient market.  Moreover, Defendants' expert . . . agrees that '[m]ost of the time, . . . stocks traded on large national exchanges are likely to be efficient.'") (internal quotation marks and citations omitted); *In re Computer Sci. Corp. Sec. Litig.*, 288 F.R.D. at 120 ("It is not surprising that no other federal courts have concluded that common shares traded on the NYSE are not traded in an efficient market."); *In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 278-79 (D. Mass. 2006) (stating "that listing on such an exchange undisputably improves the market structure for trading in a particular stock" and "that one would be hard-pressed to deny the relevance of this fact in an efficiency analysis").

there is reason to doubt the efficiency of the market, as when the additional *Cammer* factors do not weigh heavily in favor of market efficiency (or when defendants' evidence weighs against market efficiency), a plaintiff may have to present direct evidence to establish market efficiency.

Having considered the parties' arguments and evidence,[102] including that Barclays ADS trades on the NYSE at high volumes[103] with heavy analyst coverage,[104] I conclude that plaintiffs have established market efficiency indirectly and therefore do not consider whether they have also satisfied *Cammer* 5 by proof of an event study.

## 2.    Defendants Have Not Rebutted the *Basic* Presumption

---

[102]    *See* Memorandum of Law in Support of Plaintiffs' Motion for Class Certification ("Pl. Mem."), at 13-22; 7/24/15 Expert Report of Zachary Nye, Ph.D. ("Nye Report") ¶¶ 12-73; Def. Opp. at 17-20; 9/11/15 Declaration of Christopher M. James Ph.D., defendants' expert, at 8-27.

[103]    *See* Nye Report ¶ 31 (explaining that the average weekly share trading volume as a percentage of shares outstanding, excluding weeks not entirely contained within the Class Period, was 17.7% for Barclays ADS, and therefore the average weekly reported trading volume for Barclays stock exceeds the 2% strong presumption of market efficiency described in *Cammer*).

[104]    *See id.* ¶¶ 37-40 (explaining that over seven hundred analyst reports for Barclays were issued during the Class Period; information pertinent to Barclays was also disseminated to investors via media coverage, investor conferences, trade magazines, public presentations by Barclays, and SEC filings; and that the amount of reporting on Barclays by security analysts during the Class Period indicates that company-specific news was widely disseminated to investors, thereby facilitating the incorporation of such information into the market price of Barclays ADS).

In *Halliburton II*, the Supreme Court recognized that "defendants should at least be allowed to defeat the [*Basic*] presumption at the class certification stage through evidence that the misrepresentation did not in fact affect the stock price."[105]   The Court reasoned that "[w]hile *Basic* allows plaintiffs to establish [price impact] indirectly, it does not require courts to ignore a defendant's direct, more salient evidence showing that the alleged misrepresentation did not actually affect the stock's market price and, consequently, that the *Basic* presumption does not apply."[106]   *Halliburton II* supports this conclusion with the following hypothetical:

> Suppose a defendant at the certification stage submits an event study looking at the impact on the price of its stock from six discrete events, in an effort to refute the plaintiffs' claim of general market efficiency.  All agree the defendant may do this. Suppose one of the six events is the specific misrepresentation asserted by the plaintiffs.  All agree that this too is perfectly acceptable.  Now suppose the district court determines that, despite the defendant's study, the plaintiff has carried its burden to prove market efficiency, but that the evidence shows no price impact with respect to the specific misrepresentation challenged in the suit.  The evidence at the certification stage thus shows an efficient market, on which the alleged misrepresentation had no price impact.  And yet under EPJ Fund's view, the plaintiffs' action should be certified and proceed as a class action (with all that entails), even though the fraud-on-the-market theory does not

---

[105]   134 S. Ct. at 2414.  The *Basic* presumption can also be rebutted by showing that "a plaintiff would have bought or sold the stock even had he been aware that the stock's price was tainted by fraud . . . ."  *Id.* at 2408.

[106]   *Id.* at 2416.

apply and common reliance thus cannot be presumed.

Such a result is inconsistent with *Basic*'s own logic. Under *Basic*'s fraud-on-the-market theory, market efficiency and the other prerequisites for invoking the presumption constitute an indirect way of showing price impact. As explained, it is appropriate to allow plaintiffs to rely on this indirect proxy for price impact, rather than requiring them to prove price impact directly, given *Basic*'s rationales for recognizing a presumption of reliance in the first place.[107]

Thus, *Halliburton II* permits a defendant to attempt to rebut the *Basic* presumption at class certification. However, having this right does not mean that it is easily done, which is why some have recognized that *Halliburton II*'s holding will not ordinarily present a serious obstacle to class certification.[108] Indeed, this Circuit has permitted rebuttal evidence on class certification since at least 2008,[109] and the vast majority of courts have found that defendants have failed to meet their

---

[107]    *Id.* at 2415.

[108]    *See id.* at 2417 (Ginsburg J., concurring) ("[T]he Court recognizes that it is incumbent upon the defendant to show the absence of price impact. The Court's judgment, therefore, should impose no heavy toll on securities-fraud plaintiffs with tenable claims.") (internal citations omitted); *id.* at 2424 (Thomas, J., concurring in the judgment) ("[I]n practice, the so-called 'rebuttable presumption' is largely irrebuttable."). *Accord Schleicher v. Wendt*, 618 F.3d 679, 681 (7th Cir. 2010) ("When a large, public company makes statements that are said to be false, securities-fraud litigation regularly proceeds as a class action.").

[109]    *See In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 484 (2d Cir. 2008) (permitting defendants "to rebut the presumption, prior to class certification, by showing, for example, the absence of a price impact").

36

burden of proving lack of price impact.[110]  This is also true of courts in other

circuits post-*Halliburton II*.[111]

---

[110]     *See In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 10 Civ. 3461, 2015 WL 5613150, at *7 (S.D.N.Y. Sept. 24, 2015) (defendant's expert failed "to demonstrate that no part of the [stock price] decline was caused by the [ ] disclosure" of the alleged fraud); *Carpenters*, 310 F.R.D. at 95-97 (defendants' reliance on plaintiffs' proof was insufficient to show lack of price impact); *Wallace v. IntraLinks*, 302 F.R.D. 310, 317-18 (S.D.N.Y. 2014) ("defendants' speculation that factors unrelated to the [alleged fraud] . . . exclusively caused the drop in [] share price" was insufficient; *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 434 (S.D.N.Y. 2014) (defendant did not meet "burden to prove that its alleged misstatements did not improperly maintain" the stock price); *City of Livonia Emps' Ret. Sys.*, 284 F.R.D. at 182 ("Defendants' assertion that '[t]he evidence does not indicate that the drop was due to information about hepatic events in Study 315', but rather due to other confounding events, is a loss causation argument and, therefore, not appropriate at the class certification stage.") (internal citations omitted); *In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.*, 281 F.R.D. 134, 142-43 (S.D.N.Y. 2012) (certifying class where market dropped on the corrective disclosure date and defendant's expert failed to demonstrate the case was not related to alleged fraud); *In re SLM Corp. Sec. Litig.*, 2012 WL 209095, at *5-6 (S.D.N.Y. Jan. 24, 2012) (same); *In re Sadia, S.A. Sec. Litig.,* 269 F.R.D. 298, 316 (S.D.N.Y. 2010) (defendants "failed to . . . prov[e] by a preponderance of the evidence that there would have been *no* impact on price as a result of the failure to disclose information") (emphasis in original); *Fogarazzo*, 263 F.R.D. at 106 ("defendants have failed to rebut the fraud on the market presumption by the preponderance of the evidence on the basis that the analyst reports at issue lacked material information").  *Cf. In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 493 (S.D.N.Y. 2011) ("Based on the motion currently before this Court, there is no period within the proposed class period where the alleged misrepresentation caused a statistically significant increase in the price or where a corrective disclosure caused a statistically significant decline in the price.").

[111]     *See City of Sterling Heights Gen. Emps' Ret. Sys. v. Prudential Fin., Inc.*, No. 12 Civ. 5275, 2015 WL 5097883 (D.N.J. Aug. 31,  2015); *Local 703, I.B. of T. Grocery and Food Emps. Welfare Fund v. Regions Fin. Corp.*, No. 10 Civ. 2847, 2014 WL 6661918 (N.D. Ala. Nov. 19, 2014).

The notable exception is the district court's decision on remand from *Halliburton II*, in which the district court held that the presumption had been rebutted as to certain misstatements.[112]  Such rebuttal was achieved through consideration of the evidence presented by Halliburton, including that its expert "developed a market model and performed an event study to determine whether there was statistically significant price movement on the dates of the alleged misrepresentations and corrective disclosures."[113]  Reviewing the evidence, the court found that Halliburton's expert had demonstrated lack of price impact on several of the corrective disclosure dates.[114]  In addition, the court found that Halliburton had met its burden of showing lack of price impact with respect to a particular date because the plaintiff "ha[d] not shown that Halliburton disclosed any information . . . that [had] not already impounded in the market price of the stock" by that date.[115]  Finally, the court held that

> Halliburton [did] not [meet] its burden of showing lack of price impact with respect to the announcement of the Baltimore verdict on December 7th.  Although the Court finds that at least some of

---

[112]    *See generally Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251 (N.D. Tex. 2015) (holding that defendants have the burdens of production and persuasion to show lack of price impact).

[113]    *Id.* at 263.

[114]    *See id.* at 270, 271, 274, 276.

[115]    *Id.* at 272.

Halliburton's stock price decline on that date is likely attributable to uncertainty in the asbestos environment that also impacted other companies with asbestos exposure, Halliburton has not demonstrated that uncertainty caused the *entirety* of Halliburton's substantial price decline.[116]

By contrast to the proof submitted on remand in *Halliburton*, the defendants in the instant case have not submitted an event study — either analyzing the price impact on the date of the misstatements or on the corrective disclosure date — to prove lack of price impact.  Nonetheless, they argue that they have established lack of price impact.  Defendants first note that the regression analysis performed by plaintiff's expert, Dr. Nye, does not show a statistically significant increase in the price of Barclays ADS on any of the alleged misstatement dates.[117]  Of course, Dr. Nye did not attempt to show price movement on the misstatement dates.  This is because plaintiffs' case is premised on a price maintenance theory.[118]  Under that theory, "a material misstatement can impact a stock's value . . . by improperly maintaining the existing stock price."[119]

Defendants contend, however, that plaintiffs' theory of the case is inconsistent with the price maintenance theory.  This argument has two prongs.

---

[116]   *Id.* at 280 (emphasis added).

[117]   *See* Def. Opp. at 8.

[118]   *See* Reply Mem. at 6-13.

[119]   *Carpenters*, 310 F.R.D. at 86-87.

The first is that Dr. Nye apparently believes that the inflation maintained by misstatements about LX made during the Class Period entered the stock price *prior to* the beginning of the Class Period.[120]  The second is that following the logic in this Court's April 2015 Order, inflation due to LX could not have entered the stock prior to the beginning of the Class Period because LX only became material after the start of the Class Period.

However, these arguments do not foreclose plaintiffs' reliance on the price maintenance theory.  *First*, the price maintenance theory *does not* require inflation in the stock price *prior* to the date of a misstatement.  When an omission or misrepresentation prevents a non-inflated price from falling, that omission or misrepresentation introduces inflation into the stock.[121]  In addition, plaintiffs are

---

[120]    *See* Def. Opp. at 10-11.

[121]    *See* 10/26/16 Expert Rebuttal Report of Zachary Nye, Ph.D. ("Nye Reply"), at 36 ("[M]isstatements and/or material omissions can maintain or introduce artificial inflation even if they are not associated with a statistically significant price increase) (citing Deposition Transcript of Dr. Christopher James at 206 ("Q.  Can the omission of a material fact introduce inflation into the stock price?  A. Sure."); *City of Livonia Emps' Ret. Sys.*, 284 F.R.D. at 182 ("In a case such as this, where Plaintiffs argue that the failure to disclose information . . . made [] statements misleading, the fact that the stock price did not significantly increase on the days in question is not dispositive. . . . [T]he fact that the stock price remained consistent could, in fact, indicate inflation.  Indeed, in an omission case, the impact of the defendants' misrepresentation should be measured by the stock price reaction following the truth being disclosed to the market.") (citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) "[T]o establish loss causation, a plaintiff must allege that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of

not required to show *when* inflation entered into the price of Barclays ADS.[122]

Furthermore, the allegations in the Second Amended Complaint do not depend on the existence of inflation in the stock price *prior* to the start of the Class Period.  According to plaintiffs, "[d]efendants' false and misleading statements regarding Barclays' transparency and safeguards maintained the price of Barclays' securities at levels that reflected investor confidence in the integrity of the Company."[123]  Plaintiffs argue that had defendants been "honest about the workings of the dark pool and the level of 'transparency' surrounding its

---

the security.") (internal quotation marks and alterations omitted)); *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 415 (7th Cir. 2015) ("Note too that a stock can be inflated even if the price remains the same or declines after a false statement because the price might have fallen even more (e.g., "We only lost $100 million this year," when actually losses were $200 million)."); *Regions Fin. Corp.*, 762 F.3d at 1257 ("Regions's disclosures were designed to prevent a more precipitous decline in the stock's price, not bring about any change to it.  When a company releases expected information, truthful or otherwise, the efficient market hypothesis underlying *Basic* predicts that the disclosure will cause no significant change in the price.").

[122]    *See, e.g.*, *Glickenhaus*, 787 F.3d at 418 (explaining that "there is no law" that "requires the plaintiffs to prove how the inflation was introduced into the stock price in the first place").

[123]    Pl. Mem. at 6.  *See* Complaint ¶ 113 ("Defendants' false and misleading statements about Barclays' transparency and safeguards, as well as Barclays' repeated commitment to a reformed culture, maintained the price of Barclays' common stock at levels which reflected investor confidence in the integrity of the company.  Particularly in light of the public's concern of aggressive trading and manipulations by high frequency traders, Defendants' assurances of Barclays' transparency and credibility were meant to and did assuage those concerns.").

operations, Barclays' securities would have traded at a substantially lower price."[124]  Thus, plaintiffs conclude that "[t]he stock was maintained at an artificially inflated level until . . . Barclays' shares fell 7.38% on June 26, 2014."[125]  In short, "[p]laintiffs allege that Defendants' misstatements began as early as August 2011 (the start of the Class Period) and that [the misstatements] 'maintained the price of Barclays' common stock at levels which reflected investor confidence in the integrity of the company.'"[126]  Consequently, plaintiffs have asserted a tenable theory of price maintenance, and defendants' attempt at rebuttal via their argument regarding the timing of the inflation in the stock price fails.

Defendants also attempt to prove lack of price impact by reference to the price change on the corrective disclosure date.  To succeed, defendants must prove by a preponderance of the evidence that the price drop on the corrective disclosure date was not due to the alleged fraud.  Defendants attempt to do this by focusing on Dr. Nye's testimony and expert report.  Again, they do not offer their own regression analysis to show that the price drop on the corrective disclosure date was not due to the alleged fraud.

Defendants' argument has two parts.  The first is that Dr. Nye agrees

---

[124]   Pl. Mem. at 6.

[125]   *Id.*

[126]   Nye Reply at 36 (quoting Complaint ¶ 113).

that the disclosure of a government investigation can, by itself, result in a

statistically significant decline in the price of a security.  Defendants thus suggest

that because the disclosure in this case was in the context of the NYAG lawsuit,

plaintiffs have not demonstrated that the misstatements themselves caused part of

the price decline.[127]  Defendants also rely on Dr. Nye's use of reports and news

stories that do not attribute the post-disclosure price drop to "concern[s] about

---

[127]     Plaintiffs, of course, were under absolutely no duty to establish that the decline in price was "because of the correction to a prior misleading statement and that the subsequent loss could not otherwise be explained by some additional factors revealed then to the market." *Halliburton I*, 131 S. Ct. at 2185 (internal quotation marks omitted) (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005)).  That is the showing required to prove loss causation, and plaintiffs do not have to prove loss causation at class certification. *See id.* at 2186 ("The fact that a subsequent loss may have been caused by factors other than the revelation of a misrepresentation has nothing to do with whether an investor relied on the misrepresentation in the first place, either directly or presumptively through the fraud-on-the-market theory. Loss causation has no logical connection to the facts necessary to establish the efficient market predicate to the fraud-on-the-market theory.").  And while defendants presume that disclosure of the NYAG lawsuit is not related to the alleged fraud as a matter of law, I decline to make that determination at this stage in the proceedings.  To a large extent, it is a merits-based inquiry relating to loss causation that is not ripe for resolution on class certification. *See* Reply Mem. at 15 (arguing that "disclosure of the fraud and announcement of regulatory action are inextricably intertwined (the regulatory action constitutes a materialization of the risk caused by Defendants' unethical operation of Barclays LX) and therefore do not require disaggregation"); Tr. at 138:19-139:1 [Jeremy Lieberman, plaintiffs' attorney] ("There has been testimony regarding whether or not the investigations relate to the fraud, whether or not the investigatory effects somehow relate to the fraud or is that a separate issue.  We don't think so at all, your Honor.  It can't be a separate issue.  If investors knew during the [C]lass [P]eriod there was an exposure to this type of investigation, this type of lawsuit, that would have been factored into the share price.").

43

Barclays' alleged misconduct related to LX or Barclays' attempts to restore its 'integrity.'"[128]

      While defendants' arguments suggest that the post-disclosure price movement does not support a strong inference or provide compelling evidence of price impact, they have not met their burden of proving *lack of* price impact. The fact that other factors contributed to the price decline does not establish by a preponderance of the evidence that the drop in the price of Barclays ADS was not caused *at least in part* by the disclosure of the fraud at LX.[129] Accordingly, plaintiffs have established that they are entitled to rely on the *Basic* presumption, and defendants have failed to rebut the applicability of that presumption.

## C.    Individualized Damages Issues Will Not Predominate

      *Comcast Corp. v. Behrend* held that a model for determining damages

---

[128]    Def. Opp. at 13.

[129]    *See Halliburton Co.*, 309 F.R.D. at 280 ("Halliburton has not demonstrated that uncertainty caused the entirety of Halliburton's substantial price decline."); *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2015 WL 5613150, at *7 ("Defendants' attempt to demonstrate a lack of price impact merely marshals evidence which suggests a price decline for an alternate reason, but does not provide conclusive evidence that no link exists between the price decline and the misrepresentation.") (citing *Aranaz*, 302 F.R.D. at 672 ("Because Defendants have the burden of showing an absence of price impact, they must show that price impact is *inconsistent* with the results of their analysis. Thus, that an absence of price impact is consistent with their analysis is insufficient.") (emphasis in original)).

must "measure damages resulting from the class's asserted theory of damages."[130]

Relying on *Comcast*, defendants argue that plaintiffs have not shown that damages can be calculated on a class-wide basis.[131]  However, "*Comcast* does not mandate that certification pursuant to Rule 23(b)(3) requires a finding that damages are capable of measurement on a classwide basis."[132]

   Plaintiffs intend to use an event study and the constant dollar method to calculate damages.  The proposed methodology fits their theory of the case and individualized damages issues will not predominate.[133]  Defendants argue that plaintiffs must demonstrate the mechanism by which confounding information can be identified and disaggregated in order to determine the precise level of price inflation.[134]  However, "any failure of the methodology to disaggregate the losses purportedly attributable to disclosures about government enforcement activities from those that Plaintiffs attribute to the challenged statements would not defeat the class's predominance because it would affect all class members in the same

---

[130] *Roach*, 778 F.3d at 407 (interpreting *Comcast* narrowly).

[131] Def. Opp. at 20-24.

[132] *Roach*, 778 F.3d at 402.

[133] *See Carpenters*, 310 F.R.D. at 99-100.

[134] *See* Def. Opp. at 23-24.

manner."[135]  Whether plaintiffs will be able to prove loss causation or damages are

questions that go to the merits and not to whether common issues predominate.[136]

### D.   Class Period

Defendants contend that the Class Period should be defined to begin

no earlier than February 24, 2013.  According to defendants, the April 2015 Order

held that only misstatements that were made after Barclays' June 27, 2012

LIBOR-related settlement are material.[137]  Plaintiffs believe that Supreme Court

---

[135]   *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2015 WL 5613150, at *8
(internal citations and quotation marks omitted).  Defendants raise additional
arguments that do not preclude class certification but may have to be addressed at a
later stage of this case.  For example, they argue that because plaintiffs allege two
distinct schemes — that Barclays both (i) concealed the amount of aggressive high-
frequency trading in LX and (ii) improperly over-routed client orders on LX —
plaintiffs' damages framework must separately account for both.  *See* Def. Opp. at
22.

[136]   *See, e.g.*, *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 414 (S.D.N.Y.
2015) (stating that "nothing in *Comcast* requires an expert to perform his analyses
at the class certification stage") (citing cases); *Wallace*, 302 F.R.D. at 318
("Defendants' arguments concerning the proper class period belong more properly
to the discussion of damages, not class certification. Individualized calculations of
damages do not generally defeat the predominance requirement.  Presumably, if
plaintiff prevails, class members who purchased or sold at different times during
the class period will be entitled to significantly different recoveries. While
calculating the proper damages based on the date of purchase and sale may be
complicated, it does not demand excessive individual inquiry. Plaintiff's proposed
determination of damages by event study appears to be a workable methodology of
determining damages on a class-wide basis that conforms to its theory of liability .
. . .") (citations omitted); *Dodona I*, 296 F.R.D. at 270-71 (same).  I have
considered and now reject defendants' remaining arguments under *Comcast*.

[137]   *See* Def. Opp. at 25.

precedent holding that "proof [of materiality] is not a prerequisite to class certification"[138] precludes defendants' line of attack.

District courts are "empowered to carve out any appropriate class"[139] and a class should be defined to be consistent with the theory underlying plaintiffs' allegations. Thus, were the proposed class inconsistent with the August 2015 Order as a matter of law, it would be appropriate to limit the class as suggested by the defendants. However, at the time of the motion to dismiss, the parties did not ask the Court to consider when statements became material, and I did not make any finding regarding this issue.

In addition, I am satisfied that plaintiffs' allegations are consistent with material misrepresentations occurring prior to June 2012.[140] While defendants

---

[138]    *Amgen*, 133 S. Ct. at 1191.

[139]    *Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221, 229 (S.D.N.Y. 2010).

[140]    *See, e.g.*, Tr. 134:18-135:6 [Jeremy Lieberman, plaintiff's attorney] ("There is reference in the materiality section to the LIBOR scandal, but there is reference generally to the integrity of the company, the integrity of the bank, and integrity of its management, all of which are implicated, whether or not there was a LIBOR settlement or not. We do allege, going back as early as 2009, that the SEC was very concerned about dark pools, how they were being managed, how they were being maintained, and the ability for fraud to occur. Your Honor, the integrity of banks in the aftermath of the financial crisis, your Honor, to say that any investor after the financial crisis would not be concerned about blatant illegal activity which implicates large institutional investors, we think, your Honor, is actually a frivolous defense.").

will have the opportunity to require plaintiffs to prove materiality — including the relevant time period — they have not shown that there is a reason to circumscribe the Class Period now.

### E.    Appointment of Class Counsel Under Rule 23(g)

Lead Plaintiffs have retained Pomerantz LLP to represent them and the proposed Class in this matter.  The Pomerantz firm has litigated securities fraud cases under federal and state laws for seventy-five years, on behalf of institutional and individual investors in both class and individual actions.  Courts in this Circuit have previously approved the Pomerantz firm as lead plaintiffs' counsel in securities class actions on a number of occasions.[141]  I have considered each of the factors set forth in Rule 23(g) and am satisfied that the Pomerantz firm is qualified, and, along with Lead Plaintiffs, will vigorously protect the interests of the Class. Accordingly, I hereby appoint the Pomerantz firm as Class Counsel.

## V.    CONCLUSION

For the foregoing reasons, plaintiffs' motion is GRANTED.  The

---

[141]    *See, e.g.*, *Elstein v. Net1 UEPS Techs., Inc.*, No. 13 Civ. 9100, 2014 WL 3687277, at *8 (S.D.N.Y. July 23, 2014); *Goldberger v. PXRE Grp., Ltd.*, No. 06 Civ. 3410, 2007 WL 980417, at *5 (S.D.N.Y. Mar. 30, 2007); *In re Elan Corp. Sec. Litig.*, No. 02 Civ. 865, 2002 WL 31720410, at *5 (S.D.N.Y. Dec. 3, 2002) ; *In re Symbol Techs., Inc. Sec. Litig.*, No. 05 Civ. 3923, 2006 WL 1120619, at *3 (E.D.N.Y. Apr. 26, 2006).  *See also In re Groupon, Inc. Sec. Litig.*, No. 12 Civ. 2450, 2012 WL 3779311, at *5 (N.D. Ill. Aug. 28, 2012).

following Class is certified pursuant to Rule 23(a) and (b)(3):

> All purchasers of Barclays American Depositary Shares during the period from August 2, 2011 through and including June 25, 2014, excluding Defendants, officers and directors of Barclays, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

Lead Plaintiffs Mohit Sahni and Joseph Waggoner are appointed as Class

Representatives, and Pomerantz LLP is appointed as Lead Counsel. The Clerk of

the Court is directed to close this motion (Docket Nos. 50 and 55).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            February 2, 2016

49

**- Appearances -**

**For Plaintiffs**:

Jeremy A. Lieberman, Esq.
Emma Gilmore, Esq.
Tamar A. Weinrib, Esq.
Pomerantz LLP
600 Third Avenue
New York, New York 10016
(212) 661-1100

Patrick V. Dahlstrom, Esq.
Joshua B. Silverman, Esq.
Pomerantz LLP
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
(312) 377-1181

**For Defendants:**

Jeffrey T. Scott, Esq.
David H. Braff, Esq.
Matthew A. Schwartz, Esq.
Andrew H. Reynard, Esq.
John J. Hughes, III, Esq.
Sullivan & Cromwell LLP
125 Broad Street
New York, New York 10004
(212) 558-4000